## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

COALITION FOR GOOD
GOVERNANCE, ADAM SHIRLEY,
ERNESTINE THOMAS-CLARK,
ANTWAN LANG, PATRICIA
PULLAR, JUDY MCNICHOLS,
JACKSON COUNTY DEMOCRATIC
COMMITTEE, GEORGIA
ADVANCING PROGRESS
POLITICAL ACTION COMMITTEE,
RYAN GRAHAM, RHONDA
MARTIN, JEANNE DUFORT,
AILEEN NAKAMURA, ELIZABETH
THROOP, and BRADLEY
FRIEDMAN,

Plaintiffs,

v.

BRAD RAFFENSPERGER, in his
official capacities as Secretary of State
and member of the Georgia State
Elections Board, REBECCA N.
SULLIVAN, ANH LE, MATTHEW
MASHBURN, and DAVID J.
WORLEY, in their respective official
capacities as members of the Georgia
State Election Board,

Defendants.

Civil Action No.

## COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................ i

I.     INTRODUCTION ................................................................................ 1

II.    PARTIES .............................................................................................. 8

    A.    Plaintiffs ........................................................................................ 8

    B.    Defendants—Members of the State Election Board ............................. 11

        1.    Voting Members of the State Election Board ......................... 11

        2.    Secretary of State Brad Raffensperger ................................... 12

III.   JURISDICTION AND VENUE ....................................................... 13

IV.   APPLICABLE LAW .......................................................................... 13

    A.    United States Constitution .......................................................... 13

        1.    Due Process Clause ................................................................. 13

        2.    Equal Protection Clause ......................................................... 17

        3.    First Amendment .................................................................... 18

    B.    Federal Laws Providing Causes of Action ................................. 19

        1.    42 U.S.C. § 1983 .................................................................... 19

        2.    Voting Rights Act, 52 U.S.C. § 10307 ................................... 19

        3.    Federal Declaratory Judgment Act, 28 U.S.C. § 2201 ........... 20

    C.    Georgia Constitution ................................................................... 20

        1.    Georgia's Requirement of Absolute Ballot Secrecy ................ 20

        2.    Georgia's Guarantee of Right to the Courts ........................... 21

        3.    Separation of Powers .............................................................. 21

    D.    Georgia Election Code ................................................................ 21

        1.    Role of Superintendents .......................................................... 21

2. Funding of Superintendents ................................................... 26

3. Conduct of Absentee-by-Mail Voting—Pre-SB202 ................................ 26

4. Conduct of In-Person Voting ................................................. 28

5. Georgia's Open Meetings Act ................................................. 30

V. GENERAL ALLEGATIONS ........................................................ 31

A. 2020 Elections Prompted Legislative Backlash ................................ 31

B. Provisions of Georgia's Senate Bill 202 Passed in 2021 ..................... 33

1. SB202's Election Takeover Provisions ....................................... 33

2. SB202's Election Takeover Provisions – Separately Functioning Boards *of Registration* ............................................................... 39

3. SB202's Superintendent-Reinstatement Provisions ............................ 40

4. SB202's Restrictions on Superintendent Boards' Access to Counsel ...... 42

5. SB202's Criminalization of Observing an Elector While Casting a Vote 44

6. SB202's Criminalization of Free Speech and Press .......................... 45

7. SB202's Absentee Voter Identification Provisions ("Relaxed Voter ID Rule") ...................................................................... 48

8. Shortened Period for Applying for Absentee Ballots  ("Impractical Application Deadline") ...................................................... 49

C. Context Within Which SB202 Takes Effect And Will Be Applied To Plaintiffs 52

1. Georgia's Oversized Dominion BMD Touchscreens Unavoidably Compromise Ballot Secrecy .................................................. 52

2. Georgia's Recent History of Voter Data Security Breaches ................... 54

3. Covid-19 in Georgia ........................................................ 56

VI. SPECIFIC ALLEGATIONS OF THREATENED INJURY TO PLAINTIFFS .................................................................. 57

A. Defendants' Intention to Enforce SB202's Provisions ........................ 57

B. Plaintiffs' Direct Standing ................................................ 59

1.    Plaintiff Coalition for Good Governance ................................... 59

2.    Plaintiff SHIRLEY ................................................................ 64

3.    Plaintiff THOMAS-CLARK .................................................. 69

4.    Plaintiff LANG .................................................................... 71

5.    Plaintiff PULLAR ................................................................ 74

6.    Plaintiff MCNICHOLS ......................................................... 76

7.    Plaintiff JACKSON COUNTY DEMOCRATIC COMMITTEE ............. 79

8.    Plaintiff GEORGIA ADVANCING PROGRESS POLITICAL ACTION
      COMMITTEE ...................................................................... 80

9.    Plaintiff GRAHAM ............................................................... 83

10.   Plaintiff MARTIN ................................................................ 87

11.   Plaintiff DUFORT ................................................................ 91

12.   Plaintiff NAKAMURA .......................................................... 95

13.   Plaintiff THROOP ............................................................... 98

14.   Plaintiff FRIEDMAN ........................................................... 101

C.    Plaintiff CGG's Associational Standing .................................... 103

1.    Elements of CGG's Associational Standing ............................ 103

2.    Individual Standing of Plaintiff Members of CGG .................... 104

3.    Individual Standing of Non-Plaintiff Members of CGG .............. 105

D.    Plaintiff JCDC's Associational Standing ................................... 111

1.    Elements of JCDC's Associational Standing ........................... 111

2.    Individual Standing of Plaintiff Members of JCDC .................... 111

3.    Individual Standing of Non-Plaintiff Members of JCDC .............. 111

E.    Plaintiff GAPPAC's Associational Standing .............................. 116

1.    Elements of GAPPAC's Associational Standing ....................... 116

2.    Individual Standing of Plaintiff Members of GAPPAC ............... 116

3.    Individual Standing of Non-Plaintiff Members of GAPPAC .................. 116

F.    Causation.................................................................................................. 119

G.    Redressability.......................................................................................... 119

H.    Actual Controversy (Declaratory Relief)............................................... 119

VII.    CLAIMS ............................................................................................................ 120

A.    TAKEOVER PROVISION CLAIMS .................................................... 120

COUNT I ................................................................................................ 120

COUNT II ............................................................................................... 123

B.    INDIVIDUAL FEDERAL CLAIMS...................................................... 128

COUNT III ............................................................................................. 128

COUNT IV .............................................................................................. 130

COUNT V ............................................................................................... 134

COUNT VI............................................................................................... 136

COUNT VII ............................................................................................ 137

COUNT VIII ........................................................................................... 140

COUNT IX .............................................................................................. 141

COUNT X ............................................................................................... 143

COUNT XI............................................................................................... 145

COUNT XII ............................................................................................ 146

COUNT XIII ........................................................................................... 148

COUNT XIV ........................................................................................... 150

PRAYER FOR RELIEF ................................................................................................. 151

iv

## I.    INTRODUCTION

> When we consider the nature and the theory of our
> institutions of government, the principles upon which
> they are supposed to rest, and review the history of their
> development, we are constrained to conclude that they do
> not mean to leave room for the play and action of purely
> personal and arbitrary power.

*Yick Wo v. Hopkins*, 118 U.S. 356, 369–70 (1886).

This civil action, brought to obtain prospective declaratory and injunctive relief, seeks the aid of this Court to restore the sovereignty of the people of Georgia over their own elections.  With the adoption of Senate Bill 202 (Act 9), the government of the State of Georgia has not only imposed burdens on the constitutional rights of individual voters, but it has also subordinated a previously accountable system of election administration by local officials to the arbitrary powers of a single state agency, the State Election Board (the "SEB")—an agency that is both newly empowered to intervene in and take over the local conduct of elections and (what is worse) newly insulated, by statutory design, from any effective external source of timely oversight capable of constraining its abuses.

Liberty requires at least three essential things—an unfettered right to vote, freedom of speech, and the meaningful separation of powers.  This lawsuit is necessary to preserve individual constitutional rights, and constitutional government, against the attacks that SB202 makes on these three pillars of liberty.

First, the right to vote has long been recognized as a fundamental political right because voting is "preservative of all rights." *Id.* at 370. Voting is a civil right whose exercise excuses the coercion that is inherent in all governance by granting to government the legitimacy of being a true agent of the people, selected by the people, "by whom and for whom all government exists and acts." *Id.* Voting also serves as the most reliable mechanism for checking and reversing abuses by government and for imposing accountability.

But voting does not occur in a vacuum. Elections are organized events that permit the right to vote to be exercised within "reasonable and uniform regulations, in regard to the time and mode of exercising that right, which are designed to secure and facilitate the exercise of such right, in a prompt, orderly, and convenient manner." *Id.* at 371. When the administration of elections is made susceptible to arbitrary and unaccountable intrusions that can be accomplished by the State Election Board without it according any of the constitutionally required minima of procedural due process, the individual right to vote is degraded and the legitimacy of the government that elections produce is inevitably diminished. Senate Bill 202 imposes unjustified—and constitutionally unjustifiable—burdens on voters' right to vote, and on local officials' rights to procedural due process, that must be enjoined.

2

Second, the freedom of speech is not only is an individual liberty, but also an essential requirement for any system of elections that is designed to produce a government that represents the people and purports to operate with the consent of the governed.

> Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes.

*Mills v. Alabama*, 384 U.S. 214, 218–19 (1966). Senate Bill 202 burdens activities protected by the First Amendment freedoms of speech and association with the specter of potential criminal prosecution in ways that cannot be justified. "It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill v. Alabama,* 310 U.S. 88, 97 (1940). These burdens must not be allowed to stand if the individual rights of the plaintiffs, and of other Georgians, are to be respected and if Georgia's elections are to be called fair and free.

Finally, the essential role of separation of powers in protecting the people's sovereignty over their government has been recognized since the founding of the Nation. As James Madison noted in Federalist No. 51,

> In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself. A dependence on the people is, no doubt, the primary control on the government; but experience has taught mankind the necessity of auxiliary precautions.

Madison further observed that, "[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others."

In Georgia, in the context of elections, the separation of powers has, until now, been manifested in the local control of elections and in state constitutional prohibitions on a single body simultaneously exercising more than one of the legislative, judicial, and executive powers. Ga. Const. Art. I, § II, Para. III.  Senate Bill 202 destroys these components of the State's regime of separated powers by eliminating them as safeguards for the administration of Georgia's elections.  The offensive provisions of the law that accomplish this destruction of the constitutional order must be enjoined to preserve accountability and transparency in Georgia's elections.

Specifically, the following provisions of SB202 are challenged in this action and require relief from this Court:

- Provisions of SB202 that allow the SEB to remove county boards of elections and to take complete control of county election management by appointing an individual superintendent selected by the SEB.  These "Takeover Provisions" are being challenged because (a) per **COUNT I**, they violate the Plaintiff Board Members' procedural due process rights under the Fourteenth Amendment, (b) per **COUNT II**, they violate the Separation of Powers Clause of the Georgia Constitution and the Georgia Constitution's requirement that the General Assembly provide by law for the registration of all eligible voters, and hence constitute a violation of the Due Process Clause of the Fourteenth Amendment, and (c) per **COUNT III,** they constitute a burden on voting that is not justified by any sufficiently weighty government interest in violation of the Due Process Clause of the Fourteenth Amendment;

- O.C.G.A. § 21-2-568.1 (the "Elector Observation Felony") which makes it a felony to "intentionally observe an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting," a difficult experience to avoid because of the large touchscreen displays of voters' votes in the polling place.  This provision violates the Due Process Clause of the Fourteenth Amendment because (a) per **COUNT IV**, it is void for vagueness, (b) per **COUNT V**, it constitutes a burden on voting that is

5

not justified by any sufficiently weighty government interest, and (c) per

**COUNT VI**, it constitutes unlawful intimidation in violation of 52 U.S.C. §

10307;

- The Gag Rule, O.C.G.A. § 21-2-386(a)(2)(B)(vii), which makes it a

  misdemeanor for "monitors and observers" to communicate, among other

  things, "any information that they see while monitoring the processing and

  scanning of absentee ballots." Per **COUNT VII**, this provision violates the

  First Amendment by criminalizing constitutionally protected speech;

- The Estimating Ban, O.C.G.A. § 21-2-386(a)(2)(B)(vii), which makes it a

  misdemeanor for "monitors and observers" to, among other things, tally,

  tabulate, estimate or attempt to tally, tabulate, or estimate any votes on the

  absentee ballots cast.  Per **COUNT VIII**, this provision violates the Due

  Process Clause of the Fourteenth Amendment as it is void for vagueness;

- The Photography Ban, O.C.G.A. § 21-2-568.2 (2)(B), which makes it a

  misdemeanor to "[p]hotograph or record the face of an electronic ballot

  marker while a ballot is being voted or while an elector's votes are displayed

  on such electronic market," or to "[p]hotograph or record a voted ballot."

  This provision is being challenged because (a) per **COUNT IX**, it violates

  the First Amendment because it criminalizes constitutionally protected

speech and (b) per **COUNT X**, it violates the Due Process Clause of the Fourteenth Amendment as void for vagueness;

- O.C.G.A. § 21-2-381(a)(1)(C)(i), the "Relaxed Voter ID Rule," which changes the identification that voters must provide to be issued an absentee ballot from a verifiable signature to the voter's name, date of birth, address, and voter's Georgia driver's license or identification number – all information that is publicly available.  This provision is challenged because, per **COUNT XI**, the new identification requirements and relaxed security processes invite massive fraud and vote dilution as well as identity theft, and hence constitute a burden on the right to vote that is not justified by any sufficiently weighty government interest in violation of the Due Process Clause of the Fourteenth Amendment; and

- O.C.G.A. § 21-2-381(a)(1)(A), the "Impractical Application Deadline Provision," which narrows the time within which a voter may apply for an absentee ballot to a period ranging only from 78 to 11 days prior to election day, rendering absentee voting impossible for many run-off elections, and restricts the actual application time further because there is currently no secure electronic transmission method as required by SB202.  The imposition of this deadline for obtaining an absentee ballot is being challenged (a) because, per **COUNT XII**, it constitutes a burden on the right

to vote that is not justified by any sufficiently weighty government interest in violation of the Due Process Clause of the Fourteenth Amendment, and (b) because, per **COUNTS XIII AND XIV**, it treats identified classes of voters differently than other, similarly situated votes, and therefore constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment.

The foregoing offensive provisions of SB202 should and must be enjoined by this Court individually and collectively to ensure that three essential pillars of liberty—the fundamental right to vote, freedom of speech, association and press, and separation of powers—together with the sovereignty of the people of Georgia over their government, continue to be preserved in the State of Georgia.

## II.    PARTIES

### A.    Plaintiffs

1.      Plaintiffs include non-profit organizations, county election board members, members of political parties, voters, election volunteers, advocates and journalists.  Each of the Plaintiffs is introduced below, with additional information about each set forth in Part VI – Specific Allegations of Threatened Injury to Plaintiffs.

2.      Plaintiff COALITION FOR GOOD GOVERNANCE ("CGG") is a non-profit corporation organized and existing under the laws of the State of

8

Colorado.  Plaintiff CGG's purpose is to preserve and advance the constitutional liberties and individual civil rights of United States citizens, with an emphasis on the civil rights of its members that are exercised through their participation in public elections, and access to information about government activities through public meetings and public records.  Plaintiff CGG is a membership organization, with a membership that consists of both individuals and other non-profit organizations, residing in Georgia and other States.

3.      Plaintiff ADAM SHIRLEY ("SHIRLEY") is a resident of Athens-Clarke County, Georgia, a member of the Athens-Clarke County Board of Elections and Registration (the "Athens-Clarke County Board"), and a member of CGG.

4.      Plaintiff ANTWAN LANG ("LANG") is a resident of Chatham County, Georgia, a member of the Chatham County Board of Elections (the "Chatham County Board"), and a member of CGG.

5.      Plaintiff PATRICIA PULLAR ("PULLAR") is a resident of Clayton County, Georgia, a member of the Clayton County Board of Elections and Registration (the "Clayton County Board"), and a member of CGG.

6.      Plaintiff ERNESTINE THOMAS-CLARK ("THOMAS-CLARK") is a resident of Coffee County, Georgia, and a member of the Board of Elections and Registration of Coffee County (the "Coffee County Board").

7. Plaintiff JUDY MCNICHOLS ("MCNICHOLS") is a resident of Jackson County, Georgia, a member of the Jackson County Board of Elections and Voter Registration (the "Jackson County Board"), and a member of CGG.

8. Plaintiff JACKSON COUNTY DEMOCRATIC COMMITTEE ("JCDC") is a political party committee.  Plaintiff JCDC nominates two members for appointment to the Jackson County Board.

9. Plaintiff GEORGIA ADVANCING PROGRESS POLITICAL ACTION COMMITTEE ("GAPPAC") is a non-profit organization.   Plaintiff GAPPAC is a membership organization with the purpose of increasing the election of Asian Americans and Pacific Islanders ("AAPI") to public offices in Georgia and advocating for the interests of AAPI voters.

10. Plaintiff RYAN GRAHAM ("GRAHAM") is a resident of Fulton County, Georgia.  Plaintiff GRAHAM is Chair of the Libertarian Party of Georgia ("LPG").

11. Plaintiff RHONDA MARTIN ("MARTIN") is a resident of Fulton County, Georgia.  Plaintiff MARTIN, a frequent poll watcher and mail ballot monitor, is on the Board of CGG.

12. Plaintiff JEANNE DUFORT ("DUFORT") is a resident of Morgan County, Georgia, a Vice-Chair of the Morgan County Democratic Committee

("MCDC"), and a member of CGG.  Plaintiff DUFORT is a frequent poll watcher, mail ballot monitor, and vote review panelist.

13.    Plaintiff AILEEN NAKAMURA ("NAKAMURA") is a resident of Fulton County, Georgia.  Plaintiff NAKAMURA, a frequent poll watcher, is a member of CGG and GAPPAC.

14.    Plaintiff ELIZABETH THROOP ("THROOP") is a resident of DeKalb County, Georgia.  Plaintiff THROOP, a frequent poll watcher and mail ballot monitor, is a member of CGG.

15.    Plaintiff BRADLEY FRIEDMAN ("FRIEDMAN") is a radio broadcaster, journalist, and blogger, and has reported on Georgia election integrity and election security hundreds of times over the last almost twenty years.  Plaintiff FRIEDMAN publishes his blog, BradBlog.com ("The BRAD BLOG"), and hosts his weekday nationally syndicated radio show, "The BradCast."

**B.    Defendants—Members of the State Election Board**

      1.    **Voting Members of the State Election Board**

16.    Defendants DAVID J. WORLEY, REBECCA N. SULLIVAN, ANH LE, and MATTHEW MASHBURN are sued for prospective declaratory and injunctive relief in their official capacities as voting members of Georgia's State Election Board (the "SEB").   At the appropriate time, Plaintiffs will join as a defendant the yet-unappointed Chair of Georgia's State Election Board. Together

11

with any successors in office automatically substituted for any of them as Defendants by operation of Fed. R. Civ. P. 25(d), Defendants WORLEY, SULLIVAN, LE, and MASHBURN are hereinafter collectively referred to as the "SEB Voting Members."

17.    The SEB Voting Members collectively exercise the power vested in the SEB to enforce compliance with the Georgia Election Code, including the unconstitutional takeover provisions of SB202 that are challenged in this lawsuit. *See* O.C.G.A. §§ 21-2-33.1, -32.

### 2.    Secretary of State Brad Raffensperger

18.    Defendant BRAD RAFFENSPERGER ("RAFFENSPERGER") is Georgia's Secretary of State.  RAFFENSPERGER, including any successor in office automatically substituted for him as a Defendant by operation of Fed. R. Civ. P. 25(d), is sued in his official capacities as Secretary of State and as a non-voting member of the SEB for prospective declaratory and injunctive relief.

19.    As Secretary of State, Defendant RAFFENSPERGER is a non-voting, *ex officio* member of the SEB, O.C.G.A. § 21–2–30(d) (2021), and "shall, upon request of the State Election Board, provide any and all necessary support and assistance that the State Election Board, in its sole discretion, determines is necessary to enforce [the Georgia Election Code] or to carry out or conduct any of its duties," O.C.G.A. § 21–2–33.1(h) (2021).

## III.   JURISDICTION AND VENUE

20.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress threatened deprivations, under color of state law, of rights secured by the United States Constitution.

21.    This Court has subject-matter jurisdiction over each of the prospective claims for declaratory and injunctive relief raised in this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), § 1343 (jurisdiction over civil rights actions), § 1367 (supplemental jurisdiction), § 2201 (jurisdiction to grant declaratory relief) and § 2202 (jurisdiction to grant relief ancillary to declaratory judgment).

22.    Venue lies in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) because multiple defendants reside in this judicial district and all defendants are residents of Georgia and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred or are threatened to occur in this judicial district.

## IV.   APPLICABLE LAW

### A.    United States Constitution

#### 1.    Due Process Clause

23.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

a) **Substantive Due Process / Fundamental Right to Vote**

24. Fundamental rights such as the right to vote may not be unjustifiably burdened or undermined without violating the substantive protections of the Due Process Clause.

25. The right of all eligible citizens to vote in public elections is a fundamental right of individuals.

26. "[S]tate laws and patterns of state action that systematically deny equality in voting," *Burton v. Georgia*, 953 F.2d 1266, 1269 (11th Cir. 1992), and "state laws whose very design infringes on the rights of voters," *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986), violate substantive due process.

27. In addition, "episodic events that, despite non-discriminatory laws may result in the dilution of an individual's vote" and which "go well beyond the ordinary dispute over the counting and marking of ballots" also violate substantive due process "if the election process itself reaches the point of patent and fundamental unfairness." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986).

28. Conditioning the right to vote on a voter's consent to public disclosure of sensitive personal information, i.e. "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote," substantially burdens the fundamental right to vote in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

b)      **Substantive Due Process / Violation of State Law**

29.     Violations of state statutory or constitutional law implicating the very integrity of the electoral process constitute a denial of substantive due process under the Fourteenth Amendment to the U.S. Constitution.  *Gonzalez v. Governor of Georgia,* 978 F.3d 1266, 1271 (11th Cir. 2020); *Duncan v. Poythress,* 657 F.2d 691 (5th Cir. 1981).

c)      **Procedural Due Process**

30.     The Due Process Clause also protects individuals against the deprivation or abrogation by a State of underlying substantive liberty and property interests without the use of procedures that satisfy "constitutionally mandated due process minima."  *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994).

31.     The liberty protected by the Fourteenth Amendment's Due Process Clause encompasses:

> the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).  The right to seek a public office— and to hold that office, once it has been obtained—is such a liberty interest. *Becton v. Thomas*, 48 F. Supp. 2d 747, 757 (W.D. Tenn. 1999).

32.     "The fundamental requirement of due process is the opportunity to be heard and it is an 'opportunity which must be granted at a meaningful time and in a meaningful manner.'" *Parratt v. Taylor*, 451 U.S. 527, 540 (1981).

33.     "It is axiomatic that, in general, the Constitution requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994).

34.     Predeprivation procedures are fair for purposes of the Due Process Clause if they "require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur." *Parratt v. Taylor*, 451 U.S. at 538.

35.     Where adequate predeprivation process is impossible or impracticable for a State to provide, procedural due process may instead be satisfied by the State affording individuals a postdeprivation "means of redress for property deprivations satisfying the requirements of procedural due process." *Parratt v. Taylor*, 451 U.S. at 537.

36.     The Fifth Amendment's guarantee of procedural due process also protects against laws that are "so vague that [the law] fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary

enforcement." *United States v. Matchett*, 837 F.3d 1118, 1140 (11th Cir. 2016)

(citing *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

### d) **Due Process – Criminal Laws Void for Vagueness**

37.     Under the Due Process Clause of the Fourteenth Amendment, a state

penal statute must "define the criminal offense with sufficient definiteness that

ordinary people can understand what conduct is prohibited and in a manner that

does not encourage arbitrary and discriminatory enforcement." *Kolender v.*

*Lawson,* 461 U.S. 352 (1983).  "Where the legislature fails to provide such

minimal guidelines, a criminal statute may permit 'a standardless sweep [that]

allows policemen, prosecutors, and juries to pursue their personal predilections.'"

*Id.* (citation omitted).

### 2. **Equal Protection Clause**

38.     The Equal Protection Clause of the Fourteenth Amendment to the

United States Constitution provides that, "[N]or shall any State . . . deny to any

person within its jurisdiction the equal protection of the laws."  U.S. Const.

Amend. XIV.

39.     "The right to vote is protected in more than the initial allocation of the

franchise. Equal protection applies as well to the manner of its exercise. Having

once granted the right to vote on equal terms, the State may not, by later arbitrary

and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104-05 (2000).

40.     The Equal Protection Clause is violated when similarly situated people are treated differently without constitutionally adequate justification.

### 3.   **First Amendment**

41.     The First Amendment to the United States Constitution provides that, "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the government for a redress of grievances." U.S. Const. Amend. I.

### a)   **Freedom of Speech and of the Press**

42.     To be constitutional, legislative restrictions on speech that "depend on what is said" are "content-based restrictions" that "receive strict scrutiny" and must be "narrowly tailored to serve compelling state interests." *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020). "Laws or regulations almost never survive this demanding test . . . . Forbidding the government from choosing favored and disfavored messages is at the core of the First Amendment's free-speech guarantee." *Id.* at 862.

43.     "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all

matters of public concern without previous restraint or fear of

subsequent punishment." *Thornhill,* 310 U.S. at 101–02.

b)      **Right to Petition the Government**

44.     "The First Amendment right to petition the government for a redress

of grievances includes a right of access to the courts." *DeMartini v. Town of Gulf

Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019); *see also Bill Johnson's Rests. v.

NLRB*, 461 U.S. 731, 741 (1983).

45.     Interfering with a person's freedom to invoke the judicial process

violates the right of access to the courts. *Robles v. Kane*, 550 F. App'x 784, 787

(11th Cir. 2013).

**B.      Federal Laws Providing Causes of Action**

1.      **42 U.S.C. § 1983**

46.     Section 1983 provides in pertinent part that,

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or
> the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper
> proceeding for redress[.]

42 U.S.C. § 1983.

2.      **Voting Rights Act, 52 U.S.C. § 10307**

47.     Section 10307 provides:

> No person, whether acting under color of law or
> otherwise, shall intimidate, threaten, or coerce, or attempt
> to intimidate, threaten, or coerce any person for voting or
> attempting to vote. . . .

52 U.S.C. §10307.

### 3.   **Federal Declaratory Judgment Act, 28 U.S.C. § 2201**

48.   The Declaratory Judgment Act provides in pertinent part that,

> In a case of actual controversy within its jurisdiction, . . .
> any court of the United States, upon the filing of an
> appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be
> sought. Any such declaration shall have the force and
> effect of a final judgment or decree and shall be
> reviewable as such.

28 U.S.C. § 2201(a).

### C.   **Georgia Constitution**

49.   The Georgia Constitution provides that, "Legislative acts in violation

of [the Georgia] Constitution or the Constitution of the United States are void, and

the judiciary shall so declare them."  Ga. Const. Art. I. § II, Para. V (2021).

### 1.   **Georgia's Requirement of Absolute Ballot Secrecy**

50.    The Georgia Constitution provides: "Elections by the people shall be

by secret ballot."  Ga. Const. Art. II, § I, Para. 1.

### 2. Georgia's Guarantee of Right to the Courts

51.     The Georgia Constitution provides that, "No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state."  Ga. Const. Art. I, § I, Para. XII.

### 3. Separation of Powers

52.     The Georgia Constitution provides that, "The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided."  Ga. Const. Art. I, § II, Para. III.

53.     "A statute will be held unconstitutional as an improper delegation of legislative power if it is incomplete as legislation and authorizes an executive board to decide what shall and what shall not be an infringement of the law, because any statute which leaves the authority to a ministerial officer to define the thing to which the statute is to be applied is invalid."  *Howell v. State,* 237 Ga. 95, 95 (1976).

### D. Georgia Election Code

### 1. Role of Superintendents

54.     The General Assembly creates county boards of elections and boards of election and registration by local Act.  O.C.G.A. § 21–2–40.  All such boards must have at least three members. *Id.*  Such boards conduct their duties in public and operate under Georgia's Open Meetings laws. O.C.G.A § 50-14-1.

55.     Under the Georgia Election Code, elections in counties and municipalities are conducted by "superintendents."  O.C.G.A § 21–2–70 to –77.

56.     Under the Georgia Election Code, boards of registration conduct voter registration and issue absentee ballots.  O.C.G.A. §21-2-212.  In most counties (approximately 119), the duties of the election superintendent and the board of registration are combined into one board with the duties of elections and registration.

57.     For counties, prior to the enactment of SB202, "superintendent" meant, "Either the judge of the probate court of a county or the county board of elections, the county board of elections and registration, the joint city-county board of elections, or the joint city-county board of elections and registration, if a county has such."  O.C.G.A. § 21–2–2(35)(A) (2020).

58.     Each board created by local Act to serve as a superintendent is an authority created by state law and thus has a separate identity as an instrumentality of the state and is a public corporation.  *See* O.C.G.A. § 50–4–3(c).

59.     For Georgia's larger counties, a superintendent board typically consists of a collection of individuals who are separately appointed to the board for fixed terms by different stakeholders.  The stakeholders typically include both major political parties as well as the governing body of the county.  In some counties, a Superior Court judge must appoint one or more members of the county

board. The superintendent board is therefore generally not a creature of the county's elected governing authority.

60.     In Athens-Clarke County, for example, the Board of Elections consists of five individual board members, each of whom serves a four-year term—one member appointed by the Athens-Clarke County Republican Committee, one by the Athens-Clarke County Democratic Committee, and three by the Athens-Clarke County Commission.[1]

61.     In Fulton County, the Fulton County Board of Registration and Elections ("Fulton County Board") consists of five individuals who are appointed slightly differently: Republicans appoint two members, Democrats appoint two members, and the Fulton County Board of Commissioners appoints one member, who serves as the chair.

62.     In Chatham County, the Chatham County Board of Elections ("Chatham County Board") consists of four elected members (two from each major party), and the chair is appointed by the four elected members. The separate Chatham County Board of Registrars, responsible for voter registration and absentee ballot issuance, is a five-member non-partisan board nominated by a grand jury and appointed by the Superior Court under O.C.G.A. § 21-2-212.

---

[1] *See* Board of Elections Members, https://www.accgov.com/249/Board-of-Elections-Members  (last visited May 14, 2021).

63.     Boards of registrars conduct voter registration activities, update voter records, accept and approve absentee ballot applications and issue absentee mail ballots.  As noted above, most counties combine the duties of registration and election in a single board, while others (fewer than 40) maintain separate boards of registration.

64.     Georgia law does not provide a general mechanism to be used for the removal of entire boards acting as election "superintendents" or registrars. Instead, the local Acts that create these boards typically establish, on a jurisdiction-by-jurisdiction basis, a mechanism for individual *members* of the board to be removed, generally only for cause, and after judicial review.  For example, the local Act establishing the Athens-Clarke County Board of Elections and Registration provides that,  "All members shall be subject to removal from the board at any time for cause after notice and hearing, in the same manner and by the same authority as provided for removal of registrars." 1993 Ga. Act 216, § 5(c); O.C.G.A. § 21–2–212(a) (member of the board of registration ("registrars") can be removed by a superior court judge "at any time for cause after notice and hearing").  Similarly, the local Act establishing the Board of Elections and Registration of Jackson County provides that, "Each member of the board . . . shall be subject to removal from the board by the chief judge of the Superior Court of Jackson County at any time, for cause, after notice and hearing."  2011 Ga. Act 34,

24

§ 6. Elected Chatham County Board of Elections members can be removed only for cause and after a jury trial. 1984 Ga. Law No. 1194 § 2(g) and O.C.G.A. 15-6-82(c).

65.    Both before and after the enactment of SB202, Georgia law provided several ways for the SEB to compel superintendents to comply with the Georgia's Election Code, including by issuing orders, assessing fines, entering public reprimands, requiring restitution, requiring superintendents and others to attend training, and taxing a superintendents and others with the costs incurred by the SEB as part of such enforcement actions.  O.C.G.A. § 21–2–33.1(a) (2020).

66.    Where these measures are not sufficient, Georgia law also permits the SEB to seek judicial relief against a superintendent in the superior court of any county in which fraud or other illegal conduct has occurred or is likely to occur. O.C.G.A. § 21–2–32(a) (2020). In such judicial actions brought or intervened in by the SEB,

> If, in the opinion of the judge presiding over such cause, adequate relief cannot otherwise be granted to assure compliance with said laws, rules, and regulations, the judge may enter such order concerning the conduct of such election or primary which he or she shall deem necessary to assure compliance, including the right to require such election or primary to be held under the supervision of the State Election Board.

O.C.G.A. § 21–2–32(f) (2020).

### 2.    Funding of Superintendents

67.    Georgia law provides that,

> The governing authority of each county or municipality shall appropriate annually and from time to time, to the superintendent of such county or municipality, the funds that it shall deem necessary for the conduct of primaries and elections in such county or municipality and for the performance of his or her other duties under this chapter[.]

O.C.G.A. § 21–2–71.

### 3.    Conduct of Absentee-by-Mail Voting—Pre-SB202

68.    SB202 made changes to the Georgia Election Code's provision governing the conduct of absentee-by-mail voting.

69.    Prior to the enactment of SB202, Georgia voters could apply for an absentee-by-mail ballot up to 180 days before the date of a primary, election, or runoff, and no application deadline was specifically stated, having the effect of permitting voters with unforeseen last-minute circumstances preventing them from voting at the polling place to apply for absentee ballots.  O.C.G.A. § 21–2–381(a)(1)(A) (2020).

70.    Prior to the enactment of SB202, a valid absentee ballot application required "sufficient information for proper identification of the elector; the permanent or temporary address of the elector to which the absentee ballot shall be mailed; the identity of the primary, election, or runoff in which the elector wishes

to vote; and the name and relationship of the person requesting the ballot if other than the elector" and the voter's mark or signature.  O.C.G.A. § 21–2–381(a)(1)(C) (2020), (F).

71.     Prior to the enactment of SB202, a voter's eligibility to be issued an absentee ballot required the registrar or absentee ballot clerk to compare "the identifying information on the application with the information on file in the registrar's office and, if the application is signed by the elector, compare the signature or mark of the elector on the application with the signature or mark of the elector on the elector's voter registration card."  O.C.G.A. § 21–2–381(b)(1) (2020).  Prior to the enactment of SB202, absentee ballot applicants were not required to provide a Georgia driver license number or other state issued identification number in combination with a full date of birth to be eligible to be issued an absentee ballot, and the application was previously verified using the voter's individual signature or mark on file.  Signatures are the long-accepted, most secure standard for voter verification, used in at least 32 states, and three more states require witness signatures.

72.     Prior to the enactment of SB202, issued absentee ballots could be mailed to voters by the registrars or absentee ballot clerk as late as two days prior to election day.  O.C.G.A. § 21–2–384(a)(2) (2020).

4.     **Conduct of In-Person Voting**

73.     Both before and after the enactment of SB202, Georgia law required that the "equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county of this state and shall be provided to each county by the state, as determined by the Secretary of State." O.C.G.A. § 21–2–300(a)(1) (2020).  Electronic ballot marking devices are not required for municipal elections.

74.     The voting system furnished by the State must be "a uniform system of electronic ballot markers and ballot scanners." O.C.G.A. § 21–2–300(a)(3) (2020).

75.     Such "electronic ballot marker" devices — or "BMDs"— are required to be used by in-person voters on election day and by all absentee voters casting their ballots in person prior to election day in county, state or federal elections. O.C.G.A. § 21–2–300(a)(2) (2020); O.C.G.A. § 21–2–383(c) (2020).

76.     O.C.G.A. § 21-2-379.22(5) provides: "No electronic ballot marker shall be adopted or used" unless they "[p]ermit voting in absolute secrecy so that no person can see or know any other elector's votes."  Further, pursuant to O.C.G.A. § 21-2-70(13), superintendents have a duty to "conduct all elections in such manner as to guarantee the secrecy of the ballot."

77.     The BMDs chosen by the Secretary of State of Georgia and used statewide are a model manufactured by Dominion Voting Systems.  The system includes a touchscreen that is so large that the electoral choices of any voter using the BMD are plainly visible to any person with corrected eyesight within at least twenty to thirty feet with a line of sight to the voting touchscreen, violating voters' rights to vote in "absolute secrecy."  Because of the vulnerability of the BMD system to hacking, and therefore the need for continual monitoring, curtains and closed-door voting booths cannot be properly used as a privacy shield around BMD voting stations.  Wrap-around privacy shields provided by the Secretary of State do not protect the secrecy of the voters' choices.

78.     Figure 1 below is a true and correct copy of a photograph of voters seen at a polling place at Varnell gymnasium on January 5, 2021, in Dalton, Georgia, and typical of polling place setups across the state.



© Paul Hennessy/NurPhoto via Getty Images   Voters are seen at a polling place at Varnell gymnasium on January 5, 2021 in Dalton, Georgia, USA. Paul Hennessy/NurPhoto via Getty Images

**Figure 1.  Dalton, Georgia**

5. **Georgia's Open Meetings Act**

79.     Both before and after the enactment of SB202, superintendents were "agencies" subject to the Georgia Open Meetings Act.  O.C.G.A. § 50–14–1(a)(1) (2020) (defining "agency" to mean, among other things, "Every . . . board, . . . office, . . . or similar body of each such county, municipal corporation, or other political subdivision of the state.").

80.     Agencies subject to the Open Meetings Law may only formulate, present, discuss, or vote upon "any official business, policy, or public matter" at a "meeting," which means "the gathering of a quorum of the governing body of an agency" that is "open to the public" and that is held "after due notice of the

meeting and compliance with the posting and agenda requirements of this chapter."
O.C.G.A. § 50–14–1(a)(3)(A) (2020), (b)(1).

81.    "All votes at any meeting shall be taken in public after due notice of
the meeting and compliance with the posting and agenda requirements of this
chapter."  O.C.G.A. § 50–14–1(b)(1) (2020).

82.    "Any resolution, rule, regulation, ordinance, or other official action of
an agency adopted, taken, or made at a meeting which is not open to the public as
required by [the Open Meetings Act] shall not be binding."  O.C.G.A. § 50–14–
1(b)(2) (2020).

83.    "Any person who knowingly and willfully conduct[s] or participat[es]
in a meeting in violation of [the Open Meetings Act] shall be guilty of a
misdemeanor and upon conviction shall be punished by a fine not to exceed
$1,000.00."  O.C.G.A. § 50–14–6 (2020).

## V.    GENERAL ALLEGATIONS

### A.    2020 Elections Prompted Legislative Backlash

84.    SB202's introductory Section 2 states that there was a loss of voter
confidence because of the manner in which 2020 elections were conducted,
prompting the enactment of the bill. Indeed, there may have been a loss of voter
confidence resulting from end-to-end failures in election administrative processes,
from the State's malfunctioning voter database and pollbooks to lapses in absentee

31

balloting protocols and voting system tabulation irregularities. Georgia's 2020 election administration was heavily criticized in the press and remained a topic of unflattering national headlines throughout most of the year.

85.     However, rather than addressing the underlying systemic deficiencies in election administration and the voting system, the General Assembly enacted measures in SB202 to conceal ongoing problems, muzzling the press and poll monitors by criminalizing long-accepted norms of citizen oversight of elections. Further, the General Assembly granted powerful authority to the SEB to seize unilateral partisan control of locally run election and voter registration administrations and then authorizing these public functions, upon SEB takeover, to be conducted behind closed doors.

86.     Despite the proclamation of Section 2 (17) of SB202 that the new law made "the changes required to Georgia's election system to make it easy to vote and hard to cheat," widespread mail ballot fraud, never experienced in Georgia, now becomes alarming easy. Yet, absentee mail ballot voting becomes impossible for some voters because of excessively narrowed application deadlines.  Most alarming, however, is the severe curtailment of polling place voting that will be caused by the intimidating prospect of voters being accused of a felony offense by merely glancing around the polling place when the touchscreen voting system is in

use. The challenged provisions have the opposite of the stated purpose; it is now "hard to vote and easy to cheat" in Georgia.

**B.    Provisions of Georgia's Senate Bill 202 Passed in 2021**

87.    On March 25, 2021, Governor Brian Kemp signed into law Senate Bill 202 (Act 9) ("SB202"), which comprehensively revised the Georgia Election Code.   A true and correct copy of SB202, from Westlaw, is attached hereto as Exhibit A.

**1.    SB202's Election Takeover Provisions**

88.    SB202 empowers the State Election Board to "suspend[2] county or municipal superintendents and appoint an individual to serve as the temporary superintendent in a jurisdiction."  O.C.G.A. 21–2–33.2(f) (2021).  (As used herein, the provisions that govern the SEB's substitution of its own individual appointee as a superintendent, or a board of registration, or a municipality's superintendent, are collectively referred to as SB202's "**Takeover Provisions**.")

89.    SB202's Takeover Provisions provide, in pertinent part, as follows:

---

[2] SB202 uses the terms "suspend" and "suspension," O.C.G.A. §§ 21–2–33.2 (c),(e), as well as the term "removal," which is used to describe the initial action after a preliminary hearing, O.C.G.A. § 21–2–106(c), and the final removal of the suspended superintendent, O.C.G.A. §§ 21–2–33.2(e).

(a) The takeover of a local superintendent's responsibilities by the SEB's temporarily (or permanently) appointed individual superintendent is "extraordinary relief."  O.C.G.A. § 21–2–33.2(a) (2021).

*Superintendent Removal Upon Petition and Performance Review*

(b) The SEB may "pursue the extraordinary relief" of a takeover "following a recommendation based on an investigation by a performance review board." O.C.G.A. § 21–2–33.2(a) (2021).

(c) Performance review board investigations occur either at the instigation of the SEB upon its own motion, O.C.G.A. § 21–2–107(a) (2021), or upon a request transmitted to the SEB by "the governing authority of the county or municipality, as applicable," O.C.G.A. § 21–2–33.2(a) (2021), O.C.G.A. § 21–2–106(a)(1) (2021), or by members of the jurisdiction's state legislative delegation. O.C.G.A. § 21–2–106(a)(2)–(3) (2021).

(d) Following its investigation, a performance review board "shall issue a written report of its findings" that "shall include such evaluations, judgments, and recommendations as it deems appropriate."  O.C.G.A. §§ 21–2–106(b), –107(c) (2021).

*Superintendent Removal Upon SEB Motion*

(e) The SEB may also "pursue the extraordinary relief" of a takeover "on its own motion."  O.C.G.A. § 21–2–33.2(a) (2021). This SEB action does not

require a performance review or even a new investigation.  *See* O.C.G.A. § 21–2–107(d) ("the findings of . . . *any* audit or investigation performed by the State Election Board may be grounds for *removal* of one or more local election officials pursuant to Code Section 21-2-33.2" (emphasis added).

(f) Once the SEB has moved itself to initiate takeover proceedings against a superintendent or received a petition from a performance review board recommending that the SEB do so, the SEB "shall conduct a preliminary investigation to determine if sufficient cause exists to proceed to a full hearing on the petition."  O.C.G.A. § 21–2–33.2(b) (2021).

(g) In the event that a petition for a performance review has been initiated by a third party via petition to the SEB, the SEB's "preliminary investigation shall be followed by a preliminary hearing which shall take place not less than 30 days nor more than 90 days after the Secretary of State receives the petition."  O.C.G.A. § 21–2–33.2(b) (2021). There is no stated required notice period for a takeover action when initiated by the SEB.

(h) At the *preliminary* hearing, the SEB "shall determine if sufficient cause exists to proceed to a full hearing on the petition or if the petition should be dismissed."  O.C.G.A. § 21–2–33.2(b) (2021).

(i) "Following the preliminary hearing," (but apparently without a "full hearing," which the law mentions, *id.,* but never provides for), the SEB

35

"may suspend a county or municipal superintendent if at least three members

of the board find, after notice and hearing" that:

> (1) By a preponderance of the evidence, a county or
> municipal superintendent has committed at least three
> violations of this title or of State Election Board rules and
> regulations, in the last two general election cycles; and
> the county or municipal superintendent has not
> sufficiently remedied the violations; or

> (2) By clear and convincing evidence, the county or
> municipal superintendent has, for at least two elections
> within a two-year period, demonstrated nonfeasance,
> malfeasance, or gross negligence in the administration of
> the elections.

O.C.G.A. § 21–2–33.2(c) (2021).

(j) The SEB may rely on its own findings from "*any* audit or investigation," it

has conducted as grounds for removal of a "local election official."

O.C.G.A. § 21–2–107(d) and § 21-2-106(c)(emphasis added).  Alternatively,

instead of making its own findings under O.C.G.A. § 21–2–33.2(c), the SEB

may simply rely upon the findings of a performance review board as

"grounds for the removal" of "local election officials under Code Section

21–2–33.2." O.C.G.A. §§ 21–2–106(c), –107(d) (2021).[3]

---

[3] "Local election official" means a county board of elections or board of elections
and registration, a probate judge fulfilling the role of election superintendent, or a
municipal election superintendent.  O.C.G.A. § 21–2–105 (2021).

(k) "If the State Election Board makes a finding in accordance with" O.C.G.A. §

21–2–33.2(c), then the SEB "may suspend the superintendent or board of

registrars with pay and appoint an individual to serve as the temporary

superintendent," but there is no provision for the appointment of an

individual to serve as the temporary board of registrars.  O.C.G.A. § 21–2–

33.2(e)(1)(2021).

(l) The individual appointed by the SEB need not possess the qualifications

ordinarily required for an election superintendent. O.C.G.A. § 21–2–

33.2(e)(1) (2021) ("The temporary superintendent who is appointed shall be

otherwise qualified to serve or meet the necessary qualifications within three

months of appointment.").

(m)      The individual appointed by the SEB:

> shall exercise all the powers and duties of a
> superintendent as provided by law, including the
> authority to make all personnel decisions related to any
> employees of the jurisdiction who assist with carrying
> out the duties of the superintendent, including, but not
> limited to, the director of elections, the election
> supervisor, and all poll officers.

O.C.G.A. § 21–2–33.1(f) (2021).

(n) "At no time shall the State Election Board suspend more than four county or

municipal superintendents." O.C.G.A. § 21–2–33.2(g) (2021).

(o) Although SB202 refers in multiple places to the SEB's appointee as the "temporary superintendent," O.C.G.A. § 21–2–33.1(f) (2021), –33.2(e)(1), –33.2(e)(2), the law provides that, if the "suspended superintendent or registrar does not petition for reinstatement within the allotted time period, his or her suspension shall be converted into permanent removal," at which point the "temporary superintendent shall become a permanent superintendent" by operation of law "subject to removal by the jurisdiction not less than nine months after his or her appointment." O.C.G.A. § 21–2–33.2(e)(2)(2021).

(p) SB202 also implies that a mechanism exists for the "jurisdiction" to remove "the permanent superintendent" "after the expiration of the nine-month period following the appointment," O.C.G.A. § 21–2–33.2(e)(3) (2021), but there is no "jurisdiction" that could exercise such and power and SB202 creates no such mechanism.

(q) Moreover, no other provision of Georgia law establishes any process that could plausibly be invoked to remove an SEB-appointed superintendent. The existing provisions of law that address the removal of superintendent board members—i.e., the local Acts that preceded SB202—generally provide for removal only of individual members of a superintendent board, not the entire superintendent body itself, and these provisions further only

permit removals for cause, which is generally adjudicated by the superior court of the county.

(r) SB202's "permanent superintendent" thus appears to become literally a permanent superintendent if a suspended superintendent fails to achieve reinstatement, unless the SEB determines, "at any time after the expiration of the nine-month period following the appointment," "that the jurisdiction no longer requires a superintendent appointed under this Code section," in which case "any provisions of local or general law governing appointment of the superintendent shall govern the appointment of the superintendent." O.C.G.A. § 21–2–33.2(e)(4) (2021).

(s) The legal status of the "suspended board" is unclear given that the board is no longer the superintendent, and a suspended board has no authority in law to meet, make decisions, or to act.

2. **SB202's Election Takeover Provisions – Separately Functioning Boards *of Registration***

90.     As alleged above, some counties (like Chatham) have a board of registration that is separate from the county's board of election.

91.     Unlike a board of election, or a combined board of election and registration, a separate board of registration is not a "superintendent" under Georgia law, O.C.G.A. § 21–2–2 (35) (2021), or a "local election official" under

39

SB202.  O.C.G.A. § 21–2–105 (2021).  Thus, SB202 states that the SEB may "suspend the superintendent *or* board of registrars."  O.C.G.A. § 21–2–33.2(e) (2021) (emphasis added).  Though SB202 explicitly allows for the removal of a board of registrars, it does not provide for the replacement of the board of registration with an appointee, as it does for the replacement of a "superintendent," leaving no one to perform a removed board of registration's duties.  *Id.*

92.     The findings that the SEB must make to permit any suspension in the first place apply only to superintendents.  O.C.G.A. § 21–2–33.2(c) (2021).  Though SB202 gives the SEB the power to remove registrars, there are no standards relating to registrars or their duties.

93.     SB202 also makes no provision for the performance of duties or the reinstatement of a board of registration that has been removed or suspended by the SB202.  *Id.*

### 3.    **SB202's Superintendent-Reinstatement Provisions**

94.     SB202 provides that a "suspended superintendent" (but not a suspended board of registration) may seek reinstatement as follows:

> Any superintendent suspended under this Code section
> may petition the State Election Board for reinstatement
> no earlier than 30 days following suspension and no later
> than 60 days following suspension. In the event that a
> suspended superintendent or registrar does not petition
> for reinstatement within the allotted time period, his or
> her suspension shall be converted into permanent
> removal, and the temporary superintendent shall become

> a permanent superintendent subject to removal by the
> jurisdiction not less than nine months after his or her
> appointment.

O.C.G.A. § 21–2–33.2(e)(2) (2021).

95.     If a suspended superintendent petition for reinstatement:

> the State Election Board shall conduct a hearing for the
> purpose of receiving evidence relative to whether the
> superintendent's continued service as superintendent is
> more likely than not to improve the ability of the
> jurisdiction to conduct elections in a manner that
> complies with this chapter.

O.C.G.A. § 21–2–33.2(f)(2021).  When this provision is invoked, the

"superintendent" will be the SEB's appointee.  In other words, the standard for

reinstatement of a "suspended superintendent" looks not to the conduct of the

suspended superintendent while in office, but rather to the continued service of the

"superintendent," which is the SEB's appointee.

96.     SB202 further provides that,

> The suspended superintendent shall be given at least 30
> days' notice prior to such hearing and such hearing shall
> be held no later than 90 days after the petition is filed in
> accordance with Chapter 13 of Title 50, the 'Georgia
> Administrative Procedure Act,' except that the State
> Election Board shall have the power to call witnesses and
> request documents on its own initiative.

O.C.G.A. § 21–2–33.2(f) (2021).

97.     Finally, SB202 provides for judicial review of the SEB's

reinstatement decision as follows,

41

> If the State Election Board denies the petition, it shall be deemed a final agency decision under Chapter 13 of Title 50, the 'Georgia Administrative Procedure Act,' and it may be appealed in a manner consistent with Code Section 50-13-19. The Attorney General or his or her designee shall represent the interests of the State Election Board in any such judicial review.

O.C.G.A. § 21–2–33.2(f) (2021).

98.    Judicial review under the Georgia Administrative Procedure Act takes place in the superior court, O.C.G.A. § 50–13–19(a)-(b).  But judicial review will be impossible as a practical matter, because the suspended board of elections will no longer be able to function legally as a public body during its "suspension" or after its "removal."  Further, as a non-natural corporate legal person, the suspended superintendent may only appear through licensed legal counsel,  O.C.G.A. § 15-19-51(a)(1), which SB202 simultaneously frustrates by prohibiting the use of public funds for litigation and also prohibiting superintendents from receiving private funding.

### 4.    SB202's Restrictions on Superintendent Boards' Access to Counsel

99.    SB202 renders completely illusory any suspended superintendent board's or board of registration's ability to contest its suspension, petition for reinstatement, and appeal a denial of reinstatement by preventing corporate superintendents and registrars from paying for or accepting donated services of legal counsel.

42

100.   SB202 prohibits any local government from expending "any public funds for attorney fees or expenses of litigation relating to the proceedings initiated pursuant to" the Takeover Provisions "except to the extent such fees and expenses are incurred prior to and through the recommendation of the State Election Board as provided in subsection (c) of this Code section[.]" O.C.G.A. § 21–2–33.2(g) (2021).[4]  This language is confusing, at best, because O.C.G.A. § 21–2–33.2(c) contains no reference to any "recommendation" of the SEB.  The clear import of SB202's prohibition on a local government's use of public funds for litigation relating to proceedings initiated pursuant to the Takeover Provisions is to bar counties and municipalities from paying for legal counsel to advise superintendents or registrars about and actively litigate on behalf of superintendents and registrars (or themselves) against an SEB "takeover" of a local election board.

101.   At the same time, SB202 also prohibits individual election board members, pro bono attorneys, and outside organizations from paying for legal work to oppose a SEB takeover by providing that, "No superintendent shall take or accept any funding, grants, or gifts from any source other than from the governing authority of the county or municipality, the State of Georgia, or the federal

---

[4] SB202 provides that nothing in this prohibition "shall be construed to prohibit an insurance provider from covering attorneys' fees or expenses of litigation under an insurance policy."  O.C.G.A. § 21–2–33.2(g) (2021).

government." O.C.G.A. § 21–2–71(b) (2021). A similar SB202 provision bans

boards of registration from accepting such funding. O.C.G.A. §21-2-212(f) (2021)

102.   SB202 also prohibits counties and municipalities from using their

power of the purse to restrain or control the conduct of the SEB's appointee.  To

this end, SB202 provides that,

> When the State Election Board exercises its authority
> under subsection (f) of Code Section 21-2-33.1, the
> jurisdiction involved shall not diminish or reduce the
> funds already budgeted or appropriated by the
> jurisdiction pursuant to Code Section 21-2-71 and shall
> pay any necessary and reasonable funds over that
> amount, as determined by the temporary superintendent,
> to faithfully carry out their obligations under Code
> Section 21-2-70.

O.C.G.A. § 21–2–33.2(i) (2021).

### 5.   SB202's Criminalization of Observing an Elector While Casting a Vote

103.   O.C.G.A. § 21–2–568.1 (2021), the Elector Observation Felony

provision, states:

> (a) Except while providing authorized assistance in
> voting under Code Section 21-2-409 and except for
> children authorized to be in the enclosed space under
> subsection (f) of Code Section 21-2-413, no person shall
> intentionally observe an elector while casting a ballot in a
> manner that would allow such person to see for whom or
> what the elector is voting.
>
> (b) Any person who violates the provisions of subsection
> (a) of this Code section shall be guilty of a felony.

104.   Notably, long-standing Georgia law already makes it a felony to go "into the voting compartment or voting machine booth while another is voting" or to interfere "with any elector marking his or her ballot" or to disclose "to anyone how another elector voted, without said elector's consent."  O.C.G.A. § 21-2-568.

### 6.   SB202's Criminalization of Free Speech and Press

105.   SB202 also requires that the "processing and scanning of absentee ballots" "shall be open to the view of the public," O.C.G.A. § 21–2–386(a)(2)(B) (2021), but then simultaneously prohibits "monitors and observers," which would include the press, under penalty of misdemeanor, O.C.G.A. § 21–2–598, from:

> (ii) Using or bringing into the room any photographic or other electronic monitoring or recording devices, cellular telephones, or computers;

> (vi) Tallying, tabulating, estimating, or attempting to tally, tabulate, or estimate, whether partial or otherwise, any of the votes on the absentee ballots cast; and

> (vii) Communicating any information that they see while monitoring the processing and scanning of the absentee ballots, whether intentionally or inadvertently, about any ballot, vote, or selection to anyone other than an election official who needs such information to lawfully carry out his or her official duties.

O.C.G.A. § 21–2–386(a)(2)(B) (2021).

106.   O.C.G.A. § 21–2–568.2 (2)(B) (2021) (the "Photography Ban") also criminalizes photography in certain ill-defined circumstances:

(a) It shall be illegal for any person to use photographic or other electronic monitoring or recording devices, cameras, or cellular telephones, except as authorized by law, to:

(1) Photograph or record the face of an electronic ballot marker while a ballot is being voted or while an elector's votes are displayed on such electronic marker; or

(2) Photograph or record a voted ballot.

(b) Any person who violates subsection (a) of this Code section shall be guilty of a misdemeanor.

107.   The Photography Ban directly conflicts with another provision of SB202, O.C.G.A. §50-18-71(k)(2021), which confirms that images of voted ballots are public records under the Georgia Open Records Act.  Thus, SB202 provides that it is a crime to take a photograph of a document (an image of a voted ballot) that is itself a public record under Georgia law.

108.   Figure 2 is a true and correct copy of a scanned, voted, hand-marked absentee ballot and Figure 3 is a true and correct copy of a scanned, voted, BMD ballot:

46



Figure 2, Scanned Hand Marked Absentee Ballot Image



Figure 3 Scanned BMD ballot

### 7. SB202's Absentee Voter Identification Provisions ("Relaxed Voter ID Rule")

109. Effective July 1, 2021, SB202 degrades the pre-existing identification information that voters must provide to the government to be issued an absentee ballot. The Relaxed Voter ID Rule, O.C.G.A. 21–2–381(a)(1)(C)(i) (2021), mandates that the Secretary of State's absentee-ballot request form "shall require the elector to provide his or her name, date of birth, address as registered, address where the elector wishes the ballot to be mailed, and the number of his or her Georgia driver's license or identification card."

110. SB202 allows a registrar or absentee ballot clerk to "verify the identity of the applicant" for an absentee ballot by comparing "the applicant's

name, date of birth, and number of his or her Georgia driver's license or

identification card . . . on the application with the information on file in the

registrar's office."  O.C.G.A. 21–2–381(b)(1) (2021).

111.   In the same bill section that added the Relaxed Voter ID Rule, SB202

eliminated the previous well-established requirements for a registrar or absentee

ballot clerk to verify the identity of the absentee ballot applicant by comparing the

signature or mark on the application with the signature or mark on the elector's

voter registration card.  *See* 2021 Ga. Act 9, SB202, lines 1063–65 (strikeouts).

112.   As a result of the Relaxed Voter ID Rule, any person who possesses a

voter's name, birthdate, and driver license or identification card number, which are

easily available, can now submit a mailed or online application in the name of that

voter for an absentee ballot.  The imposter applicant will be verified as that voter

based solely on the three items of information and will be issued the ballot that

belongs to that voter at whatever address the imposter specifies in the absentee

ballot request.

### 8.   Shortened Period for Applying for Absentee Ballots ("Impractical Application Deadline")

113.   SB202 drastically shortens the period during which absentee-by-mail

ballots may be applied for.  Under prior law, absentee ballots could be applied for

from 180 days before election day, with no specific application deadline.   The

Impractical Application Deadline O.C.G.A. § 21–2–381(a)(1)(A) (2021), changed

the law to provide a much narrower application window that opens only 78 days prior to election day and that closes 11 days prior to election day.

114.   The shortened period for applications for absentee mail ballots creates at least three categories of constitutional problems.  First, voters who encounter unforeseen emergencies within 11 days of Election Day will be disenfranchised because there is no hardship waiver of the 11- day deadline.  Examples of voters who would be disenfranchised include voters who had serious accidents or illnesses, were quarantined, bereaved, or called for National Guard duty, emergency medical work, or unanticipated jury duty. The effective date of the Impractical Application Deadline is July 1, 2021 and it will begin to disenfranchise voters during the July 13, 2021 runoff elections.

115.   Second, runoffs for state offices are frequently determined and announced on the same day as the Secretary of State's deadline for certification of the election, with such certification occurring 17 days after the election. O.C.G.A. §21-2-499(b). Runoffs occur 28 days after Election Day, creating not even one day to timely apply for an application for a ballot for a runoff announced on the deadline for applying. Voters requiring absentee ballots will be disenfranchised by the abbreviated deadline, beginning with the July 13 runoff elections.

116.   Third, to meet the 11-day deadline without submitting an application by email, which must await the development of a secure transmission method as

explained below, the voter must mail the application well ahead of the 11-day deadline, causing an unnecessary burden on the voter, considerably reducing the time available to apply for an absentee ballot.

117.   Virtually all other states have provisions for voters in such unforeseen circumstances to obtain a mail ballot just as Governor Kemp did, indicating that there is no compelling state interest in preventing voters in such circumstances from voting.

118.    Absentee ballot applications may be transmitted by voters to the county registration officials in person or via electronic transmission, mail, or facsimile. O.C.G.A §21-2-381(a)(1)(A). The General Assembly apparently recognized the heightened risk of identity theft with the increased requirements of transmitting extensive personal identifying information on the application and required that the Secretary "develop a method to allow secure electronic transmission of such form." O.C.G.A. §21-2-381(a)(1)(C)(i).

119.   Although the provisions of the new ballot application procedures are effective July 1, 2021, the development and implementation of a secure email or other electronic transmission method of transmission are likely to require months or years of development and implementation in 159 counties. Until then, the ballot application time is significantly compressed as voters will need to mail or deliver their applications in person to meet the 11-day deadline. Mailing the application

could add several days to the voters' application completion and submission date, furthering the unreasonable burden on voters, particularly in the event of a runoff, announced within about 11 or 12 days of the runoff election.

**C.      Context Within Which SB202 Takes Effect And Will Be Applied To Plaintiffs**

120.    The recent history of Georgia elections present circumstances that render the provisions of SB202 that are challenged herein unconstitutional as those provisions will be applied to certain of the Plaintiffs.

**1.      Georgia's Oversized Dominion BMD Touchscreens Unavoidably Compromise Ballot Secrecy**

121.    In April 2019, Georgia enacted HB316, a law that mandated the adoption and implementation of a new uniform statewide voting system using electronic touchscreen ballot marking devices ("BMDs"). HB316 also required that BMDs provide "absolute secrecy" in voting. O.C.G.A. §21-2-379.22.

122.    The oversized Dominion BMD touchscreen displays voter selections in such a way that they are clearly discernible to a person with normal vision who has a line of sight to the screen from any distance at which other people are likely to be located within a polling place. *See* Figures 4, 5 and 6, *infra.*

123.    Use of the Dominion BMD touchscreens in polling places after their late 2019 adoption quickly demonstrated that the giant touchscreens destroy the privacy of the voting experience for voters who use BMDs because those voters'

electoral choices are clearly visible to election workers, poll watchers, the press, public observers, and other voters in the polling place

124.   Recognizing the problem, the Secretary of State published illustrations for how election workers should set up polling places to attempt to decrease privacy violations.  However, the Secretary's illustrations proved to be incapable of solving the problem caused by the giant BMD touchscreens and have failed to preserve ballot secrecy for voters using the BMDs for in-person voting.

125.   More traditional methods for protecting secrecy of the ballot for BMD voters, such as booths and privacy screens, cannot be used because of the technological vulnerabilities of the Dominion BMD voting system.  Booths and privacy shields cannot be used, for example, because the machines have been shown in litigation to be vulnerable to hacking exploits that can be accomplished through the simple act of a surreptitious insertion of a USB stick into an open USB port, either on the BMD or on its attached printer, during the act of voting.  To guard against this known vulnerability, the BMDs must remain fully visible to election workers at all times to prevent the voting equipment from being compromised. In fact, poll workers are required under Georgia's election code to monitor the machines for tampering, which requires watching the activity at the machines.  State Election Board Rule 183-1-12-.11(4).

126.    During legislative hearings Senator Michael Dugan, a co-sponsor of

SB202, acknowledged that the large touchscreens violated voting privacy, but also

made clear his approval of making the observation of such displays a felony.[5]

127.    Not only will the loss of ballot secrecy have a chilling effect on voting

participation, but SB202 threatens voters and observers at the polling places with

being subjected arbitrarily to a felony charge for "intentionally observing" a

voter's touchscreen display of votes, although the observation may be unavoidable.

2.    **Georgia's Recent History of Voter Data Security Breaches**

128.    From at the early 2000's until at least December 31, 2017, the Center

for Election Services ("**CES**") was housed at Kennesaw State University to

assisting the Secretary of State with managing Georgia's election system. CES was

moved to the Secretary of State's office in 2018.

129.    Acting under contract as the Secretary of State's agents, CES at KSU

hosted an enormous assemblage of sensitive information critical to the safe and

secure operation of Georgia's voting system. Among this information was the

entire voter registration database for Georgia's millions of registered voters.  This

database contained every registered voter's name, driver license or state

---

[5] Senate Ethics Committee hearing, March 1, 2020
https://www.youtube.com/watch?v=jC0x7lchU3Q.

identification number, full or partial social security number, full date of birth, and residence address.

130.   The information hosted on the CES/SOS server was not authorized to be publicly accessible.  But between at least August 2016 and March 2017, and likely for a much longer period of time, this server—and all the files on it, including the voter registration database—was fully accessible to any computer user with Internet access.

131.   In late August 2016, cybersecurity researcher Logan Lamb ("Lamb") used an automated script to access the publicly available files hosted on the CES/SOS elections server at KSU.  Upon inspecting the files his script had downloaded, Lamb discovered that they included the voter registration database containing voting histories and personal registration information of every Georgia voter.  Lamb's subsequent investigation revealed that the files his script downloaded had been publicly exposed for so long that Google's automated search engine had actually cached (i.e., saved digital backup copies of) the pages containing many of them, meaning that these approximately 6 million voter files are still available likely from numerous sources. Thus, the personal voter registration information of millions of registered Georgia voters—including driver license numbers and birthdates—has been freely available "in the wild" for at least four years as of the filing of this Complaint.

### 3.    **Covid-19 in Georgia**

132.    The ongoing COVID-19 pandemic continues to affect Georgia elections in significant ways.

133.    Georgia's Governor Brian Kemp first declared a Public Health State of Emergency in response to the pandemic on March 14, 2020.  He has subsequently extended the Public Health State of Emergency and imposed a number of restrictions on common activities through an evolving series of executive orders.

134.    On April 23, 2021, Governor Kemp issued his most recent renewal of the ongoing Public Health State of Emergency, which extended the period of emergency until May 30, 2021.

135.    Under the currently applicable restrictions imposed by Governor Kemp, individuals exposed to or themselves contracting COVID-19 are required to self-quarantine for a period of fourteen days.

136.    This quarantine period potentially conflicts with the right to vote if it occurs near an election.  A voter who is exposed to COVID close to Election Day, and must therefore self-quarantine, is rendered unable to vote in person and must instead apply for and obtain an absentee ballot to vote.

137.    Governor Kemp himself was exposed to COVID shortly prior to the November 2020 general election and was required to apply for an absentee ballot

on the Friday before Election Day. Governor Kemp's absentee ballot application was duly processed over the weekend before Election Day, and his absentee ballot arrived the Monday before Election Day, enabling Governor Kemp to vote and preventing him from being disenfranchised in the November 2020 election.[6]  Had the absentee ballot rules enacted by SB202 been in place, Governor Kemp (and doubtless many other Georgians in his same situation) would have been disenfranchised in the November 2020 election.

## VI.  SPECIFIC ALLEGATIONS OF THREATENED INJURY TO PLAINTIFFS

### A.    Defendants' Intention to Enforce SB202's Provisions

138.   Defendants who are SEB Voting Members, acting in their official capacities as voting members of the State Election Board, intend to enforce the laws established by SB202, including each provision of SB202 that is challenged herein as unconstitutional.

139.   Defendant RAFFENSPERGER intends to "provide any and all necessary support and assistance that the State Election Board, in its sole discretion, determines is necessary to enforce [the Georgia Election Code] or to

---

[6] https://www.ajc.com/politics/politics-blog/kemp-receives-absentee-ballot-while-in-quarantine-will-vote-after-all/LIUXJBW4O5AK5MQQLNBVWVUU34/ (last visited Apr. 28, 2021).

carry out or conduct any of its duties" established by SB202, including enforcing each provision of SB202 that is challenged herein as unconstitutional.  O.C.G.A. § 21–2–33.1(h) (2021).

140.   Defendant RAFFENSPERGER and members of his staff have repeatedly stated that certain county boards of elections are "habitual offenders," are "failing," and that, if given the necessary authority, Defendant RAFFENSPERGER will intervene in such counties' election management.

141.   Defendant RAFFENSPERGER and the Defendants who are SEB Voting Members have prejudged the Fulton County Board, in particular, to be one of the first superintendents targeted for suspension and removal by the SEB under SB202's Takeover Provisions based on violations of the Election Code that occurred before SB202 was even enacted. During the legislative consideration of SB202, legislators and RAFFENSPERGER were aware that the SEB already had at least 27 pending cases against the Fulton County Board investigating election law violations.  Secretary RAFFENSPERGER is investigating Fulton County voting records for the June and August 2020 elections to determine whether at least 123 voters may have voted twice. The SEB's findings in these pre-existing cases, along with numerous Fulton cases previously heard over the last two election cycles, will count as "any audit or investigation" under the Takeover Provisions

and may be invoked immediately by the SEB as grounds for the suspension or removal of the Fulton County Board.

142.   Defendant RAFFENSPERGER and his staff do not intend to implement the "method to allow secure electronic transmission" of absentee ballot request forms that is called for by SB202, O.C.G.A. § 21–2–381(a)(1)(C)(i) (2021), in time for that method to be utilized to handle absentee ballot applications in all 159 counties of Georgia during any elections to be held in 2021.

**B.   Plaintiffs' Direct Standing**

143.   Enforcement of the challenged provisions of SB202 threatens each Plaintiff with real and immediate injuries-in-fact that are neither conjectural, hypothetical, nor contingent, including the following:

1.   **Plaintiff Coalition for Good Governance**

144.   Plaintiff CGG is a non-profit corporation organized and existing under the laws of the State of Colorado.

145.   Plaintiff CGG's purpose is to preserve and advance the constitutional liberties and individual civil rights of United States citizens, with an emphasis on preserving and protecting the civil rights of its members that are exercised through their participation in public elections and oversight of government activities.

146.   Plaintiff CGG is a membership organization, with a membership that consists of both individuals and other organizations, residing in Georgia and other

States.  Individuals and organizations become members of Plaintiff CGG by providing their contact information and indicating a desire to associate with the organization. Members donate money, contribute time, and share information and intelligence with the organization to the extent they are able and motivated to do so. Members receive informational communications from Plaintiff CGG and benefit from Plaintiff CGG's facilitation and coordination of members' individual participation in civic activities that serve the organization's purpose, such as poll watching and ballot monitoring, auditing election results, participating in CGG-sponsored educational seminars, and publishing opinion pieces. Members utilize Plaintiff CGG as a resource to answer a wide range of questions about voting rights, voting processes, open meetings law, public records law, recalls, petition processes, election legislation, poll watcher training, and how to navigate election issues and challenge election law violations that they encounter.

147.   Plaintiff CGG serves its purpose in a variety of ways, including, for example, by providing information and education to its members; by serving as a non-partisan educational and informational resource for the public, county election officials, poll watchers, press, campaigns, candidates, and political parties; by monitoring nationwide developments in election law and technology; by providing speakers for events at educational institutions; by providing commentary from its leadership on election issues; by collaborating in voting rights and election

integrity initiatives with other nonpartisan nonprofits and academics; by developing and sharing research and investigation of reported election problems with the press, public and other members of the election-integrity community; by routinely formally proposing election rule-making to the Georgia State Election Board; by drafting proposed election-related legislation; and by facilitating and coordinating the engagement of members and prospective members as non-partisan participants in the electoral process through poll watching, attendance and participation at public meetings of county election boards, and other civic activities.

148. Plaintiff CGG's leaders seek to develop and maintain relationships with individual board members of Georgia county boards of election and election directors and frequently communicate with them regarding election administration policies and decisions.

149. Plaintiff CGG, acting on its own behalf, has direct organizational standing to bring each of its claims for prospective declaratory and injunctive relief that are stated herein.

150. The Challenged Provisions of SB202 impair Plaintiff CGG's ability to engage in its own projects by forcing the organization to divert resources in response.

151.   Specifically, all voter education and advocacy projects in North Carolina related to voter privacy problems and electronic voting system security have been deferred or curtailed immediately to undertake this action.

152.   CGG's project to provide subject matter expertise to a non-profit organization plaintiff challenging North Carolina's voting system certification had to be dramatically curtailed in order to address the harmful impacts of SB202.

153.   CGG's project to prepare Georgia poll watcher training materials related to voting system technology has also been postponed in order to undertake this legal action.

154.   Because of the need to focus on the challenge to SB202, CGG had to decline recent requests to assist in the preparation of advocacy materials urgently needed to challenge Colorado's legislative efforts to adopt certain types of internet voting.  This project would have been undertaken except for the urgency of this action to address SB202.

155.   As a result of the need to challenge SB202, CGG had to reduce its time commitment and scope of its leadership role in planning and co-hosting a national election security seminar for election officials.

156.   CGG had to decline invitations to work with other non-profit organizations to craft proposed amendments to HR1 and SB1 in order to devote resources to challenging SB202.

157.   CGG's Executive Director was unable to assist in the Windham, New Hampshire audit of the November 2020 election anomalies, because of undertaking the challenge of SB2020.

158.   Projects to write opinion pieces concerning Georgia's need for post-election auditing standards for submission to certain Georgia community newspapers have been reduced and deferred because of the need to take this legal action, as have plans for follow up educational webinars regarding SB202 for Georgia's county election officials because of the required diversion of resources for this legal action.

159.   CGG's project to draft, at the request of individual lawmakers, proposed Georgia legislation for improved election transparency have been deferred and reduced because of the resources required to focus on this legal action.

160.   Management of CGG has diverted considerable time from the day-to-day operations and the above-mentioned projects to raise funds for legal fees and expenses for this legal action, considerably beyond its previously anticipated 2021 fund raising requirements.

161.   The SB202 challenge also required CGG resources to be diverted from the following: the overhaul of CGG's website; preparation of newsletters to donors about CGG projects on voter privacy and election security; educational

efforts geared to municipal election superintendents and city councils on the need for hand marked paper ballot voting systems.   This substantial and continuing diversion of CGG's resources is further described below by Plaintiff DUFORT and Plaintiff THROOP, both CGG volunteers.

### 2.   **Plaintiff SHIRLEY**

162.   Plaintiffs SHIRLEY, LANG, PULLAR, THOMAS-CLARK, and MCNICHOLS have protected property interests in their positions as members of county election boards that are protected by the Fourteenth Amendment.  *See DeKalb County Sch. Dist. v. Ga. Bd. of Educ.*, No. 1:13-CV-544-RWS, 2013 U.S. Dist. LEXIS 29535, at *8–9, 2013 WL791266 (Mar. 4, 2013) (citing *Bd. of Educ. v. Allen*, 392 U.S. 236, 241 n.5 (1968); *Finch v. Miss. State Med. Ass'n, Inc.*, 585 F.2d 765, 773 (5th Cir. 1978)).

163.   Plaintiff SHIRLEY was appointed to his current term as a member of the Athens-Clarke County Board in December 2020 by the Athens-Clerk County Commission.  The Athens-Clarke County Board is a combined board with duties of a board of registration (O.C.G.A. §21-2-212) and duties of an election superintendent (O.C.G.A. §21-2-70). As a member Athens-Clarke County Board, Plaintiff SHIRLEY receives compensation for each meeting of the board that he attends in his official capacity. Plaintiff SHIRLEY's current term expires on December 31, 2024.

164.   Plaintiff SHIRLEY participates in all meetings of the Athens-Clarke County Board which are conducted in public, generally broadcast on the internet, with a formal agenda and publicly available board meeting materials. The meetings routinely permit public comment on election-related matters.

165.   Plaintiff SHIRLEY, as a member of the Athens-Clarke County Board, is facing the real threat of removal by the SEB under the Takeover Provisions of SB202.  Within the two election cycles preceding the date of filing of this Complaint, the SEB has brought proceedings to sanction the Athens-Clarke County Board for alleged election law violations which the SEB may claim are sufficient to support the findings described in O.C.G.A. § 21–2–33.2(c). In March 2020, the SEB found the Athens-Clarke County Board in violation of the requirement for uniform voting equipment when the Athens-Clarke County Board adopted the use of hand marked paper ballots to provide ballot secrecy in the face of the failure of the BMD touchscreen units to provide for ballot secrecy. The findings, along with findings in other recent and pending investigations, expose the Athens-Clarke County Board to immediate suspension or removal by the SEB at any time on the SEB's own motion.

166.   If the SEB follows through on its expressed intention to suspend or remove superintendents with existing violations, such as the Athens-Clarke County Board, Plaintiff SHIRLEY will be injured because he:

- will be subjected to deprivation of his personal property and liberty interest in his role as a member of the Athens-Clarke County Board without any predeprivation due process right to notice and an opportunity to be heard;

- will be deprived of postdeprivation due process because SB202 only permits a corporate superintendent such as the Athens-Clarke County Board, and not its constituent individual members, to seek reinstatement;

- will be deprived of the ability to have his interests represented by the Athens-Clarke County Board itself, since SB202 renders removed corporate superintendents incapable of meeting, making decisions and taking actions (such as petitioning the SEB for corporate reinstatement) as a public body and in compliance with the Georgia Open Meetings Law;

- will be deprived of the ability to have his interest represented by counsel for the removed Athens-Clarke County Board itself, since SB202 prohibits public funds from being used to contest a suspension or removal and also prohibits superintendents from accepting private funds or gifts that could be used for such purposes;

- will be deprived of income as a result of being unable to attend the Athens-Clarke County Board meetings in an official capacity (the basis for SHIRLEY's compensation as a board member), because the Athens-Clarke County Board will itself be unable to meet while suspended or removed;

- will be deprived of the due process benefits of 1993 Ga. Act 216, § 5(c) and O.C.G.A. § 21–2–212(a), which together provide that members of the Athens-Clarke County Board are removable from office only for cause after notice and a hearing and only by the judge of the superior court; and

- will be deprived of the due process benefits of O.C.G.A. § 21–2–32(f), which mandates a judicial process that must be followed by the SEB before the SEB can directly supervise the official election duties undertaken by a superintendent like Athens-Clarke County Board.

167.   Plaintiff SHIRLEY, who frequently observes election operations such as absentee ballot processing in his capacity as a member of the Athens-Clarke County Board, will be injured by SB202's prior restraints on his First Amendment right of free speech and right to petition the government, which are imposed under penalty of misdemeanor by O.C.G.A. § 21–2–386(a)(2)(B)(vii) (the Gag Rule).

168.   Plaintiff SHIRLEY is registered to vote and is an eligible elector of the State of Georgia and Athens-Clarke County and intends to vote in all upcoming elections for which he is eligible to vote.

169.   Plaintiff SHIRLEY, in his personal capacity as a voter, is threatened with imminent injury in the event he votes in person during upcoming elections. Additionally, when he visits the polling place as a member of the Athens-Clarke Board, he is threatened with the same injury.  Specifically, each time he enters the

polling place, Plaintiff SHIRLEY will see other voters voting on giant BMD

touchscreens, which will expose Plaintiff SHIRLEY to felony prosecution for

violating SB202's Elector Observation Felony, which prohibits on "intentionally

observ[ing] an elector while casting a ballot in a manner that would allow such

person to see for whom or what the elector is voting." O.C.G.A. § 21–2–568.1

(2021).

170.   Plaintiff SHIRLEY's Georgia driver's license number and date of

birth were disclosed to unknown persons in repeated breaches of the Georgia

Secretary of State's elections server in 2016 and 2017.

171.   Plaintiff SHIRLEY, in his personal capacity as a voter, is threatened

with a substantial risk that his ballot—and thus his right to vote—will be stolen

from him by someone in possession of his driver license and date of birth, since

these two pieces of personal information are in circulation as a result of lapses of

security by the Georgia Secretary of State.  This injury is threatened because

SB202 eliminated the previous absentee-by-mail signature verification check and

adopted in its place the applicant's provision of these two pieces of information as

the sole means of authenticating a voter's request for an absentee-by-mail ballot.

Should he choose to vote absentee by mail, without a truly secure transmission

method for applications first being implemented by Defendant

RAFFENSPERGER, Plaintiff SHIRLEY will be compelled "to consent to the

possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

172.   Plaintiff SHIRLEY, in his personal capacity as a voter, is also threatened with imminent injury by SB202's narrowing of the time within which to apply for an absentee-by-mail ballot for a runoff election, when the announcement of a runoff election will not be made in some elections until the deadline for applying for a runoff mail ballot.

### 3.   **Plaintiff THOMAS-CLARK**

173.   Plaintiff THOMAS-CLARK was appointed to the Coffee County Board and her current term expires in 2022.  As a Coffee County Board member, Plaintiff THOMAS-CLARK receives compensation for her work as a board member.  In addition, in her role as Chair of the Coffee County Board, Plaintiff THOMAS-CLARK assists the election staff in numerous administrative election-related activities.

174.   Plaintiff THOMAS-CLARK participates in all meetings of the Coffee County Board which are conducted in public with a formal agenda and publicly available board meeting materials.  The meetings routinely permit public comment on election-related matters.

175.   Defendant RAFFENSPERGER recently announced that the Coffee County Board, of which Plaintiff THOMAS-CLARK is a member, is under investigation, and that counties under investigation for loss of chain of custody of ballots will be brought before the State Election Board for prosecution.  The Coffee County Board is exposed to immediate suspension or removal by the SEB at any time on the SEB's own motion.

176.   If the SEB follows through on its expressed intention to suspend or remove superintendents that it claims have existing violations, such as the Coffee County Board, Plaintiff THOMAS-CLARK will be injured in the same manner alleged above for Plaintiff SHIRLEY.

177.   Plaintiff THOMAS-CLARK is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

178.   Plaintiff THOMAS-CLARK is registered to vote and is an eligible elector of the State of Georgia and Coffee County and intends to vote in all upcoming elections for which he is eligible to vote.

179.   Plaintiff THOMAS-CLARK's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

180.   Plaintiff THOMAS-CLARK, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff THOMAS-CLARK will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

181.   Plaintiff THOMAS-CLARK, in her personal capacity as a voter, and when she visits polling places in her role as a board member, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLE.

182.   Plaintiff THOMAS-CLARK, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

### 4.   **Plaintiff LANG**

183.   Plaintiff LANG's current term on the Chatham County Board started in January 2019 and ends December 31, 2022.  As a Chatham County Board

member, Plaintiff LANG receives monthly compensation for his service on the board.

184.   Plaintiff LANG participates in all meetings of the Chatham County Board which are conducted in public with a formal agenda and publicly available board meeting materials. The meetings routinely permit public comment on election-related matters.

185.   If the SEB follows through on its expressed intention to suspend or remove superintendents that it claims has existing violations, such as potentially the Chatham County Board, Plaintiff LANG will be injured in the same manner alleged above for Plaintiff SHIRLEY.

186.   Plaintiff LANG is threatened with injuries arising from SB202's prior restraints on his First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vii) (2021) in the same manner as is alleged above for Plaintiff SHIRLEY.

187.   Plaintiff LANG is registered to vote and is an eligible elector of the State of Georgia and Chatham County and intends to vote in all upcoming elections for which he is eligible to vote.

188.   Plaintiff LANG's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

189.   Plaintiff LANG, in his personal capacity as a voter, is threatened with a substantial risk that his ballot – and thus his right to vote – will be stolen from him in the same manner as is alleged above for Plaintiff SHIRLEY.  Should he choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff LANG will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process.  *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

190.   Plaintiff LANG, in his personal capacity as a voter, and when he is visiting the polling places in his role as a Chatham County Board member, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

191.   Plaintiff LANG, in his personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

192.   In his personal capacity as a voter, Plaintiff LANG is threatened with injury because SB202 permits the SEB to remove the Chatham County Board of Registrars without cause, but does not permit the SEB to appoint a replacement to handle the registration and absentee ballot issuance duties.  Plaintiff LANG, like

all other voters, will suffer from the lack of a functioning department to manage voter registration and absentee ballot issuance.

### 5.    Plaintiff PULLAR

193.    Plaintiff PULLAR's current term as a member of the Clayton County Board expires in 2022.  Plaintiff PULLAR receives compensation for each meeting she attends of the Clayton County Board in her official capacity.

194.    Plaintiff PULLAR participates in all meetings of the Clayton County Board which are conducted in public with a formal agenda and publicly available board meeting materials.  The meetings routinely permit public comment on election-related matters.

195.    Within the two election cycles preceding the date of filing of this Complaint, the SEB has conducted at least 48 alleged incidents of Clayton County voters double voting, and one investigation of violations of the Georgia Election Code by the Clayton County Board.  The findings in these investigations, along with findings in any other recent and pending investigations, expose the Clayton County Board to the risk of immediate suspension or removal by the SEB at any time on the SEB's own motion.

196.    If the SEB follows through on its expressed intention to suspend or remove superintendents that it claims has existing violations, such as potentially

the Clayton County Board, Plaintiff PULLAR will be injured in the same manner
alleged above for Plaintiff SHIRLEY.

197.   Plaintiff PULLAR is threatened with injuries arising from SB202's
prior restraints on her First Amendment right of free speech and right to petition
the government under O.C.G.A. § 21–2–386(a)(2)(B)(viii) in the same manner as
is alleged above for Plaintiff SHIRLEY.

198.   Plaintiff PULLAR is registered to vote and is an eligible elector of the
State of Georgia and Clayton County and intends to vote in all upcoming elections
for which he is eligible to vote.

199.   Plaintiff PULLAR's Georgia driver's license number and date of birth
were disclosed to unknown persons in repeated breaches of the Georgia Secretary
of State's elections server in 2016 and 2017.

200.   Plaintiff PULLAR, in her personal capacity as a voter, is threatened
with a substantial risk that her ballot—and thus her right to vote—will be stolen
from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should
she choose to vote absentee by mail, without a truly secure transmission method
for applications first being implemented by Defendant RAFFENSPERGER,
Plaintiff PULLAR will be compelled "to consent to the possibility of a profound
invasion of privacy when exercising the fundamental right to vote" in violation of

substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

201.   Plaintiff PULLAR, in her personal capacity as a voter, and as she observes polling place activities as a Clayton Board member, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

202.   Plaintiff PULLAR, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

### 6.   **Plaintiff MCNICHOLS**

203.   Plaintiff MCNICHOLS' current term as a member of the Jackson County Board expires on January 31, 2023.  Plaintiff MCNICHOLS is compensated for her service on the Jackson County Board.

204.   Plaintiff MCNICHOLS participates in all meetings of the Jackson County Board which are conducted in public with a formal agenda and publicly available board meeting materials.  The meetings routinely permit public comment on election-related matters.

205.   On behalf of the Jackson County Board, Plaintiff MCNICHOLS participates in the processing of Jackson County's mail ballots, including the collection of mail ballots from the drop boxes.  If she detects any problems, her

practice is to inform the Jackson County elections staff and to alert Pete Fuller, the Chairman of Plaintiff JDCD.

206.   Within the two election cycles preceding the date of filing of this Complaint, the SEB has brought at least three cases against the Jackson County Board, of which Plaintiff MCNICHOLS is a member, alleging violations of the Georgia Election Code. The Secretary of State is conducting an investigation alleging double voting by 5 Jackson County voters in August 2020.  The findings in these cases, along with findings in other recent and pending investigations, expose the Jackson County Board to immediate suspension or removal by the SEB at any time on the SEB's own motion.

207.   If the SEB follows through on its expressed intention to suspend or remove superintendents with existing violations, such as the Jackson County Board, Plaintiff MCNICHOLS will be injured in the same manner alleged above for Plaintiff SHIRLEY.

208.   Plaintiff MCNICHOLS is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

209.   Plaintiff MCNICHOLS is registered to vote and is an eligible elector of the State of Georgia and Jackson County and intends to vote in all upcoming elections for which she is eligible to vote.

210.   Plaintiff MCNICHOLS's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

211.   Plaintiff MCNICHOLS, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff MCNICHOLS will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

212.   Plaintiff MCNICHOLS, in her personal capacity as a voter and as she visits polling places in her role as a Jackson Board member, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

213.   Plaintiff MCNICHOLS, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the time within which to apply for absentee-by-mail ballots in the same manner as is alleged above for Plaintiff SHIRLEY.

### 7.   Plaintiff JACKSON COUNTY DEMOCRATIC COMMITTEE

214.   Plaintiff JCDC has the right under Georgia law to appoint two members of the Jackson County Board, who help protect the interests of JCDC's candidates and members and ensure transparent and accurate elections.

215.   Within the two election cycles preceding the date of filing of this Complaint, the SEB has conducted multiple investigations involving allegations of violations of the Georgia Election Code by the Jackson County Board.   The findings in these investigations, along with findings in other recent and pending cases, expose the Jackson County Board to the risk of immediate suspension or removal by the SEB at any time on the SEB's own motion.

216.   If the SEB follows through on its expressed intention to suspend or remove superintendents with existing violations, such as the Jackson County Board, Plaintiff JCDC:

- will be deprived of its current and future appointments to the Jackson County Board without any pre-deprivation due process right to notice and an opportunity to be heard;

79

- will be deprived of post-deprivation due process because SB202 only permits a corporate superintendent such as the Jackson County Board, and not appointers of the superintendent's constituent individual members, to petition for the superintendent's reinstatement;

- will be deprived of the due process benefits of local Acts and O.C.G.A. § 21–2–212(a), which together provide that members of the Jackson County Board are removable from office only for cause after notice and a hearing and only by the judge of the superior court; and

- will be deprived of its ability to participate in the public formulation of decisions by the public authority responsible for administering Jackson County elections since any appointee of the SEB, by virtue of being an individual, will be exempted from the transparency requirements of the Georgia Open Meetings Law.  Plaintiff JCDC has direct organizational standing to bring each of its claims for prospective declaratory and injunctive relief.

8.   **Plaintiff GEORGIA ADVANCING PROGRESS POLITICAL ACTION COMMITTEE**

217.   GEORGIA ADVANCING PROGRESS POLITICAL ACTION COMMITTEE ("GAPPAC") is a non-profit organization incorporated in 2017. GAPPAC is organized as a qualified state and local political organization pursuant to IRC Section 527 and Georgia's Ethics in Government Act.

218.   Plaintiff GAPPAC is a membership organization with the purpose of advancing the representation and advancement of Asian Americans and Pacific Islanders ("AAPI") to elected office in Georgia, and elected officials who advocate for AAPI issues.

219.   Plaintiff GAPPAC's members are concentrated in Gwinnett, Fulton, Cobb, DeKalb, and Forsyth Counties in Georgia.

220.   Plaintiff GAPPAC's members dedicate a significant portion of their volunteer efforts to help AAPI voters whose primary language is not English by translating voting and mail ballot instructions. GAPPAC also helps its members and others who are AAPI voters to properly and timely request and return mail ballots, which are popular with AAPI voters who may prefer to take their time to translate and study their ballot in their home, without the time pressure of a polling place.  GAPPAC also assists its members and others who are AAPI voters in curing mail ballots rejected by officials for discrepancies that may have been caused by the voter's misunderstanding of the instructions.

221.   Plaintiff GAPPAC prepares video and printed voter education materials in multiple languages to help its members and others who are AAPI voters to participate in the voting process.

222.   GAPPAC, acting on its own behalf, has direct organizational standing to bring each of its claims for prospective declaratory and injunctive relief.

223.   Plaintiff GAPPAC has diverted, and will continue diverting, organizational resources away from its other projects to counteract the Defendants' enforcement of SB202's unconstitutional provisions.

224.   Specifically, GAPPAC serves a community of voters that includes many fairly new voters and voters whose native language is not English. Massive changes in SB202's rules for voting, particularly the new dangerous threat of a felony accusation for seeing the touchscreen vote choices of other voters, requires significant and immediate diversion of resources for educational outreach to voters to explain the new rules and deadlines, and help voters understand how to try to participate and protect themselves from these wrongful threats, and from mail ballot disenfranchisement.  Such efforts must start immediately to address SB202's unconstitutional provisions, some of which will be in effect as early as May 24 when early voting begins for various June 15 elections.

225.   Educational efforts must include how to vote by mail under the new deadlines and how to take precautions to reduce the high risk of identity theft. Educational materials must be updated and produced in multiple languages. Additional funds must be raised to pay for these unplanned educational efforts. Such efforts are diverting GAPPAC resources from its day-to-day activities such as candidate and issue advocacy.   GAPPAC will also continue to divert resources to obtain legal advice relating to the preparation of the educational material and to

communications to the Gwinnett Board of Elections to urge it to protect voters from disenfranchisement because of SB202, and defend itself against takeover threats. GAPPAC management is diverting resources to contact potential vendors regarding determining the costs for the unplanned overhauling its educational materials required by the changes created by SB202.

226.   This litigation and the unanticipated voter education effort will divert resources from GAPPAC's planned core activities of recruiting AAPI candidates, campaigning for AAPI candidates, advocacy for GAPPAC's key issues, and helping new AAPI voters get registered to vote in anticipation of the upcoming November municipal elections and the 2022 midterm elections.

### 9.   **Plaintiff GRAHAM**

227.   Plaintiff GRAHAM in his role as the Chair of the Libertarian Party of Georgia ("LPG") recruits and appoints poll workers and mail ballot monitors who observe the conduct of elections across the State.  The primary focus of LPG in poll watching is voting system security, accuracy, and operations, as well as efforts to improve voter privacy.  LPG poll watchers and mail ballot monitors report to Plaintiff GRAHAM about observed election irregularities, election administration problems, ballot secrecy violations, and election security deficiencies.  Plaintiff Graham relies on these reports to inform what actions he must take as a Chair to protect the interests of the Libertarian Party in Georgia.  Plaintiff Graham intends

to continue to perform these activities in 2021 and in future elections to the extent permitted by law.

228.  Plaintiff GRAHAM is already being injured by SB202, as experienced poll watchers and mail ballot observers whom he has appointed in the past to observe election activities are expressing hesitancy to act as such observers because they fear allegations of "intentionally observing" displayed votes, leading to criminal prosecution.

229.  Plaintiff GRAHAM wishes to appoint experienced poll watchers and monitors for the upcoming June 15, 2021 elections, including the House District 34 election in Cobb County, in which there is a Libertarian candidate. Early voting for that election begins May 24, 2021, with mail ballot processing permitted to being on May 31, 2021.  Experienced poll watchers are hesitant and fearful of retribution from the Secretary of State, as many have previously publicly criticized the BMD voting system after observing for LPG in the polling places.

230.  Plaintiff GRAHAM wishes to appoint mail ballot monitors in upcoming elections, including the June 15, 2021 elections for which mail ballot processing begins May 24, 2021.  Monitors observe mail ballot processing to protect LPG's interest in fair elections and to protect the interests of its candidates, members and Georgia voters.  Such appointed monitors are threatened with injuries arising from SB202's prior restraints on their First Amendment right of

free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY. GRAHAM's efforts to appoint monitors is harmed by the threatened harm to the monitors.

231.   Plaintiff GRAHAM will be deprived of the information required to act on mail ballot processing problems or discrepancies because of restraints on his monitors' exercise of free speech.

232.   In his role as Chair of LPG it is important that Plaintiff GRAHAM be able to monitor the decision-making of the county election boards across the state. Upon the takeover of any county board of elections, Plaintiff GRAHAM will lose his ability to monitor the election management process on behalf of the LPG and to make informed decisions to protect the interests of the party, its candidates and its members.

233.   Plaintiff GRAHAM is a registered Fulton County voter.  Given the Defendants' stated intentions to suspend or remove superintendents like the Fulton County Board of Registration and Election ("the Fulton County Board"), Plaintiff GRAHAM is threatened with injury in the form of the deprivation of his right to attend and participate in public meetings of the Fulton County Board at which election administration and governance decisions for Fulton County voters will be decided.

234.   Plaintiff GRAHAM's Georgia driver's license and date of birth were disclosed to unknown person in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

235.   Plaintiff GRAHAM generally chooses to vote in person during early voting, and is now subject to the risk of felony allegations merely by glancing around the polling place.

236.   In the November 2020 general election, the Defendant Secretary of State permitted absentee ballot applicants to submit online applications that did not require pen and ink signatures but did require the applicant to provide a Georgia driver license number and date of birth. In other words, the Secretary conducted what was effectively a trial run of SB202's absentee ballot request provisions, requiring sensitive personal identifying information to be transmitted.

237.   In the November 2020 general election Plaintiff GRAHAM went to the Fulton County Metropolitan Library polling place during early voting and was told that records showed he had applied for and been issued a mail absentee ballot. Plaintiff GRAHAM had not done so and insisted on being able to vote in the polling place.  Officials gave him two choices—either not vote, or sign a form affidavit that stated (falsely) that he had requested an absentee ballot but wished to vote in person instead.  Plaintiff GRAHAM objected to being forced to sign a false

affidavit to exercise his fundamental right to vote.  Plaintiff GRAHAM has never been told why official records recorded him as requesting an absentee ballot.

238.   It is not known whether Plaintiff GRAHAM'S identity was stolen for purposes of obtaining a fraudulent mail ballot causing GRAHAM to be inaccurately told that he had requested a mail ballot. GRAHAM'S experience demonstrates the real threat of mail ballot identity theft when widely available identification numbers and dates of birth can be used to obtain a ballot.  Should he choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff GRAHAM will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process.  *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

### 10.   **Plaintiff MARTIN**

239.   Plaintiff MARTIN is registered to vote and is an eligible elector of the State of Georgia and Fulton County and intends to vote in all upcoming elections for which she is eligible to vote.

240.   Plaintiff MARTIN is a frequent poll watcher and mail ballot monitor appointed to that role by Plaintiff GRAHAM.  Plaintiff MARTIN routinely attends the Fulton County Board meetings, generally reviews the board materials available to the public, and frequently offers comments and recommendations during the

board's public comment period.  Plaintiff MARTIN has repeatedly filed formal

complaints or declarations in litigation regarding the failure to protect the secret

ballot and various election security violations. She has been publicly critical of the

secret ballot violations on local television news.[7]

241.   Within the 12 months preceding the date of filing of this Complaint,

the SEB has instituted investigations for election law violations (wrongly) alleged

to have been committed by Plaintiff MARTIN.  These baseless investigations show

the SEB's willingness to arbitrarily and unjustifiably abuse its powers to retaliate

against its critics, such as Plaintiff MARTIN.

242.   Plaintiff MARTIN, in her personal capacity as a voter, is threatened

with prosecution for the Elector Observation Felony in the same manner as is

alleged above for Plaintiff SHIRLEY.

243.   Plaintiff MARTIN will also be deterred from continuing poll

watching activity so long as she is at risk of being arbitrarily accused of a felony

for intentionally observing a voter's selections on the touchscreen voting machines.

244.   Plaintiff MARTIN will be deterred from continuing mail ballot

processing monitoring activities so long as she cannot report mail balloting

---

[7] https://www.11alive.com/article/news/georgia-voting-privacy/85-01f0e401-7864-46ec-9389-ac88323f6254  (last visited Apr. 29, 2021).

discrepancies or findings to anyone other than the superintendent, which makes the activities of little value.

245.   Plaintiff MARTIN will be deterred from continuing to monitor mail ballot processes so long as she can be accused of "estimating" or "attempting to estimate" any of the votes on absentee ballots cast" by any election official who dislikes her presence. O.C.G.A.§ 21–2–386(a)(2)(A); O.C.G.A. § 21–2–386(a)(2)(B)(vi).

246.   As both an election observer and a voter, Plaintiff MARTIN is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vii) (2021) in the same manner as is alleged above for Plaintiff SHIRLEY.

247.   Secretary RAFFENSPERGER has clearly indicated his desire to intervene in Fulton County's election administration, a goal echoed by members of the General Assembly in advocating for the passage of SB202.

248.   Given the Defendants' stated intentions to suspend or remove superintendents like the Fulton County Board, Plaintiff MARTIN is threatened with injury in the form of the deprivation of her right to attend and participate in public meetings of the Fulton County Board at which election administration and governance decisions for Fulton County voters will be decided.

249.   Plaintiff MARTIN's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

250.   Plaintiff MARTIN, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff MARTIN will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

251.   Plaintiff MARTIN, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY. MARTIN has repeatedly had problems obtaining a timely absentee ballot from Fulton County, despite properly applying weeks in advance. The narrowed window for application, and the inability to securely transmit applications electronically, makes it likely that MARTIN will be injured by an inability to obtain an absentee ballot, particularly in runoff elections, and will be forced to choose between voting in person with the associated risk of a felony accusation or not voting.

11.   **Plaintiff DUFORT**

252.   Plaintiff DUFORT is registered to vote and is an eligible elector of the State of Georgia and Morgan County and intends to vote in all upcoming elections for which she is eligible to vote.

253.   Plaintiff DUFORT is a Vice-Chair of the Morgan County Democratic Committee ("MCDC").  In this role, Plaintiff DUFORT recruits and supervises poll watchers and mail ballot monitors who observe the conduct of elections in Morgan County.  The MCDC's poll watchers and mail ballot monitors report to Plaintiff DUFORT about observed election irregularities, election administration problems, and election security deficiencies.

254.   Plaintiff DUFORT regularly attends the meetings of the Morgan County Board of Elections and Registration (the "Morgan County Board").  Plaintiff DUFORT generally reviews the board materials available to the public, and frequently offers comments and recommendations during the board's public comment period.  Plaintiff DUFORT personally knows each of the members of the Morgan County Board and often calls or meets with them to offer information and suggestions and to lodge objections to decision made by the Morgan County Board.

255.   Plaintiff DUFORT also routinely acts as a poll watcher and mail ballot monitor herself on behalf of the MCDC.  Plaintiff DUFORT has repeatedly

filed formal complaints or declarations in litigation regarding the failure to protect the secret ballot, and challenging various election security violations.

256.   Plaintiff DUFORT will be deterred from continuing poll watching activity so long as she is at risk of being accused of a felony for intentionally observing a voter's selections on the touchscreen voting machines.

257.   Plaintiff DUFORT will be deterred from continuing to monitor mail ballot processes so long as she can be accused of "estimating" or "attempting to estimate any of the votes on absentee ballots cast" by any election official who dislikes her presence. O.C.G.A.§ 21–2–386(2)(A); O.C.G.A. § 21–2–386(2)(B)(vi). These vague prohibitions constituting misdemeanors subject Plaintiff DUFORT to arbitrary enforcement in her role as a mail ballot monitor.

258.   Plaintiff DUFORT will be deterred from continuing mail ballot processing monitoring activities so long as she cannot report mail balloting discrepancies or findings to anyone other than the superintendent, which makes the activities of little value.

259.   Plaintiff DUFORT routinely serves on the mail ballot Vote Review Panel in Morgan County, a bi-partisan team that reviews mail ballots with vote marks not easily interpreted by the scanners. In that role, she has discovered and reported systemwide problems in scanner accuracy, resulting in some scanner improvement, but also ongoing litigation. The Gag Rule, making such reporting a

misdemeanor, will prohibit DUFORT from publicly reporting such problems in the future.

260.   The threat of criminal prosecution will impair Plaintiff DUFORT's ability to observe polling places and mail ballot processing and fulfill her responsibilities to recruit and appoint watchers and monitors on behalf of the Morgan County Democratic Committee.

261.   As both an election observer and a voter, Plaintiff DUFORT is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

262.   Plaintiff DUFORT, in her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

263.   Plaintiff DUFORT's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

264.   Plaintiff DUFORT, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should

she choose to vote absentee by mail, without a truly secure transmission method

for applications first being implemented by Defendant RAFFENSPERGER,

Plaintiff DUFORT will be compelled "to consent to the possibility of a profound

invasion of privacy when exercising the fundamental right to vote" in violation of

substantive due process.  *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

265.   Plaintiff DUFORT, in her personal capacity as a voter, is threatened

with injury arising from SB202's restriction of the window for absentee-by-mail

ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

266.   Plaintiff DUFORT is a frequently requested speaker for organizations

focused on voting rights, voter education, and election security. In her role as an

active member of CGG, she frequently speaks on behalf of CGG on these topics.

After the enactment of SB202, she has had to divert her volunteer time from other

CGG activities to devote to education and litigation efforts related to SB202,

creating injury to CGG's planned activities.   Such planned but now deferred CGG

activities include reviewing the accuracy of the tabulation of Morgan County

scanned ballot images in the 2020 elections, drafting proposed election rules for

CGG's SEB rule-making advocacy efforts, analyzing county election cost

increases related to the BMD voting system, and fundraising for CGG.

12.   **Plaintiff NAKAMURA**

267.   Plaintiff NAKAMURA is registered to vote and is an eligible elector of the State of Georgia and Fulton County and intends to vote in all upcoming elections for which she is eligible to vote

268.   Plaintiff NAKAMURA is frequently appointed by Plaintiff GRAHAM as a poll watcher and mail ballot monitor and has repeatedly filed formal complaints or declarations in litigation regarding the failure to protect the secret ballot and various election security violations. She has been publicly critical of the secret ballot violations in her public comments at SEB meetings and Fulton County Board of Elections meetings.

269.   Plaintiff NAKAMURA does not intend to continue poll watching activity so long as she is at risk of being accused of a felonious act of intentionally observing a voter's selections on the touchscreen voting machines.

270.   Plaintiff NAKAMURA does not intend to continue mail ballot processing monitoring activities so long as she cannot report mail balloting discrepancies or findings to anyone other than the superintendent, which makes the activities of little value.

271.   Plaintiff NAKAMURA does not intend to continue to monitor mail ballot processes so long as she can be accused of the misdemeanor of "estimating"

or "attempting to estimate any of the votes on absentee ballots cast" in violation of O.C.G.A. §21-2-386(2)(B)(vi).

272.   Given the high risk of SEB takeover of the Fulton County Board, Plaintiff NAKAMURA risks losing her right, which she frequently exercises, to monitor and participate in the Fulton County Board's public meetings to personally and on behalf of CGG advocate for fair, secure and transparent elections.

273.   As both an election observer and a voter, Plaintiff NAKAMURA is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

274.   Plaintiff NAKAMURA, in her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

275.   Plaintiff NAKAMURA's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

276.   Plaintiff NAKAMURA, in her personal capacity as a voter, is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY.

Should she choose to vote absentee by mail, without a truly secure transmission

method for applications first being implemented by Defendant

RAFFENSPERGER, Plaintiff NAKAMURA will be compelled "to consent to the

possibility of a profound invasion of privacy when exercising the fundamental

right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988

F.2d 1344, 1354 (4th Cir. 1993)

277.   Plaintiff NAKAMURA, in her personal capacity as a voter, is

threatened with injury arising from SB202's restriction of the window for

absentee-by-mail ballot applications in the same manner as is alleged above for

Plaintiff SHIRLEY.  NAKAMURA has repeatedly had problems obtaining a

timely absentee ballot from Fulton County, despite properly applying weeks in

advance. The narrowed window for application, and the inability to securely

transmit applications electronically, makes it likely that NAKAMURA will be

injured by an inability to obtain an absentee ballot, particularly in runoff elections,

and will be forced to choose between voting in person with the associated risk of a

felony accusation or not voting.

278.   Plaintiff NAKAMURA has not, to her knowledge, ever contracted

COVID-19.  Because of chronic health conditions she remains at substantial risk of

doing so, particularly in the case of variant surge, in which case she will be

required to quarantine herself immediately. The same is true of surges in influenza

or other communicable diseases. If this happens during the eleven days prior to an election, Plaintiff NAKAMURA will be unable to vote in person and will be rendered unable to vote altogether because SB202 prohibits voters from obtaining an absentee ballot during the eleven or more days prior to election day, taking into account that email applications without a secure transmission option will require application at least two weeks prior to election day.

13.   **Plaintiff THROOP**

279.   Plaintiff THROOP is registered to vote and is an eligible elector of the State of Georgia and Fulton County and intends to vote in all upcoming elections for which she is eligible to vote.

280.   Plaintiff THROOP is frequently appointed by Plaintiff GRAHAM as a poll watcher and mail ballot monitor and has repeatedly filed formal complaints or declarations in litigation regarding the failure to protect the secret ballot and challenging various election security violations.

281.   Plaintiff THROOP routinely attends the meetings of the DeKalb County Board of Elections and Registration (the "DeKalb County Board").   She reviews the public materials and interacts with board members to offer suggestions and options, or to lodge objections to policies that fail to secure DeKalb's elections or ensure fair access to the polls.

282.   Plaintiff THROOP does not intend to continue poll watching activity so long as she is at risk of being accused of a felonious act of intentionally observing a voter's selections on the touchscreen voting machines.  Plaintiff THROOP, in her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

326.   Plaintiff THROOP does not intend to continue mail ballot processing monitoring activities so long as she cannot report mail balloting discrepancies or findings to anyone other than the superintendent, which makes the activities of little value.

327.   Plaintiff THROOP does not intend to continue to monitor mail ballot processes so long as she can be accused of the misdemeanor of "estimating" or "attempting to estimate any of the votes on absentee ballots cast." (O.C.G.A. §21-2-386(2)(B)(vi).

328.   As both an election observer and a voter, Plaintiff THROOP is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

329.   Secretary Raffensperger announced his view that DeKalb performed in an "unacceptable" way in June 2020 and opened an investigation into the DeKalb County Board's conduct of the election. The SEB had 6 pending DeKalb cases and investigations as of the April 28, 2021 SEB meeting, and was investigating 137 cases of alleged double voting in DeKalb's June and August 2020 elections

330.   Given the high risk of SEB takeover of the Dekalb County Board, Plaintiff THROOP, as a DeKalb County voter, is subject to losing the right she frequently exercises to monitor and participate in the DeKalb County Board's public meetings to personally to advocate for fair, secure and transparent elections.

329.   Plaintiff THROOP 's Georgia driver's license number and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server in 2016 and 2017.

330.   Plaintiff THROOP is threatened with a substantial risk that her ballot—and thus her right to vote—will be stolen from her in the same manner as is alleged above for Plaintiff SHIRLEY. Should she choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff THROOP will be compelled "to consent to the possibility of a profound invasion of privacy when

exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

331.   Plaintiff THROOP, in her personal capacity as a voter, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff SHIRLEY.

332.   Plaintiff THROOP is an active volunteer for CGG and often undertakes graphic design projects for CGG's educational materials.  After the enactment of SB202, she has had to divert her volunteer time from other CGG activities, such as assisting in the updating of CGG's website, to prepare CGG educational materials for Georgia election officials relating to the challenged provisions of SB202, to meet with concerned citizens to explain the local impact of SB202, and to help organize this lawsuit.

### 14.   **Plaintiff FRIEDMAN**

283.   Plaintiff FRIEDMAN, a journalist, will be injured by SB202's prior restraints on his First Amendment right of free speech and freedom of the press which is imposed under penalty of misdemeanor by the Gag Rule, O.C.G.A. § 21–2–386(a)(2)(B)(ii) and (vii) (2021), and Photography Ban, O.C.G.A. §21-2-568(a).

284.   Under SB202, FRIEDMAN be prohibited from reporting mail balloting discrepancies or security concerns that he or The BRAD BLOG or the BradCast journalists may personally observe as members of the press.

285.   In addition, Plaintiff FRIEDMAN will be injured because the party-appointed observers he has relied on to supply first-hand accounts, such as Plaintiff DUFORT, are prohibited under penalty of misdemeanor from reporting their observations to Plaintiff FRIEDMAN.

286.   The enforcement of the Photography Ban will prohibit Plaintiff FRIEDMAN and his associates from bringing photographic equipment into the mail ballot processing operation, a traditional place from which press photographers and reporters document the process of the election.

287.   In recent elections, thousands of press photos were widely published of anonymous voted mail ballots from the mail ballot workrooms and audit rooms in Fulton County, and video recorded interviews were conducted with officials while at work in those rooms.

288.   Plaintiff FRIEDMAN and field reporters he would otherwise engage will be deterred from observing or photographing polling place activity so long as reporters are at risk of being accused of a felony for observing a voter's selections on the touchscreen voting machines.

289.   Plaintiff FRIEDMAN will be deterred from monitoring mail ballot processes so long as reporters can be accused of the misdemeanors of "estimating" or "attempting to estimate any of the votes on absentee ballots cast" by any election official.   O.C.G.A.§ 21–2–386(2)(A); O.C.G.A. § 21–2–386(2)(B)(vi).

290.   Plaintiff FRIEDMAN is already injured by SB202 because the criminalization of constitutionally protected activity has a chilling effect on his exercise of First Amendment rights.

291.   Plaintiff FRIEDMAN is threatened with injuries arising from SB202's prior restraints on his First Amendment right of free speech and right of freedom of the press.

### C.   Plaintiff CGG's Associational Standing

#### 1.   Elements of CGG's Associational Standing

333.   At least one of CGG's members has standing to sue each Defendant on each of CGG's claim in the member's own right.

334.   The interests CGG seeks to protect are germane to CGG's organizational purpose.

335.   The prospective injunctive and declaratory relief requested by CGG does not require the participation of CGG's individual members in this lawsuit.

## 2.   Individual Standing of Plaintiff Members of CGG

336.   Plaintiffs GRAHAM, DUFORT, NAKAMURA, THROOP, LANG, SHIRLEY, PULLAR, THOMAS-CLARK, MCNICHOLS, and MARTIN are members of Plaintiff CGG who have standing to sue in their own right due to their threatened injuries-in-fact alleged above.

337.   Within the 12 months preceding the date of filing of this Complaint, the SEB and Defendant RAFFENSPERGER have conducted investigations for election law violations alleged to have been committed by Plaintiff CGG's executive director, by CGG board member Plaintiff MARTIN, and by an expert witness who has testified in Court proceedings at Plaintiff CGG's request.  The strained allegations in these investigations smack of retaliation for CGG's litigation activities against the SEB related to election security and voter privacy. Because of this recent history of baseless investigations and enforcement proceedings against Plaintiff CGG's members, Plaintiff CGG's members have reasonable fears that the new, stronger criminal prohibitions established by SB202 will be invoked by the Defendant Secretary and SEB to harass and intimidate Plaintiff CGG's members to discourage their activities that scrutinize the voting system and election procedures.

### 3.   Individual Standing of Non-Plaintiff Members of CGG

338.   Plaintiff CGG has numerous members who not named as Plaintiffs in this litigation but who are registered Fulton County and DeKalb County voters. Given the Defendants' stated intentions to suspend or remove superintendents like the Fulton and DeKalb County Boards, Plaintiff CGG's members who are Fulton and DeKalb County voters are threatened with injury in the form of the deprivation of their right to attend and participate in public meetings of the Fulton County Board and the DeKalb County Board at which election administration and governance decisions for Fulton County and DeKalb County voters will be decided.

339.   Each of CGG's members who is a registered voter is threatened with injuries arising from SB202's prior restraints on their First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

340.   Each of CGG's members who is a registered Georgia voter, in his or her personal capacity as a voter, if they chose to or are forced to vote in person, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

341.   Each of CGG's members who is a registered voter and whose personal information has been exposed as a result of the Secretary of State's data security failures is threatened with a substantial risk that his or her ballot—and thus his or her right to vote—will be stolen in the same manner as is alleged above for Plaintiff SHIRLEY. Should its members choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff CGG's members will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

342.   Each of CGG's members who is a registered Georgia voter and who wishes to vote in person, but experiences unforeseen medical or employment demands in the 11 days prior to election day causing then to be absent from the polls, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA

343.   Each of CGG's members who is a registered Georgia voter and who is vulnerable to contracting COVID-19, or to being exposed to someone with COVID-19, is threatened with injury arising from SB202's restriction of the

window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

344.   Each of CGG's members who are registered electors in counties with a separately operating board of registration is threatened with injury arising from SB202's grant of authority to the SEB to remove the board of registration without cause and without the ability to appoint a replacement registrar in the same manner as is alleged above for Plaintiff LANG.

345.   Plaintiff CGG has members who desire to exercise their constitutional right to cast an absolutely secret ballot, which is generally unavailable in the polling places where BMDs are used and wish to vote a secret ballot by absentee ballot.

346.   Plaintiff CGG has members who desire to vote in special June 15, 2021 vacancy elections and will avoid going to the polling place because of the risk of wrongfully being accused of a felony.

347.   Plaintiff CGG has at least one member who is a candidate in the House District 34 special election on June 15, 2021 and is concerned about intimidation of supporters because of the risk of being accused of the felony of observing touchscreen displays.

348.    Plaintiff CGG has elderly members who find it physically necessary to vote by absentee mail ballot because of the difficulty of travel to polling places,

standing in polling place lines, and using the polling place equipment.  They are faced with the threat of innocently seeing votes on a touchscreen and being charged with a felony.   If these members do not receive an automatic roll-over ballot, these members will be unable to obtain a mail ballot for a state office runoff because the deadline for an absentee mail ballot application occurs on the same day that the need for a state runoff is determined, providing no reasonable window for requesting a mail ballot.

349.   Plaintiff CGG has at least one member who is a student at an out-of-state university. She and similarly situated students will be unable to vote by absentee mail ballot in state office runoff elections because the deadline for the ballot application occurs on the same day that the related election is certified and the need for the runoff election is determined. Even when the runoff is announced earlier, given the requirement to mail or deliver a ballot application in person (until a secure electronic transmission method is available), students in distant states will be unable to apply by mail before the 11-day deadline.

350.   Plaintiff CGG has a number of members who have routinely applied for absentee ballots by submitting their applications via email to assure prompt delivery of their application. Until the Secretary of State's secure transmission method can be developed and installed, the members will have even less time to submit a timely application. The secure transmission method is essential given the

new requirements that the voter submit driver's license numbers and full date of birth on the application. Without a truly secure transmission method being implemented, members who seek to vote absentee by mail will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993).

351.   Plaintiff CGG has a number of members whose health is impaired because of immune system diseases making them particularly susceptible to health risks during the current pandemic conditions. For many of CGG's members with such health conditions, a reliable, secure, and timely system of mail balloting is essential to their exercise of the franchise.

352.   Plaintiff CGG has a number of members whose Georgia driver's license numbers and dates of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server that occurred in 2016 and 2017.

353.   Plaintiff CGG has a number of members who have been publicly protesting the enactment of SB202 and have been actively involved in seeking SB202 sponsor Representative Barry Fleming's removal as county or city attorney in certain jurisdictions that he represents. These members now face the likely increased risk of being investigated for the felony act of "intentionally" observing

others' votes on the oversized touchscreens when they vote in the polling place. Several members, some of them African American, now fear entering the polling place to vote, for fear that another voter, official, or observer seeking retribution may falsely allege intentional observation---an allegation against which the voter cannot defend.

354.   Plaintiff CGG has members who are voters in counties with separate boards of registration subject to removal without cause and risk the loss of functioning voter registration and absentee balloting activities.

355.   Plaintiff CGG has several members including officers, who regularly act as poll watchers and mail ballot processing observers on behalf of political parties or candidates. As such, they have submitted multiple declarations detailing election discrepancies and security issues to the Court in other cases and provided public comment in such cases. These members, like the members who have protested SB202 and fear retribution, are also concerned about targeted enforcement of the punitive law, fearing that they may be charged with felonies for simply looking toward the machines in conjunction with their duties to watch for tampering and machine malfunctions. Member poll watchers expect that the risk of alleged felonies will cause them to curtail their volunteer poll-watching duties.

356. Because of the foregoing threatened injuries, each of CGG's members described above would have standing to sue in their own right.

### D.   Plaintiff JCDC's Associational Standing

#### 1.   Elements of JCDC's Associational Standing

357. At least one of JCDC's members has standing to sue each Defendant on each of JCDC's claim in the member's own right.

358. The interests JCDC seeks to protect are germane to JCDC's organizational purpose.

359. The prospective injunctive and declaratory relief requested by JCDC does not require the participation of JCDC's individual members in this lawsuit.

#### 2.   Individual Standing of Plaintiff Members of JCDC

360. Plaintiff MCNICHOLS is a member of Plaintiff JCDC who has standing to sue in her own right due to her threatened injuries-in-fact alleged above.

#### 3.   Individual Standing of Non-Plaintiff Members of JCDC

361. Plaintiff JCDC has numerous members who not named as Plaintiffs in this litigation but who are registered Georgia and Jackson County voters.

362. Each of JCDC's members who is a registered voter is threatened with injuries arising from SB202's prior restraints on her First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(2)(B)(vi) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

363.   Each of JCDC's members who is a registered voter, in his or her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

364.   Each of JCDC's members who is a registered voter and whose personal information has been exposed as a result of the Secretary of State's data security failures is threatened with a substantial risk that his or her ballot—and thus his or her right to vote—will be stolen in the same manner as is alleged above for Plaintiff SHIRLEY. Should its members choose to vote absentee by mail, without a truly secure transmission method for applications first being implemented by Defendant RAFFENSPERGER, Plaintiff JCDC's members will be compelled "to consent to the possibility of a profound invasion of privacy when exercising the fundamental right to vote" in violation of substantive due process. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)

365.   Each of JCDC's members who is a registered Georgia voter and who wishes to vote in person, but experiences unforeseen medical or employment demands in the 11 days prior to election day causing then to be absent from the polls, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

366. Each of JCDC's members who is a registered voter and who is vulnerable to contracting COVID-19, or to being exposed to someone with COVID-19, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

367. Members of Plaintiff JCDC, including its Chairman, Larry "Pete" Fuller, frequently attend the meetings of the Jackson County Board, review the board meeting materials, and take advantage of the public comment period to advocate for the JCDC's policy positions or to raise concerns about discrepancies and problem areas, including unlawful efforts to remove eligible voters from the voter rolls.

368. Plaintiff JCDC has members whose Georgia driver's license and date of birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's election server in 2016 and 2017.

369. Plaintiff JCDC appoints poll watchers and who observe the conduct of elections in Jackson County. In addition, Chairman Fuller routinely visits polling places on behalf of the JCDC to ensure that any problems are reported to the Jackson County Board. Chairman Fuller and JCDC's appointed watchers are threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

370.   Plaintiff JCDC has individual voter members who will be threatened with, and intimidated by, the allegation of the felonious activity of "intentionally observing" a display screen.

371.   Plaintiff JCDC's ability to appoint poll watchers given the threat of the allegation of felonious observation while poll watching will undoubtedly have a chilling effect on the recruitment of watchers, impairing JCDC's ability to protect its members and candidates interests by monitoring polling places.

372.   Plaintiff JCDC's has the right to appoint mail ballot monitors to observe mail ballot processing to protect JCDC's interest in fair elections and to protect the interests of its candidates, members and Jackson County voters.  Such appointed monitors are threatened with injuries arising from SB202's prior restraints on their First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(a)(2)(B)(vi) and (vii) (2021) in the same manner as is alleged above for Plaintiff SHIRLEY.

373.   Plaintiff JCDC will be deprived of the information required to act on mail ballot processing problems or discrepancies because of its monitors' restraints on free speech.

374.   Plaintiff JCDC anticipates experiencing difficulty recruiting mail ballot monitors because of SB202's prohibition on monitors reporting problems or discrepancies to JCDC.

375. Plaintiff JCDC's members are threatened with injury arising from SB202's restriction of the time within which to apply for absentee-by-mail ballots, including for a runoff, in the same manner as is alleged above for Plaintiff SHIRLEY.

376. SB202's restriction of time to apply for mail ballots, and the impossibility of doing so in certain runoffs, creates injury to JCDC's efforts to inform its voters of the complex rules, and to help get its candidates elected.

377. Plaintiff JCDC's resources are being diverted from its day-to-day operating activities and advocacy for its candidates to engage in this legal action to protect its interests. Further, JCDC is diverting resources and will continue to do so to educate its voters on the complex changes in the law that will impact how and when they vote. Resources will be required to be diverted to attempt to explore mitigating strategies to the voter intimidation that is certain to be experienced because of the threat of felony allegations for observing display screens in the polling place.

378. Because of the foregoing threatened injuries, each of JCDC's members described above would have standing to sue in their own right.

### E.     Plaintiff GAPPAC's Associational Standing

#### 1.     Elements of GAPPAC's Associational Standing

379.   At least one of GAPPAC's members has standing to sue each Defendant on each of GAPPAC's claim in the member's own right.

380.   The interests GAPPAC seeks to protect are germane to GAPPAC's organizational purpose.

381.   The prospective injunctive and declaratory relief requested by GAPPAC does not require the participation of GAPPAC's individual members in this lawsuit.

#### 2.     Individual Standing of Plaintiff Members of GAPPAC

382.   Plaintiff NAKAMURA is a member of Plaintiff GAPPAC who has standing to sue in her own right due to her threatened injuries-in-fact alleged above.

#### 3.     Individual Standing of Non-Plaintiff Members of GAPPAC

383.   Plaintiff GAPPAC has numerous members who are not named as Plaintiffs in this litigation but who are registered Gwinnett and Fulton County voters.  Given the Defendants' stated intentions to suspend or remove superintendents like the Fulton County Board, Plaintiff GAPPAC's members who are Fulton County voters are threatened with injury in the form of the deprivation of their right to attend and participate in public meetings of the Fulton County

Board at which election administration and governance decisions for Fulton County voters will be made.

384.   Each of GAPPAC's members who is a registered voter is threatened with injuries arising from SB202's prior restraints on their First Amendment right of free speech and right to petition the government under O.C.G.A. § 21–2–386(2)(B)(vii) (2021) and (vii) in the same manner as is alleged above for Plaintiff SHIRLEY.

385.   Each of GAPPAC's members who is a registered voter, in his or her personal capacity as a voter, is threatened with prosecution for the Elector Observation Felony in the same manner as is alleged above for Plaintiff SHIRLEY.

386.   Each of GAPPAC's members who is a registered voter and whose personal information has been exposed as a result of the Secretary of State's data security failures is threatened with a substantial risk that his or her ballot—and thus his or her right to vote—will be stolen in the same manner as is alleged above for Plaintiff SHIRLEY.

387.   Each of GAPPAC's members who is a registered voter and who is vulnerable to contracting COVID-19, or to being exposed to someone with COVID-19, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

388.   Each of GAPPAC's members who is a registered Georgia voter and who wishes to vote in person, but experiences unforeseen medical or employment demands in the 11 days prior to election day causing then to be absent from the polls, is threatened with injury arising from SB202's restriction of the window for absentee-by-mail ballot applications in the same manner as is alleged above for Plaintiff NAKAMURA.

389.   Plaintiff GAPPAC has a number of members whose Georgia Driver's License numbers and Dates of Birth were disclosed to unknown persons in repeated breaches of the Georgia Secretary of State's elections server that occurred in 2016 and 2017.

390.   Plaintiff GAPPAC has members who are frightened to go to the polling place because of the threat of purposely false and menacing felony allegations against them as Asian Americans, alleging that they "intentionally observed" another voters' touchscreen machine.

391.   GAPPAC, acting on behalf of members who are threatened with imminent injury-in-fact and who would have standing in their own right, has associational standing to bring each of its claims for prospective declaratory and injunctive relief.

392.   Because of the foregoing threatened injuries, each of GAPPAC's members described above would have standing to sue in their own right.

### F.   Causation

393.   Each of the foregoing threatened injuries-in-fact to the Plaintiffs alleged for purposes of standing is occurring, or is likely to occur, because and as a result of the Defendants' intended enforcement of SB202's unconstitutional provisions.

### G.   Redressability

394.   Each of the foregoing threatened injuries-in-fact to the Plaintiffs alleged for purposes of standing will be, or is likely to be, avoided in whole or in part if the Plaintiffs are granted the prospective declaratory and injunctive relief requested by this Complaint.

### H.   Actual Controversy (Declaratory Relief)

395.   Each of the foregoing threatened injuries-in-fact to the Plaintiffs alleged for purposes of standing establishes the existence of a substantial continuing controversy between Plaintiffs and Defendants, who have adverse legal interests.  Each of the threatened injuries-in-fact is sufficient to entitle the Plaintiff who is threatened by it to seek and obtain declaratory judgment pursuant to 28 U.S.C. § 2201.

## VII.   CLAIMS

396.   As used in the following counts, the "Board Member Plaintiffs" are Plaintiffs LANG, PULLAR, MCNICHOLS, SHIRLEY AND THOMAS-CLARK; the "Voter Plaintiffs" are the Board Member Plaintiffs and Plaintiffs CGG, JCDC, GAPPAC, GRAHAM, MARTIN, DUFORT, NAKAMURA, and THROOP.

### A.   TAKEOVER PROVISION CLAIMS

### COUNT I

**Violations of Procedural Due Process
(U.S. Const. Amend. XIV)**

**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

**(The Board Member Plaintiffs against All Defendants)**

397.   The foregoing Paragraphs 1 to 396 are incorporated and restated here.

398.   The Board Member Plaintiffs are members of county boards which are "superintendents" under Georgia law.

399.   The Board Member Plaintiffs have protected property and liberty interests in their tenure as members of the county boards.

400.   SB202's Takeover Provisions violate the Board Member Plaintiffs' rights under the procedural protections of the Fourteenth Amendment Due Process Clause of the U.S. Constitution because the Takeover Provisions, among other things:

- do not provide superintendent board members with the constitutional minima of predeprivation notice and hearing prior to the removal of the superintendent board members from office;

- do not provide superintendent board members in their individual capacities with any postdeprivation remedy for obtaining reinstatement to office after a removal;

- do not provide the superintendent board members acting through their county boards with any meaningful postdeprivation remedy for obtaining reinstatement because organizations that are parties to administrative hearings and superior court proceedings must be represented by counsel, but the Takeover Provisions bar any county board from engaging or paying for any counsel to represent them.

401.  SB202 also violates procedural due process in that it allows the SEB to remove board members, like the Board Member Plaintiffs, based upon the action or inaction of other current board members, or other former board members, and not upon the action or inaction of the board members themselves.

402.  County board members like the Board Member Plaintiffs are entitled, at a bare minimum, prior to any deprivation of their liberty and any property interests in their public office, to adequate notice of the grounds for suspension or removal, the right to be heard in a full public hearing and to address the merits of

the issues presented to an impartial tribunal, written findings based on substantial evidence of their own action or inaction, judicial review, meaningful rights to appeal, and the right to engage counsel at their employer county's expense.

403.   County board members like the Board Member Plaintiffs are also entitled to a postdeprivation remedy, including adequate notice, the right to be heard in a public hearing and to address the merits of the issues presented, written findings based on substantial evidence of their own action or inaction, judicial review, and the right to engage counsel at their employer county's expense.

404.   The Board Member Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

405.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Board Member Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Board Member Plaintiffs that entitles the Board Member Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Board Member Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT II
## Violations of Substantive Due Process
## (U.S. Const. Amend. XIV)

## 42 U.S.C. § 1983 and 28 U.S.C. § 2201

## (The Board Member Plaintiffs and the Voter Plaintiffs against All Defendants)

406.   The foregoing Paragraphs 1 to 396 are incorporated and restated here.

407.   Violations of state statutes or constitutional laws implicating the very integrity of the electoral process constitute a denial of substantive due process under the Fourteenth Amendment to the U.S. Constitution.

408.   The Takeover Provisions constitute a delegation of legislative functions to the executive in violation of the Separation of Powers Clause of the Georgia Constitution, Ga. Const. Art. I, § II, Para. III.

409.   Under Georgia law, the Georgia General Assembly has the authority to determine the election management body for each of Georgia's 159 counties by local acts.   O.C.G.A. § 21-2-40.  Pursuant to this authority, the General Assembly has in 127 counties created three to five member boards of elections, or boards of election and registration, as the "superintendents."  In the remaining 32 counties, by default, the county probate judge is the superintendent, and a board of registration conducts voter registration the issuance of absentee ballots.  O.C.G.A. §§ 21-2-212, 21-2-35(A).

410.   To change the election management body for a particular county, the General Assembly must pass a new local act amending the prior law.

411.   Determining the election management body for a county is a legislative function, belonging solely to the General Assembly.

412.   Although determining the election management body for a particular county is a legislative function, the Takeover Provisions grant to the SEB the power to determine and change the election management body for any of Georgia's 159 counties. Unlike the legislative process, in the SEB's takeover process changing the election management body, citizens are afforded little notice of such an important and drastic change and are granted no rights to participate in the public hearing.  Under the Takeover Provisions, the SEB may exercise this power by making an unreviewable finding that a county or municipal superintendent has "committed at least three violations" of Georgia's election laws *or* the State Election Board Rules, regardless of the materiality of the law allegedly violated or the circumstances of their alleged violation.  Thus, when it is exercising its power to appoint a replacement supervisor for a county superintendent, the SEB is exercising the functions of the legislature, in contravention of the Separation of Powers Clause of the Georgia Constitution.

124

413.   SB202 allows the SEB to takeover a county election superintendent upon a finding of three violation of Election Board Rules, which include minor offenses, as examples, the following:

- failure to print an individual badge for each poll watcher. Rule 183-1-13-.04;

- failure to swear in voting system programmers. Rule 183-1-12-.17;

- failure to conduct an hourly sweep of each voting station to find any unauthorized materials left behind. Rule 183-1-12-.11(3));

- equipment storage room exceeded 80% humidity on rainy day. Rule 183-1-12-.04(2).

414.   The threshold for triggering the SEB's power to replace a county election superintendent is so low that the SEB for all practical purposes has the power to select whatever counties it wants to take over and to rapidly change and remove the entire election management body of any county in Georgia at will.

415.   In addition, the SEB is itself empowered to make the very Election Rules, the violation of which triggers the SEB's power to exercise its (executive) enforcement functions.   This too constitutes an unconstitutional delegation to the SEB of legislative power and a prohibited conflation of executive and legislative functions.

416.   SB202 further gives the SEB the power to select any county that has a separate board of registration and remove such a board for no reason, with no

provision for the appointment of a substitute board of registration, which would shut down voter registration and stop the issuance of absentee ballots.  Granting the power to the State Election Board to effectively halt voter registration, registration changes, and absentee balloting is a power that the General Assembly does not have and certainly may not delegate.

417.   Giving those in control of the State Government the power, through the SEB, to select the county election superintendents and remove (but not replace) boards of registrars threatens the very integrity of the electoral process in Georgia. The SEB's appointee, who will not be accountable to anyone, will have the power to make many decisions that can influence citizens' access to the polls and the outcome of an election.   For example, the appointee will have the power to determine how many early and election day polling places there will be, where they will be located, how much voting equipment to allocate to each site, whether the county will offer Sunday voting or extended early voting hours, and how each polling place will be staffed.  In addition, the appointee will have the power to determine which mail ballots to reject for arriving too late, and which provisional ballots to count, and, ultimately, whether to certify the election results. Appointees replacing a combined board of registration and elections will have the unilateral power to hear and decide challenges to voter eligibility, a duty heretofore carefully

delegated to a public body required to conduct deliberative public hearings on such challenges.

418.   Because delegating this power to the SEB violates the Separation of Powers Clause of the Georgia Constitution and implicates the very integrity of the electoral process, the Takeover Provisions constitute a denial of substantive due process under the Fourteenth Amendment to the U.S. Constitution.

419.   The Takeover Provisions also violate Article II, Section 1, Paragraph II of the Georgia Constitution, which provides: "The General Assembly shall provide by law for the registration of voters."

420.   As discussed above, the Takeover Provisions allow the SEB to *remove* a board of registration but do not provide any mechanism for the SEB (or anyone else) to *replace* a board of registration.  The Takeover Provisions thus give the SEB the power to *stop* the registration of voters in a particular county by removing the board of registrars, rather than providing for the registration of voters, as the Georgia Constitution requires.

421.   Plaintiffs, as residents of counties where the local superintendent is at substantial risk of being targeted by Defendants' invocation of the Takeover Provisions, are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

422.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the substantial risk that Plaintiffs' local superintendent will be targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

### B.   INDIVIDUAL FEDERAL CLAIMS

### COUNT III

**Violations of Substantive Due Process
& Fundamental Right to Vote
(U.S. Const. Amend. XIV)**

**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

**(Voter Plaintiffs against All Defendants)**

423.   The foregoing Paragraphs 1 to 396 and 407 to 422 are incorporated and restated here.

424.   In counties where boards of registration are separate from boards of election, boards of registration handle absentee ballot issuance, application acceptance, ballot issuance, and ballot acceptance, and then turn the accepted absentee ballots over to the election superintendent for counting.

425.   By permitting the SEB to remove, but not replace, boards of registration, the Takeover Provisions give the SEB the power to disenfranchise voters who, in good faith reliance upon Georgia laws providing for absentee voting, decide to vote absentee in a county where the SEB has decided to remove, but cannot replace, the board of registration.

426.   The Takeover Provisions allowing the SEB to remove, but not replace, a board of registration violate the fundamental right to vote that is protected by the substantive application of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by imposing a burden on voting that is not justified by any sufficiently weighty government interest.

427.   These provisions of SB202 are unconstitutional on their face and as applied to the Voter Plaintiffs.

428.   The Voter Plaintiffs, as residents of counties where the local superintendent is at substantial risk of being targeted by Defendants' invocation of the Takeover Provisions, are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

429.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the substantial risk that Plaintiffs' local superintendent will be targeted by such enforcement, creates an actual controversy between

Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

WHEREFORE, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT IV

### Violations of Substantive Due Process & Fundamental Right to Vote (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (Voter Plaintiffs against All Defendants)

430.  The foregoing Paragraphs 1 to 396 are incorporated and restated here.

431.  SB202's "Elector Observation Felony" provision makes it a felony to "intentionally observe an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting." O.C.G.A. § 21–2–568.1 (2021).

432.   Given the large size of the Dominion BMD touchscreens, and small size of many polling places, it is frequently not possible to vote in person without appearing to commit this felony.

433.  Figure 4 is a true and correct photograph of the inside of the Gwinnett Elections Office polling place in Gwinnett County, Georgia, taken in early voting in the March 2020, Presidential Primary.



**Figure 4.  Gwinnett Elections Office Polling Place**

434.   Figure 5 is a true and correct photograph taken by an Atlanta Journal Constitution photographer of the inside of the Cartersville polling place, in Cartersville, Georgia, taken in early voting in October 2019, during the November 2019 election.



**Figure 5.  Cartersville, Georgia Polling Place**

435.   Figure 6 is a true and correct photograph of the inside of the State

Farm Arena polling place in Fulton County, Georgia, taken in October 2020,

during early voting for the General Election.



People cast their ballots during early voting for the presidential elections at State Farm Arena in Atlanta, Ga., October 12, 2020.

(Chris Aluka Berry/Reuters)

**Figure 6.  State Farm Arena**

436.   Any of the thousands of voters who entered these polling place to vote could have been charged with the felony of "intentionally observ[ing] an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting." *Id.* Had the Elector Observation Felony Provision been in effect, they could not have voted in these polling places without a substantial risk of arrest.

437.   Had the Elector Observation Felony Provision been in effect, dozens of members of the press and hundreds of poll workers could also have charged with a felony merely by entering these polling places.

438.   The Elector Observation Felony Provision violates the fundamental right to vote that is protected by the substantive application of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by imposing a burden on voting that is not justified by any sufficiently weighty government interest.

439.   The Elector Observation Felony Provision is unconstitutional on its face and as applied to the Voter Plaintiffs.

440.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

441.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

### COUNT V

**Violation of Due Process – Void for Vagueness
(U.S. Const. Amend. XIV)**

**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

**(Voter Plaintiffs against All Defendants)**

442.   The foregoing Paragraphs 1 to 396 and 431 to 441 are incorporated and restated here.

443.   SB202's Elector Observation Felony provision violates Due Process because it is void for vagueness in that it potentially criminalizes any action in a polling place, or even mere entry into a polling place, where elector's choices on the oversized Dominion BMD touchscreens are clearly displayed for anyone to see.

444.   The Elector Observation Felony provision encourages arbitrary and discriminatory enforcement and permits a standardless sweep that allows State officials to pursue their personal agendas in violation of Due Process.

445.   This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

446.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

447.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT VI

### Unlawful Voter Intimidation
### (52 U.S.C. § 10307)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (Voter Plaintiffs against All Defendants)

448.   The foregoing Paragraphs 1 to 396, 441 to 441, and 443 to 447, are incorporated and restated here.

449.   SB202's Elector Observation Felony Provision can be invoked to selectively criminalize mere entry into a polling place or even approaching a polling place with large windows.  The mere existence of the law will intimidate voters.

450.   The provision unlawfully intimidates voters because it gives law enforcement officials the authority to charge voters arbitrarily and capriciously for the felony intentionally observing another elector's screen.

451.   The provision also subjects voters to intimidation from persons who are not governmental authorities.  Any person who is hostile to the voter – for any reason – can plausibly allege that the voter intentionally observed another elector voting.

452.   Most voters have limited ways to defend themselves against arbitrary and capricious enforcement of such an allegation.

453.   The Defendants' intended enforcement of SB202's Elector Observation Felony accordingly will constitute unlawful voter intimidation under color of law in violation of 52 U.S.C. § 10307.

454.   This provision of SB202 is unlawful on its face and as applied to the Voter Plaintiffs.

455.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

456.   Defendants' intended enforcement of SB202's unlawful provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

### COUNT VII

**Violation of First Amendment**
**(U.S. Const. Amend. I)**

**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

**(All Plaintiffs against All Defendants)**

457.   The foregoing Paragraphs 1 to 396 are incorporated and restated here.

458.   Each Plaintiff intended, until enactment of SB202, to serve as a "monitor" or "observer" under O.C.G.A. § 21–2–386(2)(B)(vii), (the Gag Rule) which prohibits "monitors" and "observers," under penalty of criminal misdemeanor, from "[c]ommunicating any information that they see while monitoring the processing and scanning of the absentee ballots, whether intentionally or inadvertently, about any ballot, vote, or selection to anyone other than an election official who needs such information to lawfully carry out his or her official duties."

459.   Plaintiffs do not challenge restrictions on the disclosure of information about tallies of contests, including vote tally estimates and trends that a monitor or observer obtains observing the processing of absentee ballot before the close of the polls.  SB202, however, criminalizes far more, and includes *any* information about absentee ballot processing or scanning.

460.   For example, if a monitor or observer (including the public and members of the press) witnessed scanning machine malfunctions, unsecured ballots, mishandling of ballots, or improperly rejected ballots, such information must not be concealed from the Secretary of State, law enforcement, interested parties and the public.   Under SB202, however, if the monitor or observer reported such discrepancies to someone other than the election official who was responsible

138

for the failure, the monitor or observer would be potentially guilty of a criminal misdemeanor.

461.   The communications criminalized by SB202 occupy the core of protection afforded by the First Amendment; they penalize conduct that constitutes protected speech and petitioning of the government.

462.   SB202's prohibition on protected speech is a prior restraint that violates the First Amendment to the U.S. Constitution.

463.   This provision of SB202 is unconstitutional on its face and as applied to the Plaintiffs.

464.   Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

465.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT VIII

### Violations of Due Process – Void for Vagueness
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (All Plaintiffs against All Defendants)

466.   The foregoing Paragraphs 1 to 396 are incorporated and restated here.

467.   The Estimating Ban, O.C.G.A. § 21–2–598(vi), makes it a misdemeanor for "monitors and observers" to, among other things, tally, tabulate, estimate, or attempt to tally, tabulate, or estimate, "whether partial or otherwise, any of the votes on the absentee ballots cast."

468.   The Estimating Ban violates due process because it criminalizes the act of thinking about or attempting to think about a tally or tabulation, without the requirement of any external manifestation or communication of such thoughts.

469.   The Estimating Ban is void for vagueness because it does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited.

470.   The Estimating Ban is void for vagueness because it encourages arbitrary and discriminatory enforcement and permits a standardless sweep that allows election officials and other state actors to pursue their personal predilections.

471. This provision of SB202 is unconstitutional on its face and as applied to the Plaintiffs.

472. Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

473. Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT IX

### Violation of First Amendment
### (U.S. Const. Amend. I)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (All Plaintiffs against All Defendants)

474. The foregoing Paragraphs 1 to 396 are incorporated and restated here.

475. The Photography Ban, O.C.G.A. §21-2-568.2 (2)(B), makes it a misdemeanor to "[p]hotograph or record the face of an electronic ballot marker while a ballot is being voted or while an elector's votes are displayed on such electronic market," or to "[p]hotograph or record a voted ballot."

476.   The Photography Ban violates the First Amendment because it criminalizes constitutionally protected speech.  Photographs of election officials counting ballots and of voters in the act of voting has been an expected element of routine election press coverage for well over 100 years across the world.

477.   SB202's prohibition on protected speech is a prior restraint that violates the First Amendment to the U.S. Constitution.

478.   This provision of SB202 is unconstitutional on its face and as applied to the Plaintiffs.

479.   Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

480.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT X

### Violations of Due Process – Void for Vagueness
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (All Plaintiffs against All Defendants)

481.   The foregoing Paragraphs 1 to 396 and 475 to 480 are incorporated and restated here.

482.   The Photography Ban is void for vagueness because it does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited.

483.   The only reasonable prohibition on photography in polling places, ballot counting operations, ballot adjudication, or election audits is one that specifically and narrowly prevents the photography of electronic or hand marked legible votes on ballots that can be connected to a specific voter. The vague ban on photographing or "recording" a "voted ballot" is unjustified by any legitimate government interest, given the fact that ballots are required to be "absolutely secret" where no one may know who cast any individual ballot. For over 100 years, press photographers have published pictures of voted ballots and voters standing at voting machines, but with appropriate prohibition on capturing the votes on the face of the machine in the pre-BMD rare instance that another voter's votes could be seen.

484.   The Photography Ban is void for vagueness because it encourages arbitrary and discriminatory enforcement and permits a standardless sweep that allows election officials and other state actors to pursue their personal predilections. It may ensnare citizens conducting routine activities who have no intention of or ability to connect a voter and a ballot. For example, required video surveillance of polling places may capture images of ballots and faces of touchscreens. Video interviews of poll officials in the polling place or mail ballot processing locations may easily capture innocuous but prohibited images of voted ballots and machines.

485.   This provision of SB202 is unconstitutional on its face and as applied to the Plaintiffs.

486.   Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

487.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT XI

### Violations of Substantive Due Process
### & Fundamental Right to Vote
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (By the Voter Plaintiffs against All Defendants)

488.   The foregoing Paragraphs 1 to 396 are incorporated and restated here.

489.   The Relaxed Voter ID Rule, O.C.G.A. § 21-2-381(a)(1)(C)(i), changes the identification that voters must provide to be issued an absentee ballot from a verifiable signature to the voter's name, date of birth, address, and voter's Georgia's driver's license or identification.

490.   Because of the massive breaches of the Secretary of State's election servers in the past, the information that is now required to obtain one or more absentee ballots which will be accepted and counted is available to anyone bent on voting illegally.  As a consequence, there is a substantial risk that the Voter Plaintiffs will be disenfranchised.

491.   This provision violates the fundamental right to vote that is protected by the substantive application of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by imposing a burden on voting that is not justified by any sufficiently weighty government interest.

492.    This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

493.    The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

494.    Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT XII

**Violations of Substantive Due Process
& Fundamental Right to Vote
(U.S. Const. Amend. XIV)**

**42 U.S.C. § 1983 and 28 U.S.C. § 2201**

**(By the Voter Plaintiffs against All Defendants)**

495.    The foregoing Paragraphs 1 to 396 and 489 to 494 are incorporated and restated here.

146

496.   SB202's unreasonable narrowing of the absentee-by-mail ballot application window violates the fundamental right to vote that is protected by the substantive application of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by imposing a burden on voting that is not justified by any sufficiently weighty government interest.

497.   The ability to vote by absentee ballot is essential for many voters because of the traditional reasons of age, health, travel, or employment related conflicts.

498.   Georgia voters who desire to exercise their constitutional right to a secret ballot are not offered that option in the polling place and must vote by absentee ballot, making it crucial that absentee ballots are fully available to all voters.

499.   Given the intimidation of the polling place as a result of the threat of prosecution for the Elector Observation Felony, all voters must be given a fair opportunity to obtain an absentee ballot.

500.   The 11-day pre-election day deadline denies the right to vote by absentee ballot in most recounts for elections in which the Secretary of State certifies the election result on the certification deadline.

501.   The 11-day pre-election day deadline denies the right to vote to voters who experience unexpected conflicts and cannot be present at the polling place to vote.

502.   This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

503.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

504.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT XIII

### Violation of Equal Protection Clause
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (By the Voter Plaintiffs against all Defendants)

505.   The foregoing Paragraphs 1 to 396, 489 to 494 and 496 to 504 are incorporated and restated here.

506.  SB202's narrowing of the absentee-by-mail ballot application window violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution because, it treats identifiable classes of voters differently than other, similarly situated voters and creates a substantial risk that some voters' votes will be less effective as a result.

507.  The identifiable classes of voters who are disadvantaged by the narrowed window for mail ballot applications include:

- voters requiring an absentee ballot in a state office runoff;

- voters wishing to exercise their right to vote a secret ballot;

- voters who are intimidated by the risk of the Elector Observation Felony;

- voters who encounter unforeseen medical, employment, or civic duty obligations after the 11-day deadline;

- voters who must mail their runoff election ballot applications from long distances; and

- voters who are at a high risk of COVID-19 infection and cannot be vaccinated or who are quarantined.

508.  This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

509.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

510.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiff to declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Voter Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## COUNT XIV

### Violation of Equal Protection Clause
### (U.S. Const. Amend. XIV)

### 42 U.S.C. § 1983 and 28 U.S.C. § 2201

### (By the Voter Plaintiffs against All Defendants)

511.   The foregoing Paragraphs 1 to 396, 489 to 494, 496 to 504, and 506 to 510 are incorporated and restated here.

512.   SB202's narrowing of the absentee-by-mail ballot application window violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution because, in the circumstances of the present COVID-19 pandemic, restricting the pre-existing window for absentee-by-mail voting exposes an

identifiable class of voters to arbitrary and disparate risk of being completely disenfranchised.

513.   This provision of SB202 is unconstitutional on its face and as applied to the Voter Plaintiffs.

514.   The Voter Plaintiffs are at substantial risk of imminent injury and thus are entitled to prospective injunctive relief against Defendants acting in their official capacities under color of state law pursuant to 42 U.S.C. § 1983.

515.   Defendants' intended enforcement of SB202's unconstitutional provisions, together with the Voter Plaintiffs' substantial risk of being targeted by such enforcement, creates an actual controversy between Defendants and the Voter Plaintiffs that entitles Plaintiffs to seek declaratory relief pursuant to 28 U.S.C. § 2201.

**WHEREFORE**, the Plaintiffs respectfully request that this Court enter the relief requested in the Prayer.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.   Enter a judgment finding and declaring that the challenged provisions of SB202 violate the U.S. Constitution or 52 U.S.C. § 10307, or both, on their face and as applied to the Plaintiffs.

B.      Enter a preliminary and permanent injunction prohibiting Defendants

SEB Members from enforcing the challenged provisions of SB202;

F.      Retain jurisdiction to ensure all Defendants' ongoing compliance with

the foregoing Orders;

G.      Grant the Plaintiffs an award of their reasonable attorney's fees, costs,

and expenses incurred in this action pursuant to 42 U.S.C. § 1988; and

H.      Grant the Plaintiffs such other relief as the Court deems just and

proper.

The 17th day of May, 2021.

<table>
<tr><td>

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700
bbrown@brucepbrownlaw.com

</td><td>

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600
CIchter@Ichterdavis.com

</td></tr>
<tr><td>

*/s/ Greg K. Hecht*
Greg K. Hecht
Georgia Bar No. 003860
HECHT WALKER, P.C.
Suite B
Stockbridge, Georgia 30281
(404) 348-4881
greg@hmhwlaw.com

</td><td>

*/s/Shea E. Roberts*
Shea E. Roberts
Georgia Bar No. 608874
GIACOMA ROBERTS & DAUGHDRILL LLC
945 East Paces Rd.
Suite 2750
Atlanta, Georgia 30326
(404) 924-2850
sroberts@grdlegal.com

</td></tr>
</table>

*Attorneys for Plaintiffs*

EXHIBIT

A

2021 Georgia Laws Act 9 (S.B. 202)

GEORGIA 2021 SESSION LAWS

2021 REGULAR SESSION

Additions are indicated by **Text**; deletions by
~~Text~~ .
Vetoes are indicated by ~~Text~~ ;
stricken material by ~~Text~~ .

# Act 9

# S.B. No. 202

AN ACT To comprehensively revise elections and voting; to amend Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to elections and primaries generally, so as to revise a definition; to provide for the establishment of a voter intimidation and illegal election activities hotline; to limit the ability of the State Election Board and the Secretary of State to enter into certain consent agreements, settlements, and consent orders; to provide that the Secretary of State shall be a nonvoting ex officio member of the State Election Board; to provide for the appointment, confirmation, term, and removal of the chairperson of the State Election Board; to revise provisions relating to a quorum of such board; to require the Secretary of State to support and assist the State Election Board; to provide for the appointment of temporary and permanent replacement superintendents; to provide for procedures; to provide for performance reviews of local election officials requested by the State Election Board or local governing authorities; to provide for a definition; to provide for appointment and duties of performance review boards; to provide for reports of performance review boards; to provide for promulgation of rules and regulations; to provide additional requirements on the State Election Board's power to adopt emergency rules and regulations; to provide that no election superintendents or boards of registrars shall accept private funding; to provide that the State Election Board shall develop methods for distribution of donations; to provide that certain persons may serve as poll workers in other than the county of their residence; to provide for the appointment of acting election superintendents in the event of a vacancy or incapacitation in the office of judge of the probate court of counties without a board of elections; to provide for resumption of the duties of election superintendent upon the filling of such vacancy; to provide for the compensation of such acting election superintendents; to provide for the reduction in size of certain precincts under certain circumstances; to provide for notice when polling places are relocated; to provide for certain reports; to provide limitations on the use of buses and other moveable facilities; to provide that the name and designation of the precinct appears on every ballot; to provide for allocation of voting equipment by counties and municipalities; to provide for the manner of handling the death of a candidate prior to a nonpartisan election; to provide that no candidate shall take or be sworn into any elected public office unless such candidate has received a majority of the votes cast for such office except as otherwise provided by law; to provide for participation in a multistate voter registration system; to revise procedures and standards for challenging electors; to provide for the printing of ballots on safety paper; to provide for the time and manner for applying for absentee ballots; to provide for certain limitations and sanctions on the distribution of absentee ballot applications; to provide for the manner of processing of absentee ballot applications; to provide for absentee ballot drop boxes and the requirements therefor; to provide for the time and manner of issuing absentee ballots; to provide for the manner of voting and returning absentee ballots; to revise the times for advance voting; to limit changes to advance voting locations in the period prior to an election; to provide notice requirements for changes of advance voting locations; to provide for the processing and tabulation of absentee ballots; to provide sanctions for improperly opening an absentee ballot; to provide for certain elector identification for absentee balloting; to provide for monitors and observers; to provide for poll watcher training; to provide for restrictions on the distribution of certain items within close proximity to the polls on election days; to provide for the voting and processing of provisional ballots; to provide for duplication panels for defective ballots that cannot be processed by tabulating machines; to provide for ranked choice voting for military and overseas voters; to revise the time for runoffs; to revise eligibility to vote in runoffs; to provide for the deadline for election certification; to provide for a pilot program for the scanning and

publishing of ballots; to provide for the inspection and copying of original ballots by certain persons following the completion of a recount; to provide for special primaries and special elections to fill vacancies in certain offices; to provide for public notice and observation of preparation of voting equipment; to provide for observation of elections and ballot processing and counting; to provide for the filling of vacancies in certain offices; to prohibit observing or attempting to observe how a voter marks or has marked his or her ballot or inducing a voter to do so; to prohibit the acceptance of a ballot for return without authorization; to prohibit the photographing or other recording of ballots and ballot markers; to amend Chapter 35 of Title 36 of the Official Code of Georgia Annotated, relating to home rule powers, so as to provide for the delay of reapportionment of municipal corporation election districts when census numbers are delayed; to amend Title 50 of the Official Code of Georgia Annotated, relating to general provisions regarding state government, so as to provide for the submission and suspension of emergency rules by the State Election Board; to provide that scanned ballot images are public records; to provide for legislative findings; to provide a short title; to provide for related matters; to provide for effective dates; to repeal conflicting laws; and for other purposes.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:

### SECTION 1.

This Act shall be known and may be cited as the "Election Integrity Act of 2021."

### SECTION 2.

The General Assembly finds and declares that:

(1) Following the 2018 and 2020 elections, there was a significant lack of confidence in Georgia election systems, with many electors concerned about allegations of rampant voter suppression and many electors concerned about allegations of rampant voter fraud;

(2) Many Georgia election processes were challenged in court, including the subjective signature-matching requirements, by Georgians on all sides of the political spectrum before and after the 2020 general election;

(3) The stress of the 2020 elections, with a dramatic increase in absentee-by-mail ballots and pandemic restrictions, demonstrated where there were opportunities to update existing processes to reduce the burden on election officials and boost voter confidence;

(4) The changes made in this legislation in 2021 are designed to address the lack of elector confidence in the election system on all sides of the political spectrum, to reduce the burden on election officials, and to streamline the process of conducting elections in Georgia by promoting uniformity in voting. Several examples will help explain how these goals are achieved;

(5) The broad discretion allowed to local officials for advance voting dates and hours led to significant variations across the state in total number of hours of advance voting, depending on the county. More than 100 counties have never offered voting on Sunday and many counties offered only a single day of weekend voting. Requiring two Saturday voting days and two optional Sunday voting days will dramatically increase the total voting hours for voters across the State of Georgia, and all electors in Georgia will have access to multiple opportunities to vote in person on the weekend for the first time;

(6) Some counties in 2020 received significant infusions of grant funding for election operations, while other counties received no such funds. Promoting uniformity in the distribution of funds to election operations will boost voter confidence and ensure that there is no political advantage conferred by preferring certain counties over others in the distribution of funds;

(7) Elections in Georgia are administered by counties, but that can lead to problems for voters in counties with dysfunctional election systems. Counties with long-term problems of lines, problems with processing of absentee ballots, and other challenges in administration need accountability, but state officials are limited in what they are able to do to address those problems. Ensuring there is a mechanism to address local election problems will promote voter confidence and meet the goal of uniformity;

(8) Elections are a public process and public participation is encouraged by all involved, but the enthusiasm of some outside groups in sending multiple absentee ballot applications in 2020, often with incorrectly filled-in voter information, led to significant confusion by electors. Clarifying the rules regarding absentee ballot applications will build elector confidence while not sacrificing the opportunities for electors to participate in the process;

(9) The lengthy absentee ballot process also led to elector confusion, including electors who were told they had already voted when they arrived to vote in person. Creating a definite period of absentee voting will assist electors in understanding the election process while also ensuring that opportunities to vote are not diminished, especially when many absentee ballots issued in the last few days before the election were not successfully voted or were returned late;

(10) Opportunities for delivering absentee ballots to a drop box were first created by the State Election Board as a pandemic response. The drop boxes created by rule no longer existed in Georgia law when the emergency rules that created them expired. The General Assembly considered a variety of options and constructed a system that allows the use of drop boxes, while also ensuring the security of the system and providing options in emergency situations;

(11) The lengthy nine-week runoffs in 2020 were exhausting for candidates, donors, and electors. By adding ranked choice voting for military and overseas voters, the run-off period can be shortened to a more manageable period for all involved, easing the burden on election officials and on electors;

(12) Counting absentee ballots in 2020 took an incredibly long time in some counties. Creating processes for early processing and scanning of absentee ballots will promote elector confidence by ensuring that results are reported quickly;

(13) The sanctity of the precinct was also brought into sharp focus in 2020, with many groups approaching electors while they waited in line. Protecting electors from improper interference, political pressure, or intimidation while waiting in line to vote is of paramount importance to protecting the election system and ensuring elector confidence;

(14) Ballot duplication for provisional ballots and other purposes places a heavy burden on election officials. The number of duplicated ballots has continued to rise dramatically from 2016 through 2020. Reducing the number of duplicated ballots will significantly reduce the burden on election officials and creating bipartisan panels to conduct duplication will promote elector confidence;

(15) Electors voting out of precinct add to the burden on election officials and lines for other electors because of the length of time it takes to process a provisional ballot in a precinct. Electors should be directed to the correct precinct on election day to ensure that they are able to vote in all elections for which they are eligible;

(16) In considering the changes in 2021, the General Assembly heard hours of testimony from electors, election officials, and attorneys involved in voting. The General Assembly made significant modifications through the legislative process as it weighed the various interests involved, including adding further weekend voting, changing parameters for out-of-precinct voting, and adding transparency for ballot images; and

(17) While each of the changes in this legislation in 2021 stands alone and is severable under Code Section 1–1–3, the changes in total reflect the General Assembly's considered judgment on the changes required to Georgia's election system to make it "easy to vote and hard to cheat," applying the lessons learned from conducting an election in the 2020 pandemic.


## SECTION 3.

Chapter 2 of Title 21 of the Official Code of Georgia Annotated, relating to elections and primaries generally, is amended by revising paragraph (35) of Code Section 21–2–2, relating to definitions, as follows:

<< GA ST § 21–2–2 >>

"(35) 'Superintendent' means:

(A) Either the judge of the probate court of a county or the county board of elections, the county board of elections and registration, the joint city-county board of elections, or the joint city-county board of elections and registration, if a county has such;

(B) In the case of a municipal primary, the municipal executive committee of the political party holding the primary within a municipality or its agent or, if none, the county executive committee of the political party or its agent;

(C) In the case of a nonpartisan municipal primary, the person appointed by the proper municipal executive committee; ~~and~~

(D) In the case of a municipal election, the person appointed by the governing authority pursuant to the authority granted in Code Section 21–2–70**; and**

**(E) In the case of the State Election Board exercising its powers under subsection (f) of Code Section 21–2–33.1, the individual appointed by the State Election Board to exercise the power of election superintendent.**"

## SECTION 4.

Said chapter is further amended by revising Code Section 21–2–3, which was previously reserved, as follows:

<< GA ST § 21–2–3 >>

### "21–2–3.

**The Attorney General shall have the authority to establish and maintain a telephone hotline for the use of electors of this state to file complaints and allegations of voter intimidation and illegal election activities. Such hotline shall, in addition to complaints and reports from identified persons, also accept anonymous tips regarding voter intimidation and election fraud. The Attorney General shall have the authority to review each complaint or allegation of voter intimidation or illegal election activities within three business days or as expeditiously as possible and determine if such complaint or report should be investigated or prosecuted.** Reserved. "

## SECTION 5.

Said chapter is further amended by revising Code Section 21–2–30 relating to creation, composition, terms of service, vacancies, quorum, seal, bylaws, and meetings of the State Board of Elections as follows:

<< GA ST § 21–2–30 >>

### "21–2–30.

(a) There is created a state board to be known as the State Election Board, to be composed of the Secretary of State **a chairperson elected by the General Assembly**, an elector to be elected by a majority vote of the Senate of the General Assembly at its regular session held in each odd-numbered year, an elector to be elected by a majority vote of the House of Representatives of the General Assembly at its regular session held in each odd-numbered year, and a member of each political party to be nominated and appointed in the manner provided in this Code section. No person while a member of the General Assembly shall serve as a member of the board.

**(a.1)(1) The chairperson shall be elected by the General Assembly in the following manner: A joint resolution which shall fix a definite time for the nomination and election of the chairperson may be introduced in either branch of the General Assembly. Upon passage of the resolution by a majority vote of the membership of the Senate and House of Representatives, it shall be the duty of the Speaker of the House of Representatives to call for the nomination and election of the chairperson at the time specified in the resolution, at which time the name of the qualified person receiving a majority vote of the membership of the House of Representatives shall be transmitted to the Senate for confirmation. Upon the qualified person's receiving a majority vote of the membership of the Senate, he or she shall be declared the duly elected chairperson; and the Governor shall be notified of his or her election by the Secretary of the Senate. The Governor is directed to administer the oath of office to the chairperson and to furnish the chairperson with a properly executed commission of office certifying his or her election.**

**(2) The chairperson of the board shall be nonpartisan. At no time during his or her service as chairperson shall the chairperson actively participate in a political party organization or in the campaign of a candidate for public office, nor shall he or she make any campaign contributions to a candidate for public office. Furthermore, to qualify for appointment as chairperson, in the two years immediately preceding his or her appointment, a person shall not have qualified as a partisan candidate for public office, participated in a political party organization or the campaign of a partisan candidate for public office, or made any campaign contributions to a partisan candidate for public office.**

**(3) The term of office of the chairperson shall continue until a successor is elected as provided in paragraph (1) of this subsection. In the event of a vacancy in the position of chairperson at a time when the General Assembly is not in session, it shall be the duty of the Governor and the Governor is empowered and directed to appoint a chairperson possessing the qualifications as provided in this subsection who shall serve as chairperson until the next regular session of the General Assembly, at which time the nomination and election of a chairperson shall be held by the General Assembly as provided in paragraph (1) of this subsection.**

(b) A member elected by a house of the General Assembly shall take office on the day following the adjournment of the regular session in which elected and shall serve for a term of two years and until his or her successor is elected and qualified, unless sooner removed. An elected member of the board may be removed at any time by a majority vote of the house which elected him or her. In the event a vacancy should occur in the office of such a member of the board at a time when the General Assembly is not in session, then the President of the Senate shall thereupon appoint an elector to fill the vacancy if the prior incumbent of such office was elected by the Senate or appointed by the President of the Senate; and the Speaker of the House of Representatives shall thereupon appoint an elector to fill the vacancy if the prior incumbent of such office was elected by the House of Representatives or appointed by the Speaker of the House of Representatives. A member appointed to fill a vacancy may be removed at any time by a majority vote of the house whose presiding officer appointed him or her.

(c) Within 30 days after April 3, 1968, the state executive committee of each political party shall nominate a member of its party to serve as a member of the State Election Board and, thereupon, the Governor shall appoint such nominee as a member of the board to serve for a term of two years from the date of the appointment and until his or her successor is elected and qualified, unless sooner removed. Thereafter, such state executive committee shall select a nominee for such office on the board within 30 days after a vacancy occurs in such office and shall also select a nominee at least 30 days prior to the expiration of the term of each incumbent nominated by it; and each such nominee shall be immediately appointed by the Governor as a member of the board to serve for the unexpired term in the case of a vacancy, and for a term of two years in the case of an expired term. Each successor, other than one appointed to serve an unexpired term, shall serve for a term of two years; and the terms shall run consecutively from the date of the initial gubernatorial appointment. No person shall be eligible for nomination by such state executive committee unless he or she is an elector and a member in good standing of the political party of the committee. Such a member shall cease to serve on the board and his or her office shall be abolished if and when his or her political organization shall cease to be a 'political party' as defined in Code Section 21–2–2.

(d) The Secretary of State shall be ~~the chairperson of the board~~ **an ex officio nonvoting member of the board**. Three **voting** members of the board shall constitute a quorum, and no vacancy on the board shall impair the right of the quorum to exercise all the powers and perform all the duties of the board. The board shall adopt a seal for its use and bylaws for its own government and procedure.

(e) Meetings shall be held whenever necessary for the performance of the duties of the board on call of the chairperson or whenever any two of its members so request. Minutes shall be kept of all meetings of the board and a record kept of the vote of each member on all questions coming before the board. The chairperson shall give to each member of the board prior notice of the time and place of each meeting of the board.

(f) If any member of the board, other than the Secretary of State, shall qualify as a candidate for any public office which is to be voted upon in any primary or election regulated by the board, that member's position on the board shall be immediately vacated and such vacancy shall be filled in the manner provided for filling other vacancies on the board."

### SECTION 6.

Said chapter is further amended in Code Section 21–2–33.1, relating to enforcement of chapter, by adding new subsections to read as follows:

<< GA ST § 21–2–33.1 >>

"**(f) After following the procedures set forth in Code Section 21–2–33.2, the State Election Board may suspend county or municipal superintendents and appoint an individual to serve as the temporary superintendent in a jurisdiction. Such individual shall exercise all the powers and duties of a superintendent as provided by law, including the authority to make all personnel decisions related to any employees of the jurisdiction who assist with carrying out the duties of the superintendent, including, but not limited to, the director of elections, the election supervisor, and all poll officers.**

**(g) At no time shall the State Election Board suspend more than four county or municipal superintendents pursuant to subsection (f) of this Code section.**

**(h) The Secretary of State shall, upon the request of the State Election Board, provide any and all necessary support and assistance that the State Election Board, in its sole discretion, determines is necessary to enforce this chapter or to carry out or conduct any of its duties.**"

## SECTION 7.

Such chapter is further amended in Subpart 1 of Part 1 of Article 2, relating to the State Election Board, by adding a new Code section to read as follows:

<< GA ST § 21–2–33.2 >>

"**21–2–33.2.**
**(a) The governing authority of a county or municipality, as applicable, following a recommendation based on an investigation by a performance review board pursuant to Code Section 21–2–106 may petition the State Election Board, through the Secretary of State, for extraordinary relief pursuant to this Code section. In addition, the State Election Board, on its own motion or following a recommendation based on an investigation by a performance review board pursuant to Part 5 of this article, may pursue the extraordinary relief provided in this Code section.**

**(b) Upon receiving a petition or taking appropriate action pursuant to subsection (a) of this Code section, the State Election Board shall conduct a preliminary investigation to determine if sufficient cause exists to proceed to a full hearing on the petition. Such preliminary investigation shall be followed by a preliminary hearing which shall take place not less than 30 days nor more than 90 days after the Secretary of State receives the petition. Service of the petition shall be made by hand delivery or by statutory overnight delivery to the Secretary of State's office. At such preliminary hearing, the State Election Board shall determine if sufficient cause exists to proceed to a full hearing on the petition or if the petition should be dismissed. The State Election Board shall promulgate rules and regulations for conducting such preliminary investigation and preliminary hearing.**

**(c) Following the preliminary hearing described in subsection (b) of this Code section, the State Election Board may suspend a county or municipal superintendent pursuant to this Code section if at least three members of the board find, after notice and hearing, that:**
**(1) By a preponderance of the evidence, a county or municipal superintendent has committed at least three violations of this title or of State Election Board rules and regulations, in the last two general election cycles; and the county or municipal superintendent has not sufficiently remedied the violations; or**
**(2) By clear and convincing evidence, the county or municipal superintendent has, for at least two elections within a two-year period, demonstrated nonfeasance, malfeasance, or gross negligence in the administration of the elections.**

**(d) A majority of the members of a board of elections, board of elections and registration, or county commission; a probate judge who serves as election superintendent, or, for a sole commissioner form of government, a sole**

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

commissioner may petition the Secretary of State to continue any hearing scheduled pursuant to this Code section. Upon a showing of good cause, the State Election Board may in its sound discretion continue any such hearing. Notwithstanding any other provision of law, deliberations held on such petition by the State Election Board shall not be open to the public; provided, however, that testimony shall be taken in an open meeting and a vote on the recommendation shall be taken in an open meeting following the hearing or at the next regularly scheduled meeting.

(e)(1) If the State Election Board makes a finding in accordance with subsection (c) of this Code section, it may suspend the superintendent or board of registrars with pay and appoint an individual to serve as the temporary superintendent. The temporary superintendent who is appointed shall be otherwise qualified to serve or meet the necessary qualifications within three months of appointment.

(2) Any superintendent suspended under this Code section may petition the State Election Board for reinstatement no earlier than 30 days following suspension and no later than 60 days following suspension. In the event that a suspended superintendent or registrar does not petition for reinstatement within the allotted time period, his or her suspension shall be converted into permanent removal, and the temporary superintendent shall become a permanent superintendent subject to removal by the jurisdiction not less than nine months after his or her appointment.

(3) If, after the expiration of the nine-month period following the appointment, the jurisdiction removes the permanent superintendent, any provisions of local or general law governing appointment of the superintendent shall govern the appointment of the superintendent.

(4) If, at any time after the expiration of the nine-month period following the appointment, at least three members of the State Election Board find, after notice and hearing, that the jurisdiction no longer requires a superintendent appointed under this Code section, any provisions of local or general law governing appointment of the superintendent shall govern the appointment of the superintendent.

(f) Upon petition for reinstatement by a superintendent suspended pursuant to a finding under paragraph (1) of subsection (c) of this Code section, the State Election Board shall conduct a hearing for the purpose of receiving evidence relative to whether the superintendent's continued service as superintendent is more likely than not to improve the ability of the jurisdiction to conduct elections in a manner that complies with this chapter. The suspended superintendent shall be given at least 30 days' notice prior to such hearing and such hearing shall be held no later than 90 days after the petition is filed in accordance with Chapter 13 of Title 50, the 'Georgia Administrative Procedure Act,' except that the State Election Board shall have the power to call witnesses and request documents on its own initiative. If the State Election Board denies the petition, it shall be deemed a final agency decision under Chapter 13 of Title 50, the 'Georgia Administrative Procedure Act,' and it may be appealed in a manner consistent with Code Section 50–13–19. The Attorney General or his or her designee shall represent the interests of the State Election Board in any such judicial review.

(g) A local government shall not expend any public funds for attorneys' fees or expenses of litigation relating to the proceedings initiated pursuant to this Code section except to the extent such fees and expenses are incurred prior to and through the recommendation of the State Election Board as provided in subsection (c) of this Code section; provided, however, that nothing in this subsection shall be construed to prohibit an insurance provider from covering attorneys' fees or expenses of litigation under an insurance policy. Any suspended superintendent who is reinstated by the State Election Board pursuant to this Code section may be reimbursed by the local government for his or her reasonable attorneys' fees and related expenses incurred in pursuing such reinstatement.

(h) For purposes of this Code section, where a judge of probate court serves as the superintendent, the suspension authorized by this Code section shall apply only to the judge of probate court's duties as a superintendent and not as a judge of probate court.

(i) When the State Election Board exercises its authority under subsection (f) of Code Section 21–2–33.1, the jurisdiction involved shall not diminish or reduce the funds already budgeted or appropriated by the jurisdiction pursuant to Code

**Section 21–2–71 and shall pay any necessary and reasonable funds over that amount, as determined by the temporary superintendent, to faithfully carry out their obligations under Code Section 21–2–70.**"0

## SECTION 8.

Said chapter is further amended in Subpart 1 of Part 1 of Article 2, relating to the State Election Board, by adding new Code sections to read as follows:

<< GA ST § 21–2–35 >>

**"21–2–35.**

**(a) Notwithstanding any other provision of this chapter, Chapter 3 of Title 38, relating to emergency management, or Chapter 13 of Title 50, the "Georgia Administrative Procedure Act," to the contrary, the State Election Board may only adopt emergency rules or regulations in circumstances of imminent peril to public health, safety, or welfare. To adopt any such emergency rule or regulation, in addition to any other rule-making requirement of this chapter or Chapter 13 of Title 50, the State Election Board shall:**

**(1) Give notice to the public of its intended action;**

**(2) Immediately upon the setting of the date and time of the meeting at which such emergency rule or regulation is to be considered give notice by email of its intended action to:**

**(A) The Governor;**

**(B) The Lieutenant Governor;**

**(C) The Speaker of the House of Representatives;**

**(D) The chairpersons of the standing committees of each house of the General Assembly tasked with election matters;**

**(E) Legislative counsel; and**

**(F) The chief executive officer of each political party registered pursuant to subsection (a) of Code Section 21–2–110; and**

**(3) State in the notices required by paragraphs (1) and (2) of this subsection the nature of the emergency and the manner in which such emergency represents an imminent peril to public health, safety, or welfare.**

**(b) Upon adoption or promulgation of any emergency rule or regulation pursuant to this Code section, a majority of the State Election Board shall certify in writing that such emergency rule or regulation was made in strict and exact compliance with the provisions of this chapter and subsection (e) of Code Section 50–13–4.**

**(c) In the event of any conflict between this Code section and any provision of Chapter 13 of Title 50, this Code section shall govern and supersede any such conflicting provision.**

<< GA ST § 21–2–36 >>

**21–2–36.**

**The State Election Board, the members thereof, the Secretary of State, and any of their attorneys or staff, at least five business days prior to entering into any consent agreement, settlement, or consent order that limits, alters, or interprets any provision of this chapter, shall notify the House of Representatives and Senate Committees on the Judiciary of such proposed consent agreement, settlement, or consent order.**"

## SECTION 9.

Said chapter is further amended by revising Code Section 21–2–71, relating to payment by county or municipality of superintendent's expenses, as follows:

<< GA ST § 21–2–71 >>

**"21–2–71.**

**(a)** The governing authority of each county or municipality shall appropriate annually and from time to time, to the superintendent of such county or municipality, the funds that it shall deem necessary for the conduct of primaries and elections in such county or municipality and for the performance of his or her other duties under this chapter, including:

(1) Compensation of the poll officers, custodians, and other assistants and employees provided for in this chapter;

(2) Expenditures and contracts for expenditures by the superintendent for polling places;

(3) Purchase or printing, under contracts made by the superintendent, of all ballots and other election supplies required by this chapter, or which the superintendent shall consider necessary to carry out the provisions of this chapter;

(4) Maintenance of all voting equipment required by this chapter, or which the superintendent shall consider necessary to carry out this chapter; and

(5) All other expenses arising out of the performance of his or her duties under this chapter.

**(b) No superintendent shall take or accept any funding, grants, or gifts from any source other than from the governing authority of the county or municipality, the State of Georgia, or the federal government.**

**(c) The State Election Board shall study and report to the General Assembly a proposed method for accepting donations intended to facilitate the administration of elections and a method for an equitable distribution of such donations state wide by October 1, 2021.**"

## SECTION 10.

Said chapter is further amended in Part 3 of Article 2, relating to superintendents, by adding a new Code section to read as follows:

<< GA ST § 21–2–74.1 >>

**"21–2–74.1.**

**(a) If a county does not have a board of elections and:**

**(1) There is a vacancy in the office of judge of the probate court that has not been filled pursuant to Code Section 15–9–10 or 15–9–11; or**

**(2) The judge of the probate court is incapacitated and unable to perform the duties of the election superintendent for a period of more than five days;**

**The chief judge of the superior court in the circuit to which the county is assigned shall appoint a qualified individual to serve as the acting election superintendent during such vacancy or incapacitation.**

**(b) Upon the filling of a vacancy in the office of judge of the probate court pursuant to Code Section 15–9–10 or 15–9–11, the judge of the probate court shall resume the duties of the election superintendent.**

**(c) The sole county commissioner or the board of county commissioners shall fix the compensation of the individual who serves as acting election superintendent until the vacancy is filled or the incapacitation ends. The compensation shall be paid from the general funds of the county.**"

## SECTION 11.

Said chapter is further amended by revising subsection (a) of Code Section 21–2–92, relating to qualifications of poll officers, service during municipal election or primary, and Student Teen Election Participant (STEP) program, as follows:

<< GA ST § 21–2–92 >>

"(a)**(1)** Poll officers appointed pursuant to Code Sections 21–2–90 and 21–2–91 shall be judicious, intelligent, and upright citizens of the United States, residents of or otherwise employed by the county in which they are appointed **except as otherwise provided in paragraph (2) of this subsection** or, in the case of municipal elections, residents of or otherwise employed by the municipality in which the election is to be held or of the county in which that municipality is located, 16 years of age or over, and shall be able to read, write, and speak the English language. No poll officer shall be eligible for any nomination for public office or to be voted for at a primary or election at which the poll officer shall serve. No person who is otherwise holding public office, other than a political party office, shall be eligible to be appointed as or to serve as a poll officer. A parent, spouse, child, brother, sister, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of a candidate shall not be eligible to serve as a poll officer in any precinct in which such candidate's name appears on the ballot in any primary or election.

**(2) A poll officer may be allowed to serve in a county that adjoins the county in which such poll officer resides if, in the discretion of the election superintendent of the county in which such person resides, the waiver of such county residency or county employment requirements of paragraph (1) of this subsection do not impair the ability of the county to provide adequate staff for the performance of election duties under this chapter and if, in the discretion of the county election superintendent in which such person wishes to serve, sufficient need for more poll officers exists.**"

### SECTION 12.

Said chapter is further amended in Article 2, relating to supervisory boards and officers, by adding a new part to read as follows:

"**Part 5**

<< GA ST § 21–2–105 >>

**21–2–105.**
**As used in this part, the term 'local election official' means:**
   **(1) A county board of elections or a county board of elections and registration established pursuant to Code Section 21–2–40;**
   **(2) A judge of the probate court fulfilling the role of election superintendent; or**
   **(3) A municipal election superintendent.**

<< GA ST § 21–2–106 >>

**21–2–106.**
**(a) The following officials may request that a performance review of a local election official be conducted:**
   **(1) The governing authority of the same jurisdiction as the local election official;**
   **(2) For counties represented by more than three members of the Georgia House of Representatives and Georgia Senate, at least two members of the Georgia House of Representatives and two members of the Georgia Senate who represent the county; and**
   **(3) For counties represented by fewer than four members of the Georgia House of Representatives and Georgia Senate, at least one member of the Georgia House of Representatives and one member of the Georgia Senate who represent the county.**

Such request shall be transmitted to the State Election Board which shall appoint an independent performance review board within 30 days after receiving such resolution. The State Election Board shall appoint three competent persons to serve as members of the performance review board, one of whom shall be an employee of the elections division of the Secretary of State and two of whom shall be local election officials, provided that no such appointee shall be a local election official for the county or municipality, as applicable, under review.

(b) It shall be the duty of a performance review board to make a thorough and complete investigation of the local election official with respect to all actions of the local election official regarding the technical competency in the maintenance and operation of election equipment, proper administration and oversight of registration and elections, and compliance with state law and regulations. The performance review board shall issue a written report of its findings to the Secretary of State, the State Election Board, and the local governing authority which shall include such evaluations, judgments, and recommendations as it deems appropriate. The local governing authority shall reimburse the members of the performance review board for reasonable expenses incurred in the performance of their duties, including mileage, meals, lodging, and costs of materials.

(c) The findings of the report of the review board under subsection (b) of this Code section or of any audit or investigation performed by the State Election Board may be grounds for removal of one or more local election officials pursuant to Code Section 21–2–33.2.

<< GA ST § 21–2–107 >>

### 21–2–107.

(a) The State Election Board shall appoint an independent performance review board on its own motion if it determines that there is evidence which calls into question the competence of a local election official regarding the oversight and administration of elections, voter registration, or both, with state law and regulations.

(b) The State Election Board shall appoint three competent persons to serve as members of the performance review board, one of whom shall be an employee of the elections division of the office of Secretary of State and two of whom shall be local election officials, provided that none of the three appointees shall be a local election official for the county or municipality under review.

(c) The performance review board shall issue a written report of its findings to the State Election Board and the Secretary of State and the applicable local governing authority, which shall include such evaluations, judgments, and recommendations as it deems appropriate. The local governing authority shall reimburse the members of the performance review board for reasonable expenses incurred in the performance of their duties, including mileage, meals, lodging, and costs of materials.

(d) The findings of the report of the performance review board under subsection (c) of this Code section or of any audit or investigation performed by the State Election Board may be grounds for removal of a local election official pursuant to Code Section 21–2–33.2.

<< GA ST § 21–2–108 >>

### 21–2–108.

The State Election Board shall promulgate such rules and regulations as may be necessary for the administration of this part."

**SECTION 13.**

Said chapter is further amended in Code Section 21–2–134, relating to withdrawal, death, or disqualification of candidate for office, return of qualifying fee, and nomination certificate, by adding a new subsection to read as follows:

<< GA ST § 21–2–134 >>

"**(g) In the event of the death of a candidate on the ballot in a nonpartisan election prior to such nonpartisan election, such candidate's name shall remain on the ballot and all votes cast for such candidate shall be counted. If the deceased candidate receives the requisite number of votes to be elected, such contest shall be handled as a failure to fill the office under Code Section 21–2–504. If the deceased candidate receives enough votes to be in a run-off election, such run-off election shall be conducted as provided in Code Section 21–2–501 and the candidates in such runoff shall be determined in accordance with paragraph (2) of subsection (a) of Code Section 21–2–501.**"

## SECTION 14.

Said chapter is further amended by revising subsection (f) of Code Section 21–2–212, relating to county registrars, appointment, certification, term of service, vacancies, compensation and expenses of chief registrar, registrars, and other officers and employees, and budget estimates, as follows:

<< GA ST § 21–2–212 >>

"(f) The board of registrars of each county shall prepare annually a budget estimate in which it shall set forth an itemized list of its expenditures for the preceding two years and an itemized estimate of the amount of money necessary to be appropriated for the ensuing year and shall submit the same at the time and in the manner and form other county budget estimates are required to be filed. **No board of registrars shall take or accept any funding, grants, or gifts from any source other than from the governing authority of the county, the State of Georgia, or the federal government.**"

## SECTION 15.

Said chapter is further amended by revising Code Section 21–2–229, relating to challenge of applicant for registration by other electors, notice and hearing, and right of appeal, as follows:

<< GA ST § 21–2–229 >>

"**21–2–229.**

(a) Any elector of a county or municipality may challenge the qualifications of any person applying to register to vote in the county or municipality and may challenge the qualifications of any elector of the county or municipality whose name appears on the list of electors. Such challenges shall be in writing and shall specify distinctly the grounds of the challenge. **There shall not be a limit on the number of persons whose qualifications such elector may challenge.**

(b) Upon such challenge being filed with the board of registrars, the registrars shall set a hearing on such challenge **within ten business days after serving notice of the challenge**. Notice of the date, time, and place of the hearing shall be served upon the person whose qualifications are being challenged along with a copy of such challenge and upon the elector making the challenge **within ten business days following the filing of the challenge**. The person being challenged shall receive at least three days' notice of the date, time, and place of the hearing. Such notice shall be served either by first-class mail addressed to the mailing address shown on the person's voter registration records or in the manner provided in subsection (c) of Code Section 21–2–228.

(c) The burden shall be on the elector making the challenge to prove that the person being challenged is not qualified to remain on the list of electors. The board of registrars shall have the authority to issue subpoenas for the attendance of witnesses and the production of books, papers, and other material upon application by the person whose qualifications are being challenged

or the elector making the challenge. The party requesting such subpoenas shall be responsible to serve such subpoenas and, if necessary, to enforce the subpoenas by application to the superior court. Any witness so subpoenaed, and after attending, shall be allowed and paid the same mileage and fee as allowed and paid witnesses in civil actions in the superior court.

(d) After the hearing provided for in this Code section, the registrars shall determine said challenge and shall notify the parties of their decision. If the registrars uphold the challenge, the person's application for registration shall be rejected or the person's name removed from the list of electors, as appropriate. The elector shall be notified of such decision in writing either by first-class mail addressed to the mailing address shown on the person's voter registration records or in the manner provided in subsection (c) of Code Section 21–2–228 for other notices.

(e) Either party shall have a right of appeal from the decision of the registrars to the superior court by filing a petition with the clerk of the superior court within ten days after the date of the decision of the registrars. A copy of such petition shall be served upon the other parties and the registrars. Unless and until the decision of the registrars is reversed by the court, the decision of the registrars shall stand.

**(f) Failure to comply with the provisions of this Code section by the board of registrars shall subject such board to sanctions by the State Election Board.**"

### SECTION 16.

Said chapter is further amended by revising Code Section 21–2–230, relating to challenge of persons on list of electors by other electors, procedure;, hearing, and right of appeal, as follows:

<< GA ST § 21–2–230 >>

**"21–2–230.**
(a) Any elector of the county or municipality may challenge the right of any other elector of the county or municipality, whose name appears on the list of electors, to vote in an election. Such challenge shall be in writing and specify distinctly the grounds of such challenge. Such challenge may be made at any time prior to the elector whose right to vote is being challenged voting at the elector's polling place or, if such elector cast an absentee ballot, prior to 5:00 P.M. on the day before the ~~election~~ **absentee ballots are to begin to be scanned and tabulated**; provided, however, that challenges to persons voting by absentee ballot in person at the office of the registrars or the absentee ballot clerk shall be made prior to such person's voting. **There shall not be a limit on the number of persons whose qualifications such elector may challenge.**

(b) Upon the filing of such challenge, the board of registrars shall immediately consider such challenge and determine whether probable cause exists to sustain such challenge. If the registrars do not find probable cause, the challenge shall be denied. If the registrars find probable cause, the registrars shall notify the poll officers of the challenged elector's precinct or, if the challenged elector voted by absentee ballot, notify the poll officers at the absentee ballot precinct and, if practical, notify the challenged elector and afford such elector an opportunity to answer.

(c) If the challenged elector appears at the polling place to vote, such elector shall be given the opportunity to appear before the registrars and answer the grounds of the challenge.

(d) If the challenged elector does not cast an absentee ballot and does not appear at the polling place to vote and if the challenge is based on grounds other than the qualifications of the elector to remain on the list of electors, no further action by the registrars shall be required.

(e) If the challenged elector cast an absentee ballot and it is not practical to conduct a hearing prior to the close of the polls and the challenge is based upon grounds other than the qualifications of the elector to remain on the list of electors, the absentee

ballot shall be treated as a challenged ballot pursuant to subsection (e) of Code Section 21–2–386. No further action by the registrars shall be required.

(f) If the challenged elector does not cast an absentee ballot and does not appear at the polling place to vote and the challenge is based on the grounds that the elector is not qualified to remain on the list of electors, the board of registrars shall proceed to hear the challenge pursuant to Code Section 21–2–229.

(g) If the challenged elector cast an absentee ballot and the challenge is based upon grounds that the challenged elector is not qualified to remain on the list of electors, the board of registrars shall proceed to conduct a hearing on the challenge on an expedited basis prior to the certification of the consolidated returns of the election by the election superintendent. The election superintendent shall not certify such consolidated returns until such hearing is complete and the registrars have rendered their decision on the challenge. If the registrars deny the challenge, the superintendent shall proceed to certify the consolidated returns. If the registrars uphold the challenge, the name of the challenged elector shall be removed from the list of electors and the ballot of the challenged elector shall be rejected and not counted and, if necessary, the returns shall be adjusted to remove any votes cast by such elector. The elector making the challenge and the challenged elector may appeal the decision of the registrars in the same manner as provided in subsection (e) of Code Section 21–2–229.

(h) If the challenged elector appears at the polls to vote and it is practical to conduct a hearing on the challenge prior to the close of the polls, the registrars shall conduct such hearing and determine the merits of the challenge. If the registrars deny the challenge, the elector shall be permitted to vote in the election notwithstanding the fact that the polls may have closed prior to the time the registrars render their decision and the elector can actually vote, provided that the elector proceeds to vote immediately after the decision of the registrars. If the registrars uphold the challenge, the challenged elector shall not be permitted to vote and, if the challenge is based upon the grounds that the elector is not qualified to remain on the list of electors, the challenged elector's name shall be removed from the list of electors.

(i) If the challenged elector appears at the polls to vote and it is not practical to conduct a hearing prior to the close of the polls or if the registrars begin a hearing and subsequently find that a decision on the challenge cannot be rendered within a reasonable time, the challenged elector shall be permitted to vote by casting a challenged ballot on the same type of ballot that is used by the county or municipality for provisional ballots. Such challenged ballot shall be sealed in double envelopes as provided in subsection (a) of Code Section 21–2–419 and, after having the word 'Challenged,' the elector's name, and the alleged cause of the challenge written across the back of the outer envelope, the ballot shall be deposited by the person casting such ballot in a secure, sealed ballot box notwithstanding the fact that the polls may have closed prior to the time the registrars make such a determination, provided that the elector proceeds to vote immediately after such determination of the registrars. In such cases, if the challenge is based upon the grounds that the challenged elector is not qualified to remain on the list of electors, the registrars shall proceed to finish the hearing prior to the certification of the consolidated returns of the election by the election superintendent. If the challenge is based on other grounds, no further action shall be required by the registrars. The election superintendent shall not certify such consolidated returns until such hearing is complete and the registrars have rendered their decision on the challenge. If the registrars deny the challenge, the superintendent shall proceed to certify the consolidated returns. If the registrars uphold the challenge, the name of the challenged elector shall be removed from the list of electors and the ballot of the challenged elector shall be rejected and not counted and, if necessary, the returns shall be adjusted to remove any votes cast by such elector. The elector making the challenge and the challenged elector may appeal the decision of the registrars in the same manner as provided in subsection (e) of Code Section 21–2–229.

**(j) Failure to comply with the provisions of this Code section by the board of registrars shall subject such board to sanctions by the State Election Board.**"

## SECTION 17.

Said chapter is further amended in subsection (b) of Code Section 21–2–232, relating to removal of elector's name from list of electors, by adding a new paragraph to read as follows:

<< GA ST § 21–2–232 >>

"**(3) Once becoming a member of the nongovernmental entity described in subsection (d) of Code Section 21–2–225, the Secretary of State shall obtain regular information from such entity regarding electors who may have moved to another state, died, or otherwise become ineligible to vote in Georgia. The Secretary of State shall use such information to conduct list maintenance on the list of eligible electors.**"

## SECTION 18.

Said chapter is further amended by revising Code Section 21–2–263, relating to reduction in size of, or provision of additional voting equipment or poll workers to, precincts containing more than 2,000 electors when voting in such precincts at previous general election not completed one hour after closing of polls, as follows:

<< GA ST § 21–2–263 >>

### "21–2–263.

**(a)** If**,** at the previous general election**,** a precinct contained more than 2,000 electors and if all those electors desiring to vote had not completed voting one hour following the closing of the polls, the superintendent shall either reduce the size of said precinct so that it shall contain not more than 2,000 electors in accordance with the procedures prescribed by this chapter for the division, alteration, and consolidation of precincts no later than 60 days before the next general election or provide additional voting equipment or poll workers, or both, before the next general election. For administering this Code section, the chief manager of a precinct which contained more than 2,000 electors at the previous general election shall submit a report thereof, under oath, to the superintendent as to the time required for completion of voting by all persons in line at the time the polls were closed. Any such change in the boundaries of a precinct shall conform with the requirements of subsection (a) of Code Section 21–2–261.1.

**(b) If, at the previous general election, a precinct contained more than 2,000 electors and if electors desiring to vote on the day of the election had to wait in line for more than one hour before checking in to vote, the superintendent shall either reduce the size of such precinct so that it shall contain not more than 2,000 electors in accordance with the procedures prescribed by this chapter for the division, alteration, and consolidation of precincts no later than 60 days before the next general election or provide additional voting equipment or poll workers, or both, before the next general election. For administering this Code section, the chief manager of a precinct which contained more than 2,000 electors at the previous general election shall submit a report thereof to the superintendent of the reported time from entering the line to checking in to vote. Such wait time shall be measured no fewer than three different times throughout the day (in the morning, at midday, and prior to the close of polls) and such results shall be recorded on a form provided by the Secretary of State. Any such change in the boundaries of a precinct shall conform with the requirements of subsection (a) of Code Section 21–2–261.1.**"

## SECTION 19.

Said chapter is further amended by revising subsection (a) of Code Section 21–2–265, relating to duty of superintendent to select polling places, change, petition objecting to proposed change, space for political parties holding primaries, facilities for disabled voters, selection of polling place outside precinct to better serve voters, and restriction on changing polling place on or near date of election, as follows:

<< GA ST § 21–2–265 >>

"(a) The superintendent of a county or the governing authority of a municipality shall select and fix the polling place within each precinct and may, either on his, her, or its own motion or on petition of ten electors of a precinct, change the polling place within any precinct. Except in case of an emergency or unavoidable event occurring within ten days of a primary or election, which emergency or event renders any polling place unavailable for use at such primary or election, the superintendent of a county or the governing authority of a municipality shall not change any polling place until notice of the proposed change shall have been published for once a week for two consecutive weeks in the legal organ for the county or municipality in which the polling place is located. Additionally, ~~on the first election~~ **during the seven days before and on the** day **of the first election** following such change, a notice of such change shall be posted on the previous polling place and at three other places in the immediate vicinity thereof. **Each notice posted shall state the location to which the polling place has been moved and shall direct electors to the new location. At least one notice at the previous polling place shall be a minimum of four feet by four feet in size.** The occupant or owner of the previous polling place, or his or her agent, shall be notified in writing of such change at the time notice is published in the legal organ."

## SECTION 20.

Said chapter is further amended by revising subsections (a) and (b) of Code Section 21–2–266, relating to use of public buildings as polling places, use of portable or movable facilities, and unrestricted access to residential communities, as follows:

<< GA ST § 21–2–266 >>

"(a) In selecting polling places **and advance voting locations**, the superintendent of a county or the governing authority of a municipality shall select, wherever practicable and consistent with subsection (d) of Code Section 21–2–265, schoolhouses, municipal buildings or rooms, or other public buildings for that purpose. In selecting polling places **and advance voting locations**, the superintendent of a county or the governing authority of a municipality shall give consideration to the comfort and convenience those places to be selected will provide to both electors and poll officers. School, county, municipal, or other governmental authorities, upon request of the superintendent of a county or the governing authority of a municipality, shall make arrangements for the use of their property for polling places **or advance voting locations**; provided, however, that such use shall not substantially interfere with the use of such property for the purposes for which it is primarily intended.

(b) The superintendent of a county or the governing authority of the municipality shall have discretion to procure and provide portable or movable polling facilities of adequate size for any precinct**; provided, however, that buses and other readily movable facilities shall only be used in emergencies declared by the Governor pursuant to Code Section 38–3–51 to supplement the capacity of the polling place where the emergency circumstance occurred**."

## SECTION 20A.

Said chapter is further amended by revising subsection (a) of Code Section 21–2–284, relating to form of official primary ballot and attestation regarding receiving value in exchange for vote, as follows:

<< GA ST § 21–2–284 >>

"(a) In each primary separate official ballots shall be prepared for the political party holding the primary. At the top of each ballot shall be printed in prominent type the words 'OFFICIAL PRIMARY BALLOT OF _____ PARTY FOR,' followed by the **name and** designation of the precinct for which it is prepared and the name and date of the primary."

## SECTION 20B.

Said chapter is further amended by revising Code Section 21–2–284.1, relating to form of ballot in nonpartisan municipal primaries, as follows:

<< GA ST § 21–2–284.1 >>

**"21–2–284.1.**

In the case of nonpartisan municipal primaries, the form of the official nonpartisan primary ballot shall conform insofar as practicable to the form of the official primary ballot as detailed in Code Section 21–2–284, **including the printing of the name and designation of the precinct on the top of the ballot,** except that:

(1) The following shall be printed at the top of each ballot in prominent type:

'OFFICIAL NONPARTISAN PRIMARY BALLOT OF

_____

**(Name of Municipality)';**

(2) There shall be no name or designation of any political organization nor any words, designation, or emblems descriptive of a candidate's political affiliation printed under or after any candidate's name which is printed on the ballot; and

(3) The incumbency of a candidate seeking election for the public office he or she then holds shall be indicated on the ballot."

## SECTION 20C.

Said chapter is further amended by revising subsection (a) of Code Section 21–2–285, relating to form of official election ballot, attestation on receipt of benefit in exchange for vote, and when an election is not required, as follows:

<< GA ST § 21–2–285 >>

"(a) At the top of each ballot for an election shall be printed in prominent type the words 'OFFICIAL BALLOT,' followed by the **name and** designation of the precinct for which it is prepared and the name and date of the election."

## SECTION 21.

Said chapter is further amended by revising Code Section 21–2–285.1, relating to form of ballot, run-off election, and declaration of prevailing candidate in nonpartisan elections, as follows:

<< GA ST § 21–2–285.1 >>

**"21–2–285.1.**

The names of all candidates for offices which the General Assembly has by general law or local Act provided for election in a nonpartisan election shall be printed on each official primary ballot; and insofar as practicable such offices to be filled in the nonpartisan election shall be separated from the names of candidates for party nomination to other offices by being listed last on each ballot, with the top of that portion of each official primary ballot relating to the nonpartisan election to have printed in prominent type the words 'OFFICIAL NONPARTISAN ELECTION BALLOT.' In addition, there shall be a ballot that contains just the official nonpartisan election ballot available for electors who choose not to vote in a party primary. **Such ballot shall have printed at the top the name and designation of the precinct.** Directions that explain how to cast a vote, how to write in a candidate, and how to obtain a new ballot after the elector spoils his or her ballot shall appear immediately under the caption, as specified by rule or regulation of the State Election Board. Immediately under the directions, the name of each such nonpartisan candidate shall be arranged alphabetically by last name under the title of the office for which they are candidates and be printed thereunder. The incumbency of a candidate seeking election for the public office he or she then holds shall be indicated on the

ballot. No party designation or affiliation shall appear beside the name of any candidate for nonpartisan office. An appropriate space shall also be placed on the ballot for the casting of write-in votes for such offices. In the event that no candidate in such nonpartisan election receives a majority of the total votes cast for such office, there shall be a nonpartisan election runoff between the candidates receiving the two highest numbers of votes; and the names of such candidates shall be placed on the official ballot at the general primary runoff in the same manner as prescribed in this Code section for the nonpartisan election and there shall be a separate official nonpartisan election runoff  **run-off** ballot for those electors who do not choose or are not eligible to vote in the general primary runoff. In the event that only nonpartisan candidates are to be placed on a run-off ballot, the form of the ballot shall be as prescribed by the Secretary of State or election superintendent in essentially the same format as prescribed for the nonpartisan election. **Except as provided in subsection (g) of Code Section 21–2–134, the** The  candidate having a majority of the votes cast in the nonpartisan election or the candidate receiving the highest number of votes cast in the nonpartisan election runoff shall be declared duly elected to such office.”

## SECTION 21A.

Said chapter is further amended by revising paragraph (3) of subsection (b) of Code Section 21–2–286, relating to printing specifications, numbering, and binding of ballots, as follows:

<< GA ST § 21–2–286 >>

“(3) Ballots printed by an electronic ballot marker shall be designed as prescribed by the Secretary of State to ensure ease of reading by electors**, provided that each ballot shall have the name and designation of the precinct printed at the top**.”

## SECTION 21B.

Said chapter is further amended by revising Code Section 21–2–287, relating to form of absentee ballot, as follows:

<< GA ST § 21–2–287 >>

**“21–2–287.**

The form for the absentee ballot shall be in substantially the same form as the official ballots used in the precincts, except it shall be printed with only the name stub and without a number strip and may  **shall** have the precinct **name and** designation printed or stamped thereon.”

## SECTION 22.

Said chapter is further amended by revising subsection (b) of Code Section 21–2–367, relating to installation of systems, number of systems, and good working order, as follows:

<< GA ST § 21–2–367 >>

“(b)**(1)** In each precinct in which optical scanning voting systems are used **in a state-wide general election**, the county or municipal governing authority, as appropriate,  **election superintendent** shall provide at least one voting booth or enclosure for each 250 electors therein, or fraction thereof.
  **(2) For any other primary, election, or runoff, the county or municipal election superintendent may provide a greater or lesser number of voting booths or enclosures if, after a thorough consideration of the type of election, expected turnout, the number of electors who have already voted by advance voting or absentee ballot, and other relevant factors that inform the appropriate amount of equipment needed, such superintendent determines that a different amount of equipment is needed or sufficient. Such determination shall be subject to the provisions of Code Section 21–2–263.**”

## SECTION 23.

Said chapter is further amended by revising Code Section 21–2–372, relating to ballot description, as follows:

<< GA ST § 21–2–372 >>

### "21–2–372.

Ballots shall be of suitable design, size, and stock to permit processing by a ballot scanner and shall be printed in black ink on clear, white, or colored material. **Other than ballots delivered electronically to qualified electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. Section 20301, et seq., the ballots shall be printed on security paper that incorporates features which can be used to authenticate the ballot as an official ballot but which do not make the ballot identifiable to a particular elector.**"

## SECTION 23A.

Said chapter is further amended in Code Section 21–2–379.23, relating to requirements for ballot display for electronic ballot markers, role of Secretary of State, and printed paper ballot controls during recount, by adding a new subsection to read as follows:

<< GA ST § 21–2–379.23 >>

"**(e) Each ballot printed by an electronic ballot marker shall include the name and designation of the precinct at the top.**"

## SECTION 24.

Said chapter is further amended by revising subsection (c) of Code Section 21–2–379.25, relating to programming for ballot design and style, verification, appointment of custodians, and role of custodians, as follows:

<< GA ST § 21–2–379.25 >>

"(c) On or before the third day preceding a primary or election, including special primaries, special elections, and referendum elections, the superintendent shall have each electronic ballot marker tested to ascertain that it will correctly record the votes cast for all offices and on all questions and produce a ballot reflecting such choices of the elector in a manner that the State Election Board shall prescribe by rule or regulation. Public notice of the time and place of the test shall be made at least five days prior thereto; provided, however, that, in the case of a runoff, the public notice shall be made at least three days prior thereto . **The superintendent of each county or municipality shall publish such notice on the homepage of the county's or municipality's publicly accessible website associated with elections, if the county or municipality maintains a publicly accessible website, and in a newspaper of general circulation in the county or municipality and by posting in a prominent location in the county or municipality. Such notice shall state the date, time, and place or places where preparation and testing of the voting system components for use in the primary or election will commence, that such preparation and testing shall continue from day to day until complete, and that representatives** Representatives  of political parties and bodies, news media, and the public shall be permitted to observe such tests. **The superintendent of the county or municipality shall also provide such notice to the Secretary of State who shall publish on his or her website the information received from superintendents stating the dates, times, and locations for preparation and testing of voting system components. However, such representatives of political parties and bodies, news media, and the public shall not in any manner interfere with the preparation and testing of voting system components. The advertisement in the newspaper of general circulation shall be prominently displayed, shall not be less than 30 square inches, and shall not be placed in the section of the newspaper where legal notices appear.**"

## SECTION 25.

Said chapter is further amended by revising Code Section 21–2–381, relating to making of application for absentee ballot, determination of eligibility by ballot clerk, furnishing of applications to colleges and universities, and persons entitled to make application, as follows:

<< GA ST § 21–2–381 >>

## "21–2–381.

(a)(1)(A) Except as otherwise provided in Code Section 21–2–219 **or for advance voting described in subsection (d) of Code Section 21–2–385**, not ~~more~~ **earlier** than ~~180~~ **78** days **or less than 11 days** prior to the date of the primary or election, or runoff of either, in which the elector desires to vote, any absentee elector may make, either by mail, by facsimile transmission, by electronic transmission, or in person in the registrar's or absentee ballot clerk's office, an application for an official ballot of the elector's precinct to be voted at such primary, election, or runoff. **To be timely received, an application for an absentee-by-mail ballot shall be received by the board of registrars or absentee ballot clerk no later than 11 days prior to the primary, election, or runoff. For advance voting in person, the application shall be made within the time period set forth in subsection (d) of Code Section 21–2–385.**

(B) In the case of an elector residing temporarily out of the county or municipality or a physically disabled elector residing within the county or municipality, the application for the elector's absentee ballot may, upon satisfactory proof of relationship, be made by such elector's mother, father, grandparent, aunt, uncle, sister, brother, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, or sister-in-law of the age of 18 or over.

(C)**(i) Any person applying for an absentee-by-mail ballot shall make application in writing on the form made available by the Secretary of State. In order to confirm the identity of the voter, such form shall require the elector to provide his or her name, date of birth, address as registered, address where the elector wishes the ballot to be mailed, and the number of his or her Georgia driver's license or identification card issued pursuant to Article 5 of Chapter 5 of Title 40. If such elector does not have a Georgia driver's license or identification card issued pursuant to Article 5 of Chapter 5 of Title 40, the elector shall affirm this fact in the manner prescribed in the application and the elector shall provide a copy of a form of identification listed in subsection (c) of Code Section 21–2–417. The form made available by the Secretary of State shall include a space to affix a photocopy or electronic image of such identification. The Secretary of State shall develop a method to allow secure electronic transmission of such form.** The application shall ~~be in writing and shall contain sufficient information for proper identification of the elector;~~ ~~the permanent or temporary address of the elector to which the absentee ballot shall be mailed;~~ **also include** the identity of the primary, election, or runoff in which the elector wishes to vote; ~~and~~ the name and relationship of the person requesting the ballot if other than the elector**; and an oath for the elector or relative to write his or her usual signature with a pen and ink affirming that the elector is a qualified Georgia elector and the facts presented on the application are true. Submitting false information on an application for an absentee ballot shall be a violation of Code Sections 21–2–560 and 21–2–571**.

> **(ii) A blank application for an absentee ballot shall be made available online by the Secretary of State and each election superintendent and registrar, but neither the Secretary of State, election superintendent, board of registrars, other governmental entity, nor employee or agent thereof shall send absentee ballot applications directly to any elector except upon request of such elector or a relative authorized to request an absentee ballot for such elector. No person or entity other than a relative authorized to request an absentee ballot for such elector or a person signing as assisting an illiterate or physically disabled elector shall send any elector an absentee ballot application that is prefilled with the elector's required information set forth in this subparagraph. No person or entity other than the elector, a relative authorized to request an absentee ballot for such elector, a person signing as assisting an illiterate or physically disabled elector with his or her application, a common carrier charged with returning the ballot application, an absentee ballot clerk, a registrar, or a law enforcement officer in the course of an investigation shall handle or return an elector's**

**completed absentee ballot application. Handling a completed absentee ballot application by any person or entity other than as allowed in this subsection shall be a misdemeanor. Any application for an absentee ballot sent to any elector by any person or entity shall utilize the form of the application made available by the Secretary of State and shall clearly and prominently disclose on the face of the form:**

**'This is NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot. It is being distributed by [insert name and address of person, organization, or other entity distributing such document or material].'**

**(iii) The disclaimer required by division (ii) of this subparagraph shall be:**

>**(I) Of sufficient font size to be clearly readable by the recipient of the communication;**
>
>**(II) Be contained in a printed box set apart from the other contents of the communication; and**
>
>**(III) Be printed with a reasonable degree of color contrast between the background and the printed disclaimer.**

(D) Except in the case of physically disabled electors residing in the county or municipality or electors in custody in a jail or other detention facility in the county or municipality, no absentee ballot shall be mailed to an address other than the permanent mailing address of the elector as recorded on the elector's voter registration record or a temporary out-of-county or out-of-municipality address. **Upon request, electors held in jails or other detention facilities who are eligible to vote shall be granted access to the necessary personal effects for the purpose of applying for and voting an absentee ballot pursuant to this chapter.**

(E) Relatives applying for absentee ballots for electors must also sign an oath stating that facts in the application are true.

(F) If the elector is unable to fill out or sign such elector's own application because of illiteracy or physical disability, the elector shall make such elector's mark, and the person filling in the rest of the application shall sign such person's name below it as a witness.

(G) Any elector meeting criteria of advance age or disability specified by rule or regulation of the State Election Board or any elector who is entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. Section 1973ff, et seq., as amended, may request in writing on one application a ballot for a presidential preference primary held pursuant to Article 5 of this chapter and for a primary as well as for any runoffs resulting therefrom and for the election for which such primary shall nominate candidates as well as any runoffs resulting therefrom. If not so requested by such person, a separate and distinct application shall be required for each primary, run-off primary, election, and run-off election. Except as otherwise provided in this subparagraph, a separate and distinct application for an absentee ballot shall always be required for any special election or special primary.

(2) A properly executed registration card submitted under the provisions of subsection (b) of Code Section 21–2–219, if submitted within 180 days of a primary or election in which the registrant is entitled to vote, shall be considered to be an application for an absentee ballot under this Code section, or for a special absentee ballot under Code Section 21–2–381.1, as appropriate.

(3)**(A) All persons or entities, other than the Secretary of State, election superintendents, boards of registrars, and absentee ballot clerks, that send applications for absentee ballots to electors in a primary, election, or runoff shall mail such applications only to individuals who have not already requested, received, or voted an absentee ballot in the primary, election, or runoff. Any such person or entity shall compare its mail distribution list with the most recent information available about which electors have requested, been issued, or voted an absentee ballot in the primary, election, or runoff and shall remove the names of such electors from its mail distribution list. A person or entity shall not be liable for any violation of this subparagraph if such person or entity relied upon information made available by the Secretary of State within five business days prior to the date such applications are mailed.**

>**(B) A person or entity in violation of subparagraph (A) of this paragraph shall be subject to sanctions by the State Election Board which, in addition to all other possible sanctions, may include requiring such person or entity to pay restitution to each affected county or municipality in an amount up to $100.00 per duplicate absentee ballot application that is processed by the county or municipality due to such violation or the actual cost incurred by each affected county or municipality for the processing of such duplicate absentee ballot applications.** Reserved.

(4) In extraordinary circumstances as described in Code Section 21–2–543.1, the registrar or absentee ballot clerk shall determine if the applicants are eligible to vote under this Code section and shall either mail or issue the absentee ballots for the election for representative in the United States Congress to an individual entitled to make application for absentee ballot under subsection (d) of this Code section the same day any such application is received, so long as the application is received by 3:00 P.M., otherwise no later than the next business day following receipt of the application. Any valid absentee ballot shall be accepted and processed so long as the ballot is received by the registrar or absentee ballot clerk not later than 45 days after the ballot is transmitted to the absent uniformed services voter or overseas voter, but in no event later than 11 days following the date of the election.

(b)(1) Upon receipt of a timely application for an absentee ballot, a registrar or absentee ballot clerk shall enter thereon the date received. The registrar or absentee ballot clerk shall **verify the identity of the applicant and** determine, in accordance with the provisions of this chapter, if the applicant is eligible to vote in the primary or election involved. In order to be found eligible to vote an absentee ballot by mail **verify the identity of the applicant**, the registrar or absentee ballot clerk shall compare the identifying information **applicant's name, date of birth, and number of his or her Georgia driver's license or identification card issued pursuant to Article 5 of Chapter 5 of Title 40** on the application with the information on file in the registrar's office and, if the application is signed by the elector, compare the signature or mark of the elector on the application with the signature or mark of the elector on the elector's voter registration card . **If the application does not contain the number of the applicant's Georgia driver's license or identification card issued pursuant to Article 5 of Chapter 5 of Title 40, the registrar or absentee ballot clerk shall verify that the identification provided with the application identifies the applicant.** In order to be found eligible to vote an absentee ballot in person at the registrar's office or absentee ballot clerk's office, such person shall show one of the forms of identification listed in Code Section 21–2–417 and the registrar or absentee ballot clerk shall compare the identifying information on the application with the information on file in the registrar's office.

(2) If found eligible, the registrar or absentee ballot clerk shall certify by signing in the proper place on the application and then:

(A) Shall mail the ballot as provided in this Code section;

(B) If the application is made in person, shall issue the ballot to the elector within the confines of the registrar's or absentee ballot clerk's office as required by Code Section 21–2–383 if the ballot is issued during the advance voting period established pursuant to subsection (d) of Code Section 21–2–385; or

(C) May deliver the ballot in person to the elector if such elector is confined to a hospital.

(3) If found ineligible **or if the application is not timely received**, the clerk or the board of registrars shall deny the application by writing the reason for rejection in the proper space on the application and shall promptly notify the applicant in writing of the ground of ineligibility, a copy of which notification should be retained on file in the office of the board of registrars or absentee ballot clerk for at least one year. However, an absentee ballot application shall not be rejected **solely** due to an apparent **a** mismatch between the signature **identifying information** of the elector on the application and the signature **identifying information** of the elector on file with the board of registrars. In such cases, the board of registrars or absentee ballot clerk shall send the elector a provisional absentee ballot with the designation 'Provisional Ballot' on the outer oath envelope and information prepared by the Secretary of State as to the process to be followed to cure the signature discrepancy. If such ballot is returned to the board of registrars or absentee ballot clerk prior to the closing of the polls on the day of the primary or election, the elector may cure the signature discrepancy by submitting an affidavit to the board of registrars or absentee ballot clerk along with a copy of one of the forms of identification enumerated in subsection (c) of Code Section 21–2–417 before the close of the period for verifying provisional ballots contained in subsection (c) of Code Section 21–2–419. If the board of registrars or absentee ballot clerk finds the affidavit and identification to be sufficient, the absentee ballot shall be counted as other absentee ballots. If the board of registrars or absentee ballot clerk finds the affidavit and identification to be insufficient, then the procedure contained in Code Section 21–2–386 shall be followed for rejected absentee ballots.

(4) If the registrar or clerk is unable to determine the identity of the elector from information given on the application **or if the application is not complete or if the oath on the application is not signed**, the registrar or clerk should promptly write **contact the elector in writing** to request **the necessary** additional information **and a signed copy of the oath**.

(5) In the case of an unregistered applicant who is eligible to register to vote, the clerk or the board shall immediately mail a blank registration card as provided by Code Section 21–2–223, and such applicant, if otherwise qualified, shall be deemed

eligible to vote by absentee ballot in such primary or election, if the registration card, properly completed, is returned to the clerk or the board on or before the last day for registering to vote in such primary or election. ~~If the closing date for registration in the primary or election concerned has not passed, the clerk or registrar shall also mail a ballot to the applicant, as soon as it is prepared and available; and the ballot shall be cast in such primary or election if returned to the clerk or board not later than the close of the polls on the day of the primary or election concerned.~~

(c) In those counties or municipalities in which the absentee ballot clerk or board of registrars provides application forms for absentee ballots, the clerk or board shall provide such quantity of the application form to the dean of each college or university located in that county as said dean determines necessary for the students of such college or university.

(d)(1) A citizen of the United States permanently residing outside the United States is entitled to make application for an absentee ballot from Georgia and to vote by absentee ballot in any election for presidential electors and United States senator or representative in Congress:

(A) If such citizen was last domiciled in Georgia immediately before his or her departure from the United States; and

(B) If such citizen could have met all qualifications, except any qualification relating to minimum voting age, to vote in federal elections even though, while residing outside the United States, he or she does not have a place of abode or other address in Georgia.

(2) An individual is entitled to make application for an absentee ballot under paragraph (1) of this subsection even if such individual's intent to return to Georgia may be uncertain, as long as:

(A) He or she has complied with all applicable Georgia qualifications and requirements which are consistent with 42 U.S.C. Section 1973ff concerning absentee registration for and voting by absentee ballots;

(B) He or she does not maintain a domicile, is not registered to vote, and is not voting in any other state or election district of a state or territory or in any territory or possession of the United States; and

(C) He or she has a valid passport or card of identity and registration issued under the authority of the Secretary of State of the United States or, in lieu thereof, an alternative form of identification consistent with 42 U.S.C. Section 1973ff and applicable state requirements, if a citizen does not possess a valid passport or card of identity and registration.

(e) The State Election Board is authorized to promulgate reasonable rules and regulations for the implementation of paragraph (1) of subsection (a) of this Code section. Said rules and regulations may include provisions for the limitation of opportunities for fraudulent application, including, but not limited to, comparison of voter registration records with death certificates."

### SECTION 26.

Said chapter is further amended by revising Code Section 21–2–382, relating to additional sites as additional registrar's office or place of registration for absentee ballots, as follows:

<< GA ST § 21–2–382 >>

**"21–2–382.**

(a) Any other provisions of this chapter to the contrary notwithstanding, the board of registrars may establish ~~additional sites as~~ additional registrar's offices or places of registration for the purpose of receiving absentee ballots under Code Section 21–2–381 and for the purpose of ~~voting absentee ballots~~ **advance voting** under Code Section 21–2–385, provided that any such site **is a building that** is a branch of the county courthouse, a courthouse annex, a government service center providing general government services, another government building generally accessible to the public, or a ~~location~~ **building** that is used as an election day polling place, notwithstanding that such ~~location~~ **building** is not a government building.

(b) Any other provisions of this chapter to the contrary notwithstanding, in all counties of this state having a population of 550,000 or more according to the United States decennial census of 1990 or any future such census, any **building that is a**

branch of the county courthouse or courthouse annex established within any such county shall be an additional registrar's or absentee ballot clerk's office or place of registration for the purpose of receiving absentee ballots under Code Section 21–2–381 and for the purpose of ~~voting absentee ballots~~ **advance voting** under Code Section 21–2–385.

**(c)(1) A board of registrars or absentee ballot clerk shall establish at least one drop box as a means for absentee by mail electors to deliver their ballots to the board of registrars or absentee ballot clerk. A board of registrars or absentee ballot clerk may establish additional drop boxes, subject to the limitations of this Code section, but may only establish additional drop boxes totaling the lesser of either one drop box for every 100,000 active registered voters in the county or the number of advance voting locations in the county. Any additional drop boxes shall be evenly geographically distributed by population in the county. Drop boxes established pursuant to this Code section shall be established at the office of the board of registrars or absentee ballot clerk or inside locations at which advance voting, as set forth in subsection (d) of Code Section 21–2–385, is conducted in the applicable primary, election, or runoff and may be open during the hours of advance voting at that location. Such drop boxes shall be closed when advance voting is not being conducted at that location. All drop boxes shall be closed when the advance voting period ends, as set forth in subsection (d) of Code Section 21–2–385. The drop box location shall have adequate lighting and be under constant surveillance by an election official or his or her designee, law enforcement official, or licensed security guard. During an emergency declared by the Governor pursuant to Code Section 38–3–51, drop boxes may be located outside the office of the board of registrars or absentee ballot clerk or outside of locations at which advance voting is taking place, subject to the other limitations of this Code section.**

**(2) The opening slot of a drop box shall not allow ballots to be tampered with or removed and shall be designed to minimize the ability for liquid or other substances that may damage ballots to be poured into the drop box. A drop box shall be labeled "OFFICIAL ABSENTEE BALLOT DROP BOX" and shall clearly display the signage developed by the Secretary of State pertaining to Georgia law with regard to who is allowed to return absentee ballots and destroying, defacing, or delaying delivery of ballots.**

**(3) The board of registrars or absentee ballot clerk shall arrange for the collecting and return of ballots deposited at each drop box at the conclusion of each day where advance voting takes place. Collection of ballots from a drop box shall be made by a team of at least two people. Any person collecting ballots from a drop box shall have sworn an oath in the same form as the oath for poll officers set forth in Code Section 21–2–95. The collection team shall complete and sign a ballot transfer form upon removing the ballots from the drop box which shall include the date, time, location, number of ballots, confirmation that the drop box was locked after the removal of the ballots, and the identity of each person collecting the ballots. The collection team shall then immediately transfer the ballots to the board of registrars or absentee ballot clerk, who shall process and store the ballots in the same manner as absentee ballots returned by mail are processed and stored. The board of registrars, absentee ballot clerk, or a designee of the board of registrars or absentee ballot clerk shall sign the ballot transfer form upon receipt of the ballots from the collection team. Such form shall be considered a public record pursuant to Code Section 50–18–70.**

**(4) At the beginning of voting at each advance location where a drop box is present, the manager of the advance voting location shall open the drop box and confirm on the reconciliation form for that advance voting location that the drop box is empty. If the drop box is not empty, the manager shall secure the contents of the drop box and immediately inform the election superintendent, board of registrars, or absentee ballot clerk, who shall inform the Secretary of State."**

## SECTION 27.

Said chapter is further amended by revising Code Section 21–2–384, relating to preparation and delivery of supplies, mailing of ballots, oath of absentee electors and persons assisting absentee electors, master list of ballots sent, challenges, and electronic transmission of ballots, as follows:

<< GA ST § 21–2–384 >>

**"21–2–384.**

(a)(1) The superintendent shall, in consultation with the board of registrars or absentee ballot clerk, prepare, obtain, and deliver before the date specified in paragraph (2) of this subsection an adequate supply of official absentee ballots to the board of registrars or absentee ballot clerk for use in the primary or election or as soon as possible prior to a runoff. Envelopes and other supplies as required by this article may be ordered by the superintendent, the board of registrars, or the absentee ballot clerk for use in the primary or election.

(2) The board of registrars or absentee ballot clerk shall mail or issue official absentee ballots to all eligible applicants not more than 49 **29** days but not less than 45 **25** days prior to any presidential preference primary, general primary other than a municipal general primary, general election other than a municipal general election, or special primary or special election in which there is a candidate for a federal office on the ballot; 22 days prior to any municipal general primary or municipal general election; and as soon as possible prior to any runoff. In the case of all other special primaries or special elections, the board of registrars or absentee ballot clerk shall mail or issue official absentee ballots to all eligible applicants within three days after the receipt of such ballots and supplies, but no earlier than 22 days prior to the election; provided, however, that should **official absentee ballots shall be issued to** any elector of the jurisdiction be permitted to vote by absentee ballot **who is entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizen Absentee Voting Act, 52 U.S.C. Section 20301, et seq., as amended,** beginning 49 days prior to a **federal** primary or election, all eligible applicants of such jurisdiction shall be entitled to vote by absentee ballot beginning 49 days prior to such primary or election **and not later than 45 days prior to a federal primary or election**. As additional applicants **who submitted timely applications for an absentee ballot** are determined to be eligible, the board or clerk shall mail or issue official absentee ballots to such additional applicants immediately upon determining their eligibility; provided, however, that no absentee ballot shall be mailed by the registrars or absentee ballot clerk on the day prior to a primary or election and provided, further, that no absentee ballot shall be issued on the day prior to a primary or election **. For all timely received applications for absentee ballots, the board of registrars or absentee ballot clerk shall mail or issue absentee ballots, provisional absentee ballots, and notices of rejection as soon as possible upon determining their eligibility within the time periods set forth in this subsection. During the period for advance voting set forth in Code Section 21–2–385, the board of registrars or absentee ballot clerk shall make such determinations and mail or issue absentee ballots, provisional absentee ballots, and notices of rejection of application within three days after receiving a timely application for an absentee ballot.** The board of registrars **or absentee ballot clerk** shall, within the same **time periods specified in this subsection, electronically transmit official absentee ballots to all electors who have requested to receive their official absentee ballot electronically and are entitled to vote such absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. Section 1973ff **52 U.S.C. Section 20301**, et seq., as amended.

(3) The date a ballot is voted in the registrar's or absentee ballot clerk's office or the date a ballot is mailed or issued to an elector and the date it is returned shall be entered on the application record therefor.

(4) **Notwithstanding any other provision of this chapter, an elector confined in a hospital may make application for an absentee ballot** The delivery of an absentee ballot to a person confined in a hospital may be made by the registrar or clerk on the day of a primary or election or during a five-day **ten-day** period immediately preceding the day of such primary or election. **Such application shall immediately be processed and, if such applicant is determined to be eligible, the board of registrars or absentee ballot clerk may deliver the absentee ballot to such elector.**

(5) In the event an absentee ballot which has been mailed by the board of registrars or absentee ballot clerk is not received by the applicant, the applicant may notify the board of registrars or absentee ballot clerk and sign an affidavit stating that the absentee ballot has not been received. The board of registrars or absentee ballot clerk shall then issue a second absentee ballot to the applicant and cancel the original ballot issued. The affidavit shall be attached to the original application. A second application for an absentee ballot shall not be required.

(b) Except for ballots voted within the confines of the registrar's or absentee ballot clerk's office, in addition to the mailing envelope addressed to the elector, the superintendent, board of registrars, or absentee ballot clerk shall provide two envelopes for each official absentee ballot, of such size and shape as shall be determined by the Secretary of State, in order to permit the placing of one within the other and both within the mailing envelope. On the smaller of the two envelopes to be enclosed in the mailing envelope shall be printed the words 'Official Absentee Ballot' and nothing else. On the back of the **The** larger of the

two envelopes to be enclosed within the mailing envelope shall be printed **contain** the form of oath of the elector and the oath for persons assisting electors, as provided for in Code Section 21–2–409, and the penalties provided for in Code Sections 21–2–568, 21–2–573, 21–2–579, and 21–2–599 for violations of oaths; and on **a place for the elector to print his or her name; a signature line; a space for the elector to print the number of his or her Georgia driver's license or identification card issued pursuant to Article 5 of Chapter 5 of Title 40; a space for the elector to mark to affirm that he or she does not have a Georgia driver's license or identification card issued pursuant to Article 5 of Chapter 5 of Title 40; a space for the elector to print his or her date of birth; and a space for the elector to print the last four digits of his or her social security number, if the elector does not have a Georgia driver's license or state identification card issued pursuant to Article 5 of Chapter 5 of Title 40. The envelope shall be designed so that the number of the elector's Georgia driver's license or identification card issued pursuant to Article 5 of Chapter 5 of Title 40, the last four digits of the elector's social security number, and the elector's date of birth shall be hidden from view when the envelope is correctly sealed. Any person other than the elector who requested the ballot, an authorized person who is assisting the elector entitled to assistance in voting pursuant to Code Section 21–2–409, an absentee ballot clerk, registrar, or law enforcement officer in the course of an investigation who knowingly unseals a sealed absentee ballot envelope shall be guilty of a felony. On** the face of such envelope shall be printed the name and address of the board of registrars or absentee ballot clerk. The larger of the two envelopes shall also display the elector's name and voter registration number. The mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, the uniform instructions for the manner of preparing and returning the ballot, in form and substance as provided by the Secretary of State, provisional absentee ballot information, if necessary, and a notice in the form provided by the Secretary of State of all withdrawn, deceased, and disqualified candidates and any substitute candidates pursuant to Code Sections 21–2–134 and 21–2–155 and nothing else. The uniform instructions shall include information specific to the voting system used for absentee voting concerning the effect of overvoting or voting for more candidates than one is authorized to vote for a particular office and information concerning how the elector may correct errors in voting the ballot before it is cast including information on how to obtain a replacement ballot if the elector is unable to change the ballot or correct the error. **The uniform instructions shall prominently include specific instructions stating that the elector shall mark his or her ballot in private and sign the oath by writing his or her usual signature with a pen and ink under penalty of false swearing that the elector has not allowed any person to observe the marking of his or her ballot other than an authorized person lawfully assisting the elector if the elector is entitled to assistance, the elector's child under 18 years of age, or any child under 12 years of age and that the elector will not permit any unauthorized person to deliver or return the voted ballot to the board of registrars. The uniform instructions shall include a list of authorized persons who may deliver or return the voted ballot to the board of registrars on behalf of the elector as provided in subsection (a) of Code Section 21–2–385. The uniform instructions shall include the contact information of the Secretary of State which may be used by the elector to report any unauthorized person requesting to observe the elector voting his or her ballot or the elector's voted ballot or any unauthorized person offering to deliver or return the voted ballot to the board of registrars.**

(c)(1) The oaths referred to in subsection (b) of this Code section shall be in substantially the following form:

I, the undersigned, do swear (or affirm) **under penalty of false swearing** that I am a citizen of the United States and of the State of Georgia; that I possess the qualifications of an elector required by the laws of the State of Georgia; that I am entitled to vote in the precinct containing my residence in the primary or election in which this ballot is to be cast; that I am eligible to vote by absentee ballot; that I have not marked or mailed any other absentee ballot, nor will I mark or mail another absentee ballot for voting in such primary or election; nor shall I vote therein in person; and that I have read and understand the instructions accompanying this ballot; and that I have carefully complied with such instructions in completing this ballot**; that I have marked and sealed this ballot in private and have not allowed any unauthorized person to observe the voting of this ballot or how this ballot was voted except those authorized under state and federal law; and that I will not give or transfer this ballot to any person not authorized by law to deliver or return absentee ballots**. I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law.

_____

Signature or Mark of Elector

_____

Printed Name of Elector

Oath of Person Assisting Elector (if any):

I, the undersigned, do swear (or affirm) that I assisted the above-named elector in marking such elector's absentee ballot as such elector personally communicated such elector's preference to me; and that such elector is entitled to receive assistance in voting under provisions of subsection (a) of Code Section 21–2–409.

This, the _____ day of _____, _____.

_____

Signature of Person Assisting Elector

_____

Printed Name of Person Assisting Elector

Reason for assistance (Check appropriate square):

☐ Elector is unable to read the English language.

☐ Elector requires assistance due to physical disability.

The forms upon which such oaths are printed shall contain the following information:

Georgia law provides that any person who knowingly falsifies information so as to vote illegally by absentee ballot or who illegally gives or receives assistance in voting, as specified in Code Section 21–2–568 or 21–2–573, shall be guilty of a felony.

(2) In the case of absent uniformed services or overseas voters, if the presidential designee under Section 705(b) of the federal Help America Vote Act promulgates a standard oath for use by such voters, the Secretary of State shall be required to use such oath on absentee ballot materials for such voters and such oath shall be accepted in lieu of the oath set forth in paragraph (1) of this subsection.

(d) Each board of registrars or absentee ballot clerk shall maintain for public inspection a master list, arranged by precincts, setting forth the name and residence of every elector to whom an official absentee ballot has been sent. Absentee electors whose names appear on the master list may be challenged by any elector prior to 5:00 P.M. on the day before ~~the primary or election~~ **absentee ballots are to begin being scanned and tabulated**.

(e)**(1) The election superintendent shall prepare special absentee run-off ballots for general primaries and general elections for use by qualified electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. Section 20301, et seq.**

**(2) Such special absentee run-off ballots for the general primary shall list the titles of all offices being contested at the general primary and the candidates qualifying for such general primary for each office and shall permit the elector to vote in the general primary runoff by indicating his or her order of preference for each candidate for each office. A separate ballot shall be prepared for each political party, but a qualified elector under this subsection shall be mailed only the ballot of the political party in whose primary such elector requests to vote. The Secretary of State shall prepare instructions for use with such special absentee run-off ballots, including instructions for voting by mail using an electronically transmitted ballot. Such ballot shall be returned by the elector in the same manner as other absentee ballots by such electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. Section 20301, et seq.**

**(3) Such special absentee run-off ballots for the general election shall list the titles of all offices being contested at the general election and the candidates qualifying for such general election for each office and shall permit the elector to vote in the general election runoff by indicating his or her order of preference for each candidate for each office.**

**(4) To indicate order of preference for each candidate for each office to be voted on, an elector shall put the numeral '1' next to the name of the candidate who is the elector's first choice for such office, the numeral '2' for the elector's second choice, and so forth, in consecutive numerical order, such that a numeral indicating the elector's preference is written by the elector next to each candidate's name on the ballot. An elector shall not be required to indicate preference for more than one candidate for an office if the elector so chooses.**

**(5) A special absentee run-off ballot shall be enclosed with each general primary absentee ballot sent to an elector who is entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. Section 20301, et seq., along with instructions on how to cast the special absentee run-off ballot and the two envelopes to be used in returning such ballot as provided in subsection (b) of this Code section, provided that the envelopes bear the notation of 'Official Overseas/Military General Primary Run-off Ballot.' An elector shall be sent only the ballot containing the candidates of the political party in whose primary such elector desires to vote.**

**(6) A special absentee run-off ballot shall be enclosed with each general election absentee ballot sent to an elector entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. Section 20301, et seq., along with instructions on how to cast the special absentee run-off ballot and the two envelopes to be used in returning such ballot as provided in subsection (b) of this Code section, provided that the envelopes bear the notation of 'Official Overseas/Military General Election Run-off Ballot.'** The State Election Board shall by rule or regulation establish procedures for the transmission of blank absentee ballots by mail and by electronic transmission for all electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. Section ~~20302~~ **20301**, et seq., as amended, and by which such electors may designate whether the elector prefers the transmission of such ballots by mail or electronically, for use in county, state, and federal primaries, elections, and runoffs in this state and, if the Secretary of State finds it to be feasible, for use in municipal primaries, elections, and runoffs. If no preference is stated, the ballot shall be transmitted by mail. The State Election Board shall by rule or regulation establish procedures to ensure to the extent practicable that the procedures for transmitting such ballots shall protect the security and integrity of such ballots and shall ensure that the privacy of the identity and other personal data of such electors who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. Section ~~20302~~ **20301**, et seq., as amended, to whom a blank absentee ballot is transmitted under this Code section is protected throughout the process of such transmission."

### SECTION 28.

Said chapter is further amended by revising subsections (a) and (d) of and adding a new subsection to Code Section 21–2–385, relating to procedure for voting by absentee ballot and advance voting, to read as follows:

<< GA ST § 21–2–385 >>

"(a) At any time after receiving an official absentee ballot, but before the day of the primary or election, except electors who are confined to a hospital on the day of the primary or election, the elector shall vote his or her absentee ballot, then fold the ballot and enclose and securely seal the same in the envelope on which is printed 'Official Absentee Ballot.' This envelope shall then be placed in the second one, on which is printed the form of the oath of the elector; the name and oath of the person assisting, if any; and other required identifying information. The elector shall then fill out, subscribe, and swear to the oath printed on such envelope. **In order to verify that the absentee ballot was voted by the elector who requested the ballot, the elector shall print the number of his or her Georgia driver's license number or identification card issued pursuant to Article 5 of Chapter 5 of Title 40 in the space provided on the outer oath envelope. The elector shall also print his or her date of birth in the space provided in the outer oath envelope. If the elector does not have a Georgia driver's license or state identification card issued pursuant to Article 5 of Chapter 5 of Title 40, the elector shall so affirm in the space provided on the outer oath envelope and print the last four digits of his or her social security number in the space provided on the outer oath envelope. If the elector does not have a Georgia driver's license, identification card issued pursuant to Article 5 of Chapter 5 of Title 40, or a social security number, the elector shall so affirm in the space provided on the outer oath envelope and place a copy of one of the forms of identification set forth in subsection (c) of Code Section 21–2–**

**417 in the outer envelope.** Such envelope shall then be securely sealed and the elector shall then personally mail or personally deliver same to the board of registrars or absentee ballot clerk, provided that mailing or delivery may be made by the elector's mother, father, grandparent, aunt, uncle, brother, sister, spouse, son, daughter, niece, nephew, grandchild, son-in-law, daughter-in-law, mother-in-law, father-in-law, brother-in-law, sister-in-law, or an individual residing in the household of such elector. The absentee ballot of a disabled elector may be mailed or delivered by the caregiver of such disabled elector, regardless of whether such caregiver resides in such disabled elector's household. The absentee ballot of an elector who is in custody in a jail or other detention facility may be mailed or delivered by any employee of such jail or facility having custody of such elector. An elector who is confined to a hospital on a primary or election day to whom an absentee ballot is delivered by the registrar or absentee ballot clerk shall then and there vote the ballot, seal it properly, and return it to the registrar or absentee ballot clerk. If the elector registered to vote for the first time in this state by mail and has not previously provided the identification required by Code Section 21–2–220 and votes for the first time by absentee ballot and fails to provide the identification required by Code Section 21–2–220 with such absentee ballot, such absentee ballot shall be treated as a provisional ballot and shall be counted only if the registrars are able to verify the identification and registration of the elector during the time provided pursuant to Code Section 21–2–419."

"(d)(1) There shall be a period of advance voting that shall commence:
　　(A) On the fourth Monday immediately prior to each primary or election; **and**
　　(B) On the fourth Monday immediately prior to a runoff from a general primary;
　　(C) On the fourth Monday immediately prior to a runoff from a general election in which there are candidates for a federal office on the ballot in the runoff; and
　　(D) **(B)** As soon as possible prior to a runoff from any other general **primary or** election in which there are only state or county candidates on the ballot in the runoff but no later than the second Monday immediately prior to such runoff

and shall end on the Friday immediately prior to each primary, election, or runoff. Voting shall be conducted during normal business hours **beginning at 9:00 A.M. and ending at 5:00 P.M.** on weekdays**, other than observed state holidays,** during such period and shall be conducted on the second Saturday **and third Saturdays during the hours of 9:00 A.M. through 5:00 P.M. and, if the registrar or absentee ballot clerk so chooses, the second Sunday, the third Sunday, or both the second and third Sundays** prior to a primary or election during the hours of 9:00 A.M. through 4:00 P.M. **determined by the registrar or absentee ballot clerk, but no longer than 7:00 A.M. through 7:00 P.M.**; provided, however, that in primaries and elections in which there are no federal or state candidates on the ballot, no Saturday voting hours shall be required; and provided, further, that if such second Saturday is a public and legal holiday pursuant to Code Section 1–4–1, if such second Saturday follows a public and legal holiday occurring on the Thursday or Friday immediately preceding such second Saturday, or if such second Saturday immediately precedes a public and legal holiday occurring on the following Sunday or Monday, such advance voting shall not be held on such second Saturday but shall be held on the third Saturday prior to such primary or election **beginning at 9:00 A.M. and ending at 5:00 P.M**. Except as otherwise provided in this paragraph, counties and municipalities **the registrars** may extend the hours for voting beyond regular business hours **to permit advance voting from 7:00 A.M. until 7:00 P.M.** and may provide for additional voting locations pursuant to Code Section 21–2–382 to suit the needs of the electors of the jurisdiction at their option**; provided, however, that voting shall occur only on the days specified in this paragraph and counties and municipalities shall not be authorized to conduct advance voting on any other days**.

　　(2) The registrars or absentee ballot clerk, as appropriate, shall provide reasonable notice to the electors of their jurisdiction of the availability of advance voting as well as the times, dates, and locations at which advance voting will be conducted. In addition, the registrars or absentee ballot clerk shall notify the Secretary of State in the manner prescribed by the Secretary of State of the times, dates, and locations at which advance voting will be conducted.

　　**(3) The board of registrars shall publish the dates, times, and locations of the availability of advance voting in its jurisdiction on the homepage of the county's publicly accessible website associated with elections or registrations, or if the county does not have such a website, in a newspaper of general circulation, and by posting in a prominent location in the county, no later than 14 days prior to the beginning of the advance voting period for a general primary, special primary, general election, or special election and no later than seven days prior to the beginning of the advance voting**

period for any run-off election. Any new advance voting locations added after that deadline shall be published in the same manner as soon as possible. The board of registrars shall not remove any advance voting location after the notice of such location is published, except in the case of an emergency or unavoidable event that renders a location unavailable for use. Any changes that are made due to an emergency or unavoidable event after a notice of a location has been published shall be published as soon as possible in the same manner set forth in this paragraph.

(e) On each day of an absentee voting period, each county board of registrars or municipal absentee ballot clerk shall report for the county or municipality to the Secretary of State and post on the county or municipal website, or if the county or municipality does not maintain such a website, a place of public prominence in the county or municipality, not later than 10:00 A.M. on each business day the number of persons to whom absentee ballots have been issued, the number of persons who have returned absentee ballots, and the number of absentee ballots that have been rejected. Additionally, on each day of an advance voting period, each county board of registrars or municipal absentee ballot clerk shall report to the Secretary of State and post on the county or municipal website, or if the county or municipality does not maintain such a website, a place of public prominence in the county or municipality, not later than 10:00 A.M. on each business day the number of persons who have voted at the advance voting sites in the county or municipality. During the absentee voting period and for a period of three days following a primary, election, or runoff, each county board of registrars or municipal absentee ballot clerk shall report to the Secretary of State and post on the county or municipal website, or if the county or municipality does not maintain such a website, a place of public prominence in the county or municipality, not later than 10:00 A.M. on each business day the number of persons who have voted provisional ballots, the number of provisional ballots that have verified or cured and accepted for counting, and the number of provisional ballots that have been rejected."

## SECTION 29.

Said chapter is further amended by revising Code Section 21–2–386, relating to safekeeping, certification, and validation of absentee ballots, rejection of ballot, delivery of ballots to manager, duties of managers, precinct returns, and notification of challenged elector, as follows:

<< GA ST § 21–2–386 >>

### "21–2–386.

(a)(1)(A) The board of registrars or absentee ballot clerk shall keep safely, unopened, and stored in a manner that will prevent tampering and unauthorized access all official absentee ballots received from absentee electors prior to the closing of the polls on the day of the primary or election except as otherwise provided in this subsection.

(B) Upon receipt of each ballot, a registrar or clerk shall write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk shall then compare the **number of the elector's Georgia driver's license number or state identification card issued pursuant to Article 5 of Chapter 5 of Title 40 and date of birth entered on the absentee ballot envelope** identifying information on the oath   with the **same** information on file in his or her office, shall compare the signature or mark on the oath with the signature or mark on the absentee elector's voter registration card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or mark taken from said card or application, and shall, if the information and signature appear to be valid and other identifying information appears to be correct,   **contained in the elector's voter registration records. If the elector has affirmed on the envelope that he or she does not have a Georgia driver's license or state identification card issued pursuant to Article 5 of Chapter 5 of Title 40, the registrar or clerk shall compare the last four digits of the elector's social security number and date of birth entered on the envelope with the same information contained in the elector's voter registration records. The registrar or clerk shall also confirm that the elector signed the oath and the person assisting the elector, if any, signed the required oath. If the elector has signed the elector's oath, the person assisting has signed the required oath, if applicable, and the identifying information entered on the absentee ballot envelope matches the same information contained in the elector's voter registration record, the registrar or**

**clerk shall** so certify by signing or initialing his or her name below the voter's oath. Each elector's name so certified shall be listed by the registrar or clerk on the numbered list of absentee voters prepared for his or her precinct.

(C) If the elector has failed to sign the oath, or if the ~~signature~~ **identifying information entered on the absentee ballot envelope** does not ~~appear to be valid~~ **match the same information appearing in the elector's voter registration record**, or if the elector has failed to furnish required information or information so furnished does not conform with that on file in the registrar's or clerk's office, or if the elector is otherwise found disqualified to vote, the registrar or clerk shall write across the face of the envelope 'Rejected,' giving the reason therefor. The board of registrars or absentee ballot clerk shall promptly notify the elector of such rejection, a copy of which notification shall be retained in the files of the board of registrars or absentee ballot clerk for at least two years. Such elector shall have until the end of the period for verifying provisional ballots contained in subsection (c) of Code Section 21–2–419 to cure the problem resulting in the rejection of the ballot. The elector may cure a failure to sign the oath, ~~an invalid signature~~ **nonmatching identifying information**, or missing information by submitting an affidavit to the board of registrars or absentee ballot clerk along with a copy of one of the forms of identification enumerated in subsection (c) of Code Section 21–2–417 before the close of such period. The affidavit shall affirm that the ballot was submitted by the elector, is the elector's ballot, and that the elector is registered and qualified to vote in the primary, election, or runoff in question. If the board of registrars or absentee ballot clerk finds the affidavit and identification to be sufficient, the absentee ballot shall be counted.

(D) An elector who registered to vote by mail, but did not comply with subsection (c) of Code Section 21–2–220, and who votes for the first time in this state by absentee ballot shall include with his or her application for an absentee ballot or in the outer oath envelope of his or her absentee ballot either one of the forms of identification listed in subsection (a) of Code Section 21–2–417 or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector. If such elector does not provide any of the forms of identification listed in this subparagraph with his or her application for an absentee ballot or with the absentee ballot, such absentee ballot shall be deemed to be a provisional ballot and such ballot shall only be counted if the registrars are able to verify current and valid identification of the elector as provided in this subparagraph within the time period for verifying provisional ballots pursuant to Code Section 21–2–419. The board of registrars or absentee ballot clerk shall promptly notify the elector that such ballot is deemed a provisional ballot and shall provide information on the types of identification needed and how and when such identification is to be submitted to the board of registrars or absentee ballot clerk to verify the ballot.

(E) Three copies of the numbered list of voters shall also be prepared for such rejected absentee electors, giving the name of the elector and the reason for the rejection in each case. Three copies of the numbered list of certified absentee voters and three copies of the numbered list of rejected absentee voters for each precinct shall be turned over to the poll manager in charge of counting the absentee ballots and shall be distributed as required by law for numbered lists of voters.

(F) All absentee ballots returned to the board or absentee ballot clerk after the closing of the polls on the day of the primary or election shall be safely kept unopened by the board or absentee ballot clerk and then transferred to the appropriate clerk for storage for the period of time required for the preservation of ballots used at the primary or election and shall then, without being opened, be destroyed in like manner as the used ballots of the primary or election. The board of registrars or absentee ballot clerk shall promptly notify the elector by first-class mail that the elector's ballot was returned too late to be counted and that the elector will not receive credit for voting in the primary or election. All such late absentee ballots shall be delivered to the appropriate clerk and stored as provided in Code Section 21–2–390.

(G) Notwithstanding any provision of this chapter to the contrary, until the United States Department of Defense notifies the Secretary of State that the Department of Defense has implemented a system of expedited absentee voting for those electors covered by this subparagraph, absentee ballots cast in a primary, election, or runoff by eligible absentee electors who reside outside the county or municipality in which the primary, election, or runoff is held and are members of the armed forces of the United States, members of the merchant marine of the United States, spouses or dependents of members of the armed forces or merchant marine residing with or accompanying such members, or overseas citizens that are postmarked by the date of such primary, election, or runoff and are received within the three-day period following such primary, election, or runoff, if proper in all other respects, shall be valid ballots and shall be counted and included in the certified election results.

(2)**(A) Beginning at 8:00 A.M. on the third Monday prior to** ~~After the opening of the polls on~~ the day of the primary, election, or runoff, the ~~registrars or absentee ballot clerks~~ **election superintendent** shall be authorized to open the outer **oath** envelope ~~on which is printed the oath of the elector~~ **of absentee ballots that have been verified and accepted pursuant to subparagraph (a)(1)(B) of this Code section,** ~~in such a manner as not to destroy the oath printed thereon; provided, however, that the registrars or absentee ballot clerk shall not be authorized to~~ remove the contents of such outer envelope**,** ~~or to~~ open the inner envelope marked 'Official Absentee Ballot,' ~~except as otherwise provided in this Code section~~ **and scan the absentee ballot using one or more ballot scanners**. At least three persons who are registrars, deputy registrars, poll workers, or absentee ballot clerks must be present before commencing; and three persons who are registrars, deputy registrars, or absentee ballot clerks shall be present at all times while the ~~outer~~ **absentee ballot** envelopes are being opened **and the absentee ballots are being scanned**. ~~After opening the outer envelopes, the ballots shall be safely and securely stored until the time for tabulating such ballots.~~ **However, no person shall tally, tabulate, estimate, or attempt to tally, tabulate, or estimate or cause the ballot scanner or any other equipment to produce any tally or tabulate, partial or otherwise, of the absentee ballots cast until the time for the closing of the polls on the day of the primary, election, or runoff except as provided in this Code section. Prior to beginning the process set forth in this paragraph, the superintendent shall provide written notice to the Secretary of State in writing at least seven days prior to processing and scanning absentee ballots. Such notice shall contain the dates, start and end times, and location or locations where absentee ballots will be processed and scanned. The superintendent shall also post such notice publicly in a prominent location in the superintendent's office and on the home page of the county election superintendent's website, if the county election superintendent maintains such a website. The Secretary of State shall publish on his or her website the information he or she receives from superintendents stating the dates, times, and locations where absentee ballots will be processed.**

**(B) The proceedings set forth in this paragraph shall be open to the view of the public, but no person except one employed and designated by the superintendent shall touch any ballot or ballot container. Any person involved in processing and scanning absentee ballots shall swear an oath, in the same form as the oath for poll officers provided in Code Section 21–2–95, prior to beginning the processing and scanning of absentee ballots. The county executive committee or, if there is no organized county executive committee, the state executive committee of each political party and political body having candidates whose names appear on the ballot for such election shall have the right to designate two persons and each independent and nonpartisan candidate whose name appears on the ballot for such election shall have the right to designate one person to act as monitors for such process. In the event that the only issue to be voted upon in an election is a referendum question, the superintendent shall also notify in writing the chief judge of the superior court of the county who shall appoint two electors of the county to monitor such process. While viewing or monitoring the process set forth in this paragraph, monitors and observers shall be prohibited from:**

**(i) In any way interfering with the processing or scanning of absentee ballots or the conduct of the election;**

**(ii) Using or bringing into the room any photographic or other electronic monitoring or recording devices, cellular telephones, or computers;**

**(iii) Engaging in any form of campaigning or campaign activity;**

**(iv) Taking any action that endangers the secrecy and security of the ballots;**

**(v) Touching any ballot or ballot container;**

**(vi) Tallying, tabulating, estimating, or attempting to tally, tabulate, or estimate, whether partial or otherwise, any of the votes on the absentee ballots cast; and**

**(vii) Communicating any information that they see while monitoring the processing and scanning of the absentee ballots, whether intentionally or inadvertently, about any ballot, vote, or selection to anyone other than an election official who needs such information to lawfully carry out his or her official duties.**

**(C) The State Election Board shall promulgate rules requiring reconciliation procedures; prompt and undelayed scanning of ballots after absentee ballot envelopes are opened; secrecy of election results prior to the closing of the polls on the day of a primary, election, or runoff; and other protections to protect the integrity of the process set forth in this paragraph.**

(3) A county election superintendent may, in his or her discretion, after 7:00 A.M. on the day of the primary, election, or runoff ~~open the inner envelopes in accordance with the procedures prescribed in this subsection and~~ begin tabulating the

absentee ballots. If the county election superintendent chooses to open the inner envelopes and begin tabulating such ballots prior to the close of the polls on the day of the primary, election, or runoff, the superintendent shall notify in writing, at least seven days prior to the primary, election, or runoff, the Secretary of State of the superintendent's intent to begin the absentee ballot tabulation prior to the close of the polls. The county executive committee or, if there is no organized county executive committee, the state executive committee of each political party and political body having candidates whose names appear on the ballot for such election in such county shall have the right to designate two persons and each independent and nonpartisan candidate whose name appears on the ballot for such election in such county shall have the right to designate one person to act as monitors for such process. In the event that the only issue to be voted upon in an election is a referendum question, the superintendent shall also notify in writing the chief judge of the superior court of the county who shall appoint two electors of the county to monitor such process.

(4) The county election superintendent shall publish a written notice in the superintendent's office of the superintendent's intent to begin the absentee ballot tabulation prior to the close of the polls and publish such notice at least one week prior to the primary, election, or runoff in the legal organ of the county.

(5) The process for opening the ~~inner~~ **absentee ballot** envelopes**, scanning absentee ballots,** ~~of~~ and tabulating absentee ballots on the day of a primary, election, or runoff as provided in this subsection shall be ~~a confidential process~~ **conducted in a manner** to maintain the secrecy of all ballots and to protect the disclosure of any balloting information before 7:00 P.M. on election day. No absentee ballots shall be tabulated before 7:00 A.M. on the day of a primary, election, or runoff.

(6) All persons conducting the tabulation of absentee ballots during the day of a primary, election, or runoff, including the vote review panel required by Code Section 21–2–483, and all monitors and observers shall be sequestered until the time for the closing of the polls. All such persons shall have no contact with the news media; shall have no contact with other persons not involved in monitoring, observing, or conducting the tabulation; shall not use any type of communication device including radios, telephones, and cellular telephones; shall not utilize computers for the purpose of ~~e-mail~~ **email**, instant messaging, or other forms of communication; and shall not communicate any information concerning the tabulation until the time for the closing of the polls; provided, however, that supervisory and technical assistance personnel shall be permitted to enter and leave the area in which the tabulation is being conducted but shall not communicate any information concerning the tabulation to anyone other than the county election superintendent; the staff of the superintendent; those persons conducting, observing, or monitoring the tabulation; and those persons whose technical assistance is needed for the tabulation process to operate.

(7) The absentee ballots shall be tabulated in accordance with the procedures of this chapter for the tabulation of absentee ballots. As such ballots are tabulated, they shall be placed into locked ballot boxes and may be transferred to locked ballot bags, if needed, for security. The persons conducting the tabulation of the absentee ballots shall not cause the tabulating equipment to produce any count, partial or otherwise, of the absentee votes cast until the time for the closing of the polls **except as otherwise provided in this Code section**.

(b) **When requested by the superintendent, but not earlier than the third Monday prior to a primary, election, or runoff** ~~As soon as practicable after 7:00 A.M. on the day of the primary, election, or runoff, in precincts other than those in which optical scanning tabulators are used~~ , a registrar or absentee ballot clerk shall deliver the official absentee ballot of each certified absentee elector, each rejected absentee ballot, applications for such ballots, and copies of the numbered lists of certified and rejected absentee electors to the ~~manager in charge of the absentee ballot precinct of the county or municipality, which shall be located in the precincts containing the county courthouse or polling place designated by the municipal superintendent. In those precincts in which optical scanning tabulators are used, such absentee ballots shall be taken to the tabulation center or other place~~ **location** designated by the superintendent, and the **superintendent or** official receiving such absentee ballots shall issue his or her receipt therefor. ~~Except as otherwise provided in this Code section, in no event shall the counting of the ballots begin before the polls close~~.

(c) **The superintendent shall cause the verified and accepted absentee ballots to be opened and tabulated as provided in this Code section. A** ~~Except as otherwise provided in this Code section, after the close of the polls on the day of the primary, election, or runoff, a~~ manager shall then open the outer envelope in such manner as not to destroy the oath printed thereon and shall deposit the inner envelope marked 'Official Absentee Ballot' in a ballot box reserved for absentee ballots. In the event that an outer envelope is found to contain an absentee ballot that is not in an inner envelope, the ballot shall be sealed in an inner

envelope, initialed and dated by the person sealing the inner envelope, and deposited in the ballot box and counted in the same manner as other absentee ballots, provided that such ballot is otherwise proper. Such manager with two assistant managers, appointed by the superintendent, with such clerks as the manager deems necessary shall count the absentee ballots following the procedures prescribed by this chapter for other ballots, insofar as practicable, and prepare an election return for the county or municipality showing the results of the absentee ballots cast in such county or municipality .

(d) All absentee ballots shall be counted and tabulated in such a manner that returns may be reported by precinct; and separate returns shall be made for each precinct in which absentee ballots were cast showing the results by each precinct in which the electors reside. **The superintendent shall utilize the procedures set forth in this Code section to ensure that the returns of verified and accepted absentee ballots cast are reported to the public as soon as possible following the closing of the polls on the day of the primary, election, or runoff. Failure to utilize these procedures to ensure that the returns of verified and accepted absentee ballots are reported as soon as possible following the close of polls shall subject the superintendent to sanctions by the State Election Board. If a superintendent fails to report the returns of verified and accepted absentee ballots by the day following the election at 5:00 P.M., the State Election Board may convene an independent performance review board pursuant to Code Section 21–2–107.**

(e) If an absentee elector's right to vote has been challenged for cause, a poll officer shall write 'Challenged,' the elector's name, and the alleged cause of challenge on the outer envelope and shall deposit the ballot in a secure, sealed ballot box; and it shall be counted as other challenged ballots are counted. Where direct recording electronic voting systems are used for absentee balloting and a challenge to an elector's right to vote is made prior to the time that the elector votes, the elector shall vote on a paper or optical scanning ballot and such ballot shall be handled as provided in this subsection. The board of registrars or absentee ballot clerk shall promptly notify the elector of such challenge.

(f) It shall be unlawful at any time prior to the close of the polls for any person to disclose or for any person to receive any information regarding the results of the tabulation of absentee ballots except as expressly provided by law."

## SECTION 30.

Said chapter is further amended in Code Section 21–2–390, relating to delivery of election materials to clerk of superior court or city clerk after primary or election and accounting for ballots by registrars or municipal absentee ballot clerks, by designating the existing text as subsection (a) and adding a new subsection to read as follows:

<< GA ST § 21–2–390 >>

"**(b) The Secretary of State shall be authorized to inspect and audit the information contained in the absentee ballot applications or envelopes at his or her discretion at any time during the 24 month retention period. Such audit may be conducted state wide or in selected counties or cities and may include the auditing of a statistically significant sample of the envelopes or a full audit of all of such envelopes. For this purpose, the Secretary of State or his or her authorized agents shall have access to such envelopes in the custody of the clerk of superior court or city clerk.**"

## SECTION 31.

Said chapter is further amended in Code Section 21–2–403, relating to time for opening and closing of polls, by redesignating the existing text as subsection (a) and adding a new subsection to read as follows:

<< GA ST § 21–2–403 >>

"**(b) Poll hours at a precinct may be extended only by order of a judge of the superior court of the county in which the precinct is located upon good cause shown by clear and convincing evidence that persons were unable to vote at that**

precinct during a specific period or periods of time. Poll hours shall not be extended longer than the total amount of time during which persons were unable to vote at such precinct. Any order extending poll hours at a precinct beyond 9:00 P.M. shall be by written order with specific findings of fact supporting such extension."

## SECTION 32.

Said chapter is further amended by revising subsections (c) and (e) of Code Section 21–2–408, relating to poll watchers, designation, duties, removal for interference with election, reports by poll watchers of infractions or irregularities, and ineligibility of candidates to serve as poll watchers, as follows:

<< GA ST § 21–2–408 >>

"(c) In counties or municipalities using direct recording electronic (DRE) voting systems or optical scanning voting systems, each political party may appoint two poll watchers in each primary or election, each political body may appoint two poll watchers in each election, each nonpartisan candidate may appoint one poll watcher in each nonpartisan election, and each independent candidate may appoint one poll watcher in each election to serve in the locations designated by the superintendent within the tabulating center. Such designated locations shall include the check-in area, the computer room, the duplication area, and such other areas as the superintendent may deem necessary to the assurance of fair and honest procedures in the tabulating center. **The locations designated by the superintendent shall ensure that each poll watcher can fairly observe the procedures set forth in this Code section.** The poll watchers provided for in this subsection shall be appointed and serve in the same manner as other poll watchers."

"(e) No person shall be appointed or be eligible to serve as a poll watcher in any primary or election in which such person is a candidate. **No person shall be eligible to serve as a poll watcher unless he or she has completed training provided by the political party, political body, or candidate designating the poll watcher. Upon request, the Secretary of State shall make available material to each political party, political body, or candidate that can be utilized in such training but it shall be the responsibility of the political party, political body, or candidate designating the poll watcher to instruct poll watchers in their duties and in applicable laws and rules and regulations. Each political party, political body, or candidate shall, in their written designation of poll watchers, certify under oath that the named poll watchers have completed the training required by this Code section.**"

## SECTION 33.

Said chapter is further amended by revising subsections (a) and (e) of Code Section 21–2–414, relating to restrictions on campaign activities and public opinion polling within the vicinity of a polling place, cellular phone use prohibited, prohibition of candidates from entering certain polling places, and penalty, as follows:

<< GA ST § 21–2–414 >>

"(a) No person shall solicit votes in any manner or by any means or method, nor shall any person distribute or display any campaign material, **nor shall any person give, offer to give, or participate in the giving of any money or gifts, including, but not limited to, food and drink, to an elector,** nor shall any person solicit signatures for any petition, nor shall any person, other than election officials discharging their duties, establish or set up any tables or booths on any day in which ballots are being cast:
    (1) Within 150 feet of the outer edge of any building within which a polling place is established;
    (2) Within any polling place; or
    (3) Within 25 feet of any voter standing in line to vote at any polling place.

These restrictions shall not apply to conduct occurring in private offices or areas which cannot be seen or heard by such electors."

"(e) This Code section shall not be construed to prohibit a poll officer from distributing materials, as required by law, which are necessary for the purpose of instructing electors or from distributing materials prepared by the Secretary of State which are designed solely for the purpose of encouraging voter participation in the election being conducted **or from making available self-service water from an unattended receptacle to an elector waiting in line to vote**."

### SECTION 34.

Said chapter is further amended by revising subsections (a) and (b) of Code Section 21–2–418, relating to provisional ballots, as follows:

<< GA ST § 21–2–418 >>

"(a) If a person presents himself or herself at a polling place, absentee polling place, or registration office in his or her county of residence in this state for the purpose of casting a ballot in a primary or election stating a good faith belief that he or she has timely registered to vote in such county of residence in such primary or election and the person's name does not appear on the list of registered electors, the person shall be entitled to cast a provisional ballot in his or her county of residence in this state as provided in this Code section. **If the person presents himself or herself at a polling place in the county in which he or she is registered to vote, but not at the precinct at which he or she is registered to vote, the poll officials shall inform the person of the polling location for the precinct where such person is registered to vote. The poll officials shall also inform such person that any votes cast by a provisional ballot in the wrong precinct will not be counted unless it is cast after 5:00 P.M. and before the regular time for the closing of the polls on the day of the primary, election, or runoff and unless the person executes a sworn statement, witnessed by the poll official, stating that he or she is unable to vote at his or her correct polling place prior to the closing of the polls and giving the reason therefor.**

(b) Such person voting a provisional ballot shall complete an official voter registration form and a provisional ballot voting certificate which shall include information about the place, manner, and approximate date on which the person registered to vote. The person shall swear or affirm in writing that he or she previously registered to vote in such primary or election, is eligible to vote in such primary or election, has not voted previously in such primary or election, and meets the criteria for registering to vote in such primary or election. **If the person is voting a provisional ballot in the county in which he or she is registered to vote but not at the precinct in which he or she is registered to vote during the period from 5:00 P.M. to the regular time for the closing of the polls on the day of the primary, election, or runoff, the person shall execute a sworn statement, witnessed by the poll official, stating that he or she is unable to vote at his or her correct polling place prior to the closing of the polls and giving the reason therefor.** The form of the provisional ballot voting certificate shall be prescribed by the Secretary of State. The person shall also present the identification required by Code Section 21–2–417."

### SECTION 35.

Said chapter is further amended by revising Code Section 21–2–419, relating to validation of provisional ballots and reporting to Secretary of State, as follows:

<< GA ST § 21–2–419 >>

### "21–2–419.

(a) A person shall cast a provisional ballot on the same type of ballot that is utilized by the county or municipality. Such provisional ballot shall be sealed in double envelopes as provided in Code Section 21–2–384 and shall be deposited by the person casting such ballot in a secure, sealed ballot box.

(b) At the earliest time possible after the casting of a provisional ballot, but no later than the day after the primary or election in which such provisional ballot was cast, the board of registrars of the county or municipality, as the case may be, shall be notified

by the election superintendent that provisional ballots were cast in the primary or election and the registrars shall be provided with the documents completed by the person casting the provisional ballot as provided in Code Section 21–2–418. Provisional ballots shall be securely maintained by the election superintendent until a determination has been made concerning their status. The board of registrars shall immediately examine the information contained on such documents and make a good faith effort to determine whether the person casting the provisional ballot was entitled to vote in the primary or election. Such good faith effort shall include a review of all available voter registration documentation, including registration information made available by the electors themselves and documentation of modifications or alterations of registration data showing changes to an elector's registration status. Additional sources of information may include, but are not limited to, information from the Department of Driver Services, Department of Family and Children Services, Department of Natural Resources, public libraries, or any other agency of government including, but not limited to, other county election and registration offices.

(c)(1) If the registrars determine after the polls close, but not later than three days following the primary or election, that the person casting the provisional ballot timely registered to vote and was eligible and entitled to vote **in the precinct in which he or she voted** in such primary or election, the registrars shall notify the election superintendent and the provisional ballot shall be counted and included in the county's or municipality's certified election results.

(2) If the registrars determine after the polls close, but not later than three days following the primary or election, that the person voting the provisional ballot timely registered and was eligible and entitled to vote in the primary or election but voted in the wrong precinct, then the board of registrars shall notify the election superintendent **only if such person voted between the hours of 5:00 P.M. and the regular time for the closing of the polls on the day of the primary, election, or runoff and provided the sworn statement required by subsection (b) of Code Section 21–2–418**. The superintendent shall count such person's votes which were cast for candidates in those races for which the person was entitled to vote but shall not count the votes cast for candidates in those races in which such person was not entitled to vote. The superintendent shall order the proper election official at the tabulating center or precinct to prepare an accurate duplicate ballot containing only those votes cast by such person in those races in which such person was entitled to vote for processing at the tabulating center or precinct, which shall be verified in the presence of a witness. Such duplicate ballot shall be clearly labeled with the word 'Duplicate,' shall bear the designation of the polling place, and shall be given the same serial number as the original ballot. The original ballot shall be retained **and the sworn statement required by subsection (b) of Code Section 21–2–418 shall be transmitted to the Secretary of State with the certification documents required by paragraph (4) of subsection (a) of Code Section 21–2–497 and such statement shall be reviewed by the State Election Board**.

(3) If the registrars determine that the person casting the provisional ballot did not timely register to vote or was not eligible or entitled to vote **in the precinct in which he or she voted** in such primary or election or shall be unable to determine within three days following such primary or election whether such person timely registered to vote and was eligible and entitled to vote in such primary or election, the registrars shall so notify the election superintendent and such ballot shall not be counted. The election superintendent shall mark or otherwise document that such ballot was not counted and shall deliver and store such ballots with all other ballots and election materials as provided in Code Section 21–2–500.

(d)(1) At the earliest time possible after a determination is made regarding a provisional ballot, the board of registrars shall notify in writing those persons whose provisional ballots were not counted that their ballots were not counted because of the inability of the registrars to verify that the persons timely registered to vote or other proper reason. The registrars shall process the official voter registration form completed by such persons pursuant to Code Section 21–2–418 and shall add such persons to the electors list if found qualified.

(2) At the earliest time possible after a determination is made regarding a provisional ballot, the board of registrars shall notify in writing those electors who voted in the wrong precinct and whose votes were partially counted of their correct precinct.

(e) The board of registrars shall complete a report in a form designated by the Secretary of State indicating the number of provisional ballots cast and counted in the primary or election."

### SECTION 36.

Said chapter is further amended in Part 1 of Article 11, relating to general provisions regarding preparation for and conduct of primaries and elections, by adding new Code sections to read as follows:

<< GA ST § 21–2–420 >>

**"21–2–420.**

**(a) After the time for the closing of the polls and the last elector voting, the poll officials in each precinct shall complete the required accounting and related documentation for the precinct and shall advise the election superintendent of the total number of ballots cast at such precinct and the total number of provisional ballots cast. The chief manager and at least one assistant manager shall post a copy of the tabulated results for the precinct on the door of the precinct and then immediately deliver all required documentation and election materials to the election superintendent. The election superintendent shall then ensure that such ballots are processed, counted, and tabulated as soon as possible and shall not cease such count and tabulation until all such ballots are counted and tabulated.**

**(b) The election superintendent shall ensure that each precinct notifies the election superintendent of the number of ballots cast and number of provisional ballots cast as soon as possible after the time for the closing of the polls and the last elector votes. The election superintendent shall post such information publicly. The State Election Board shall promulgate rules and regulations regarding how such information shall be publicly posted to ensure transparency, accuracy, and security.**

<< GA ST § 21–2–421 >>

**21–2–421.**

**(a) As soon as possible but not later than 10:00 P.M. following the close of the polls on the day of a primary, election, or runoff, the election superintendent shall report to the Secretary of State and post in a prominent public place the following information:**

**(1) The number of ballots cast at the polls on the day of the primary, election, or runoff, including provisional ballots cast;**

**(2) The number of ballots cast at advance voting locations during the advance voting period for the primary, election, or runoff; and**

**(3) The total number of absentee ballots returned to the board of registrars by the deadline to receive such absentee ballots on the day of the primary, election, or runoff.**

**(b) Upon the completion of the report provided for in subsection (a) of this Code section, the election superintendent shall compare the total number of ballots received as reported in subsection (a) of this Code section and the counting of the ballots in the primary, election, or runoff minus any rejected and uncured absentee ballots, uncounted provisional ballots, and any other uncounted ballots, with the total number of ballots cast in the primary, election, or runoff. The results of such comparison and all explanatory materials shall be reported to the Secretary of State. The reason for any discrepancy shall be fully investigated and reported to the Secretary of State."**

**SECTION 37.**

Said chapter is further amended by revising subsections (a) and (d) of Code Section 21–2–437, relating to procedure as to count and return of votes generally and void ballots, as follows:

<< GA ST § 21–2–437 >>

"(a) After the polls close and as soon as all the ballots have been properly accounted for and those outside the ballot box as well as the voter's certificates, numbered list of voters, and electors list have been sealed, the poll officers shall open the ballot box

and take therefrom all ballots contained therein. In primaries in which more than one ballot box is used, any ballots or stubs belonging to another party holding its primary in the same polling place shall be returned to the ballot box for the party for which they were issued. In primaries, separate tally and return sheets shall be prepared for each party, and separate poll officers shall be designated by the chief manager to count and tally each party's ballot. Where the same ballot box is being used by one or more parties, the ballots and stubs shall first be divided by party before being tallied and counted. The ballots shall then be counted one by one and a record made of the total number. Then the chief manager, together with such assistant managers and other poll officers as the chief manager may designate, under the scrutiny of one of the assistant managers and in the presence of the other poll officers, shall read aloud the names of the candidates marked or written upon each ballot, together with the office for which the person named is a candidate, and the answers contained on the ballots to the questions submitted, if any; and the other assistant manager and clerks shall carefully enter each vote as read and keep account of the same in ink on a sufficient number of tally papers, all of which shall be made at the same time. All ballots, after being removed from the box, shall be kept within the unobstructed view of all persons in the voting room until replaced in the box. No person, while handling the ballots, shall have in his or her hand any pencil, pen, stamp, or other means of marking or spoiling any ballot. The poll officers shall immediately proceed to canvass and compute the votes cast and shall not adjourn or postpone the canvass or computation until it shall have been fully completed, ~~except that, in the discretion of the superintendent, the poll officers may stop the counting after all contested races and questions are counted, provided that the results of these contested races and questions are posted for the information of the public outside the polling place and the ballots are returned to the ballot box and deposited with the superintendent until counting is resumed on the following day~~ ."

"(d) Any ballot marked so as to identify the voter shall be void and not counted, except a ballot cast by a challenged elector whose name appears on the electors list; such challenged vote shall be counted as prima facie valid but may be voided in the event of an election contest. Any ballot marked by anything but pen or pencil shall be void and not counted. Any erasure, mutilation, or defect in the vote for any candidate shall render void the vote for such candidate but shall not invalidate the votes cast on the remainder of the ballot, if otherwise properly marked. If an elector shall mark his or her ballot for more persons for any nomination or office than there are candidates to be voted for such nomination or office, or if, for any reason, it may be impossible to determine his or her choice for any nomination or office, his or her ballot shall not be counted for such nomination or office; but the ballot shall be counted for all nominations or offices for which it is properly marked. Unmarked ballots or ballots improperly or defectively marked so that the whole ballot is void shall be set aside and shall be preserved with other ballots. In primaries, votes cast for candidates who have died, withdrawn, or been disqualified shall be void and shall not be counted. **Except as provided in subsection (g) of Code Section 21–2–134 regarding nonpartisan elections, in** ~~In~~  elections, votes for candidates who have died or been disqualified shall be void and shall not be counted."

## SECTION 38.

Said chapter is further amended by revising subsection (a) of Code Section 21–2–438, relating to ballots identifying voter, not marked, or improperly marked declared void, as follows:

<< GA ST § 21–2–438 >>

"(a) Any ballot marked so as to identify the voter shall be void and not counted, except a ballot cast by a challenged elector whose name appears on the electors list; such challenged vote shall be counted as prima facie valid but may be voided in the event of an election contest. Any ballot marked by anything but pen or pencil shall be void and not counted. Any erasure, mutilation, or defect in the vote for any candidate shall render void the vote for such candidate but shall not invalidate the votes cast on the remainder of the ballot, if otherwise properly marked. If an elector shall mark his or her ballot for more persons for any nomination or office than there are candidates to be voted for such nomination or office, or if, for any reason, it may be impossible to determine his or her choice for any nomination or office, his or her ballot shall not be counted for such nomination or office; but the ballot shall be counted for all nominations or offices for which it is properly marked. Ballots not marked or improperly or defectively marked so that the whole ballot is void; ~~,~~  shall be set aside and shall be preserved with the other ballots. In primaries, votes cast for candidates who have died, withdrawn, or been disqualified shall be void and shall not be

counted. **Except as provided in subsection (g) of Code Section 21–2–134 regarding nonpartisan elections, in** ~~In~~   elections, votes for candidates who have died or been disqualified shall be void and shall not be counted.”

## SECTION 38A.

Said chapter is further amended by revising subsection (a) of Code Section 21–2–480, relating to caption for ballots, party designations, and form and arrangement, as follows:

<< GA ST § 21–2–480 >>

“(a) At the top of each ballot for an election in a precinct using optical scanning voting equipment shall be printed in prominent type the words ‘OFFICIAL BALLOT,’ followed by the **name and** designation of the precinct for which it is prepared and the name and date of the election.”

## SECTION 38B.

Said chapter is further amended by revising Code Section 21–2–482, relating to absentee ballots for precincts using optical scanning voting equipment, as follows:

<< GA ST § 21–2–482 >>

### “21–2–482.

Ballots in a precinct using optical scanning voting equipment for voting by absentee electors shall be prepared sufficiently in advance by the superintendent and shall be delivered to the board of registrars as provided in Code Section 21–2–384. Such ballots shall be marked ‘Official Absentee Ballot’ and shall be in substantially the form for ballots required by Article 8 of this chapter, except that in counties or municipalities using voting machines, direct recording electronic (DRE) units, or ballot scanners, the ballots may be in substantially the form for the ballot labels required by Article 9 of this chapter or in such form as will allow the ballot to be machine tabulated. Every such ballot shall have printed on the face thereof the following:

‘I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law.’

The form for either ballot shall be determined and prescribed by the Secretary of State **and shall have printed at the top the name and designation of the precinct**.”

## SECTION 39.

Said chapter is further amended by revising subsection (f) of Code Section 21–2–483, relating to counting of ballots, public accessibility to tabulating center and precincts, execution of ballot recap forms, and preparation of duplicate ballots, as follows:

<< GA ST § 21–2–483 >>

“(f) If it appears that a ballot is so torn, bent, or otherwise defective that it cannot be processed by the tabulating machine, the superintendent, in his or her discretion, may order ~~the proper election official at the tabulating center or precinct~~   **a duplication panel** to prepare a true duplicate copy for processing ~~with the ballots of the same polling place, which shall be verified in the presence of a witness~~   . **In a partisan election, the duplication panel shall be composed of the election superintendent or a designee thereof and one person appointed by the county executive committee of each political party having candidates whose names appear on the ballot for such election, provided that, if there is no organized county executive committee for a political party, the person shall be appointed by the state executive committee of the political party. In a nonpartisan**

**election or an election involving only the presentation of a question to the electors, the duplication panel shall be composed of the election superintendent or a designee thereof and two electors of the county or municipality. In the case of a nonpartisan county or municipal election or an election involving only the presentation of a question to the electors, the two elector members of the panel shall be appointed by the chief judge of the superior court of the county or municipality in which the election is held. In the case of a municipality which is located in more than one county, the two elector members of the panel shall be appointed by the chief judge of the superior court of the county in which the city hall of the municipality is located. The election superintendent may create multiple duplication panels to handle the processing of such ballots more efficiently.** All duplicate ballots shall be clearly labeled by the word 'duplicate,' shall bear the designation of the polling place, and shall ~~be given the same serial number as the defective ballot~~ **contain a unique number that will allow such duplicate ballot to be linked back to the original ballot**. The defective ballot shall be retained."

### SECTION 40.

Said chapter is further amended by revising Code Section 21–2–492, relating to computation and canvassing of returns, notice of when and where returns will be computed and canvassed, blank forms for making statements of returns, and swearing of assistants, as follows:

<< GA ST § 21–2–492 >>

**"21–2–492.**

The superintendent shall arrange for the computation and canvassing of the returns of votes cast at each primary and election at his or her office or at some other convenient public place at the county seat or municipality **following the close of the polls on the day of such primary or election** with accommodations for those present insofar as space permits. An interested candidate or his or her representative shall be permitted to keep or check his or her own computation of the votes cast in the several precincts as the returns from the same are read, as directed in this article. The superintendent shall give at least one week's notice prior to the primary or election by publishing same in a conspicuous place in the superintendent's office, of the ~~time and~~ place ~~when and~~ where he or she will commence and hold his or her sessions for the computation and canvassing of the returns; and he or she shall keep copies of such notice posted in his or her office during such period. The superintendent shall procure a sufficient number of blank forms of returns made out in the proper manner and headed as the nature of the primary or election may require, for making out full and fair statements of all votes which shall have been cast within the county or any precinct therein, according to the returns from the several precincts thereof, for any person voted for therein, or upon any question voted upon therein. The assistants of the superintendent in the computation and canvassing of the votes shall be first sworn by the superintendent to perform their duties impartially and not to read, write, count, or certify any return or vote in a false or fraudulent manner."

### SECTION 41.

Said chapter is further amended by revising subsections (a) and (k) of Code Section 21–2–493, relating to computation, canvassing, and tabulation of returns, investigation of discrepancies in vote counts, recount procedure, certification of returns, and change in returns, and adding a new subsection to read as follows:

<< GA ST § 21–2–493 >>

"(a) The superintendent shall, ~~at or before 12:00 Noon~~ **after the close of the polls** on the day ~~following the~~ **of a** primary or election, at his or her office or at some other convenient public place at the county seat or in the municipality, of which due notice shall have been given as provided by Code Section 21–2–492, publicly commence the computation and canvassing of the returns and continue ~~the same~~ **until all absentee ballots received by the close of the polls, including those cast by advance voting, and all ballots cast on the day of the primary or election have been counted and tabulated and the results of such tabulation released to the public and, then, continuing with provisional ballots as provided in Code Sections**

**21–2–418 and 21–2–419 and those absentee ballots as provided in subparagraph (a)(1)(G) of Code Section 21–2–386** from day to day until completed. For this purpose**,** the superintendent may organize his or her assistants into sections, each of which ~~which~~  **whom** may simultaneously proceed with the computation and canvassing of the returns from various precincts of the county or municipality in the manner provided by this Code section. Upon the completion of such computation and canvassing, the superintendent shall tabulate the figures for the entire county or municipality and sign, announce, and attest the same, as required by this Code section."

"**(j.1) The Secretary of State shall create a pilot program for the posting of digital images of the scanned paper ballots created by the voting system.**

(k) As the returns from each precinct are read, computed, and found to be correct or corrected as aforesaid, they shall be recorded on the blanks prepared for the purpose until all the returns from the various precincts which are entitled to be counted shall have been duly recorded; then they shall be added together, announced, and attested by the assistants who made and computed the entries respectively and shall be signed by the superintendent. The consolidated returns shall then be certified by the superintendent in the manner required by this chapter. Such returns shall be certified by the superintendent not later than 5:00 P.M. on the ~~second Friday~~  **Monday** following the date on which such election was held and such returns shall be immediately transmitted to the Secretary of State~~; provided, however, that such certification date may be extended by the Secretary of State in his or her discretion if necessary to complete a precertification audit as provided in Code Section 21–2–498~~ ."

### SECTION 42.

Said chapter is further amended by revising Code Section 21–2–501, relating to number of votes required for election, as follows:

<< GA ST § 21–2–501 >>

### "21–2–501.

(a)(1) Except as otherwise provided in this Code section, no candidate shall be nominated for public office in any primary or special primary or elected to public office in any election or special election **or shall take or be sworn into such elected public office** unless such candidate shall have received a majority of the votes cast to fill such nomination or public office. In instances where no candidate receives a majority of the votes cast, a run-off primary, special primary runoff, run-off election, or special election runoff between the candidates receiving the two highest numbers of votes shall be held. Unless such date is postponed by a court order, such ~~run-off primary, special primary runoff, run-off election, or special election~~  runoff shall be held ~~as provided in this subsection~~.

~~(2) In the case of a runoff from a general primary or a special primary or special election held in conjunction with a general primary, the runoff shall be held on the Tuesday of the ninth week following such general primary.~~

~~(3) In the case of a runoff from a general election for a federal office or a runoff from a special primary or special election for a federal office held in conjunction with a general election, the runoff shall be held on the Tuesday of the ninth week following such general election.~~

~~(4) In the case of a runoff from a general election for an office other than a federal office or a runoff from a special primary or special election for an office other than a federal office held in conjunction with a general election, the runoff shall be held~~ on the twenty-eighth day after the day of holding the preceding general **or special primary or general or special** election.

~~(5) In the case of a runoff from a special primary or special election for a federal office not held in conjunction with a general primary or general election, the runoff shall be held on the Tuesday of the ninth week following such special primary or special election.~~

~~(6) In the case of a runoff from a special primary or special election for an office other than a federal office not held in conjunction with a general primary or general election, the runoff shall be held on the twenty-eighth day after the day of holding the preceding special primary or special election; provided, however, that, if such runoff is from a special primary or special election held in conjunction with a special primary or special election for a federal office and there is a runoff being~~

conducted for such federal office, the runoff from the special primary or special election conducted for such other office may be held in conjunction with the runoff for the federal office.

(7) **(2)** If any candidate eligible to be in a runoff withdraws, dies, or is found to be ineligible, the remaining candidates receiving the two highest numbers of votes shall be the candidates in the runoff.

(8) **(3)** The candidate receiving the highest number of the votes cast in such run-off primary, special primary runoff, run-off election, or special election runoff to fill the nomination or public office sought shall be declared the winner.

(9) **(4)** The name of a write-in candidate eligible for election in a runoff shall be printed on the election or special election run-off ballot in the independent column.

(10) **(5)** The run-off primary, special primary runoff, run-off election, or special election runoff shall be a continuation of the primary, special primary, election, or special election for the particular office concerned. Only the electors who ~~were~~ **are** duly registered to vote and not subsequently deemed disqualified to vote in the ~~primary, special primary, election, or special election~~ **runoff** for candidates for that particular office shall be entitled to vote therein, and only those votes cast for the persons designated as candidates in such run-off primary, special primary runoff, run-off election, or special election runoff shall be counted in the tabulation and canvass of the votes cast. No elector shall vote in a run-off primary or special primary runoff in violation of Code Section 21–2–224.

(b) For the purposes of this subsection, the word 'plurality' shall mean the receiving by one candidate alone of the highest number of votes cast. If the municipal charter or ordinances of a municipality as now existing or as amended subsequent to September 1, 1968, provide that a candidate may be nominated or elected by a plurality of the votes cast to fill such nomination or public office, such provision shall prevail. Otherwise, no municipal candidate shall be nominated for public office in any primary or elected to public office in any election unless such candidate shall have received a majority of the votes cast to fill such nomination or public office.

(c) In instances in which no municipal candidate receives a majority of the votes cast and the municipal charter or ordinances do not provide for nomination or election by a plurality vote, a run-off primary or election shall be held between the candidates receiving the two highest numbers of votes. Such runoff shall be held on the twenty-eighth day after the day of holding the first primary or election, unless such run-off date is postponed by court order~~.; provided, however, that, in the case of a runoff from a municipal special election that is held in conjunction with a special election for a federal office and not in conjunction with a general primary or general election, the municipality may conduct such runoff from such municipal special election on the date of the special election runoff for the federal office. Only the electors entitled to vote in the first primary or election shall be entitled to vote in any run-off primary or election resulting therefrom; provided, however, that no~~ **No** elector shall vote in a run-off primary in violation of Code Section 21–2–216. The run-off primary or election shall be a continuation of the first primary or election, and only those votes cast for the candidates receiving the two highest numbers of votes in the first primary or election shall be counted. No write-in votes may be cast in such a primary, run-off primary, or run-off election. If any candidate eligible to be in a runoff withdraws, dies, or is found to be ineligible, the remaining candidates receiving the two highest numbers of votes shall be the candidates in such runoff. The municipal candidate receiving the highest number of the votes cast in such run-off primary or run-off election to fill the nomination or public office sought shall be declared the winner. The municipality shall give written notice to the Secretary of State of such runoff as soon as such municipality certifies the preceding primary, special primary, election, or special election.

(d) The name of a municipal write-in candidate eligible for election in a municipal runoff shall be printed on the municipal run-off election ballot in the independent column.

(e) In all cities having a population in excess of 100,000 according to the United States decennial census of 1980 or any future such census, in order for a municipal candidate to be nominated for public office in any primary or elected to public office in any municipal election, he or she must receive a majority of the votes cast.

(f) Except for presidential electors, to be elected to public office in a general election, a candidate must receive a majority of the votes cast in an election to fill such public office. To be elected to the office of presidential electors, no slate of candidates

shall be required to receive a majority of the votes cast, but that slate of candidates shall be elected to such office which receives the highest number of votes cast."

**SECTION 43.**

Said chapter is further amended by revising Code Section 21–2–540, relating to conduct of special elections generally, as follows:

<< GA ST § 21–2–540 >>

**"21–2–540.**

(a)**(1)** Every special **primary and special** election shall be held and conducted in all respects in accordance with the provisions of this chapter relating to **general primaries and** general elections; and the provisions of this chapter relating to **general primaries and** general elections shall apply thereto insofar as practicable and as not inconsistent with any other provisions of this chapter. **All special primaries and special elections held at the time of a general primary, as provided by Code Section 21–2–541, shall be conducted by the poll officers by the use of the same equipment and facilities, insofar as practicable, as are used for such general primary.** All **special primaries and** special elections held at the time of a general election, as provided by Code Section 21–2–541, shall be conducted by the poll officers by the use of the same equipment and facilities, ~~so far~~ **insofar** as practicable, as are used for such general election.

**(2) If a vacancy occurs in a partisan office to which the Governor is authorized to appoint an individual to serve until the next general election, a special primary shall precede the special election.**

(b) At least 29 days shall intervene between the call of a special primary and the holding of same, and at least 29 days shall intervene between the call of a special election and the holding of same. The period during which candidates may qualify to run in a special primary or a special election shall remain open for a minimum of two and one-half days. Special **primaries and special** elections which are to be held in conjunction with the presidential preference primary, a state-wide general primary, or state-wide general election shall be called at least 90 days prior to the date of such presidential preference primary, state-wide general primary, or state-wide general election; provided, however, that this requirement shall not apply to **special primaries and** special elections held on the same date as such presidential preference primary, state-wide general primary, or state-wide general election but conducted completely separate and apart from such state-wide general primary or state-wide general election using different ballots or voting equipment, facilities, poll workers, and paperwork. ~~Notwithstanding any provision of this subsection to the contrary, special elections which are to be held in conjunction with the state-wide general primary or state-wide general election in 2014 shall be called at least 60 days prior to the date of such state-wide general primary or state-wide general election.~~

(c)(1) Notwithstanding any other provision of law to the contrary, a special primary or special election to fill a vacancy in a county or municipal office shall be held only on one of the following dates which is at least 29 days after the date of the call for the special election:

(A) In odd-numbered years, any such **special primary or** special election shall only be held on:

(i) The third Tuesday in March;

(ii) The third Tuesday in June;

(iii) The third Tuesday in September; or

(iv) The Tuesday after the first Monday in November; and

(B) In even-numbered years, any such **special primary or** special election shall only be held on:

(i) The third Tuesday in March; provided, however, that in the event that a **special primary or** special election is to be held under this provision in a year in which a presidential preference primary is to be held, then any such **special primary or** special election shall be held on the date of and in conjunction with the presidential preference primary;

(ii) The date of the general primary; or

(iii) The Tuesday after the first Monday in November;

provided, however, that, in the event that a **special primary or** special election to fill a federal or state office on a date other than the dates provided in this paragraph has been scheduled and it is possible to hold a **special primary or** special election to fill a vacancy in a county, municipal, or school board office in conjunction with such **special primary or** special election to fill a federal or state office, the **special primary or** special election to fill such county, municipal, or school board office may be held on the date of and in conjunction with such **special primary or** special election to fill such federal or state office**,** provided all other provisions of law regarding such **primaries and** elections are met.

(2) Notwithstanding any other provision of law to the contrary, a special election to present a question to the voters shall be held only on one of the following dates which is at least 29 days after the date of the call for the special election:

(A) In odd-numbered years, any such special election shall only be held on the third Tuesday in March or on the Tuesday after the first Monday in November; and

(B) In even-numbered years, any such special election shall only be held on:

(i) The date of and in conjunction with the presidential preference primary if one is held that year;

(ii) The date of the general primary; or

(iii) The Tuesday after the first Monday in November.

(3) The provisions of this subsection shall not apply to:

(A) Special elections held pursuant to Chapter 4 of this title, the 'Recall Act of 1989,' to recall a public officer or to fill a vacancy in a public office caused by a recall election; and

(B) Special primaries or special elections to fill vacancies in federal or state public offices.

(d) Except as otherwise provided by this chapter, the superintendent of each county or municipality shall publish the call of the **special primary or** special election.

(e)**(1)** Candidates in special elections for partisan offices **that are not preceded by special primaries** shall be listed alphabetically on the ballot and may choose to designate on the ballot their party affiliation. The party affiliation selected by a candidate shall not be changed following the close of qualifying.

**(2) Candidates in special primaries shall be listed alphabetically on the ballot.**"


## SECTION 44.

Said chapter is further amended by revising subsection (b) of Code Section 21–2–541, relating to holding of special primary or election at time of general primary or election and inclusion of candidates and questions in special primary or election on ballot, as follows:

<< GA ST § 21–2–541 >>

"(b) If the times specified for the closing of the registration list for a special primary or **special** election are the same as those for a general primary or **general** election, the candidates and questions in such special primary or **special** election shall be included on the ballot for such general primary or **general** election. In such an instance, the name of the office and the candidates in such **special primary or** special election shall appear on the ballot in the position where such names would ordinarily appear if such contest was a general primary or **general** election."


## SECTION 45.

Said chapter is further amended by revising Code Section 21–2–542, relating to special election for United States senator vacancy and temporary appointment by Governor, as follows:

<< GA ST § 21–2–542 >>

**"21–2–542.**

Whenever a vacancy shall occur in the representation of this state in the Senate of the United States, such vacancy shall be filled for the unexpired term by the vote of the electors of the state at **a special primary to be held at the time of the next general primary followed by** a special election to be held at the time of the next November state-wide general election, occurring at least 40 days after the occurrence of such vacancy; and it shall be the duty of the Governor to issue his or her proclamation for such **special primary and special** election. Until such time as the vacancy shall be filled by an election as provided in this Code section, the Governor may make a temporary appointment to fill such vacancy."

### SECTION 46.

Said chapter is further amended in Article 14, relating to special elections and primaries generally and municipal terms of office, by adding a new Code section to read as follows:

<< GA ST § 21–2–546 >>

**"21–2–546.**

**Notwithstanding any other law to the contrary, in each county in this state in which there is a civil and magistrate court established by local Act of the General Assembly, vacancies in the office of chief judge of such court caused by death, retirement, resignation, or otherwise shall be filled by the appointment of a qualified person by the Governor to serve until a successor is duly elected and qualified and until January 1 of the year following the next general election which is more than six months following such person's appointment.**"

### SECTION 47.

Said chapter is further amended by revising subsection (a) of Code Section 21–2–568, relating to entry into voting compartment or booth while another voting, interfering with elector, inducing elector to reveal or revealing elector's vote, and influencing voter while assisting, as follows:

<< GA ST § 21–2–568 >>

"(a) Any person who knowingly:

(1) Goes into the voting compartment or voting machine booth while another is voting or marks the ballot or registers the vote for another, except in strict accordance with this chapter;

(2) Interferes with any elector marking his or her ballot or registering his or her vote;

(3) Attempts to induce any elector ~~before depositing his or her ballot~~ to show how he or she marks or has marked his or her ballot; ~~or~~

(4) Discloses to anyone how another elector voted, without said elector's consent, except when required to do so in any legal proceeding**; or**

**(5) Accepts an absentee ballot from an elector for delivery or return to the board of registrars except as authorized by subsection (a) of Code Section 21–2–385** shall be guilty of a felony."

### SECTION 48.

Said chapter is further amended in Article 15, relating to miscellaneous offenses, by adding new Code sections to read as follows:

<< GA ST § 21–2–568.1. >>

**"21–2–568.1.**

(a) Except while providing authorized assistance in voting under Code Section 21–2–409 and except for children authorized to be in the enclosed space under subsection (f) of Code Section 21–2–413, no person shall intentionally observe an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting.

(b) Any person who violates the provisions of subsection (a) of this Code section shall be guilty of a felony.

<< GA ST § 21–2–568.2 >>

**21–2–568.2.**
(a) It shall be illegal for any person to use photographic or other electronic monitoring or recording devices, cameras, or cellular telephones, except as authorized by law, to:
  (1) Photograph or record the face of an electronic ballot marker while a ballot is being voted or while an elector's votes are displayed on such electronic ballot marker; or
  (2) Photograph or record a voted ballot.

(b) Any person who violates subsection (a) of this Code section shall be guilty of a misdemeanor."

## SECTION 49.

Chapter 35 of Title 36 of the Official Code of Georgia Annotated, relating to home rule powers, is amended by revising subsection (a) of Code Section 36–35–4.1, relating to reapportionment of election districts for municipal elections, as follows:

<< GA ST § 36–35–4.1 >>

"(a) Subject to the limitations provided by this Code section, the governing authority of any municipal corporation is authorized to reapportion the election districts from which members of the municipal governing authority are elected following publication of the United States decennial census of 1980 or any future such census. Such reapportionment of districts shall be effective for the election of members to the municipal governing authority at the next regular general municipal election following the publication of the decennial census**; provided, however, that, if the publication of the decennial census occurs within 120 days of the next general or special municipal election, such reapportionment of districts shall be effective for any subsequent special election and the subsequent general municipal election**."

## SECTION 50.

Title 50 of the Official Code of Georgia Annotated, relating to state government, is amended by revising subsection (b) of Code Section 50–13–4, relating to procedural requirements for adoption, amendment, or repeal of rules, emergency rules, limitation on action to contest rule, and legislative override, as follows:

<< GA ST § 50–13–4 >>

"(b) If any agency finds that an imminent peril to the public health, safety, or welfare, including but not limited to, summary processes such as quarantines, contrabands, seizures, and the like authorized by law without notice, requires adoption of a rule upon fewer than 30 days' notice and states in writing its reasons for that finding, it may proceed without prior notice or hearing or upon any abbreviated notice and hearing that it finds practicable to adopt an emergency rule. Any such rule adopted relative to a public health emergency shall be submitted as promptly as reasonably practicable to the House of Representatives and Senate Committees on Judiciary**, provided that any such rule adopted relative to a state of emergency by the State Election Board shall be submitted as soon as practicable but not later than 20 days prior to the rule taking effect. Any emergency rule adopted by the State Election Board pursuant to the provisions of this subsection may be suspended upon the majority**

**vote of the House of Representatives or Senate Committees on Judiciary within ten days of the receipt of such rule by the committees**. The rule may be effective for a period of not longer than 120 days but the adoption of an identical rule under paragraphs (1) and (2) of subsection (a) of this Code section is not precluded; provided, however, that such a rule adopted pursuant to discharge of responsibility under an executive order declaring a state of emergency or disaster exists as a result of a public health emergency, as defined in Code Section 38–3–3, shall be effective for the duration of the emergency or disaster and for a period of not more than 120 days thereafter."

### SECTION 51.

Said title is further amended in Code Section 50–18–71, relating to right of access to public records, timing, fees, denial of requests, and impact of electronic records, by adding a new subsection to read as follows:

<< GA ST § 50–18–71 >>

"**(k) Scanned ballot images created by a voting system authorized by Chapter 2 of Title 21 shall be public records subject to disclosure under this article.**"

### SECTION 52.

(a) Sections 21, 23, 25, 27, 28, and 29 of this Act shall become effective on July 1, 2021.

(b) All other sections of this Act shall become effective upon its approval by the Governor or upon its becoming law without such approval.

### SECTION 53.

All laws and parts of laws in conflict with this Act are repealed.

Approved March 25, 2021

---

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.