# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| COALITION FOR GOOD GOVERNANCE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BRIAN KEMP, et al.,<br><br>Defendants. | Civil Action No. 21-cv-02070-JPB |

## BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................ i

I.      INTRODUCTION ................................................................. 1

II.     PRELIMINARY ISSUES ........................................................ 2

    A.   Plaintiffs Have Standing ................................................ 2

    B.   No Immunities Apply ..................................................... 5

III.    LEGAL STANDARDS ........................................................... 5

    A.   Granting of a Preliminary Injunction .............................. 5

    B.   Procedure and Evidence ................................................. 5

IV.     SUCCESS ON THE MERITS .................................................. 6

    A.   O.C.G.A. § 21-2-568.1 (the "Elector Observation Felony") ................................. 6

        1.   Unconstitutional Burden on the Right to Vote ........................ 8

        2.   Void for Vagueness ........................................ 9

    B.   O.C.G.A. § 21–2–386(a)(2)(B)(vii) (the "Gag Rule") ........................ 10

        1.   Statutory Context ........................................ 11

        2.   The Gag Rule Violates the First Amendment ........................ 11

        3.   The Gag Rule is Void for Vagueness ........................ 15

    C.   O.C.G.A. § 21-2-386(a)(2)(A) and (B) (vi) (the "Estimating Bans") are Void for Vagueness ........................ 16

    D.   O.C.G.A. § 21-2-568.2 (2)(B) (the "Photography Ban") Violates the First Amendment ........................ 20

    E.   Runoff Absentee Voting Statute ........................ 21

V.      Plaintiffs will be Irreparably Harmed if Injunction is Denied ........................ 24

VI.     Balance of Equities and Public Interest Favor Granting the Injunction ........................ 25

## I.    INTRODUCTION

This lawsuit seeks to preserve the right to vote without unjustified state interference, to protect freedom of speech, and to ensure a meaningful separation of powers – three pillars of liberty.  Though the lawsuit generally seeks broader relief, this Motion for Preliminary Injunction focuses specifically on four criminal laws within SB202 that must be enjoined immediately to protect pending elections because they plainly are unconstitutional and defeat the stated goal of SB202, which is to enhance election integrity.  These laws have the purpose and the effect of severely obstructing election transparency, degrading election security, and intimidating voters and members of the press who serve the vital role of providing citizen oversight of election administration. These four criminal laws ("the Challenged Criminal Laws") are:

(1) O.C.G.A. § 21-2-568.1 (the "Elector Observation Felony") makes it a felony to "intentionally observe an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting."

(2) O.C.G.A. § 21–2–386(a)(2)(B)(vii) (the "Gag Rule") prohibits "monitors" and "observers," under penalty of criminal misdemeanor, from "[c]ommunicating any information that they see while monitoring the processing and scanning of the absentee ballots" "to anyone other than an election official who needs such information to lawfully carry out his or her official duties."

(3) O.C.G.A. §§ 21-2-386(a)(2)(A) and (B)(vi) (the "Estimating Bans") make it a misdemeanor for "monitors and observers" to, among other things, tally, tabulate, estimate or attempt to tally, tabulate, or estimate

the number of absentee ballots cast or any votes on the absentee ballots cast.

(4) O.C.G.A. § 21-2-568.2 (2)(B) (the "Photography Ban") makes it a misdemeanor to "[p]hotograph or record the face of an electronic ballot marker while a ballot is being voted or while an elector's votes are displayed on such electronic market," or to "[p]hotograph or record a voted ballot."

As explained below, each of these Challenged Criminal Laws violate the First Amendment or the Due Process Clause, or both. Notably, Proposed Intervenors Republican National Committee, et al., while opposing every other count in Plaintiffs' Complaint, "take no position" on the Challenged Criminal Laws. (Doc. 7-1 at 5).

This Motion also seeks to enjoin the enforcement of a fifth provision, the Eleven Day Rule, O.C.G.A. § 21–2–381(a)(1)(A), which makes it impossible for voters to obtain absentee ballots for runoff elections and constitutes an unconstitutionally unjustified and severe burden on the right to vote. The Eleven Day Rule becomes effective with the July 13, 2021, runoff elections. The Eleven Day Rule, along with the Challenged Criminal Laws, will be collectively referred to as the "Challenged Provisions."

## II.    PRELIMINARY ISSUES

### A.    Plaintiffs Have Standing

In the Complaint and in the declarations filed with this Motion, Plaintiffs have established the requisite Article III standing. With respect to the Challenged

Criminal Provisions, the individual Plaintiffs have standing to bring pre-enforcement suits because they have "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeber v. Governor,* 848 F. 3d 1293, 1304 (11th Cir. 2017) (internal quotations and citation omitted).[1]  Like the plaintiffs in *Wollschlaeger*, the Plaintiffs here "wish to say and do what they believe [the challenged law] prevents them from saying and doing," and according have standing to challenge the law.  *Id. See also Thornhill v. Alabama,* 310 U.S. 88, 97-98 (1940).  Indeed, Plaintiffs have already experienced injury during the conduct of the June 15, 2021, elections beginning May 24, 2021, when early voting began.  *See supra* footnote 1.

With respect to the right to vote claims, a plaintiff "need not have the franchise wholly denied to suffer injury."  Here, the voter Plaintiffs have alleged "concrete, particularized, non-hypothetical injury" in the form of burdens on the

---

[1] As to Plaintiff Shirley, *see* Amended Complaint, Doc. 14, at ¶¶ 168 to 170; Thomas-Clark, *see id.* ¶¶ 178 to 179, 182 to 183; Lang, *see id.* ¶¶ 187 to 188, 191 to 192; Pullar, *see id.* ¶¶ 198 to 199, 202 to 203; McNichols, *see id.* ¶¶ 209 to 210, 213 to 214; Graham, *see id.* ¶ 236; Martin, *see id.* ¶¶ 242 to 247; Dufort, *see id.* ¶¶ 256 to 263; Nakamura, *see id.* ¶¶ 270 to 272, 274 to 275; Throop, *see id.* ¶¶ 283 to 286; and Friedman, *see id.* ¶¶ 293 to 301.  *See also* Dufort Decl., Ex. C hereto, at ¶¶ 13, 15, 17, 19, 21; Friedman Decl., Ex. D hereto, at ¶¶ 6 to 10; Martin Decl., Ex. G hereto, at ¶¶ 22, 27 to 30; Nakamura Decl., Ex. H hereto, at ¶¶ 5 to 7; 9 to 13; Throop Decl., Ex. J hereto, at ¶¶ 14-15.

right to vote, which is more than sufficient.[2]  *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir.2005); *Common Cause/Georgia v. Billips*, 554 F.3d 1340, 1350 (11th Cir. 2009) (W. Pryor, J.) (reversing District Court's dismissal based on standing).  With respect to all of the Challenged Provisions, each of the Plaintiff Organizations – Coalition for Good Governance ("CGG"), Jackson County Democratic Committee ("JCDC"), and Georgia Advancing Progress Political Action Committee ("GAPPAC") – have organizational standing because they are diverting resources activities to educate voters about the Challenged Provisions and to block their enforcement, *see id.,* and have associational standing because their members have individual standing to sue.[3]

---

[2] As to Plaintiff Shirley, *see* Amended Complaint, Doc. 14, at ¶¶ 170, 173; Thomas-Clark, *see id.* ¶¶ 182 to 183; Lang, *see id.* ¶¶ 191 to 192; Pullar, *see id.* ¶¶ 202 to 203; McNichols, *see id.* ¶¶ 213 to 214; Graham, *see id.* ¶¶ 236; Martin, *see id.* ¶¶ 243, 252; Dufort, *see id.* ¶¶ 263, 266; Nakamura, *see id.* ¶¶ 275, 278 to 279; and Throop, *see id.* ¶¶ 283, 291.  *See also* Dufort Decl., Ex. C  hereto, at ¶¶ 22; Graham Decl. Ex. E hereto, at ¶¶ 11;  Martin Decl.,  Ex. G hereto, at ¶¶ 25; Nakamura Decl., Ex. H hereto, at ¶ 7, ¶¶ 14-15; Throop Decl.,  Ex. J hereto, at ¶¶ 11 to 13.

[3]  As to CGG, *see* Amended Complaint, Doc. 14, at ¶¶ 151 to 162 (organizational) and ¶¶ 302 (associational).  As to JCDC, *see id.* ¶¶  345 to 346 (organizational); ¶¶ 339, 344, 347 (associational).  As to GAPPAC, *see id.* ¶¶ 224 to 227 (organizational) and ¶ 348 (associational).  *See also* Marks Decl., Ex. B hereto, at ¶¶ 13, 28; Throop Decl., Ex. J hereto, at ¶¶ 16 to 17; Gray Decl., Ex. F hereto, at ¶¶ 9 – 14; Smith Decl., Ex. I hereto, at ¶¶ 6 to 11.

The Plaintiff Organizations also have organizational standing because the Criminal Provisions directly injure their ability to act on information about elections.[4]

### B.    No Immunities Apply

This case is against state officials challenging the federal constitutionality of state laws and accordingly is not a suit against the State for purposes of Eleventh Amendment immunity.  *Ex parte Young*, 209 U.S. 123 (1908); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984).

## III.   LEGAL STANDARDS

### A.    Granting of a Preliminary Injunction

Chief Justice Roberts summarized the familiar test for the granting of a preliminary injunction in *Winter v. NRDC*, 555 U.S. 7, 20 (2008):

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

These are not rigid requirements to be applied by rote.  "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."  *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982).

### B.    Procedure and Evidence

---

[4]  Marks Decl., Ex. B hereto, at ¶¶ 19 to 20; ¶21; ¶¶ 25-27; ¶¶ 29; ¶¶ 33-37; and ¶ 39; Dufort Decl., Ex. C hereto, at ¶¶ 15-19, ¶21;  Nakamura Decl., Ex. H hereto, at ¶¶ 10,12-13; Throop Decl., Ex. J hereto, at ¶ 14.

Though discovery in this case has not formally opened and the Defendants have not answered the Complaint, this Motion is not premature.  "The grant of a temporary injunction need not await any procedural steps perfecting the pleadings or any other formality attendant upon a full-blown trial of this case."  *United States v. Lynd*, 301 F.2d 818, 823 (5th Cir. 1962) (Tuttle, J.).  In considering this Motion, the Court also is permitted to rely upon hearsay and upon declarations in lieu of live testimony.  *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (at the "preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction").

## IV.   SUCCESS ON THE MERITS

### A.   O.C.G.A. § 21-2-568.1 (the "Elector Observation Felony")

O.C.G.A. § 21-2-568.1 makes it a felony to "intentionally observe an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting" (the "Elector Observation Felony").  A person convicted of this felony can be imprisoned for up to ten years.  O.C.G.A. § 21-2-600.

Given the size, brightness, and upright orientation of the Dominion ballot marking device touchscreens, it is hardly possible to enter a polling place in Georgia without potentially committing this felony.  The photographs below show polling places in Cartersville and the State Farm Arena in Atlanta.

 

People cast their ballots during early voting for the presidential elections at State Farm Arena in Atlanta, Ga., October 12, 2020.
(Chris Aluka Berry/Reuters)

Any voter, member of the press, poll worker or poll watcher entering into either polling place could be charged with the Elector Observation Felony. As these and other photographs in the record show,[5] walking to a voting station requires the voter to pass other voters and hence observe "an elector while casting a ballot." In addition, because a voter's choices on the BMD touchscreens can be seen from more than 20 feet away,[6] to observe an elector is to do so "in a manner that would allow such person to see for whom or what the elector is voting." O.C.G.A. § 21-2-568.1. For walking into a polling place and unavoidably seeing another person voting on a giant screen – a voter can be sent to prison for up to ten years, and the mandatory minimum is one year of incarceration. *See supra* note 1.

---

[5] *See* Mark Decl., Ex. B hereto, Ex 1.

[6] *See* Marks Decl., Ex. B hereto, ¶ 7 to 9; Martin Decl, Ex. G hereto, ¶¶ 16-20; Throop Decl., Ex. J hereto, ¶ 5 ,9, 13.

1.    **Unconstitutional Burden on the Right to Vote**

The Elector Observation Felony plainly violates the Due Process Clause of the Fourteenth Amendment because it constitutes an unjustifiable burden on the right to vote under the test set forth by the Supreme Court in Anderson *v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Taksuhi,* 504 U.S. 428 (1992). The test requires that the court weigh

> 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interest put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

*Id.* at 438 (quoting *Anderson*, 460 U.S. at 789).   As Judge William Pryor stated in *Jacobson v. Fla. Sec'y of State,* 974 3d 1236, 1264 (11th Cir. 2020), "[i]f the statute burdened voting or associational rights even slightly . . . [u]nder *Anderson* and *Burdick*, we would weigh the burden imposed by the law against the state interests justifying that burden."

Under *Anderson* and *Burdick*, the first consideration is the "character and magnitude of the asserted injury" to Plaintiffs' First and Fourteenth Amendment rights.  *Anderson*, 460 U.S. at 789.  "Burdens are severe if they go beyond the merely inconvenient."  *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring in the judgment).  In this case, Plaintiffs are not merely inconvenienced; to vote in person, Plaintiffs must subject themselves to the

risk of being prosecuted, convicted of a felony, and imprisoned.  This is a severe

burden on the right to vote by any measure.

When, as here, the rights of voters are subjected to "severe" restrictions, the

regulation must be "'narrowly drawn to advance a state interest of compelling

importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279,

289 (1992)).  The only governmental interest that could possibly be served by this

law is protecting electors' ballot secrecy. But as long as the Defendant Secretary of

State orders the use the BMDs, electors' ballot secrecy will be severely

compromised anyway.  Moreover, Georgia law already makes it a felony to go

"into the voting compartment or voting machine booth while another is voting,"

interfere "with any elector making his or her ballot," or disclose "to anyone how

another elector voted," O.C.G.A. § 21-2-568, and a misdemeanor to allow

someone else to see his or her ballot "for a fraudulent purpose."   O.C.G.A § 21-2-

579.  The Elector Observation Felony is not narrowly tailored and does not

advance a compelling governmental interest. Defendants cannot meet their burden

of justifying such a severe restriction of the right to vote.

### 2.     **Void for Vagueness**

The Elector Observation Rule also is unconstitutional because it does not

"define the criminal offense with sufficient definiteness that ordinary people can

understand what conduct is prohibited and in a manner that does not encourage

arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357 (1983).  The Elector Observation Rule "contains no standard for determining what a suspect has to do" to avoid disobeying the law.  *Id.* at 358.   If a voter goes into a polling place, there is little he or she can do to avoid violating the law.

The vagueness of the law is particularly egregious because it addresses "activities [that] are historically part of the amenities of life as we have known them."  *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164 (1972) (holding vagrancy law void for vagueness).  Every person who attempts to vote in-person in Georgia is no longer simply a patriotic citizen, but a potential suspect, chargeable with a felony at the whim of the authorities or political opponents.  The law permits "'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'"  *Kolender*, 461 U.S. at 358 (citation omitted).  "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

For the foregoing reasons, Plaintiffs are likely to succeed in their challenge to the Elector Observation Rule as an unconstitutional burden on the right to vote and as unconstitutionally vague.

**B.      O.C.G.A. § 21–2–386(a)(2)(B)(vii) (the "Gag Rule")**

1.    **Statutory Context**

The Gag Rule and the related Estimating Bans are also attempts to silence critics and curtail unfavorable press about the administration of elections in Georgia.  The Gag Rule, addressed in this Part B, and the Estimating Bans, addressed separately below in Part C, are contained in Section 29 of SB202 and codified in revisions to O.C.G.A. § 21–2–386.  Section 29 addresses generally the processing of voted absentee ballots.  These provisions are effective July 1, 2021. *See* SB202, Section 52, and will apply to the July 13 runoff elections.

Subsection (a)(2) describes the process for opening and scanning of the absentee ballots.  Significantly, although only election officials actually open the envelopes and scan the ballots, absentee ballot processing is required to be a very public process.  "The proceedings set forth in this paragraph shall be open to the view of the public, but no person except one employed and designated by the superintendent shall touch any ballot or ballot container."  O.C.G.A. § 21–2–386(a)(2)(B).

2.    **The Gag Rule Violates the First Amendment**

The Gag Rule, O.C.G.A. § 21–2–386(a)(2)(B)(vii) prohibits "monitors" and "observers" from:

> Communicating any information that they see while monitoring the processing and scanning of the absentee ballots, whether intentionally or inadvertently, about any ballot, vote, or selection to anyone other

> than an election official who needs such information to lawfully carry
> out his or her official duties.

Any person who violates this provision is guilty of a misdemeanor, O.C.G.A. § 21-2-598, subject to fines up to $1,000 and imprisonment not to exceed 12 months. O.C.G.A. § 21-2-599.[7]

The Gag Rule by its terms applies to "observers," that is, members of the press or public who observe the scanning and processing of the absentee ballots in the weeks leading up to election day, and "monitors," the persons selected by the political parties or, in the case of referendum questions, the superior court of the county.  This vague statute prohibits members of the public and the monitors from communicating to anyone (other than specified officials) at any time what they learn from their observation and monitoring of the absentee ballot processing and scanning process, preventing the reporting to law enforcement and the public of discrepancies, irregularities, and fraud.

In determining whether the criminalization of speech is constitutional, the first question is whether the regulation is content-based.  The Gag Rule is content-based on its face because it prohibits speech that has the content of "information that they [monitors and observers] see while monitoring" and does not prohibit

---

[7] O.C.G.A. § 21-2-33.1 gives the Secretary the authority to impose civil sanctions, including monetary penalties of up to $5,000, for every violation.

speech that does not have such content.  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert, Ariz.,* 575 U.S, 155, 163 (2015).[8]

Because the Gag Rule is content-based, the usual presumption of constitutionality of state laws is reversed, and the government has the burden of proving that the law is "narrowly tailored to serve compelling state interests." *Wollschlaeger,* 848 F.3d at 1331.  Defendants cannot carry their burden of justifying the content-based Gag Rule.  There is nothing in SB202 itself that would suggest a legitimate governmental interest in the Gag Rule.  *See* SB202, Section 2.

Indeed, the fact that the Gag Rule applies to communications to "anyone *other than an election official who needs such information to lawfully carry out his or her official duties,*" gives it away: the Gag Rule serves no "*governmental* interest"; it only serves the purely private interest of the election official who does not want anyone else to know about his or her malfunctioning scanners,

---

[8] It is no defense that the Gag Rule uniformly applies to speech about the processing and scanning of absentee ballots regardless of the viewpoint of the speaker. "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."  *Consol. Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 537 (1980).

dysfunctional operations, inaccurate tabulations, or violations of law. Additionally, if what the monitor or observer sees is the failure of such election officials to properly discharge their duties, the Gag Rule will facilitate a cover-up of that failure.

Furthermore, the Gag Rule criminalizes speech that is vital to the establishment and preservation of "election integrity" – the stated purpose of SB202.[9]  A clear example of how the Gag Rule (as well as the Estimating Bans and the Photography Ban, discussed below) work to defeat election integrity comes from the work of Plaintiff Jeanne Dufort.  While a member of the Vote Review Panel for Morgan County in the June 2020 Primaries, Ms. Dufort observed that the Dominion scan and tabulation software was leaving some valid votes uncounted on some mail ballots.  (Dufort Decl., Ex. C hereto, at ¶ 6).  After making this discovery, Ms. Dufort took a number of highly reasonable and responsible actions that have been criminalized under SB202: she alerted a Dominion technician of the problem (who initially denied the problem); discussed her observations with other members of the bi-partisan Vote Review Panel; and discussed her observations with CGG and Harri Hursti, a nationally recognized expert in ballot scanning

---

[9] Section 1 of SB202 states that the Act "shall be known and may be cited as the 'Election Integrity Act of 2021.'"  Section 2, paragraph 4 states that the "changes made in the legislation are designed to address the lack of elector confidence in the election system."

technologies.  Along the way, Ms. Dufort gave her best estimate of the quantity of the discrepancies that she observed.  Based on Mr. Hursti's initial conclusions, Ms. Dufort reported the issue to Morgan County officials and the State Election Board. (*Id.* at ¶ 8, 10).

The Secretary of State's office initially denied that there were any problems and accused Ms. Dufort of being an "activist with an axe to grind."  (*Id.* at ¶ 8). The Associated Press, however, published a photo of examples of votes that were not counted, which was later included in an order by Judge Totenberg in *Curling v. Raffensperger,* No. 17-cv-2989 (Doc. 964 at 100 - 111) after Ms. Dufort testified in that case.  Based on Ms. Dufort's discoveries, the State Board of Elections enacted a rule changing the scanner settings to include more votes.  (*Id.,* at ¶¶ 7-10).  Ms. Dufort's action undoubtedly improved election integrity.  Had the Gag Rule, Estimating Bans, or Photography Ban been in effect, however, Ms. Dufort could not have taken most of these actions without committing multiple crimes.

The Gag Rule also runs counter to the stated government interest in election integrity.  It is a content-based law that cannot be squared with the First Amendment.

### 3.   The Gag Rule is Void for Vagueness

The Gag Rule, like the Elector Observation Rule also is unconstitutional because it does not "define the criminal offense with sufficient definiteness that

ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender,* 461 U.S. at 357.  The Gag Rule is indefinite in that it is vague as to the duration of the prohibited activities.  On the one hand, the introductory sentence in the main paragraph seems only to prohibit speech *during* the viewing and monitoring process, but not prohibiting speech thereafter: "While viewing or monitoring the process set forth in this paragraph, monitors and observers shall be prohibited from . . . ."  On the other hand, the provision is broad enough that a zealous State Election Board investigator or prosecutor could charge a citizen for communicating the information at any time.  The Gag Rule is not nearly definite enough to give fair notice as to its scope and, because of its vagueness, lends itself "to arbitrary and discriminatory enforcement."  *Kolender v. Lawson,* 461 U.S. at 358.

Plaintiffs are therefore likely to prevail on the merits of their claim that the Gag Rule is unconstitutional under either the First Amendment or the Due Process Clause, or both.

### C.    O.C.G.A. § 21-2-386(a)(2)(A) and (B) (vi) (the "Estimating Bans") are Void for Vagueness

The Estimating Bans appear in both Subsection A (concerning both ballots and votes) and Subsection B (concerning votes) of O.C.G.A. § 21-2-386(a)(2). Each section has a slightly different scope.  The Subsection A Estimating Ban states that:

> [N]o person shall tally, tabulate, estimate, or attempt to tally, tabulate, or estimate or cause the ballot scanner or any other equipment to produce any tally or tabulate, partial or otherwise, of the absentee ballots cast until the time for the closing of the polls on the day of the primary, election, or runoff except as provided in this Code section.

Subsection B(vi) prohibits "monitors and observers" "[w]hile viewing or monitoring the process set forth in this paragraph" from:

> Tallying, tabulating, estimating, or attempting to tally, tabulate, or estimate, whether partial or otherwise, any of the votes on the absentee ballots cast.

O.C.G.A. § 21-2-386(a)(2)(B)(vi).

The Subsection A Estimating Ban defines the duration of the prohibition – until the closing of the polls.  The Subsection B Estimating Ban, however, like the Gag Rule, is unconstitutionally indefinite because it does not define the duration of the prohibition: it could be limited to "[w]hile [they are] viewing or monitoring," as the introductory sentence says, or forever.

Both Estimating Bans are unconstitutional because they are vague as to what conduct they criminalize.  The Estimating Bans criminalize pure thought.  They do not prohibit visual access to the voted absentee ballots.  Indeed, the observers and monitors, who by law are authorized to monitor the absentee ballot processing and scanning activity, are authorized to see, and do see, "votes on the absentee ballots cast."  The crime also does not require a showing that results of any estimating of ballots processed or tallying of votes were recorded or disclosed; the crime is

complete once the perpetrator has silently and mentally tallied, tabulated, or estimated, or attempted to do so.

The Estimating Bans criminalize how the monitors and observers think about what they are authorized to see, but it will be impossible for any observer or monitor to tell when their thinking about the voted absentee ballots crosses the line into criminal conduct. Viewing even a single ballot will register with the observer or monitor some kind of impression that might be deemed at least an attempted tally, even if is it not remembered long enough to be tabulated with the results of any other absentee ballot that is observed. If an observer thinks to him or herself - "This absentee ballot being scanned shows one vote for Smith and no votes on the referendum" – is that a crime? Or does the observer cross the line when the next absentee ballot is observed, when the observer thinks: "Now there are two votes for Smith and still no votes for the referendum." Would Ms. Dufort have crossed the line by keeping a mental note of how many uncounted votes she was observing while trying to determine the magnitude of the scanning and tabulating problem?

The potential criminalization of such thoughts appears so absurd that it may be hard to take seriously, but if not enjoined the law will have seriously detrimental real-world consequences. This vague criminal law will continue to chill the good faith efforts by the political parties and the public to observe absentee ballot

processing and scanning, a crucial election process that must be subject to public oversight.

Further, the mail ballot scanner system automatically displays a real time "public counter" of the number of ballots scanned, which is intended to be a public reference the number of ballots scanned, although the Estimating Ban (Subsection A) prohibits making a tally or an estimate of that number.

In addition to not sufficiently defining the crime, the Estimating Bans will encourage "arbitrary and discriminatory enforcement." With no observable or objective indicia of criminal conduct, law enforcement officials or the SEB can prosecute any observer or monitor with the accusation that the perpetrator appeared to be attempting to tally or estimate either votes or ballots.   In a polarized political environment, it is not difficult to imagine political opponents using the statute to accuse each other of criminal activity in the tallying and estimating of votes or ballots—it is almost guaranteed.

Plaintiffs therefore are likely to succeed on the merits of their claim that the Estimating Bans are void for vagueness because they do not "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" or in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender,* 461 U.S. at 358.

**D.     O.C.G.A. § 21-2-568.2 (2)(B) (the "Photography Ban") Violates the First Amendment**

The Photography Ban makes it a misdemeanor to "[p]hotograph or record the face of an electronic ballot marker while a ballot is being voted or while an elector's votes are displayed on such electronic marker," or to "[p]hotograph or record a voted ballot." O.C.G.A. § 21-2-568.2 (2)(B).

The Photography Ban criminalizes what has for at least a century been a staple of coverage of American elections.  Americans expect to see their civic leaders at the polls with their ballots, or officials counting the ballots. A few examples of these photos, including of President Taft, President Reagan, Martin Luther King, Jr., the first women voters, and others are attached as Exhibit A.  The Photography Ban would make such ubiquitous photography a crime.

The Photography Ban violates the First Amendment.  Audio and visual recordings are protected by the First Amendment as recognized "organ[s] of public opinion" and as a "significant medium for the communication of ideas." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (extending First Amendment protection to movies).  Prohibiting citizens from photographing or recording election activity has a direct impact on how citizens are able to obtain access to and present information and accordingly infringes on expressive conduct protected by the First Amendment.  *Blackston v. State of Alabama*, 30 F.3d 117, 120 (11th Cir. 1994).  *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) ("The First

20

Amendment protects actual photos, videos, and recordings ... and for this protection to have meaning the Amendment must also protect the act of *creating* that material.")

The Photography Ban is presumptively unconstitutional because it is explicitly content-based: it prohibits photographs and recordings based upon the information that they capture. It may be justified only if the government proves that the Ban is "narrowly tailored to serve compelling state interests." *Reed,* 575 U.S. at 163. The Ban serves no compelling state interest. Ballot secrecy is not the justification because the law is not limited to prohibiting photographs that identify specific electors. Moreover, the ban on photographing or recording a "voted ballot" is plainly contrary to any governmental interest because SB202 makes such ballot images "public records" under the Georgia Open Records Act. O.C.G.A. § 50-18-71(k).

Plaintiffs are likely to succeed on the merits of their challenge to the Photography Ban.

### E.      Runoff Absentee Voting Statute

Prior to the enactment of SB202, there was no stated deadline to apply for an absentee ballot. However, officials were not (and are not) permitted to issue absentee ballots on Election Day or the day prior. O.C.G.A. § 21-2-384(a)(2) (2020). In SB202, the General Assembly established an application deadline for

absentee ballots of 11 days prior to the election.   O.C.G.A. § 21-2-381(a)(1)(A) (effective July 1, 2021).   Where there is a runoff, this change has the effect of disenfranchising citizens who vote absentee-by-mail because the deadline for the Secretary's certification of an election (which will determine whether there will be a runoff and who will be in a runoff) is 11 days prior to the date of the runoff election.[10]  There is no Georgia law allowing for absentee ballot applications to be submitted, accepted, or issued *before* an election is officially set.  Thus, if the Secretary certifies an election at the deadline for doing so, and there is a runoff, no citizen will be able to apply for or obtain an absentee-by-mail ballot for the runoff election.

This is a severe burden on the right to vote that is not justified by a compelling government interest.  Instructive by comparison is the Eleventh Circuit's recent decision in *New Georgia Project v. Raffensperger,* 976 F3d 1278 (11th Cir. 2020).  In that case, the Court held that Georgia's "decades-old" law requiring that absentee ballot be received by election day (as opposed to being post-marked by election day) was *not* a severe burden on the right to vote because "Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots."  These included allowing voters to request absentee

[10] Georgia law provides that election results for state races must be certified within 17 says of an election and that runoffs are 28 days after the election.  O.C.G.A. § 21-2-499(b).

ballots "as early as 180 days before the election" and returning their ballots through "the mail, hand-delivery, or a drop box."  976 F.3d at 1281.

Here, there is no mitigation whatsoever.  Voters cannot apply early for an absentee ballot for an election that has not been announced.  And, if the Secretary certifies an election at the deadline for doing so, and there is a runoff, it is too late for voters to obtain an absentee ballot.  This is a severe burden on the right to vote for everyone who votes absentee-by-mail.  It also cruelly discriminates against those who are physically unable to vote in person, particularly the elderly and the disabled and others whose medical condition makes it dangerous to vote in person, particularly during a pandemic.[11]  It also is a severe burden on those who choose to vote absentee because they want to avoid the risk of being accused of the Elector Observation Felony,[12] to protect their personal identifying information,[13] or desire to exercise their right to vote a secret ballot.

There is no reason for this change to Georgia law, much less the compelling justification that the Constitution requires.  *Burdick,* 504 U.S. at 433.  Allowing voters to apply for absentee ballots within the 11-day period in advance of an election imposes no administrative burden on the State, smooths out county

---

[11] *See* Nakamura Decl., Ex. H hereto, at ¶ 14.

[12] *See* Martin Decl., Ex. G hereto, at ¶¶ 25; Dufort Decl., Ex. C hereto, at ¶¶ 17, 22.

[13] *See* Graham Decl., Ex. E hereto, at ¶¶ 14 to 15.

administrative processing workload, and does not implicate any concern relating to election integrity. Plaintiffs are therefore likely to succeed on the merits of their claim that the law is unconstitutional.

## V.   Plaintiffs will be Irreparably Harmed if Injunction is Denied

Plaintiffs are likely to suffer irreparable harm in the absence of preliminary injunctive relief.  As to the abridgement of the right to vote claims, the "denial of an opportunity to cast a vote that a person may otherwise be entitled to cast- even once- is an irreparable harm." *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020).  *See also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("'A restriction on the fundamental right to vote therefore constitutes irreparable injury.")

Vague criminal law laws that violate Due Process "inflict[] *per se* irreparable harm." *SisterSong Women of Color Reprod. Just. Collective v. Kemp*, 472 F. Supp. 3d 1297, 1327 (N.D. Ga. 2020).  *See also Am. C.L. Union of Georgia v. Miller*, 977 F. Supp. 1228, 1235 (N.D. Ga. 1997) (self-censorship for fear of criminal prosecution under law that was void for vagueness constituted a substantial threat of irreparable harm).  The loss of First Amendment rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## VI.     Balance of Equities and Public Interest Favor Granting the Injunction

The balance of equities tips heavily in Plaintiffs' favor.  On the one hand, no right is more precious in a free country than the right to vote.  *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). "Other rights, even the most basic, are illusory if the right to vote is undermined."  *Id.*  The Defendants, on the other hand, will not be injured if they are unable to enforce the Challenged Provisions because they still have laws that they may use to enforce to protect the integrity of the election process without trampling on citizens' constitutional rights.  *ACLU v. Miller,* 977 F. Supp. 1228, 1235 (N.D. Ga. (granting injunction, finding balance of equities weighed heavily in plaintiffs' favor because, *inter alia,* "Georgia already has in place many less restrictive means to address fraud and misrepresentation—the interests defendants claim the act at issue promotes").

Granting injunctive relief is also in the public interest "because the public has an interest in having representatives elected in accordance with the Constitution." *Wright v. Sumter Cty. Bd. Of Elections and Registration*, 361 F. Supp. 1296, 1303 (M.D.Ga. 2018).

For the foregoing reasons, the Motion should be granted.

Respectfully submitted this 14th day of June, 2021.

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700
bbrown@brucepbrownlaw.com

/s/ Cary Ichter
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600
CIchter@Ichterdavis.com

/s/ Greg K. Hecht
Greg K. Hecht
Georgia Bar No. 003860
HECHT WALKER, P.C.
205 Corporate Center Dr.
Suite B
Stockbridge, Georgia 30281
(404) 348-4881
greg@hmhwlaw.com

/s/Shea E. Roberts
Shea E. Roberts
Georgia Bar No. 608874
GIACOMA ROBERTS & DAUGHDRILL LLC
945 East Paces Rd., Suite 2750
Atlanta, Georgia 30326
(404) 924-2850
sroberts@grdlegal.com

26

<u>CERTIFICATE OF SERVICE AND CERTIFICATE OF COMPLIANCE WITH
LOCAL RULE 5.1</u>

Pursuant to N.D. Ga. L.R. 5.1(C), I certify that the foregoing was prepared using Times New Roman 14 font.  I electronically filed this using CM/ECF, thus electronically serving all counsel of record.

This 14th day of June, 2021.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700
bbrown@brucepbrownlaw.com

27