**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

COALITION FOR GOOD
GOVERNANCE, *et al.,*

     *Plaintiffs,*

v.

BRIAN KEMP, Governor of the State
of Georgia, in his official capacity, *et
al.,*

     *Defendants.*

CIVIL ACTION

FILE NO. 1:21-CV-02070-JPB

<u>**DEFENDANTS'[1] RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**</u>

---

[1] Defendants are Governor Brian Kemp, Secretary of State Brad
Raffensperger, and State Election Board members Sara Ghazal, Anh Le,
Rebecca Sullivan, and Matthew Mashburn.

**INTRODUCTION**

Plaintiffs' Amended Complaint runs almost 160 pages, seeking relief on 14 separate counts. It claims that SB 202—an update to Georgia's election laws after conducting the 2020 elections in a pandemic—attacks "three pillars of liberty," "destroys . . . components of the State's regime of separate powers," and accomplishes the "destruction of the constitutional order." [Doc. 14, pp. 8, 10-11]. Despite these dire accusations, Plaintiffs' Motion for Preliminary Injunction challenges only five provisions of SB 202 as an emergency, all of which are related to the orderly conduct of elections. [Doc. 15-1, pp. 3-4].

While Plaintiffs clearly disagree with the Georgia General Assembly's decisions about election administration, they have not properly invoked this Court's jurisdiction. They have not established their standing for emergency relief, and even if they had, they have failed to show any likelihood of success on the merits. Viewing and photographing ballots was already criminal activity under Georgia law and SB 202 clarified several issues that arose in 2020. Further, the General Assembly adopted reasonable rules for early scanning to ensure quicker reporting of election results. Finally, a fixed deadline for absentee ballots protects voters and other states have deadlines to apply for absentee ballots far longer than Georgia's. Plaintiffs also cannot be granted an injunction because they unjustifiably delayed bringing these matters to the

1

Court—SB 202 became law almost three months ago and Plaintiffs waited until days before the provisions they challenge would be enforced to seek relief.

Plaintiffs ultimately have a policy disagreement with how the State has chosen to structure its elections, but, "States—not federal courts—are in charge of setting those rules." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020) (*NGP*); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight"). The lead Plaintiff, Coalition for Good Governance (CGG), is no stranger to attempting to litigate its policy disagreements about election administration through the courts. It has sued to force Georgia to use hand-marked paper ballots because of its unfounded concerns about hacking of Dominion voting machines, *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1313 (N.D. Ga. 2020); to delay elections and alter election procedures in the midst of a pandemic, *Coal. for Good Governance v. Raffensperger*, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996, at *2 (N.D. Ga. May 14, 2020); to overturn election results because of its theories about Georgia's prior electronic voting machines, *Martin v. Fulton Cty. Bd. of Registration & Elections*, 307 Ga. 193, 195 (2019); and to eliminate electronic voting machines because of its worries about the size of the screens of Dominion equipment, *Coal. for Good Governance v. Gaston*, Case No.

20CV00077(S) (Sumter Cty. Sup. Ct. March 2, 2020). CGG wants the State of Georgia to use hand-marked paper ballots because of its belief that Georgia's Dominion voting machines can be hacked, *see, e.g.,* [Doc. 15-8, ¶ 17], and seek to do so through whatever means necessary—now including this litigation.

Like other courts hearing the claims brought by CGG, this Court should deny the emergency relief Plaintiffs request, and, when the time comes to rule on the jurisdictional issues, dismiss this entire case.

## FACTUAL BACKGROUND

Plaintiffs ask this Court to enjoin five provisions of Georgia law, as modified by SB 202. But none of these provisions made major changes to existing law and almost all of them were law before SB 202.[2]

## I.    O.C.G.A. § 21-2-568.1: Election observation.

Prior to SB 202, it was already a felony to induce an elector "to show how he or she marks or has marked his or her ballot" or to disclose "to anyone who another elector voted, without said elector's consent." O.C.G.A. § 21-2-568(a)(3) and (4). The "enclosed space" of a precinct is also heavily regulated.[3] Additional

---

[2] A copy of the enacted version of SB 202 is attached as Ex. A.

[3] "It is, at least on Election Day, government controlled property set aside for the sole purpose of voting. The space is 'a special enclave, subject to greater restriction.'" *Minn. Voters All. v. Mansky,* 138 S. Ct. 1876, 1886 (2018), quoting, *Int'l Soc. for Krishna Consciousness v. Lee*, 505 U. S. 672, 680 (1992).

provisions place limitations on who can be in the enclosed space while voters are voting and limited activities in that space. O.C.G.A. § 21-2-413, -414. Those restrictions include prohibitions on (1) the general public entering unless they are voting or providing assistance, (2) anyone but law enforcement carrying firearms, and (3) campaigning. *Id*. Only a limited number of authorized poll watchers are allowed inside. *Id*.

Consistent with those existing limitations on activities in the enclosed space and to ensure a secret ballot, SB 202 added a provision making it a felony to engage in the *intentional* observation of an elector casting a ballot "in a manner that would allow such person *to see for whom or what the elector is voting*." Ex. A at 95:2448-2454 (emphasis added). While Ms. Marks and others say they have seen screens set up where votes could be seen, [Doc. 15-3, ¶¶ 6-11], existing rules require superintendents to arrange each polling place "in such a manner as to provide for the privacy of the elector while voting." Ga. Comp. R. & Regs r. 183-1-12-.11(4). Further, the Secretary of State provided guidance to counties on proper precinct layout, and county election officials are responsible for the setup of voting machines in ways that comply with Georgia law. Declaration of Blake Evans, attached as Ex. B, at ¶ 3 and Ex. 1. And SB 202 does not prohibit *accidental* observation of a voting-machine screen—only intentional efforts to see a person's votes. Ex. A at 95:2448-2454.

## II.   O.C.G.A. § 21-2-386(a)(2)(B)(vii): Nondisclosure of information about absentee ballots during early scanning.

Because the tabulation of ballots cast in the 2020 general election took a very long time for some counties, the legislature decided that "[c]reating processes for early processing and scanning of absentee ballots will promote elector confidence by ensuring that results are reported quickly." Ex. A at 6:123-125. Prior to SB 202, early scanning of absentee ballots could only be performed by a sequestered group of individuals beginning at 7:00 AM on Election Day itself and there was no danger of those individuals leaving to report totals or estimates during that process because it took place in a single day. O.G.C.A. § 21-2-386(a)(2) (2019). In order to mitigate the risk that early vote counts would be disclosed during early scanning in the weeks before an election, the legislature had to ensure that information about the scanning process would not be publicized prior to the close of the polls.[4] Accordingly, SB 202 permits only election officials to handle ballots, requires individuals involved to swear an oath, and places several requirements on observers to avoid disclosure of vote counts. Plaintiffs seek to enjoin two of these requirements, namely, preventing observers and monitors from attempting to

---

[4] One declarant agrees with this goal, [Doc. 15-3, ¶ 18], but disagrees with the method the legislature used and further dislikes early scanning generally. *Id.*

5

tally or estimate vote totals and communicating information about a vote they might see to anyone other than an election official.[5] Ex. A at 67:1698-1712. Plaintiffs refer to these provisions as the "Estimating Ban" and "Gag Rule," respectively. [Doc. 15-1, p. 3]. If these two provisions were enjoined, individuals would be free to share information about the early-scanning process with the general public and with candidates. *See, e.g., Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (federal courts may only enjoin officials from enforcing a statute).

### III.   O.C.G.A. § 21-2-568.2(2)(B): Penalties for photography.

Prior to SB 202, it was already a violation of the Election Code to take pictures inside of a polling place and specifically to photograph the face of a voting machine with the ballot displayed. O.C.G.A. § 21-2-413(e). But there was no specific penalty, meaning the only possible penalty was the catch-all misdemeanor for violations of the Election Code. O.C.G.A. § 21-2-598. In SB 202, the General Assembly provided a specific misdemeanor penalty for

---

[5] These provisions closely track the emergency State Election Board rules that were used throughout 2020 for early scanning of ballots. *See, e.g.*, Ga. Comp. R. & Regs. r. 183-1-14-0.7-.15. Other states that allow scanning before Election Day also prohibit and/or criminalize disclosure of tallies before the polls are closed. *See, e.g.*, Ariz. Rev. Stat. § 16-551 (felony in Arizona to release tallies early); N.M. Stat. Ann. § 1-6-14(H) (New Mexico); Del. Code Ann. tit. 15, § 5510; C.R.S. 1-7.5-107.5 (Colorado).

conduct that was already a misdemeanor and further clarified that photographing or recording a voted ballot outside of a polling place (such as an absentee ballot) was also a misdemeanor.[6] Ex. A at 96:2455-2462. It is not hard to imagine a vote-buying scheme that requires a voter to show proof of their vote to the person paying them—something this provision criminalizes.

## IV.   O.C.G.A. § 21-2-381(a)(1)(A): Definite period for applying for absentee ballot.

Before SB 202, Georgia voters could request absentee ballots up until the day before the election, O.C.G.A. § 21-2-381(a)(1)(A) (2020), but this often led to problems for voters. As the legislature explained, "many absentee ballots issued in the last few days before the election were not successfully voted or were returned late." Ex. A at 5:110-112. The State's policy of setting a deadline to apply for an absentee ballot before the election places Georgia well within the mainstream of other states—at least eight other states have deadlines of 11 days or longer, including Rhode Island's 21-day deadline.[7] The incorrect

---

[6] Several other states also prohibit taking photographs of ballots. *See, e.g.*, Ala. Code § 17-9-50.1; 25 Pa. Stat. Ann. § 3530 (prohibiting allowing anyone to see ballot or machine "with the apparent intention of letting it be known how he is about to vote").

[7] Ariz. Rev. Stat. § 16-542(E) (11 days); Idaho Code § 34-1002(7) (11 days); Ind. Code Ann. § 3-11-4-3(a)(4) (12 days); Iowa Code § 53.2(1)(b) (11 days); Mo. Rev. Stat. § 115.279(3) (second Wednesday before election); Neb. Rev. Stat. Ann § 32-941 (second Friday before election); Tex. Elec. Code § 84.007(c) (11 days); R.I. Gen. Laws Section 17-20-2.1(c) (21 days).

belief of some declarants that they cannot apply for an absentee ballot before the election is certified, [Docs. 15-7, ¶¶ 9-10; 15-10, ¶¶ 7-8], misses the fact that applications can be accepted as early as 78 days before a potential runoff and there is no certification-based starting date. Ex. B at ¶ 4; Ex. A at 38:927-937.

## ARGUMENT AND CITATION OF AUTHORITY

### I.    Standard of review.

Because preliminary injunctions are such extraordinary and drastic remedies, courts may not grant this type of relief "unless the movant clearly established the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (cleaned up). Plaintiffs must show that: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008).

A preliminary injunction is never granted as a matter of right, even if a plaintiff can show a likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). While it is already a form of extraordinary relief, that relief is even more drastic in the context of elections, because of the public interest in orderly elections and election integrity. *Purcell v. Gonzalez*, 549 U.S.

1, 4–5, 127 S. Ct. 5 (2006). And the Elections Clause "commits the administration of elections to Congress and state legislatures – not Courts." *Coal. for Good Governance*, 2020 U.S. Dist. LEXIS 86996, *7–8.

Further, when "an impending election is imminent and a State's election machinery is already in progress," equitable considerations justify a court denying an attempt to gain immediate relief. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Repub. Nat'l Comm. v. Dem. Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). This is because parties must show they exercised reasonable diligence in filing their request for relief, especially in the context of elections. *Benisek*, 138 S. Ct. at 1944.

## II.   Plaintiffs lack standing to bring their Motion.

Before addressing the merits of the Plaintiffs' Motion for Preliminary Injunction, it is first necessary that they establish standing because this Court has limited jurisdiction to "review and revise legislative and executive action." *Summers v. Earth Island Inst.,* 555 U.S. 488, 492 (2009) (citing *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180-181 (2000)). "Federal courts are not 'constituted as free-wheeling enforcers of the Constitution and laws.'" *Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006)). The restrictions on standing are "founded in concern

about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Thus, if Plaintiffs cannot demonstrate standing, their claims for injunctive relief must be denied.[8]

To establish standing for injunctive relief, Plaintiffs must establish the three requisites of standing: an injury "that is concrete and particularized . . . [and] actual and imminent, not conjectural or hypothetical"; traceability; and redressability. *Summers*, 555 U.S. at 493. With respect to claims of future injury, "there must be a substantial risk of injury, or the alleged injury must be 'certainly impending.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Ultimately, "[h]ow likely is enough is necessarily a qualitative judgment." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F. 3d 1153, 1161 (11th Cir. 2008). But, "the Supreme Court has made clear that a generalized grievance, 'no matter how sincere,'" is not enough. *Wood,* 981 F. 3d at 1314 (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013)).

### A.   Plaintiffs' purported injury is not certainly impending or substantially likely to occur.

In support of their standing argument, Plaintiffs incorporate numerous paragraphs in their Amended Complaint and several declarations given by

---

[8] Defendants will also shortly be filing a motion to dismiss Plaintiffs' Amended Complaint on additional jurisdictional grounds.

some of the individual plaintiffs. *See* [Doc. 15-1, p. 5 n.1, 2]. The allegations and declarations offer a variety of reasons why the individual Plaintiffs feel they will be injured by the Challenged Provisions.[9] Further, the organizational Plaintiffs also claim both associational and organizational standing. [Doc. 15-1, p. 6 n.3]. Many of these purported injuries overlap to varying degrees but it is notable that all share the same critical deficiency: none of the individual Plaintiffs have stated—whether by declaration or in the Amended Complaint itself—that they intend to or ultimately will violate any of the Challenged Provisions. To the contrary, most plaintiffs have communicated a *generalized fear* of prosecution that they say is sufficiently chilling that they will altogether avoid places or situations where such laws are put into effect. *Id*. This creates a standing problem for Plaintiffs.

If Plaintiffs are clearly not planning on running afoul of the challenged laws, then there is no injury that is "certainly impending" or "substantially likely" to occur. This also applies equally to CGG, which only alleges it will divert funds based on speculative future injuries or responses to the fears of its members and voters. [Doc. 15-3, ¶¶ 13, 20, 25]. Instead, each of the Plaintiffs will be actively *avoiding* the purported injury caused by the

---

[9] Defendants use Plaintiffs' "Challenged Provisions" language to refer to all five provisions for which Plaintiffs seek an injunction.

Challenged Provisions. But "[p]laintiffs must demonstrate a 'personal stake in the outcome' in order 'to assure that concrete adverseness which sharpens the presentation of issues' necessary." *Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983) (quoting *Baker v. Carr,* 369 U.S. 186, 204 (1962)). In *Lyons,* an individual sued to bar the Los Angeles Police Department from using chokeholds based on fears he might be placed in a chokehold again. *Id.* at 98. In considering the plaintiff's subjective fears, the Court explained that an "[a]bstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury…" *Id.* at 101–02. And "the plaintiff's subjective apprehensions" were not enough. *Id.* at 107 n.8 (emphasis in original).

Here, the declarations submitted by the individual Plaintiffs rely on their subjective fears of prosecution under the Challenged Provisions (or difficulty complying with them), as well as concerns about merely being accused of violating such laws. *See generally*, [Docs. 15-3 through 15-6, 15-8, 15-9, 15-11]. While they may feel those concerns sincerely, that does not afford Plaintiffs standing. This is particularly true where, as here, the alleged fear of prosecution or accusation depends on the unknown conduct of some unknown

third party at some point in the future.[10] A long chain of events encompassing the actions of third parties not before the Court must occur before Plaintiffs' fears could even get close to becoming reality. This "attenuated chain  of possibilities," *Clapper*, 568 U.S. at 410, means Plaintiffs could only be injured *if* they change their mind regarding going to polling places and other areas where the Challenged Provisions are in effect and *if* they commit some violation of the Challenged Provisions—which none have expressed an intent to do—and *then* a third party observes and reports such violation and *then* another third party refers that violation to the SEB, the Secretary, or some criminal enforcement arm (like a district attorney or the Attorney General). And that's not all—that criminal enforcement arm will then have to independently decide to prosecute Plaintiffs and then actually commence such prosecution. Only then would Plaintiffs suffer any injury whatsoever.[11] This hypothetical chain of events demonstrates the abstract and conjectural nature of Plaintiffs' purported injury. And the Supreme Court has "been reluctant to

---

[10] As discussed below, the Secretary of State and SEB have no ability to bring criminal charges against Plaintiffs—those can only be brought by the Attorney General after referral or by a district attorney. *See, e.g.*, O.C.G.A. § 21-2-33.1.
[11] Given that Plaintiffs can apply for a runoff absentee ballot well before the deadline for certification, Ex. B at ¶ 4, they likewise could only be injured if they chose to wait before applying for a ballot.

endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper,* 568 U.S. at 414.

The individual Plaintiffs' declarations also claim they have opted to change their behavior in light of the Challenged Provisions. That is, they are choosing not to go to polling places out of a fear of violating the law. This, they may claim, is an actual injury that has already occurred, satisfying the injury-in-fact requirement for purposes of standing. But this is also not an injury. And the individual Plaintiffs are also not suffering any injury because none of them are eligible to vote in any special election runoff being held on July 13.

"[I]f the hypothetical harm is not 'certainly impending,' or there is not a substantial risk of the harm, a plaintiff cannot conjure standing by inflicting some direct harm on itself to mitigate a *perceived* risk." *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F. 3d 1332, 1339 (11th Cir. 2021) (quoting *Clapper*, 568 U.S. at 416) (emphasis added). Plaintiffs' respective decisions to curb their conduct or altogether change their behavior as a result of their subjective fears of prosecution are exactly the kind of self-inflicted harm courts have declined to recognize as an injury for purposes of Article III standing.[12]

---

[12] Indeed, at least one Plaintiff alleges the exact same belief in an elevated risk of identity theft that was found insufficient to state an injury in *Tsao. See, e.g.*, [Doc. 15-6, ¶ 15] ("identity theft risk").

CGG's claim of a diversion of resources is also, at most, a self-inflicted injury not tied to the Challenged Provisions. Its claimed expenditures also constitute CGG's pursuit of its organizational purpose, and it cannot claim standing "based solely on the baseline work they are already doing." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019); *see also Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Reg. & Elections*, No. 1:20-CV-01587-WMR, 2020 U.S. Dist. LEXIS 211736, at *4 (N.D. Ga. Oct. 5, 2020).

Thus, the injuries claimed by Plaintiffs are not sufficient to afford them standing to bring this Motion for injunctive relief and it should be denied.

### B.   Plaintiffs do not have standing because they do not have a particularized injury.

An injury in fact is "an invasion of a legally protected interest that is both concrete *and particularized* and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (emphasis added). A particularized injury is one that "affect[s] the plaintiff in an *individualized* way." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1548 (2016). Here, Plaintiffs take issue with four generally applicable criminal statutes that they have never been previously subjected to or, as demonstrated above, can reasonably show they are substantially likely to be subjected to in

the future. They also claim that providing a deadline for absentee ballot applications will injure them in some unknown way. *See, e.g.*, [Doc. 14, ¶ 173].

"A generalized grievance is undifferentiated and common to all members of the public." *Wood,* 981 F. 3d at 1314 (quoting *Lujan,* 504 U.S. at 575) (internal quotations omitted). "[W]hen the asserted harm is . . . shared in substantially equal measure by . . . a large class of citizens, it is not a particularized injury." *Id.* at 1315 (quoting *Warth,* 422 U.S. at 499) (internal quotations omitted). And while Plaintiffs claim to have altered their behavior, that is not sufficient to create an injury. Nor can efforts to manufacture injury be sufficient to convert a general grievance into a particularized one.

This Court should "decline the invitation to slight the preconditions for equitable relief," by granting Plaintiffs' Motion. *Lyons,* 461 U.S. at 112. Indeed, as the *Lyons* court properly held, federal courts should exercise "restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of an irreparable injury which is both great and immediate." *Id.*

## C.   The alleged injuries suffered by Plaintiffs are not fairly traceable to Defendants.

"Traceability is the second element of the standing doctrine." *Anderson v. Raffensperger,* 497 F. Supp. 3d 1300, 1328 (2020). "It requires 'a fairly

traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.'" *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). Further, "'standing may be defeated by finding a different cause' and '[d]irect breaks in the causal chain have defeated standing in a wide variety of other circumstances.'" *Id.* (quoting Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 3531.5 (3d ed. Apr. 2020 Update)).

None of the Challenged Provisions are traceable to Defendants because, although they may have authority with respect to *civil* enforcement proceedings, neither the Secretary nor the SEB are responsible for *criminal* enforcement of election laws. *See generally,* O.C.G.A. § 21-2-33.1. In fact, to the extent Defendants became aware of a violation of the Challenged Provisions, such violation would—at most—be referred to the appropriate law enforcement official for a separate decision on criminal enforcement. Further, Defendants have no role in the administration or processing of absentee ballots for purposes of the deadline. O.C.G.A. § 21-2-381(b) (applications processed by registrars); *Ga. Republican Party, Inc. v. Sec'y of State of Ga.*, No. 20-14741-RR, 2020 U.S. App. LEXIS 39969, at *6 (11th Cir. Dec. 20, 2020).

But despite Defendants' clear inability to enforce criminal statutes or administer absentee ballots, Plaintiffs have only sued the Secretary of State and SEB. In so doing, they failed to sue any of the "independent officials . . .

who are not subject to the Secretary's control," but are nevertheless responsible for enforcement. *Jacobson*, 974 F.3d at 1253. The mere fact that the Secretary is designated the "chief election officer of the state" does not make every complained of injury in the election context traceable to the Secretary. *Id.* at 1254; *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1300 (11th Cir. 2019) (en banc).

Because the purported future injuries are not traceable to Defendants, Plaintiffs' request for a preliminary injunction should be denied. "Plaintiffs have not shown their injury (even assuming it was imminent) is traceable to the State Defendants. That means Plaintiffs lack standing to sue the State Defendants here." *Anderson,* 497 F. Supp. 3d at 1329.

### D. The relief Plaintiffs request is not redressable by an order from this Court against Defendants.

Neither the Secretary nor the SEB will be the cause of the purported future injuries here. Thus, any relief ordered from this Court against Defendants "will not redress that injury—either 'directly or indirectly.'" *Jacobson*, 974 F.3d at 1254. And this Court cannot bind the appropriate law enforcement officials through an order against Defendants. *Id.* at 1255; *see also Mass. v. Mellon,* 262 U.S. 447, 488 (1923). Put differently, "[r]edressability requires that the court be able to afford relief *through the exercise of its power,* not through the persuasive or even awe-inspiring effect of *explaining* the

exercise of its power." *Franklin v. Massachusetts,* 505 U.S. 788, 825 (1992) (Scalia, J., concurring in judgment).

For all of these reasons, Plaintiffs lack standing to seek an injunction against Defendants with respect to the Challenged Provisions.

## III. Plaintiffs are not likely to succeed on the merits.

But even if Plaintiffs have standing, they have not shown they are likely to succeed on the merits of their claims.

### A. Undue burden on the right to vote.

Plaintiffs first seek to enjoin the Election Observation provisions and changes to runoff timelines as facially unconstitutional burdens on the right to vote. [Doc. 15-1, pp. 8-11, 23-26]. But facial challenges to election practices are disfavored because "the proper [judicial] remedy—even assuming [the law imposes] an unjustified burden on some voters—[is not] to invalidate the entire statute." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 203 (2008) (controlling opinion) (cleaned up). Such challenges "must fail where the statute has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). "Regulations imposing severe burdens on the plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a state's 'important regulatory interests' will usually be enough to justify 'reasonable

nondiscriminatory restrictions.'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Although there is no "litmus test," courts distinguish severe burdens from non-severe ones, and everyday burdens such as photo identification laws "aris[e] from life's vagaries" and thus fall into the latter category. *Crawford*, 553 U.S. at 191, 197-98. Significantly, lesser burdens impose no burden of proof or evidentiary showing on states. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009).

The provisions regarding intentionally observing voters' choices on the ballot imposes no burden whatsoever on the right to vote. Plaintiffs claim that merely voting in person places them at risk, [Doc. 15-1, pp. 10-11], but Plaintiffs face no such harm if they do not *intentionally* attempt to view the votes of others—just as was true prior to SB 202. O.C.G.A. § 21-2-568(a)(3) and (4). Even if there was a burden, the use of the word "intentionally" addresses any burden because it is well within the regulatory interest of the state to protect the right to a secret ballot through penalties for intentional observation. *See, e.g.*, Ga. Const. Art. II, Sec. I, Par. I.

Further, the 11-day deadline for applying for an absentee ballot "do[es] not implicate the right to vote at all" because Georgia provides "numerous avenues to mitigate chances that voters will be unable to cast their ballots."

*NGP*, 976 F.3d at 1281. The deadlines are "reasonable nondiscriminatory restrictions" and therefore the state's "important regulatory interests" are more than enough to justify them—especially when they are similar to those in many other states—ending Plaintiffs' fundamental right to vote claim. *Timmons*, 520 U.S. at 358; *Burdick*, 504 U.S. at 434.

For these reasons, this Court should deny Plaintiffs' requested relief on the observation provisions and 11-day provision.

### B.    Vagueness challenges.

Plaintiffs next seek to enjoin the observation provisions and early-scanning provisions as unconstitutionally vague. [Doc. 15-1, pp. 11-12, 17-21]. But "it is clear what the [provisions] as a whole prohibit[]," *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S. Ct. 2294, 2300 (1972). How does one avoid the criminal penalties of the observation provisions? By not *intentionally* trying to see how someone else is voting. How does one avoid the penalties for disclosure of information about the votes of individuals during the early scanning process? By not making those disclosures.

Further, Plaintiffs' claim that what they call the "Estimating Bans" "criminalized pure thought" is nonsensical—in context, the statute clearly refers to an observer trying to make a count of ballots to inform others about a particular candidate's status before the polls close. Ex. A at 66:1671-1675,

67:1698-1712. Plaintiffs' claim that this is part of the normal process of observing, [Doc. 15-9, ¶ 13], is simply wrong—this type of information, if shared, can give a candidate an advantage during the counting process, which is exactly why disclosure was already prohibited when scanning took place only on Election Day and under the emergency rule that allowed early scanning in 2020.[13]

Far from being unclear, the prohibitions in the statutory provisions—which track those used in the emergency rule throughout 2020—are "clearly defined," *Grayned*, 408 U.S. at 107, and thus are not unconstitutionally vague.

## C.   **First Amendment challenges.**

Finally, Plaintiffs seek to enjoin the early scanning provisions and ban on photographing ballots as violations of the First Amendment. [Doc. 15-1, pp. 13-17, 22-23]. First, the provisions on early scanning apply to a specific location—where the scanning of absentee ballots is taking place—meaning the First Amendment claim must be evaluated based on the forum. *Mansky*, 138 S. Ct. at 1885; *Int'l Soc. for Krishna Consciousness*, 505 U. S. at 678. During early scanning, that location is similar to a precinct—in other words, "a government-controlled property set aside for the sole purpose of voting."

---

[13] The SEB has not yet adopted rules on the "secrecy of election results prior to the closing of the polls" as required by SB 202. Ex. A at 67:1713-1717.

*Mansky*, 138 S. Ct. at 1886. Moreover, ballots, like draft cards, are also government property. *See U.S. v. O'Brien*, 391 U.S. 367, 387-88 (1968). Plaintiffs, in effect, appear to be claiming a First Amendment right to disclose election results before the election is over—indeed, while counting is ongoing. However, there is a significant government interest in upholding the secrecy of the ballot and the integrity of elections.

Further, the speech in question is also not content-based—it is not like a restriction on certain types of signs, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)—rather, even if it regulates expressive activity in some way, it should be evaluated as a regulation of elections under *Anderson/Burdick. See, e.g., Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 777 (M.D. Tenn. 2020). Under that standard, preventing Plaintiffs from disclosing election results before the election is complete does not burden the right to vote; and, even if it does, the regulatory interests in protecting ballot secrecy, orderly election administration, and voter confidence amply justify so slight a burden. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009); *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1124 (N.D. Ga. 2020). This eliminates Plaintiffs' constitutional claim.

The photography provisions also do not violate the First Amendment. Photographing individuals *in the act of voting* is completely different than what

O.C.G.A. § 21-2-568.2(2)(B) actually prohibits. The provision prohibits recording a voters' *actual votes* wherever those might be taking place, in part in order to avoid vote-payment schemes, and because it serves a very compelling state interest—ensuring the secrecy of the ballot. That scanned ballot images are public records *after* an election is completely different than whether voters' ballots can be published *during* an election. [Doc. 15-1, p. 23].

## IV. Plaintiffs will not suffer any irreparable harm.

For all the reasons explained above, Plaintiffs will not suffer any irreparable harm because none have alleged that they will potentially violate the Challenged Provisions. Further, Plaintiffs only claim *potential* harm *if* certain events happen regarding the 11-day deadline or rely on incorrect information that they cannot request an absentee ballot for a runoff until the prior election is certified. [Docs. 15-6, ¶ 1215-7, ¶ 14; 15-9, ¶ 15; 15-10, ¶ 7].

## V. The equities and public interest counsel heavily against any injunction.

Plaintiffs' proposed injunction is not in the public interest because of their lack of diligence and because the granting of such injunction and the confusion that will follow would likely harm the voting rights of the public, result in voter frustration, and even disenfranchisement.

Litigation involving elections is unique because of the interest in the orderly administration and integrity of the election process. *Purcell*, 549 U.S. at 4. The risks of voter confusion and conflicting orders counsel against changing election rules, especially when there is little time to resolve factual disputes. *Id*. at 5-6. Plaintiffs must show they exercised reasonable diligence—something they cannot do. *Benisek*, 138 S.Ct. at 1944. Plaintiffs never challenged nearly identical provisions that were in existing law, and then waited months after SB 202 became law before filing their current Motion. Plaintiffs thus cannot show they are entitled to injunctive relief.

Moreover, in this instance it is not just voters who may now be confused because of Plaintiffs' lack of diligence, but also poll workers, election officials, supervisors, and law enforcement who have been preparing to carry out their duties with the assumption that the Challenged Provisions would be in effect. If this Court in the eleventh hour enjoins the Challenged Provisions, particularly the deadline for applying for absentee ballots, it will likely hamper the smooth administration of the upcoming election and potentially result in voter confusion or outright disenfranchisement.

## CONCLUSION

This Court should follow the lead of other courts which have heard CGG's claims in the past and deny Plaintiffs' Motion.

Respectfully submitted this 24th day of June, 2021.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

Gene C. Schaerr*
Erik Jaffe*
H. Christopher Bartolomucci*
SCHAERR | JAFFE LLP

26

1717 K Street NW, Suite 900
Washington, DC  20006
Telephone: (202) 787-1060
Fax: (202) 776-0136
gschaerr@schaerr-jaffe.com

* Admitted *pro hac vice*

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson