# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| COALITION FOR GOOD GOVERNANCE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacities as Secretary of State and member of the Georgia State Elections Board, et al.,<br><br>*Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE; et al.,<br><br>*Intervenor-Defendants*. | No. 1:21-cv-02070-JPB |

## INTERVENOR-DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Introduction..................................................................................................1

Relevant Background.....................................................................................2

Argument......................................................................................................5

    I.    The deadline to apply for mail ballots is likely constitutional. ..........6

        A.    The deadline does not implicate voting rights because there is no constitutional right to vote by mail. .................................7

        B.    The deadline does not implicate voting rights because it imposes, at most, idiosyncratic burdens on some voters. .......10

    II.    Under the *Purcell* principle, the equities weigh against entering a disruptive federal injunction so close to election day........................16

Conclusion .................................................................................................19

Certificate of Compliance ..........................................................................19

Certificate of Service ................................................................................19

## INTRODUCTION

Plaintiffs are not the first to ask a federal court to enjoin an election law just weeks before election day. Litigants filed a record number of these requests in 2020, and their cases virtually all ended the same way: The district court either denied the injunction or had its injunction stayed by the circuit court or Supreme Court. *See, e.g.*, *New Ga. Proj. v. Raffensperger*, 976 F.3d 1278, 1283 & n.2 (11th Cir. 2020) (collecting cases). The "mantra" from *Purcell v. Gonzalez*, 549 U.S. 1 (2006)—that "'lower federal courts should ordinarily not alter the election rules on the eve of an election'"—has "consistently pointed … in one direction": requests for extraordinary relief in election cases should be denied. *New Ga. Proj.*, 976 F.3d at 1283 (quoting *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020)). Yet Plaintiffs do not even cite *Purcell* in their motion, let alone try to distinguish it. The *Purcell* principle alone dooms their motion.

Plaintiffs are also unlikely to prove that Georgia's deadline for submitting applications for mail ballots is unconstitutional. Georgia lets voters apply for mail ballots until 11 days before the election—a deadline that *still* hasn't expired for the upcoming runoff on July 13. The State's interests in easing administration for election officials and facilitating timely voting easily justify any alleged burdens from the deadline. But this Court doesn't even have any burdens to balance: The deadline imposes *no* relevant burdens because it affects only absentee voting and has no effect on the average, objective voter.

For all these reasons, the Court should deny Plaintiffs' motion to preliminarily enjoin Georgia's 11-day deadline for mail-ballot applications.

1

## RELEVANT BACKGROUND

Georgia requires candidates for public office to receive "a majority of the votes." O.C.G.A. §21-2-501(a)(1). When no candidate crosses the 50% threshold, the two highest vote-getters compete in a runoff. *Id.* The runoff must be held 28 days after the general election. *Id.* Per the Georgia Constitution, the runoff is not a new election, but "a continuation of the general election." Ga. Const. art. II, §2, ¶II. So "only persons who were entitled to vote in the general" can vote in the runoff. *Id.*

Georgia voters can pick one of three ways to vote: in person on election day, absentee during a generous period of early voting, or absentee by mail. *See* O.C.G.A. §21-2-381 (eff. July 1, 2021); §21-2-385 (eff. July 1, 2021); §21-2-388. Voters do not need an excuse to vote absentee. §21-2-380(b). To use the mail option, voters must request their ballot via an official application. §21-2-381(a). The application can be submitted "online, by mail, by fax, or in person." *Vote by Absentee Ballot*, Georgia.gov, bit.ly/3qkX4zD (last visited June 24, 2021); *accord* O.C.G.A. §21-2-381(a)(1)(A).

Applications for mail ballots must be received "no later than 11 days prior to the primary, election, or runoff." O.C.G.A. §21-2-381(a)(1)(A). This 11-day deadline was added by SB 202. Under prior law, Georgia did not specify any cutoff date for submitting mail-ballot applications. That oversight proved costly in 2020, when Georgia experienced a "dramatic increase" in mail voting. Election Integrity Act of 2021, §2(3). According to the legislature's findings, the "lengthy absentee ballot process" under the prior regime "led to [voter]

confusion." §2(9). Because voters could request ballots "in the last few days before the election," "many absentee ballots … were not successfully voted or were returned late." *Id.* Georgia thus adopted a clear deadline to help voters vote, "reduce the burden on election officials" and "boost voter confidence." §2(3). With this reform, Georgia joined (according to one source) over a dozen States that require absentee-ballot applications to arrive at least ten days before the election. *See generally Absentee Ballot Deadlines*, Vote.org, bit.ly/3gDkLiw (last visited June 24, 2021).

SB 202 goes into effect on July 1. On June 15, Georgia held two special elections—one for state house district 34 and one for state house district 156. Norris Decl., Ex. A. No candidate received a majority, so runoffs are scheduled for July 13. *See* Ex. B (state calendar); Ex. C (Cobb County calendar); Ex. D (election results). Voters who plan to vote in the July runoff have been able to apply for a mail ballot since at least June 16. *See, e.g.*, Ex. E (Cobb County providing on June 16 an "[a]pplication for [the] July 13, 2021 Special Election Runoff" to vote by mail). And voters can continue applying for mail ballots through "July 2, 2021." Ex. B.

Plaintiffs are three organizations and 11 individuals. Am. Compl. (Doc. 14) ¶¶2-15. Though SB 202 was signed on March 25, Plaintiffs filed this lawsuit on May 17 and moved for a preliminary injunction on June 14. *See* Compl. (Doc. 1) ¶87; Mot. (Doc. 15-1). They now ask this Court to preliminarily enjoin, for the entire State, the 11-day deadline for mail-ballot applications. *See* Mot. 1-2 (Doc. 15); Proposed Order 3 (Doc. 15-13). Plaintiffs would not force election

officials to mail ballots on election day or the day prior, however. *See* Br. 21
(Doc. 15-1) (citing O.C.G.A. §21-2-384(a)(2) (2020)).

Plaintiffs' argument, then, is that voters have a constitutional right to
apply for mail ballots until *two days* before the election—a position that would
invalidate the application deadlines in over 30 States. *See Absentee Ballot
Deadlines*, *supra*. For the July runoffs, Plaintiffs' position would require elec-
tion officials to accept applications until July 11, instead of July 2. Importantly,
Georgia requires mail ballots to arrive by election day. O.C.G.A. §21-2-
386(a)(1)(F) (eff. July 1, 2021). Yet Plaintiffs provide no evidence about how
late a voter could apply for a mail ballot and realistically expect to both receive
it in the mail and return it by election day. *Cf. DNC v. Wis. State Legislature*,
141 S. Ct. 28, 37-38 (2020) (Kavanaugh, J., concurring in denial of application
to vacate stay) ("No one thinks that voters who request absentee ballots as late
as [five days before the election] can both receive the ballots and *mail* them
back in time to be received by election day.").

Plaintiffs instead support their request with two declarations, one from
a voter in state house district 34 and one from the Democratic candidate in
that race. *See* Gray Decl. (Doc. 15-7); Smith Decl. (Doc. 15-10). While both de-
clarants would prefer to vote absentee, neither explains why they cannot apply
for a mail ballot before July 2. Instead, they mistakenly assume that applica-
tions cannot be submitted until the results of the general election are formally
certified. *See* Gray Decl. ¶7; Smith Decl. ¶7. (For what it's worth, Cobb County
did certify the election results on June 21. Norris Decl., Ex. F (30:00 to 37:30).)

# ARGUMENT

A preliminary injunction is an "'extraordinary and drastic remedy.'" *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015). One should not be granted unless the movant "'clearly carries its burden of persuasion on each of [four] prerequisites'":

1. A "substantial likelihood of success on the merits."

2. An "irreparable injury."

3. An injury that "outweighs possible harm" to others.

4. And service of the "public interest."

*Id.* The movant's "'[f]ailure to show any of the[se] four factors … is fatal.'" *Callahan v. HHS*, 939 F.3d 1251, 1265 n.13 (11th Cir. 2019).

This standard is heightened when a preliminary injunction would give the movant "practically all of the relief" it seeks in the case. *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958). Here, for example, a preliminary injunction would not simply maintain the status quo until the end of trial; it would *permanently* change the rules for the July runoff, plus any other election that begins and ends before this case concludes. This sort of preliminary injunction "should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Id.*; *see, e.g.*, *Disability L. Ctr. of Alaska v. Meyer*, 484 F. Supp. 3d 693, 698-99 (D. Alaska 2020) (applying this heightened standard where the preliminary injunction would have required the State to mail additional absentee-ballot applications in the upcoming election).

Movants do not satisfy the normal standard for a preliminary injunction, let alone the heightened one. Their challenge to the 11-day deadline for mail-ballot applications lacks merit. And the equities do not favor their late-breaking attempt to change the rules. Their motion should be denied.

## I.    The deadline to apply for mail ballots is likely constitutional.

Despite Plaintiffs' rhetoric, Br. 22 (Doc. 15-1), "reasonable election deadlines do not 'disenfranchise' anyone under any legitimate understanding of that term," *Wis. State Legislature*, 141 S. Ct. at 35 (Kavanaugh, J., concurring). As the State will explain, the 11-day deadline for mail-ballot applications easily passes any balancing test. The deadline "simply" requires voters to "take reasonable steps and exert some effort to ensure that their [applications] are submitted on time." *New Ga. Proj. v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020). Voters who fail to apply "prior to the cutoff date" are not burdened by the deadline, but by their "own failure to take timely steps to [apply]." *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973). Any burden would be more than justified by the State's interests in "conducting an efficient election," "maintaining order," avoiding voter confusion, facilitating voting, and "preventing voter fraud." *New Ga. Proj.*, 976 F.3d at 1282.

But no balancing is even needed because Plaintiffs' claim has two more fundamental flaws. First, regulations of absentee voting, like the deadline challenged here, do not implicate the right to vote at all; Georgians remain free to vote in person, and there is no constitutional right to vote by mail. Second, the deadline imposes, at most, only idiosyncratic burdens on some voters—not

the kind of generalized, categorical burdens that count under the *Anderson-Burdick* test. These legal errors permeate the claims in this case, as well as the other six cases that challenge SB 202. They make Plaintiffs unlikely to succeed on the merits here.

### A.   The deadline does not implicate voting rights because there is no constitutional right to vote by mail.

Georgia's 11-day deadline affects only one form of voting: absentee by mail. It has no effect on in-person voting—either on election day or during the generous period of early voting. Because in-person voting is available and unaffected by the challenged deadline, "the right to vote is not 'at stake.'" *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020) (quoting *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969)).

The Constitution guarantees *one* method of voting; "there is no constitutional right to an absentee ballot." *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020); *accord Tully v. Okeson*, 977 F.3d 608, 611 (7th Cir. 2020) ("[U]nless a state's actions make it harder to cast a ballot at all, the right to vote is not at stake."). When States impose a limit on absentee voting, but not in-person voting, "[i]t is ... not the right to vote that is at stake ... but a claimed right to receive absentee ballots"—which the Supreme Court has said is not a constitutional right. *McDonald*, 394 U.S. at 807. As the Fifth Circuit explained during the pandemic, the Constitution is not violated "unless ... the state has 'in fact absolutely prohibited' the plaintiff from voting." *Tex. Democratic Party*,

961 F.3d at 404. And "permit[ting] the plaintiffs to vote in person," as Georgia does, "is the exact opposite of 'absolutely prohibit[ing]' them from doing so." *Id.*

The Supreme Court announced this rule "unambiguously" in *McDonald. New Ga. Proj.*, 976 F.3d at 1288 (Lagoa, J., concurring). There, Illinois law allowed some classes of voters to cast absentee ballots, but not people in jail. *McDonald*, 394 U.S. at 803-04. When inmates who couldn't post bail challenged the law, the Supreme Court unanimously held that "the right to vote" was not "at stake." *Id.* at 807. There is no "right to receive absentee ballots." *Id.* Illinois' rules on absentee voting "d[id] not themselves deny … the exercise of the franchise" because they only "ma[d]e voting *more* available to some groups." *Id.* at 807-08 (emphasis added). And Illinois' election code "as a whole" did not "deny … the exercise of the franchise" either. *Id.* Illinois had not "precluded [the inmates] from voting" because the inmates had potential options to vote in person. *Id.* at 808 & n.6. In other words, the inmates' constitutional claims failed because they were not "absolutely prohibited from voting by the State." *Id.* at 808 n.7.

When Intervenors raised this same point in *New Georgia Project*, the Eleventh Circuit agreed. *Compare* Amicus Br. of RNC & GAGOP, 2020 WL 5757920, at *4 (11th Cir. Sept. 23, 2020) ("Georgia's Election Day deadline does not implicate the right to vote at all."), *with* 976 F.3d at 1281 ("Georgia's Election Day deadline does not implicate the right to vote at all."). In that case, the Eleventh Circuit stayed a preliminary injunction against Georgia's deadline for returning mail ballots. That deadline, the Eleventh Circuit explained, "does

not implicate the right to vote at all" because "Georgia has provided numerous avenues" to vote, including "early in-person voting" and "vot[ing] in person on Election Day." 976 F.3d at 1281. Though *New Georgia Project* is not a binding precedent, *see id.* at 1280 n.1, it is correct and persuasive. The Eleventh Circuit was applying the test for a stay pending appeal, after all, and that test turns on the same four factors that govern motions for a preliminary injunction. *Id.* at 1280.

This Court should reject Plaintiffs' suggestion that in-person voting is somehow not a safe alternative. *Cf.* Br. 23 (Doc. 15-1). Courts rejected this argument even during the height of the pandemic. *See, e.g.*, *New Ga. Proj.*, 976 F.3d at 1281, 1284; *DNC v. Bostelmann*, 977 F.3d 639, 642-43 (7th Cir. 2020); *Tex. Democratic Party*, 961 F.3d at 404-05. For good reason: Georgia's officials have decided that in-person voting is safe, and federal courts lack the expertise, competence, accountability, or authority to override that decision. *See, e.g.*, *Wis. State Legislature*, 141 S. Ct. at 32 (Kavanaugh, J., concurring). Overriding Georgia's decision would make even less sense today, with vaccines freely available, infections plummeting, and society reopened. *See* Norris Decl., Ex. G (statement of Governor Kemp). While some voters might subjectively fear voting in person, courts "cannot hold private citizens' decisions to stay home for their own safety against the State." *Thompson v. Dewine*, 959 F.3d 804, 810 (6th Cir. 2020). And Plaintiffs' declarants are not afraid: They either voted in person recently, *see* Gray Decl. ¶6, or encouraged others to do so, *see*

Norris Decl., Ex. H (urging voters to "stay in line"); Ex. I (urging voters to "get out and vote" and "bring a friend or two with you").

In short, the "fundamental right to vote" is "the ability to cast *a* ballot"— "not the right to do so in a voter's preferred manner, such as by mail." *Tully*, 977 F.3d at 613 (emphasis added). Because Georgia's 11-day deadline affects only mail voting, Plaintiffs' constitutional challenge necessarily fails.

### B.    The deadline does not implicate voting rights because it imposes, at most, idiosyncratic burdens on some voters.

Plaintiffs' constitutional challenge fails for another fundamental reason. Right-to-vote claims are assessed under *Anderson-Burdick*, the balancing test derived from the Supreme Court's decisions in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* test "requires [courts] to weigh the burden imposed by the law against the state interests justifying the law." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261 (11th Cir. 2020) (citing *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009)). But as the Eleventh Circuit recently explained— quoting Justice Scalia's concurrence in *Crawford*—courts "'have to identify a burden before [they] can weigh it.'" *Id.* (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring in the judgment)). The only burdens that Plaintiffs assert are legally "irrelevant" because they are "special burden[s] on some voters," not categorical burdens on all voters. *Crawford*, 553 U.S. at 204 (Scalia, J., concurring in the judgment).

Plaintiffs try to argue that the 11-day deadline makes it impossible for *any* voter to obtain a mail ballot for a runoff. Plaintiffs assume that no one can apply for a mail ballot until the Secretary of State certifies the results of the general election. Absent certification, they say, no one can know whether there will even *be* a runoff. And because the Secretary might not certify the results until 11 days before the runoff, Plaintiffs fret that the window to apply for mail ballots might never open. *See* Br. 21-22 (Doc. 15-1).

Plaintiffs misunderstand Georgia law. The date for the runoff is set by law. *See* O.C.G.A. §21-2-501(a)(1) ("Unless such date is postponed by a court order, such runoff shall be held on the twenty-eighth day after the … election."). So the date for the July runoff is, and always has been, July 13. *See* Norris Decl., Ex. B. By the end of the night on June 15 it was clear that no candidate had won 50% of the votes and that a runoff would be held on July 13. *See* Exs. C, D. That's why counties have been accepting mail-ballot applications for the July runoff since at least June 16—the day after the general election. *See* Ex. E. As one of Plaintiffs' declarants said immediately after the general election, the July 13 runoff is "official" and "voting's open." Ex. J; *see also* Ex. K (announcing on election night that "the votes have been counted" and "it's clear we will be advancing to the runoff" "on July 13th"). Plaintiffs cite no evidence that applications for mail ballots are currently being rejected or that any election official is waiting for the Secretary's certification. Every Georgian who wants to vote by mail in the runoff can apply for a ballot now—the July 2 deadline hasn't even arrived.

11

The only possible burdens imposed by Georgia's 11-day deadline, then, would be highly idiosyncratic. The deadline cannot prevent someone from voting unless that person (for some unique reason) cannot apply for a mail ballot until ten days before the election, cannot vote in person during the early-voting period, and cannot vote in person on election day. If such people exist at all, they are incredibly rare. More to the point, Plaintiffs make no effort to "quantify" the number of people who fall into this category. *Crawford*, 553 U.S. at 200 (op. of Stevens, J.); *Common Cause/Ga.*, 554 F.3d at 1354. And even if they had, "[z]eroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016).

The better view, as Justice Scalia explained in *Crawford*, is that burdens arising from "the peculiar circumstances of individual voters" are legally "irrelevant." 553 U.S. at 204-06 (Scalia, J., concurring in the judgment). Georgia's 11-day cutoff for mail-ballot applications is a "generally applicable, nondiscriminatory voting regulation." *Id.* at 205; *see New Ga. Proj.*, 976 F.3d at 1281. Because it imposes no burdens on voters "categorically," it imposes no relevant burdens at all. 553 U.S. at 206 (Scalia, J., concurring in the judgment).

This categorical approach to *Anderson-Burdick* follows from several Supreme Court precedents:

- In holding that Hawaii's ban on write-in voting "impose[d] only a limited burden on voters' rights," *Burdick* looked at the ban's effect on voters generally, rather than on the plaintiff specifically. 504 U.S. at 436-37, 439. (Indeed, it was *the dissent* in

*Burdick* that focused on the law's impact on "some individual voters." *Id.* at 448 (Kennedy, J., dissenting).)

- In rejecting voters' challenge to Oklahoma's primary election, *Clingman v. Beaver* emphasized that "Oklahoma's semiclosed primary system does not severely burden the associational rights of the state's citizenry" generally—irrespective of its specific effect on the individual plaintiffs. 544 U.S. 581, 593 (2005).

- *Storer v. Brown* likewise held that the "sever[ity]" of California's ballot-access requirements must be assessed based on "the nature, extent, and *likely* impact" of those requirements—not the known impact on the specific candidates who were plaintiffs. 415 U.S. 724, 738 (1974) (emphasis added).

*See also Crawford*, 553 U.S. at 206-07 (Scalia, J., concurring in the judgment) (analyzing other precedents).

Common sense also supports the categorical approach. Given inevitable differences in voters' circumstances, every voting requirement "affects different voters differently." *Id.* at 205. But those different effects are not different "burdens" imposed by a generally applicable law; they "are no more than the different *impacts* of the single burden that the law uniformly imposes on all voters." *Id.* The Constitution does not prohibit mere disparate impacts. *Id.* at 207 (citing *Washington v. Davis*, 426 U.S. 229, 248 (1976)). Holding otherwise would imply that every voting requirement in every State is subject to invalidation whenever any voter's personal, idiosyncratic circumstances make that requirement particularly difficult. The Constitution does not tell courts to inject case-by-case hardship waivers into every election law. It entrusts state legislatures with making these policy decisions. *See* U.S. Const., art. I, §4;

art. II, §1; amend. X. This constitutional design militates against the "sort of detailed judicial supervision" that a "voter-by-voter examination of the burdens of voting regulations" would require. *Crawford*, 553 U.S. at 208 (Scalia, J., concurring in the judgment).

Though Justice Scalia was writing only for himself and two others in *Crawford*, his concurrence accurately describes the governing law. As he explained, the categorical approach comes from several Supreme Court precedents—all good law, all binding. *See id.* at 206-07. The lead opinion in *Crawford*, moreover, "neither reject[ed] nor embrace[d]" the categorical approach. *Id.* at 208. It didn't need to because the plaintiff there failed to "provide any concrete evidence of the burden" that the law imposed "on any class of voters." *Id.* at 201-02 (op. of Stevens, J.). Several lower courts have thus followed Justice Scalia's concurrence as an accurate statement of the law. *See, e.g., Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 236 (5th Cir. 2020); *Ne. Ohio Coal.*, 837 F.3d at 663 (Keith, J., concurring in part, dissenting in part) ("The Majority relies in part on Justice Scalia's concurrence in *Crawford* ...."). The Eleventh Circuit has also relied on it. *See, e.g., Jacobson*, 974 F.3d at 1261; *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1327 (11th Cir. 2021).

The categorical approach indisputably applies to requests for facial relief. As *Crawford*'s lead opinion explains, a facial challenge "must fail where the statute has a 'plainly legitimate sweep,'" so courts evaluating a facial challenge must focus on an election law's "broad application to all ... voters." 553

14

U.S. at 202-03 (op. of Stevens, J.). That an election law imposes "an unjustified burden on some voters," the lead opinion reiterated, cannot "invalidate the entire statute." *Id.* at 203; *accord id.* at 198-200 (evaluating the burden on "most voters" and explaining that an unjustified burden on "a few voters" is "by no means sufficient"). As a court recently explained in another case involving Intervenors, a plaintiff cannot maintain a facial challenge "based only on burdens tied to the peculiar circumstances of individual voters." *League of Women Voters of Minn. Educ. Fund v. Simon*, 2021 WL 1175234, at *8 (D. Minn. Mar. 29, 2021). Nor, of course, can a plaintiff obtain a "statewide" preliminary injunction for "*all*" voters" when the challenged law only "imposes 'excessively burdensome requirements' on *some* voters." *Brakebill v. Jaeger*, 905 F.3d 553, 558 (8th Cir. 2018).

Yet Plaintiffs seek facial, statewide relief without proving excessive burdens on all voters. They ask this Court to enjoin Georgia's 11-day deadline across the board. *See* Mot. (Doc. 15); Proposed Order (Doc. 15-13). They do not ask for as-applied relief for any "particular persons." *Cf. Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016). Even if that kind of relief were permissible (and it isn't, *see Crawford*, 553 U.S. at 208 (Scalia, J., concurring in the judgment)), the organizational Plaintiffs lack standing to seek as-applied relief, *see Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 974 F.3d 408, 421-22 (3d Cir. 2020). And no individual voter would be entitled to a preliminary injunction because the window to apply for mail ballots is *still* open. Individuals who need to apply

late should apply now. Plaintiffs' request for a statewide injunction is both unnecessary and unlawful.

## II.   Under the *Purcell* principle, the equities weigh against entering a disruptive federal injunction so close to election day.

That Plaintiffs are unlikely to succeed on the merits dooms their motion. Plaintiffs' arguments on irreparable harm, the balance of equities, and the public interest all *assume* they are right on the merits. *See* Br. 24-25 (Doc. 15-1). Because they are wrong, this Court "need not consider" those factors to deny Plaintiffs' motion. *GeorgiaCarry.Org*, 788 F.3d at 1329.

But even if Plaintiffs had proven a likely violation of the Constitution, their motion still should be denied. In election cases, Plaintiffs also must overcome the *Purcell* principle. Based on *Purcell*, the Supreme Court has "repeatedly" instructed "lower federal courts" not to "alter the election rules on the eve of an election." *RNC*, 140 S. Ct. at 1207. This principle defeated virtually every emergency request to enjoin a state election law in the last cycle. *See, e.g.*, *New Ga. Proj.*, 976 F.3d at 1283 & n.2; *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086-87 (9th Cir. 2020); *Bostelmann*, 977 F.3d at 641-42. Importantly, *Purcell* is a *sufficient* basis to deny a preliminary injunction. *See Purcell*, 549 U.S. at 5 (granting a stay while expressing "no opinion" on the underlying merits); *Riley v. Kennedy*, 553 U.S. 406, 426 (2008) (explaining that *Purcell* "require[s] courts to allow elections to proceed despite pending legal challenges").

The *Purcell* principle guards against judicial interference in approaching elections, "assuring voters that all will play by the same, legislatively enacted

rules." *New Ga. Proj.*, 976 F.3d at 1284. This principle of noninterference promotes "[c]onfidence in the integrity of our electoral processes," which "is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4. And it protects against "voter confusion and [the] consequent incentive to remain away from the polls." *Id.* at 4-5. The *Purcell* principle also promotes "the public interest in orderly elections." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944-45 (2018). Running an election is a "complicated endeavor," requiring a "massive coordinated effort" by many "officials and volunteers." *Wis. State Legislature*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). Even "seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences." *Id.*

Plaintiffs' motion falls well within *Purcell*'s forbidden window. The July runoff is just a few weeks away, and the July 2 deadline for mail-ballot applications is even closer. *See, e.g.*, *North Carolina v. League of Women Voters of N.C.*, 574 U.S. 927 (2014) (staying a lower-court order that changed election laws 32 days before the election); *Husted v. Ohio State Conference of NAACP*, 573 U.S. 988 (2014) (61 days); *Purcell*, 549 U.S. 1 (33 days); *Bostelmann*, 977 F.3d at 642 (six weeks before the election and four weeks before the challenged deadline). In fact, "we are not on the eve of the election—we are in the middle of it." *New Ga. Proj.*, 976 F.3d at 1283. As explained, the runoff is merely a continuation of the general election, and absentee voting for the runoff has already begun.

Plaintiffs offer no response to *Purcell* in their motion. Any new responses in their reply will be unpersuasive. While it was not clear until June 15 that the July 13 runoff would be necessary, it was always a possibility, and Plaintiffs have known since March that SB 202 would go into effect on July 1. Yet Plaintiffs waited three months to file this motion—when preparations for the runoff were already underway. *See Dobson v. Dunlap*, 576 F. Supp. 2d 181, 187-88 (D. Me. 2008) (denying a preliminary injunction in an election case when the plaintiff waited three months to file it).

Nor can Plaintiffs rely on the fact that SB 202 itself changed the law. "It is one thing for state legislatures to alter their own election rules … It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent." *Wis. State Legislature*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). Election officials in Georgia are aware that SB 202 has passed and have been preparing to comply with it. A preliminary injunction from a federal court will require election administrators to now "understand the court's injunction, then devise plans to implement that late-breaking injunction, and then determine as necessary how best to inform voters, as well as state and local election officials and volunteers, about those last-minute changes." *Id.* Especially given the likelihood of a "conflicting" stay order on appeal, the risk of "voter confusion" and the "consequent incentive to remain away from the polls" is unacceptably high. *Purcell*, 549 U.S. at 4-5.

18

## CONCLUSION

This Court should deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

Dated: June 24, 2021                                   */s/ Cameron T. Norris*

John E. Hall, Jr.                                          Tyler R. Green (*pro hac vice*)
  Georgia Bar No. 319090                      Cameron T. Norris (*pro hac vice*)
William Bradley Carver, Sr.                         Steven C. Begakis (*pro hac vice*)
  Georgia Bar No. 115529                      CONSOVOY MCCARTHY PLLC
W. Dowdy White                                        1600 Wilson Blvd., Ste. 700
  Georgia Bar No. 320879                      Arlington, VA 22209
HALL BOOTH SMITH, P.C.                         (703) 243-9423
191 Peachtree St. NE, Ste. 2900              tyler@consovoymccarthy.com
Atlanta, GA 30303                                   cam@consovoymccarthy.com
(404) 954-6967                                         steven@consovoymccarthy.com

*Counsel for the RNC, NRSC, NRCC, and GAGOP*

## CERTIFICATE OF COMPLIANCE

I certify that this answer complies with Local Rule 5.1(B) because it uses 13-point Century Schoolbook font.

/s/ *Cameron T. Norris*

## CERTIFICATE OF SERVICE

On June 24, 2021, I e-filed this answer on ECF, which will serve every-one requiring service.

/s/ *Cameron T. Norris*