**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| COALITION FOR GOOD GOVERNANCE, *et al.*<br><br>    *Plaintiffs*,<br><br>v.<br><br>BRIAN KEMP, in his official capacity as Governor of the State of Georgia, *et al.*,<br><br>    *Defendants*. | Civil Action No.:<br>1:21-CV-02070-JPB |

**<u>BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. ii

INTRODUCTION ..................................................................................... 1

PROCEDURAL BACKGROUND .................................................................. 2

FACTUAL BACKGROUND ........................................................................ 5

   I.   O.C.G.A. § 21-2-33.2: The Suspension Rule. ........................................... 5

   II.   O.C.G.A. § 21-2-568.1: The Observation Rule. ...................................... 8

   III.   O.C.G.A. §§ 21-2-386(a)(2)(B)(vii), -386-(a)(2)(A), and-386(a)(2) (B)(vi): The Tally and Communication Rules. ............................................. 9

   IV.   O.C.G.A. § 21-2-568.2: The Photography Rules. .................................. 12

ARGUMENT AND CITATION TO AUTHORITY ......................................... 13

   I.   Plaintiffs lack Article III standing. ....................................................... 14

      A.   The Board Member plaintiffs only have theoretical injuries. .......... 15

      B.   Plaintiffs lack standing because any harm to them or their members is speculative. .................................................................................... 16

      C.   Plaintiffs cannot show traceability or redressability on any of their remaining claims. ................................................................................. 18

   II.   Defendants are entitled to summary judgment on each count of Plaintiffs' Second Amended Complaint. ................................................... 22

      A.   Defendants are entitled to summary judgment on all claims regarding the Suspension Rule (Counts I, II, and III). ............................ 22

         1.   The Suspension Rule complies with procedural due process (Count I). .............................................................................................. 22

         2.   The Suspension Rule complies with substantive due process (Count II). ............................................................................................. 27

         3.   The Suspension Rule does not burden the right to vote (Count III). ............................................................................................ 30

      B.   Defendants are entitled to summary judgment on all claims regarding the Observation Rules (Counts IV, V, and VI). ....................... 31

         1.   The Observation Rule does not impose an undue burden on the right to vote (Count IV). ...................................................................... 31

2.   The Observation Rule is not vague (Count V). .............................. 34

3.   The Observation Rule does not intimidate voters (Count VI). ..... 35

C.   Defendants are entitled to summary judgment on all claims regarding the Communications and Tally Rules (Counts VII, VIII, and XI). ...................................................................................... 38

1.   The Communications Rule does not violate the First Amendment (Count VII). ................................................................. 38

2.   The Tally Rules are not vague (Count VIII). ................................ 39

3.   The Tally Rules do not violate the First Amendment (Count XI). 41

D.   Defendants are entitled to summary judgment on all claims regarding the Photography Rules (Counts IX and X). ............................ 42

1.   The Photography Rules do not violate the First Amendment (Count IX). ................................................................................. 42

2.   The Photography Rules are not vague (Count X). ........................ 46

CONCLUSION ............................................................................................... 47

## INTRODUCTION

Plaintiffs in this case challenge various common-sense election administration rules, including SB 202's accountability structure for county officials established through the bipartisan State Election Board. But despite their policy disagreements with Defendants, Plaintiffs cannot present admissible evidence to support the sweeping allegations in their latest Complaint, and Defendants are entitled to judgment as a matter of law on all claims.

First, Plaintiffs' claims about the temporary suspension of county election officials who engage in long-term mismanagement of elections fail because Plaintiffs cannot show any (1) imminent injury; (2) lack of due process for the temporary suspension; or (3) impact on the right to vote, each of which is required for Plaintiffs to prevail. Only Fulton County has even had a performance review conducted under the provisions of SB 202, and that panel recommended that those county officials *not* be suspended following a comprehensive process that achieved its goal of providing incentives for the county to improve election administration.

Second, Plaintiffs' claims about observing voters while they are voting fail because Plaintiffs cannot demonstrate any impact on the right to vote or that the provisions are vague. Indeed, this Court has already concluded that

1

accidental viewing of another's ballot is not actionable, and Plaintiffs have done nothing to develop the evidentiary record otherwise.

Third, Plaintiffs cannot succeed on their challenges to the provisions of SB 202 that ensure early scanning totals are not disclosed before the polls close. This Court has already denied Plaintiffs' attempts to enjoin these provisions, and there is no basis to change that outcome.

Finally, Plaintiffs cannot show that the rules regarding photographing ballots have any impact on them, nor can they show that those rules violate any provision of the U.S. Constitution.

Plaintiffs made grand promises in their latest Complaint and in their briefing opposing the motion to dismiss earlier in this case. But now they must come forward with admissible evidence supporting their claims. They have not and cannot, and this Court should enter judgment in favor of Defendants on all counts.

## PROCEDURAL BACKGROUND

Although this case was filed in May 2021, Plaintiffs have taken remarkably few steps to develop any factual support for their claims. Indeed, shortly after filing their initial complaint, Plaintiffs amended their complaint and sought emergency relief for a subset of their claims. [Docs. 1, 14, 15]. After

this Court denied nearly all the emergency relief Plaintiffs sought,[1] [Doc. 49],

it later denied Defendants' motion to dismiss, finding that, while Plaintiffs

alleged enough to get to the discovery phase of the case, they would be required

to develop a record to support their claims. [Docs. 50, 78]. Despite this

opportunity, Plaintiffs have failed to do so even though this Court gave them

multiple extensions of discovery.

This Court originally issued a scheduling order setting the expert report

deadline for May 16, 2022, and the end of discovery for July 1, 2022. [Doc. 67].

Shortly after that Order, Plaintiffs sought to amend their Complaint again,

and the case essentially ground to a halt. [Doc. 69]. Plaintiffs never put forward

any expert testimony in support of their claims and did not conduct any

depositions. The parties agreed to extend discovery once, with a new end date

for discovery of October 3, 2022. [Docs. 83, 84]. When Plaintiffs later sought to

extend discovery over the objection of Defendants, this Court noted the lack of

depositions or experts from Plaintiffs and granted a limited, 45-day extension.

[Doc. 89, p. 2].

After Defendants served notices of deposition on Plaintiffs following

unsuccessful attempts to schedule those depositions [Doc. 91], Plaintiffs next

---

[1] This Court granted a limited injunction that allowed photographing ballots
outside of the polling place. [Doc. 49, pp. 39].

sought to dismiss most of their claims, which Defendants opposed. [Docs. 92, 94]. Plaintiffs then sought to extend discovery until 30 days after this Court ruled on their motion to stay. [Doc. 96]. This Court denied the motion for a stay, granted the motion for extension of discovery through May 8, 2023, and later extended the end of discovery to June 16, 2023. [Docket Order, May 8, 2023].

During the additional discovery extensions, Plaintiffs amended their Complaint for the second time to drop several claims. Thus, under the Second Amended Complaint [Doc. 104], Plaintiffs challenge four "buckets" of changes made by SB 202. First, they challenge provisions related to suspension of county election officials who violate state law over multiple election cycles (the "Suspension Rule"[2] in Counts I, II, and III). Second, they challenge provisions related to observing voters while they vote (the "Observation Rule" in Counts IV, V, and VI). Third, they claim that provisions designed to avoid the premature disclosure of election results are unconstitutional (the "Tally Rules" and the "Communication Rule" in Counts VII, VIII, and XI). Fourth, they challenge prohibitions on photography of ballots (the "Photography Rules" in

---

[2] For ease of reference, Defendants utilize this Court's names for each challenged provision as referenced in the Order on the motion to dismiss. [Doc. 78, pp. 2–3].

Count IX and X). In their Second Amended Complaint, Plaintiffs abandoned their challenges to the Ballot Application Rule and the Voter ID Rule that this Court reviewed in ruling on Defendants' motion to dismiss [Doc. 78, pp. 28–32, 40–43].

Now that discovery is concluded, Plaintiffs are no longer entitled to the presumptions they received at the motion-to-dismiss phase. As discussed below, there is a complete lack of evidence supporting their remaining claims at this stage of the case, warranting judgment as a matter of law in favor of Defendants.

## FACTUAL BACKGROUND

### I.    O.C.G.A. § 21-2-33.2: The Suspension Rule.

SB 202 provided the State Election Board (SEB) the ability, after notice and a hearing, to *temporarily* suspend election superintendents after they committed multiple violations of the law over multiple election cycles. O.C.G.A. § 21-2-33.2; Statement of Material Facts ("SMF") ¶ 1. The General Assembly explained why it took this step: "Ensuring there is a mechanism to address local election problems will promote voter confidence and meet the goal of uniformity" because of the lack of accountability under existing law. Senate Bill 202 As Passed, attached as Ex. D ("SB 202"), at 5:96–101.

Since the adoption of SB 202 in 2021, none of the counties where the Board Member Plaintiffs[3] serve (currently or previously) were subjected to an investigation or performance review. SMF ¶ 2; Declaration of Ryan Germany ("Germany Dec."), attached as Ex. A, ¶¶ 4–6. The only county election officials who have undergone a performance review are the members of the Fulton County Board of Elections and Registration and staff. SMF ¶ 3; Germany Dec., ¶¶ 4–6; Fulton Performance Review Board Report ("Fulton Report"), attached as Ex. 1 to Germany Dec.; Excerpts of Response to Interrogatories, attached as Ex. B, Nos. 1–2.

The Fulton County Performance Review was initiated by members of the General Assembly in the local legislative delegation. SMF ¶ 4; Fulton Report, p. 5. The three-member Review Board personally observed "pre-election, Election Day, and post-election processes at Fulton County in both the 2021 municipal elections and the 2022 general and runoff elections." SMF ¶ 5; Fulton Report at 6. Those observations included at least four visits to the Fulton County Election Processing Center and at least 16 visits to different

---

[3] The Second Amended Complaint identifies the "Board Member Plaintiffs" as Plaintiffs Shirley, Lang, Pullar, Thomas-Clark, and McNichols, serving on the boards of elections and/or registration for Athens-Clarke, Coffee, Chatham, Clayton, and Jackson Counties at the time the lawsuit was filed. [Doc 104, ¶¶ 146–197].

election day polling place and advance-voting locations. SMF ¶ 6; Fulton Report at 6. The Review Board also worked with the Carter Center to observe Fulton County elections in November 2022 to assist with its review. SMF ¶ 7; Fulton Report at 6. Finally, the Review Board conducted formal interviews with staff and members of the Fulton County Board of Elections, reviewed procedures, and coordinated with the Secretary's office for its review. SMF ¶ 8; Fulton Report at 7.

When it issued its report, the Review Board confirmed that, in prior years, "disorganization and a lack of a sense of urgency in resolving issues plagued Fulton County elections." SMF ¶ 9; Fulton Report at 1. But the Review Board also recognized the improvement in election administration in Fulton County from 2020 through 2022, at least in part because of the incentives created by the Performance Review itself. SMF ¶ 10; Fulton Report at 18. As a result, the Review Board did not recommend any Fulton officials be suspended under the Suspension Rule. SMF ¶ 11; Fulton Report at 18–19.

The SEB did not suspend the Fulton officials, has not announced any plans for conducting additional performance reviews, and is not considering suspension of additional county election officials, including the Board Member Plaintiffs here. SMF ¶¶ 12–14; Germany Dec., ¶¶ 7–8. Thus, the SEB has not

suspended any county officials, nor has it announced any plans to do so or to investigate any other county at this point.

## II.   O.C.G.A. § 21-2-568.1: The Observation Rule.

Prior to SB 202, it was already a felony to induce an elector "to show how he or she marks or has marked his or her ballot" or to disclose "to anyone how another elector voted, without said elector's consent." O.C.G.A. § 21-2-568(a)(3) and (4). The "enclosed space" of a precinct was also heavily regulated.[4] Additional provisions placed limitations on who can be in the enclosed space while voters are voting and limited activities in that space. O.C.G.A. §§ 21-2-413, 414. Those restrictions include prohibitions on (1) the general public entering unless they are voting or providing assistance, (2) anyone but law enforcement carrying firearms, and (3) campaigning. *Id*. Only a limited number of authorized poll watchers are allowed inside. *Id*.

Consistent with those existing limitations on activities in the enclosed space and to ensure a secret ballot, SB 202 added a provision making it a felony to engage in the *intentional* observation of an elector casting a ballot "in a manner that would allow such person *to see for whom or what the elector is*

---

[4] "It is, at least on Election Day, government-controlled property set aside for the sole purpose of voting. The space is 'a special enclave, subject to greater restriction.'" *Minn. Voters All. v. Mansky,* 138 S. Ct. 1876, 1886 (2018) (quoting *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 680 (1992)).

*voting.*" SMF ¶ 15; SB 202 at 95:2448–2454 (emphasis added). As this Court recognized, the intent requirement "excludes inadvertent viewing and applies only if a person ***intentionally*** attempts to see for whom an elector is voting." [Doc. 49, pp. 28–29] (emphasis in original). Further, existing rules require county superintendents to arrange each polling place "in such a manner as to provide for the privacy of the elector while voting." Ga. Comp. R. & Regs. r. 183-1-12-.11(4). The Secretary of State provided guidance to counties on proper precinct layout, and county election officials are ultimately responsible for the setup of voting machines in ways that comply with Georgia law. SMF ¶ 16; Declaration of Blake Evans, attached as Ex. C ("Evans Dec."), ¶ 3 and Ex. 1. Plaintiffs cannot point to any evidence of arbitrary enforcement of the rule or its improper use to target political opponents.

The State has an interest in protecting the secrecy of the ballot process and upholding the integrity of elections, which the Observation Rule protects. [Doc. 49, p. 29]; Ga. Const. Art. II, § I, ¶ I; *see also Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009).

## III.   O.C.G.A.  §§  21-2-386(a)(2)(B)(vii),  -386-(a)(2)(A),  and-386(a)(2)(B)(vi): The Tally and Communication Rules.

Following the 2020 election, some counties were repeatedly asked how many votes they had left to tabulate that they could not answer in a timely

fashion. SMF ¶ 17; Germany Dec., ¶ 9. Because posting election results quickly is one of the best things that election officials can do to generate confidence in the outcome of an election, the legislature decided that "[c]reating processes for early processing and scanning of absentee ballots will promote elector confidence by ensuring that results are reported quickly." SMF ¶¶ 18; SB 202 at 6:123–125; Germany Dec., ¶ 9. Prior to SB 202, early scanning of absentee ballots could only be performed by a sequestered group of individuals beginning at 7:00 a.m. on Election Day itself, so there was no danger of those individuals leaving to report vote totals or estimates during that single-day process. SMF ¶ 19; O.G.C.A. § 21-2-386(a)(2) (2019); Germany Dec., ¶ 13. To mitigate the risk that early vote counts would be disclosed during early scanning in the weeks before an election, the legislature designed a process that ensured that information about the scanning process would not be publicized prior to the final close of the polls. SMF ¶ 20; Germany Dec., ¶¶ 11, 12, 14. Accordingly, SB 202 permits only election officials to handle absentee ballots, requires individuals involved to swear an oath, and places several requirements on observers to avoid disclosure of vote counts. SMF ¶ 21; SB 202 at 39:965–40:981; 66:1687–1690; 67:1698–1712; Germany Dec., ¶ 15. Plaintiffs seek to enjoin two of these requirements, namely, preventing observers and monitors from attempting to tally or estimate vote totals (the Tally Rules) and

communicating information about a vote they might see to anyone other than an election official (the Communication Rule) before polls are closed.[5] SB 202 at 67:1698–1712.

The Communication Rule only applies to "any ballot, vote or selection" during the viewing or monitoring of the absentee-ballot scanning process. SMF ¶ 23; Germany Dec., ¶ 16. This process occurs in a room that also has other specific requirements about the use of recording devices and other equipment. SMF ¶ 24; Germany Dec., ¶ 17. Maintaining the secrecy of that process is critical to preserving the integrity of the election process by ensuring vote totals are not disclosed while other voters are still voting or have yet to vote. SMF ¶ 25; Germany Dec., ¶ 18. Likewise, the Tally Rules protect the integrity of the election process by ensuring that county votes or estimates about vote totals do not take place prior to the conclusion of the voting process. SMF ¶ 26; Germany Dec., ¶ 19. If officials were enjoined from enforcing these two provisions, individuals would be free to share information about the early-scanning process with the general public and with candidates, which would

---

[5] These provisions closely track the emergency SEB rules that were used throughout 2020 for early scanning of ballots. SMF ¶ 22; Germany Dec., ¶ 10. Other states that allow scanning before Election Day also prohibit and/or criminalize disclosure of tallies before the polls are closed. *See, e.g.*, Ariz. Rev. Stat. Ann. § 16-551 (felony in Arizona to release tallies early); N.M. Stat. Ann. § 1-6-14(H); Del. Code Ann. tit. 15, § 5510; Colo. Rev. Stat. § 1-7.5-107.5.

11

undermine the integrity of the election process. SMF ¶¶ 27–28; Germany Dec., ¶¶ 20–22.

## IV.   O.C.G.A. § 21-2-568.2: The Photography Rules.

Prior to SB 202, it was already a violation of the Election Code to take pictures inside a polling place and specifically to photograph the face of a voting machine with the ballot displayed. O.C.G.A. § 21-2-413(e). But there was no specific penalty, meaning the only possible penalty was the catch-all misdemeanor for violations of the Election Code. O.C.G.A. § 21-2-598.

In SB 202, the General Assembly provided a specific misdemeanor penalty for conduct that was already a misdemeanor and further clarified that photographing or recording a voted ballot outside of a polling place (such as an absentee ballot) was also a misdemeanor.[6] SB 202 at 96:2455–2462. This provision can prevent vote-buying schemes that require a voter to show proof of their vote to the person paying them and also prevent others from pressuring voters to show for whom they voted. SMF ¶ 29; Germany Dec., ¶ 23. This provision protects individuals from being subjected to outside pressure as a result of the votes they cast and ensures ballot secrecy. SMF ¶ 30; Germany

---

[6] Several other states also prohibit taking photographs of ballots. *See, e.g.*, Ala. Code § 17-9-50.1; 25 Pa. Stat. Ann. § 3530 (prohibiting allowing anyone to see ballot or machine "with the apparent intention of letting it be known how he is about to vote").

Dec, ¶¶ 24–26; Ga. Const. Art. II, § I, ¶ I (guarantee of secret ballot). Further, this provision ensures that photographic images of a voter's ballot are not stored in ways that can connect the ballot to the voter, preserving the voter's privacy, ballot secrecy, and the integrity of the election. SMF ¶ 31; Germany Dec., ¶ 27.

**ARGUMENT AND CITATION TO AUTHORITY**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden but need not disprove the opposing party's claims. Instead, the moving party may point to the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Marion v. DeKalb County*, 821 F. Supp. 685, 687 (N.D. Ga. 1993). In defending its claims, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "must come forward with ***significant, probative evidence*** demonstrating the existence of a triable issue of fact." *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995) (emphasis added) (quoting *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)). As discussed below, Plaintiffs have not produced any evidence and cannot show

that there is any dispute over a material fact on any of Plaintiffs' remaining claims, and Defendants are entitled to judgment as a matter of law.

## I.  Plaintiffs lack Article III standing.

The first basis for judgment in Defendants' favor is Plaintiffs' lack of standing. Federal courts may decide only active "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. To establish standing to present a case or controversy, a litigant must prove: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)); *U.S. v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). "[E]ach element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.'" *Jacobson*, 974 F.3d at 1245 (quoting *Lujan*, 504 U.S. at 561). While standing is provisionally determined at the time a lawsuit is filed, it is continuously reevaluated and "must persist throughout a lawsuit." *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022) ("*GALEO*"). Further, "[i]f a case 'no longer presents a live controversy with respect to which the court can give meaningful relief,' the case is moot and must be dismissed."

*Id.* (quoting *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009)).

For purposes of both the Defendants' Motion to Dismiss [Doc. 41] and Plaintiffs' Motion for Preliminary Injunction [Doc. 15], this Court found that at least one Plaintiff had standing to bring each count asserted in the Amended Complaint [Doc. 49, pp. 4–14; Doc. 78, pp. 5–15]. As Defendants argued at the time, Plaintiffs do not have an injury based on their subjective fear of prosecution or of arbitrary enforcement of various provisions of SB 202 because those potential injuries are too attenuated and speculative, and rely too heavily on the independent actions of third parties, to constitute a concrete and cognizable injury for purposes of Article III standing. This is all the more clear now that discovery is complete. Further, Plaintiffs cannot demonstrate any traceability to or redressability by Defendants regarding their remaining claims.

## A.   The Board Member plaintiffs only have theoretical injuries.

Since this case was filed, at least one Board Member Plaintiff is no longer serving on an election board. SMF ¶ 32; Deposition of Patricia Pullar [Doc. 122] ("Pullar Dep."), 24:18–25:1. And of the remaining Board Member Plaintiffs, there is no evidence of any pending action against any county boards, including

15

the counties where Board Member Plaintiffs serve. SMF ¶ 33; Germany Dec., ¶¶ 7–8. Further, the Board Member Plaintiffs can only be injured if (1) they engage in violations of the Election Code, (2) over multiple election cycles, that lead (3) to a motion or performance review, that (4) finds support for those violations. O.C.G.A. § 21-2-33.2. As a result, any injury is only speculative and cannot constitute the basis for any relief. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1344 (11th Cir. 2021).

**B.     Plaintiffs lack standing because any harm to them or their members is speculative.**

The lack of any impending injury requires summary judgment on standing. As the Eleventh Circuit recently explained, imposing harm on members or the organization itself as a result of something that is not "certainly impending" means there is no injury for purposes of standing. *City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 638, 640 (11th Cir. 2023). So too here: Because Plaintiffs cannot present any evidence that any county official is currently subject to potential suspension under the Suspension Rules, SMF ¶ 34; Germany Dec., ¶¶ 7–8; Fulton Report; the harm is not certainly impending, and these claims must be dismissed.

16

Further, while Plaintiffs claim that they have changed their behavior because of the Observation, Tally, and Communication Rules, the individual Plaintiffs have not shown any enforcement or investigation against them personally for any alleged violations. They thus rely solely on subjective fears of prosecution (or claimed difficulty complying with those laws), as well as concerns about merely being accused of violating such laws. While they may sincerely feel those concerns, there is a long chain of events encompassing the actions of third parties not before the Court that must occur before Plaintiffs' fears could even get close to becoming reality. This "attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, means Plaintiffs could only be injured if *all* of the following events occur: (1) they change their mind regarding going to polling places and other areas where the challenged provisions are in effect; (2) they commit some violation of the challenged provisions (which none has expressed an intent to do); (3) a third party (a) observes and (b) reports such violation; and, finally (4) that third party refers that violation to the SEB, the Secretary, or some criminal enforcement arm (such as a district attorney or the Attorney General). And that criminal enforcement arm will then have to engage in a series of actions and deliberations to *independently decide* to prosecute Plaintiffs and *then* actually commence such prosecution. Only then would Plaintiffs suffer any injury whatsoever.

17

This hypothetical chain of events demonstrates the abstract and conjectural nature of Plaintiffs' purported injury. And courts are and should be "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 414. Thus, like the plaintiffs who took action based on fear of racial profiling in Florida, Plaintiffs cannot show any injury is certainly impending from the provisions of SB 202 that they challenge. *City of S. Miami*, 65 F.4th at 638-40.

## C.  Plaintiffs cannot show traceability or redressability on any of their remaining claims.

Even if Plaintiffs have an injury, they still cannot show that their injury is traceable to or redressable by Defendants. Plaintiffs' claims encompass criminal penalties, which are only enforceable by district attorneys or other prosecutorial officials, O.C.G.A. §§ 21-2-598, -599, -600, 15-18-6, 17-7-71, and Plaintiffs have not named any prosecutorial officials in this lawsuit. Thus, regardless of any relief entered against Defendants, Plaintiffs' alleged injury would not be fully addressed because they still would have potential criminal charges brought by officials Plaintiffs did not sue.

This Court previously found that traceability and redressability were met in an analysis that correctly recognized the foundational standard that "to satisfy the causation requirement of standing, a plaintiff's injury must be

'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" [Doc. 49, p. 11] (quoting *Jacobson,* 974 F.3d at 1253). The Court also highlighted the important limiting principle that "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Id.* (quoting *Lewis v. Governor of Ala.,* 944 F.3d 1287, 1301 (11th Cir. 2019)). But the Court then relied on two Eleventh Circuit cases that predate *Jacobson* and *Lewis* to find traceability and redressability, but in doing so failed to recognize several key limiting principles on the authority of federal courts that undermine that finding.

The Court first relied on a 1988 case from the Eleventh Circuit for the proposition that all that is needed to find traceability and redressability is that "the state officer sued must, by virtue of his office, have some connection with the unconstitutional act or conduct... Whether this connection arises out of general law, or is specially created by the act itself, is not material so long as it exists." [Doc. 49, p. 12] (quoting *Luckey v. Harris,* 860 F.2d 1012, 1015–16 (11th Cir. 1988)). This conclusion is contradicted by the holdings of *Jacobson* and *Lewis*. Thus, this Court incorrectly concluded that all that really matters for purposes of traceability and redressability is if a party, like the Governor, "is generally responsible for enforcing the state's laws." *Id.* But this is

19

inconsistent with the *Jacobson* method of evaluating traceability and redressability. And the second pre-*Jacobson* case relied upon by this Court was entirely dependent on *Luckey* for its analysis, which provides no helpful guidance as to how this circuit views traceability and redressability today. *See* [Doc. 49, p. 13] (citing *Ga. Latino Alliance for Human Rights v. Governor of Ga.,* 691 F.3d 1250 (11th Cir. 2012)).

Indeed, the law in the Eleventh Circuit no longer allows the conclusion that "prospective relief could be ordered against the… governor of Georgia, who is **generally responsible** for enforcing the state's laws." [Doc. 49, p. 12] (emphasis added). The key questions for traceability and redressability "are who caused the injury and how it can be remedied." *City of S. Miami*, 65 F.4th at 640. As *Jacobson* explains*,* "general supervision and administration of the election laws[] does not make the [challenged election law] traceable to [the Secretary of State]." 974 F.3d at 1254; *see also Lewis,* 944 F.3d at 1300 (where the court rejected the plaintiffs' reliance upon "a host of provisions of the Alabama Code that generally describe the Attorney General's [enforcement] authority" to establish traceability).

In the same way, redressability cannot be established for all challenged provisions except for the Suspension Rule because enjoining *Defendants* will

not redress any alleged injury because the *provisions* will not be enjoined. The

Eleventh Circuit made clear that a district court's jurisdiction is limited:

> The district court's decision rests on the flawed notion that by declaring the ballot statute unconstitutional, it eliminated the legal effect of the statute in all contexts. But "federal courts have no authority to erase a duly enacted law from the statute books." Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 936 (2018); *see also Steffel v. Thompson*, 415 U.S. 452, 469, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974) ("Of course, a favorable declaratory judgment . . . cannot make even an unconstitutional statute disappear." (internal quotation marks omitted)). Our power is more limited: we may "enjoin executive officials from taking steps to enforce a statute." Mitchell, supra, at 936.

*Jacobson*, 974 F.3d at 1255.

Accordingly, the Governor's general authority here to enforce all state

laws does not automatically establish traceability as to each challenged

provision. *See City of S. Miami*, 65 F.4th at 614 ("Neither the governor nor the

attorney general acts under [the statute] in such a way that the organizations'

injury is traceable to them or redressable by enjoining them."). Similarly, the

general authority of the Secretary of State and State Election Board related to

elections does not satisfy the redressability or traceability requirements for the

challenged provisions outside of the Suspension Rule.

Moreover, as discussed above, the Court exercising its authority to enjoin

enforcement of certain provisions does not enjoin the provisions themselves.

*Jacobson*, 974 F.3d at 1255. So, if another party—such as a district attorney or

other prosecutor (the only officials authorized to bring criminal charges under the challenged provisions)—can continue to enforce the challenged provisions even were this Court to enjoin the parties to this action, Plaintiffs have not established redressability under Article III. *Id.*

## II.   Defendants are entitled to summary judgment on each count of Plaintiffs' Second Amended Complaint.

Even if Plaintiffs have standing, Defendants are still entitled to summary judgment on the merits of each of Plaintiffs' current claims.

### A.   Defendants are entitled to summary judgment on all claims regarding the Suspension Rule (Counts I, II, and III).

#### 1.   *The Suspension Rule complies with procedural due process (Count I).*

As this Court explained, the Board Member Plaintiffs claim "that the Suspension Rule violates their right to procedural due process" because they are at risk of being "improperly deprived of their protected property interest in their respective county board seats [without] a pre-deprivation notice and hearing and a 'meaningful' post-deprivation remedy." [Doc. 78, p. 17] (quoting Am. Compl. ¶¶ 368–69), *accord* [Doc. 104, ¶¶ 352–353]. In its Order denying Defendants' motion to dismiss, the Court noted that "[c]onstitutionally adequate process is 'a guarantee of fair procedure,'" *id.,* at 19, and inquiring into whether a state law provides sufficient due process requires a 'flexible

concept that varies with the particular situation.' *Id.* at 20. This flexible concept is detailed in *Mathews v. Eldridge*, and entails weighing several factors. 424 U.S. 319, 335 (1976).

According to *Mathews,* the Court must weigh the private interest affected; the risk of an "erroneous deprivation" of such interest; the relative value in any additional or substitute safeguards; and the Government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* In its Order denying Defendants' motion to dismiss, this Court held that Plaintiffs' claims on this count were not appropriate for dismissal "[s]ince a proper analysis of the issues requires reference to facts not stated in the Amended Complaint." [Doc. 78, p. 21]. But now, with the benefit of ample time for discovery, we have the necessary facts or—more accurately—the absence of necessary facts, to permit this Court to dispose of this Count of Plaintiffs' Complaint.

*Mathews* involved a social security disability claimant's purported right to receive benefits and answered a somewhat different question from the one at issue here. In *Mathews,* the claimant acknowledged that the review procedures available to him were adequate "if disability benefits were not terminated until *after* the evidentiary hearing stage of the administrative

23

process." 424 U.S. at 333. Here, Plaintiffs take issue with the *process itself*, not just the timing of the decision, while acknowledging they would only be deprived of their purported property right *after* a notice and hearing takes place. [Doc. 104, ¶ 84]. Thus, they are already in a better position than the plaintiff in *Mathews*. Turning next to the three due-process factors identified in *Mathews,* it is clear that there is no evidence that Plaintiffs have been deprived of their due-process rights.

Initially, Plaintiffs do not have a property interest in their seats on the respective election boards. When this Court previously denied Intervenor-Defendants' motion to dismiss Board Member Plaintiffs' due process claims, it held that "the Board Member Plaintiffs plausibly allege that they have a protected interest in their board seats and that the Suspension Rule threatens to take away that interest without an adequate opportunity to be heard." [Doc. 78, p. 20]. It further found that "[a] property interest does not fall outside due process protection simply because it can be extinguished by statute." *Id*. at 20–21. In support, the Court drew on the 1985 case of *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). But *Loudermill* is not useful on this question because it involved consideration of whether a school board could summarily dismiss an *employee* when a statute otherwise conferred on that employee a right to employment. The statute provided that the particular

24

employee at issue "can be terminated only for cause, and may obtain administrative review if discharged." *Id*. at 535 (quoting Ohio Rev. Code. Ann. Sec. 124.34). Thus, it was established in *Loudermill*—unlike in this case—that a property interest had been conferred by statute.

In this case, there is no conferral—because no such conferral can occur for an election board official. "[T]he Supreme Court has held that 'unlawful denial by state action of a right to state political office is not a denial of a right of property or liberty secured by the due process clause.'" *Gamza v. Aguirre*, 619 F.2d 449, 452 n.3 (5th Cir. 1980[7]) (quoting *Snowden v. Hughes*, 321 U.S. 1, 7 (1944)). Courts in other circuits have also agreed. *See, e.g.*, *Miller v. Centre Cty.*, No. 4:15-CV-1754, 2016 U.S. Dist. LEXIS 62019, *44–45 (M.D. Pa. May 11, 2016) (collecting cases); *see also LaPointe v. Winchester Bd. of Ed.*, 366 F. App'x 256, 257 (2d Cir. 2010); *Taylor v. Beckham*, 178 U.S. 548, 576 (1900) ("public offices are mere agencies or trusts, and not property as such").

Thus, Board Member Plaintiffs do not have a protected property interest in their seats and this alone is sufficient to grant judgment as a matter of law to Defendants on Count I.

---

[7] This Fifth Circuit case is binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

But even if there is a property interest, there is no risk of erroneous deprivation. More than two years since passage of SB 202 and with the completion of a statewide general election, none of the Board Member Plaintiffs is able to point to a single instance in which they were targeted because of the Suspension Rule. SMF ¶ 35; Deposition of Ernestine Thomas-Clark [Doc. 119], 39:11–40:8; Deposition of Adam Shirley [Doc. 118], 40:21–41:1; Deposition of Judy McNichols [Doc. 121], 44:11–46:2; Pullar Dep., 28:11–29:4. Far from confirming the Board Member Plaintiffs' unfounded and speculative fears, the passage of time has revealed quite a different result, with the SEB empaneling just one performance review panel. SMF ¶ 36; Germany Dec., ¶ 7. That investigation was robust and searching, involved state officials, county officials, and the Carter Center, and ultimately did not result in the suspension of any county official. SMF ¶ 37; Germany Dec., ¶ 6; Fulton Report. Further, the panel concluded that the creation of the performance review that precedes the Suspension Rule incentivized the county officials to improve the administration of elections. SMF ¶ 38; Fulton Report, pp. 18–19. In its Order denying Defendants' motion to dismiss, this Court found that Defendants did not point to "***relevant*** circumstances where the rule would be constitutional." [Doc. 78, p. 24] (emphasis in original). But with two years of the Suspension

Rule in practice, there is ample evidence that the provision provides constitutionally adequate process.

Moreover, the Suspension Rule closely mirrors that portion of O.C.G.A. § 20-2-73 that allows the takeover of elected members of school boards. Both the school board rule and the Suspension Rule allow the notice and hearing *prior* to any suspension. *Id.* Both require a showing of cause before the process can be initiated. *Id.* Both provide for reinstatement. *Id.* And both provide for judicial review. *Id.* In the school-board context, courts have upheld this nearly identical process as constitutionally permissible. *DeKalb Cty. Sch. Dist. v. Ga. State Bd. of Educ.,* 294 Ga. 349, 369 (2013). There is no reason to hold any differently for the Suspension Rule under Plaintiffs' procedural due process claim. The Suspension Rule does not violate any due-process rights of any Plaintiff, and this Count should be dismissed.

### 2. *The Suspension Rule complies with substantive due process (Count II).*

While styled as a substantive due process claim, Count II of Plaintiffs' Second Amended Complaint alleges that the provisions authorizing the SEB to temporarily replace an underperforming election superintendent violate the *Georgia* Constitution as an improper delegation of legislative functions. [Doc. 104, ¶¶ 360–364, 370–371]. But these claims are not cognizable in federal court

because they do not allege "an ongoing violation of *federal* law and seek[] relief properly characterized as prospective." *Verizon Md. Inc. v. PSC*, 535 U.S. 635, 645 (2002) (cleaned up) (emphasis added).

While Plaintiffs briefly mention the Fourteenth Amendment [Doc. 104, ¶ 359], almost all of Count II focuses on alleged state-law violations. And "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

This Court previously kept Count II alive because the Court believed that Count II was within the *Ex Parte Young*, 209 U.S. 123 (1908), exception to the Eleventh Amendment. [Doc. 78, pp. 26–28]. But now at summary judgment, Plaintiffs' mere allegations will not suffice—especially without any evidence that the SEB has or will use the takeover provisions in the cavalier manner suggested by Plaintiffs. Indeed, Plaintiffs have produced no evidence suggesting "a deprivation of federally protected rights" or showing "the fundamental fairness of the electoral process" being "seriously undermined" by the Suspension Rule. [Doc. 78, p. 27] (citing *Duncan v. Poythress,* 657 F.2d 691, 700 (5th Cir. Unit B Sep. 1981)). If anything, the SEB, led by Judge William Duffey, has protected the voting rights of Georgia's citizens while protecting the rights of the members of local boards of election in the exercise of their

duties. SMF ¶ 39; Fulton Report, pp. 18–19. The performance review of Fulton County was comprehensive, cooperative, and resulted in better election administration in Georgia's largest county—and Plaintiffs can point to no evidence to the contrary. SMF ¶ 40; Fulton Report, pp. 18–19.

Thus, without any evidence to support Plaintiffs' allegations, this Count must be dismissed. But if this Court does not grant summary judgment in favor of Defendants on Count II, it should certify the questions of state law it presents to the Georgia Supreme Court. As the United States Supreme Court has noted, "[w]arnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 79 (1997); *see also Forgione v. Dennis Pirtle Agency, Inc.*, 93 F.3d 758, 761 (11th Cir. 1996). But that is not necessary given the Georgia Supreme Court's ruling in *DeKalb Cty. Sch. Dist.,* 294 Ga. at 369, finding a similar suspension process complied with all relevant constitutional provisions. Thus, Defendants are entitled to judgment as a matter of law on Count II.

### 3.   The Suspension Rule does not burden the right to vote (Count III).

Plaintiffs' last attempt to invalidate the Suspension Rule is to attack it as a violation of the right to vote. But even if Plaintiffs had standing to challenge the provision in this Count—which they do not because they cannot demonstrate any injury—nothing in the record indicates a county registrar will be suspended by the SEB with SEB allowing the position to sit vacant, thus depriving voters of the ability to vote or register to vote, as Plaintiffs claim. [Doc. 104, ¶¶ 377–378]. Plaintiffs' nightmare scenario of a county board of registrars with no members is just that: a dream conjured up by attorneys that would require the SEB to disregard its legal obligations to Georgia voters. The fears expressed two years ago have not come to pass. Quite to the contrary, the SEB has thus far suspended *zero* county officials, to say nothing of failing to replace an official that was suspended after a thorough investigative procedure, before even considering whether suspension was appropriate in the one matter that potentially met the strict criteria of SB 202's Suspension Rule. SMF ¶ 41; Germany Dec., ¶¶ 6–8. Plaintiffs offer no evidence otherwise.

At best, Plaintiffs continue to assert the tenuous notion that the SEB may someday remove some yet-to-be-named registrar and fail to replace him, her, or a board, and that this possibility will prevent voters from registering to

vote. [Doc. 104, ¶ 378]. This extremely speculative harm renders the injury too attenuated to support jurisdiction. *Clapper*, 568 U.S. at 409.

But even if mere speculative future harm were an "injury," the General Assembly adopted the Suspension Rule specifically to provide protect voters and remedies for "counties with dysfunctional election systems." SB 202 at 5:97. And the evidence demonstrates the Suspension Rule processes have resulted in improved elections. SMF ¶ 42; Fulton Report, pp. 18–19. Thus, the hypothetical and unlawful scenario offered by Plaintiffs would be directly contrary to the aims of SB 202 itself. The government interests in uniformity and a well-run election system, including ensuring opportunities for all voters to vote, more than justify the Suspension Rule providing the State a way to remedy ongoing violations of State law by local election officials. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). As a result, this Court should grant Defendants judgment as a matter of law on Count III.

**B.    Defendants are entitled to summary judgment on all claims regarding the Observation Rules (Counts IV, V, and VI).**

**1.    *The Observation Rule does not impose an undue burden on the right to vote (Count IV).***

As the Eleventh Circuit recently explained, claims brought under the fundamental right to vote and the Equal Protection Clause related to elections are evaluated "under what is known as the *Anderson-Burdick* test, weighing

31

'the character and magnitude of the asserted injury' to voting rights 'against the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022) (quoting *Burdick*, 504 U.S. at 434, and *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

> That inquiry is a sliding scale:
>
> If we conclude that the State's policy imposes a severe burden on the right to vote, we subject the policy to strict scrutiny—meaning that the rule survives only if it is narrowly tailored to serve a compelling state interest. . . . When the burden is more modest, though, so is the inquiry. . . . So long as a policy is "reasonable and nondiscriminatory," the State's "important regulatory interests in conducting orderly elections" will generally be enough to justify it.

*Id.* (citations omitted).

This balancing test is important because there is "no license for 'second-guessing and interfering with' state decisions; ***the Constitution charges States, not federal courts, with designing election rules***." *Id.* (citing *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020)) (emphasis added). And it is not enough to show a burden on the right to vote. Plaintiffs "must show, at the very least, that the burdens imposed 'represent a significant increase over the usual burdens of voting.'" *Id.* (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality opinion)).

This Court previously determined that the Observation Rule does not extend to inadvertent actions of voters and therefore likely does not impose a severe burden on the right to vote. [Doc. 49, p. 29]. The evidence in the record and the passage of time have vindicated this view. Indeed, Plaintiffs cannot point to any evidence suggesting the Observation Rule has been applied in a manner inconsistent with this Court's interpretation in its order. The Plaintiffs' fears that their casual glances will result in prosecution remain unfounded. And since the Observation Rule does not impose a severe burden on the right to vote, the state's interests in protecting Georgia voters' right to a secret ballot and upholding the integrity of elections is enough to justify what is a very minimal burden placed on Plaintiffs: that they must not *intentionally* view other voters' ballots while in the polling place. Moreover, even if this were a severe burden, which it is not, the state interests in maintaining the secrecy of a voter's ballot more than justify the slight burden. Ga. Const., Art. II, § I, ¶ I; Germany Dec., ¶ 30.

Also, any burden is not created by Defendants because Plaintiffs have not sued the parties responsible for their alleged injuries. It is the *counties* that select polling locations and decide how to set up ballot stations according to the orientation of the space they have selected. SMF ¶ 43; Evans Dec., ¶ 3 and Ex. 1. Thus, even if there were an injury, as explained above, it is not traceable to,

nor redressable by, Defendants. If the scenario occurs where Plaintiffs simply cannot look around without accidentally (but also somehow intentionally) viewing other voters' ballots, it is because the county has set up the polling location in a way that allows for that. In either case, Defendants are entitled to judgment as a matter of law on this Count.

### 2.   *The Observation Rule is not vague (Count V).*

This Court previously drew upon several cases to guide its void-for-vagueness analysis regarding the Observation Rule. As the Court pointed out, "the void for vagueness doctrine encompasses 'at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; and second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." [Doc. 49, pp. 29–30] (quoting *Wollschlaeger v. Governor of Fla.,* 848 F.3d 1293, 1320 (11th Cir. 2017)). In other words, it requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id*. The Observation Rule meets all of these requirements.

First, this Court has already concluded that the Observation Rule "provides fair warning as to what conduct is prohibited and therefore satisfies

the first prong of the vagueness test." [Doc. 49, p. 31]. Plaintiffs cannot provide any evidence to the contrary beyond their own claimed confusion. While the Court noted the second prong "might be a closer question," it nonetheless found that "the rule's intent requirement addresses those concerns" it had about the potential for arbitrary enforcement. *Id.* at 32; *see also League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 946 (11th Cir. 2023) (finding *mens rea* element in election statute addressed vagueness claims).

Having now had the benefit of discovery, Plaintiffs have failed to adduce any evidence proving that this law has been arbitrarily enforced against Plaintiffs or any other Georgia voter. For the same reasons the Court denied Plaintiffs' preliminary injunction request on this Count, it should similarly grant judgment as a matter of law to Defendants on Count V.

### 3. *The Observation Rule does not intimidate voters (Count VI).*

Plaintiffs next claim that the observation provisions are illegal voter intimidation in violation of 52 U.S.C. § 10307. [Doc. 104, ¶¶ 401–08]. But even if there were a private right of action under this provision, a prohibition on *intentional* observation of others voting cannot be intimidating to the one doing the unlawful observation.

First, this section of the Voting Rights Act (VRA) provides no private right of action—and "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "Where Congress has not created a private right of action, courts may not do so." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) (finding no private right of action under the Help America Vote Act); *see also Brnovich v. Dem Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J, concurring) (questioning whether implied right of action exists under VRA); *Ala. State Conference of the NAACP v. Alabama*, 949 F.3d 647, 656–57 (11th Cir. 2020) (Branch, J., dissenting) (arguing that VRA has not abrogated state sovereign immunity), *vacated as moot by Ala. v. Ala. State Conference of NAACP*, 2021 WL 1951778, *1 (U.S. 2021). This is because "Section 1983 does not provide an avenue for relief every time a state actor violates a federal law." *Vega v. Tekoh*, 142 S. Ct. 2095, 2106 n.6 (2022) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005)) (cleaned up). Because Plaintiffs do not have a right to bring a claim under this provision, this Count must be dismissed.

Second, even if a private right of action existed, Plaintiffs' claim that the Observation Rule somehow intimidates voters because it could potentially be "invoked to selectively criminalize mere entry into a polling place or even approaching a polling place with large windows" [Doc. 104, ¶ 401] is without

36

any evidentiary proof. Plaintiffs cannot even point to a single individual who is being prosecuted as a result of such innocent activities. SMF ¶ 44–45; Germany Dec., ¶ 30; Ex. B, Response Nos. 1–2. Thus, like the other bases for challenging the Observation Rule, Plaintiffs' fears of selective criminalization are entirely speculative. And the record demonstrates that Plaintiffs' fears are unfounded. Indeed, there is no evidence that *any* investigations or charges have been brought against any Plaintiff in this action or any voter for merely "approaching a polling place with large windows." SMF ¶ 45; Ex. B, Response Nos. 1–2.

Further, the intent requirement of the Observation Rule removes the potential for arbitrary application of the law. *See* [Doc. 49, p. 32]. Considering this view of the law against the backdrop of *zero* prosecutions—arbitrary or otherwise—against any Georgia voter, this Court should grant Defendants' Motion for Summary Judgment as to Count VI of the Second Amended Complaint because no voter can be intimidated by being required to avoid *intentionally* viewing another voter's secret ballot.

**C.   Defendants are entitled to summary judgment on all claims regarding the Communications and Tally Rules (Counts VII, VIII, and XI).**

### 1.   *The Communications Rule does not violate the First Amendment (Count VII).*

Even with broad constitutional protections on freedom of speech, "the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates from political advocacy." *Minn. Voters All. v. Mansky,* 138 S. Ct. 1876, 1885–86 (2018). In determining whether a particular location is, in fact, a "non-public forum," courts consider whether it is "a space that 'is not by tradition or designation a forum for public communication.'" *Id.* at 1885 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46 (1983)). As this Court has already explained, "where the regulation of speech in a nonpublic forum is content-based but neutral as to viewpoint, 'there is no requirement of narrow tailoring.'" [Doc. 49, pp. 16–17] (quoting *Mansky,* 138 S. Ct. at 1888). "Instead, courts employ a lower standard of review, which requires only that the regulation be 'reasonable in light of the purpose served by the forum.'" *Id.* at 17 (quoting *Mansky,* 138 S. Ct. at 1886).

The Communication Rule easily fits within this legal principle. Issues involving the First Amendment are unique in the context of elections. Ballots,

like draft cards, are government property, *see U.S. v. O'Brien,* 391 U.S. 367, 387–88 (1968), and so the government can implement reasonable regulations governing the disclosure of the information contained in them. This is particularly true when that disclosure can affect the outcome of a vote. The State has a strong interest in ensuring that observers do not attempt to depress or otherwise alter voter turnout by disclosing a vote tally before the election has concluded. SMF ¶ 46; Germany Dec., ¶¶ 11–14, 18–19. Further, it is possible that such observers may inadvertently (or purposely) disclose the *wrong* tally, which again could depress or alter turnout in the election. SMF ¶ 47; Germany Dec., ¶¶ 20–22. That is why SB 202's reasonably tailored, content-neutral, and time-limited restriction on disclosures by such observers, who already occupy a privileged position as compared to typical voters that the government itself permits, does not violate the First Amendment.

For these reasons, the Communication Rule satisfies the First Amendment, and this Court should grant judgment as a matter of law to Defendants on Count VII.

### 2. *The Tally Rules are not vague (Count VIII).*

As discussed previously, "the void for vagueness doctrine encompasses 'at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly;

second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." [Doc. 49, pp. 29–30] (quoting *Wollschlaeger,* 848 F.3d at 1320).

Plaintiffs claim the "Tally Rules violate due process because they criminalize the act of thinking about or attempting to think about a tally or tabulation…" [Doc. 104, ¶ 420]. But this Court has already found this characterization of the Tally Rules unpersuasive: "[t]he Court disagrees with Plaintiffs' argument that the Tally Rules punish pure thought and inherently lack any 'observable or objective indicia of criminal conduct.'" [Doc. 49, p. 34]. Moreover, the evidence in the record shows that this rule has not been arbitrarily or discriminatorily applied nor has it been applied in the manner Plaintiffs claim they feared.[8] SMF ¶ 48; Ex. B, Response Nos. 1–2. Thus, for the same reasons the Court denied Plaintiffs' preliminary injunction request on this Count, it should similarly grant judgment as a matter of law to Defendants.

---

[8] This Count is also based on extremely speculative harm that can only result in an injury based on an attenuated chain of possibilities, removing any standing for claims on this Count. *Clapper*, 568 U.S. at 409.

40

### 3. *The Tally Rules do not violate the First Amendment (Count XI).*

Finally, Plaintiffs claim that the Tally Rules "criminalize the overt acts of recording or communicating tallies, tabulations, or estimates of the number of absentee ballots cast or the tallies of votes on the absentee ballots cast" in alleged violation of the First Amendment. [Doc. 104, ¶ 462]. But, to the extent the First Amendment applies to prohibition of these observations and disclosures—and it is not clear that it does—for the same reasons the Communications Rule does not violate the First Amendment, neither do the challenged Tally Rules. As previously noted, the prohibited conduct is limited to the processes around the scanning of absentee ballots. Thus, it takes place in a non-public forum and a content-neutral analysis must be applied. *Mansky*, 138 S. Ct. at 1885. And during early scanning, that location is similar to a precinct—in other words, "a government-controlled property set aside for the sole purpose of voting." *Id.* at 1886. It is entirely reasonable for the government to prohibit disclosure of voting tallies by observers when such disclosure could affect or alter the ultimate vote.

Further, the speech in question is not content-based and should be evaluated under *Anderson/Burdick* because the Tally Rules relate to the "mechanics of the electoral process." *McIntyre v. Ohio Elections Comm'n*, 514

41

U.S. 334, 345 (1995); *see also VoteAmerica v. Raffensperger*, 609 F. Supp. 3d 1341, 1361 (N.D. Ga. 2022). Under that standard, preventing Plaintiffs from disclosing election results before the election is over does not burden the right to vote; and, even if it does, the regulatory interests in protecting ballot secrecy, orderly election administration, and voter confidence amply justify so slight a burden. *Common Cause/Georgia,* 554 F. 3d at 1354; *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. Of Registration & Elections,* 446 F. Supp. 3d 1111, 1124 (N.D. Ga. 2020); *see* Deposition of Jeanne Dufort [Doc. 120], 40:18–42:18 (describing monitoring of election administration when observing).

Thus, the Tally Rules also comply with the First Amendment, and Defendants are entitled to judgment as a matter of law on this Count.

## D.   Defendants are entitled to summary judgment on all claims regarding the Photography Rules (Counts IX and X).

### 1.   *The Photography Rules do not violate the First Amendment (Count IX).*

This Court earlier determined that the Photography Rules contain two separate provisions—one that applies in polling locations (Photography Rule I) and another that applies in any location (Photography Rule II). [Doc. 49, pp. 2, 21–22]. Because Photography Rule I only applies in a non-public forum, as discussed above, the State's interests in protecting ballot secrecy and avoiding fraud in the precinct are sufficient to uphold this provision under a First

Amendment challenge—and Plaintiffs have no evidence to the contrary. *Mansky,* 138 S. Ct. at 1885; [Doc. 49, p. 20].

But this Court granted a preliminary injunction regarding Photography Rule II. A closer examination of the issues and evidence demonstrates that, even assuming strict scrutiny under the First Amendment applies to this rule (and Defendants maintain that it does not), Defendants are still entitled to summary judgment on Count IX.

When the Court granted a preliminary injunction on Photography Rule II, it expressed concern that Defendants failed to "argue[] that it is narrowly tailored to serve [compelling government] interests." [Doc. 49 p. 22]. But the broad nature of Georgia's no-excuse absentee voting, where every Georgia voter, everywhere in the world, can obtain a ballot, demonstrates the need for protecting the integrity of the ballot beyond the polling place itself. The same interests of ballot secrecy and "preventing fraud, including vote payment schemes," [Doc. 49, p. 22], apply with equal force to absentee ballots outside the polling place itself. In fact, rules to protect those interests are even more important outside of the polling place because that type of voting is done beyond the supervision of election officials. The State's interest in protecting the integrity of a voter's vote is compelling, and the idea that the State cannot offer the same protections to voters who choose to vote absentee as it offers to

43

voters who choose to vote in-person is a distinction that does not make sense. After all, voters voting absentee and voters voting in-person are engaged in the same activity—voting their ballot—and should be afforded the same protections. And both voters are part of a system that offers voters protections from vote-buying schemes and intimidation in order to give the entire electorate confidence in election results. SMF ¶ 49; Germany Dec., ¶¶ 23–25. Georgia's system of no-excuse absentee voting depends on being able to put in place reasonable requirements to protect absentee voters from intimidation, undue influence, or vote-buying schemes.

Vote-buying schemes, where a third-party may offer to pay or offer something of value in return for a vote, or intimidates voters, where a third-party may not explicitly offer to buy votes but may pressure a voter to publicly reveal how they voted, undermine the foundations of merit-based representative democracy and the protections of a secret ballot guaranteed in the Georgia Constitution.[9] SMF ¶ 50; Ga. Const. Art. II, § I, ¶ I; Germany Dec., ¶ 26. And Photography Rule II's extension of Photography Rule I to the ballot itself wherever it may be located—rather than limiting it strictly to the polling

---

[9] Vote-buying schemes have a long pedigree in United States politics. *See* Donald Debats, *Vote Buying in Nineteenth Century US Elections*, *available at* https://sociallogic.iath.virginia.edu/sites/default/files/BeforeSecret-Buying.pdf

place—not only makes sense, but it is the only reliable way to ensure the government's compelling interest is achieved. For that reason, this rule is indeed narrowly tailored to that interest.

Further, cameras are now commonplace in almost every mobile device in use today. SMF ¶ 51; Germany Dec., ¶ 28. And pictures are often quickly uploaded to a cloud storage provider on the Internet and would connect the voter's ballot with the voter immediately. SMF ¶ 52; Germany Dec., ¶ 28. It is typically private companies and not the user (and certainly not the State) that control the security protocols at the locations where the photographic data is stored. SMF ¶ 53; Germany Dec., ¶ 29. Thus, to protect Georgia voters, the State needs a reliable way to ensure that sensitive data like a voted ballot is not leaked or otherwise aggregated by a nefarious actor. SMF ¶ 54; Germany Dec., ¶ 27. This applies even if a voter thinks they are only taking a picture for themselves and not intending to share it with anyone—the conveniences of modern technology may make that desire illusory. Merely hoping that all the parties involved in modern cloud data storage (cell phone provider, cell phone network provider, internet provider, data storage provider, etc.) implement sufficient safeguards against data breaches is not sufficient. The best protection is a prohibition on taking a picture of the ballot itself in the first place. This is a narrowly tailored prohibition to stem the many security

breaches that could occur once the photo is taken in addition to the potential for vote-buying schemes, intimidation, or undue influence. SMF ¶ 54; Germany Dec., ¶ 27. Moreover, it provides a reliable mechanism to prevent absentee vote-buying schemes or intimidation of absentee voters, which, by definition, take place outside the security of the polling place, O.C.G.A. § 21-2-385(a), and thus are more susceptible to such schemes.

For the foregoing reasons, both photography rules are narrowly tailored to achieve a compelling government interest and, for that reason, Defendants are entitled to summary judgment on Count IX of the Second Amended Complaint.

### 2.    *The Photography Rules are not vague (Count X).*

As this Court has already noted, "Photography Rule I applies only to polling stations…" [Doc. 49, p. 21]. This limits the reach of the rule to a non-public forum, which in turn subjects this Court's review of the prohibition to "the lower reasonable standard of review." *Id.* The prohibition clearly satisfies this standard because it is tailored to prevent fraud "including vote payment schemes…" *Id.* at 22. And, as with the other provisions in this section, discovery has not produced any evidence showing that this rule will be arbitrarily or discriminatorily enforced in the ways Plaintiffs claim. SMF ¶ 55; Ex. B, Response Nos. 1–2.

Thus, because the Photography Rules make clear "what is required" and there is no evidence of any lack of "precision and guidance" to those enforcing the law, [Doc. 49, pp. 29–30] (quoting *Wollschlaeger,* 848 F.3d at 1320), they are not void for vagueness. Accordingly, the Court should grant Defendants summary judgment on this Count for the same reasons it denied the Plaintiffs injunctive relief.

## CONCLUSION

Plaintiffs disagree with the Georgia General Assembly about how elections should be run. But the mere fact of those disagreements does not make them questions of constitutional import.

The role of this Court is limited. And the Eleventh Circuit has recognized that "[t]he wisdom of the Legislature's policy choices is not ours to judge." *League of Women Voters of Fla. Inc.*, 66 F.4th at 931. Because none of the claims raised by Plaintiffs involves a violation of the Constitution, but only disagreements about the policy of election administration, this Court should grant judgment as a matter of law to Defendants on all counts.

Respectfully submitted this 17th day of July, 2023,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505

47

Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Gene C. Schaerr*
Special Assistant Attorney General
H. Christopher Bartolomucci*
Brian J. Field*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

/s/ Bryan P. Tyson
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn

48

Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104
ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson