# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| COALITION FOR GOOD GOVERNANCE, *et al.*<br><br>    *Plaintiffs*,<br><br>v.<br><br>BRIAN KEMP, in his official capacity as Governor of the State of Georgia, *et al.*,<br><br>    *Defendants*. | Civil Action No.:<br>1:21-CV-02070-JPB |

## DECLARATION OF C. RYAN GERMANY

I, C. Ryan Germany, declare under penalty of perjury that the following statements are true and accurate to the best of my knowledge.

1.      When SB 202 was enacted, I was the General Counsel for the Office of the Georgia Secretary of State. I held that position from January 2014 until January 2023. My job responsibilities included providing legal advice and guidance to all divisions of the Secretary of State's Office, including the Elections Division. I also worked closely with the State Election Board. I routinely interacted with county election officials.

2.      In that role, I also worked with the Georgia General Assembly on election legislation. The Georgia General Assembly frequently enacts election-

1

related legislation after an election. Through such legislation, the General Assembly ensures that the State applies lessons learned and responds to issues that arose from each election cycle, ensuring that the State's elections continue to be efficient, secure, accessible, and are conducted in a way that voters can have confidence in the election's results. This was true after both the 2018 and 2020 elections.

3.      I regularly provided input to the General Assembly and its members regarding the administration of elections based on my experience in the Secretary of State's office and my interactions with county election officials.

4.      Since the passage of SB 202, the only county election officials that have been the subject of a performance review pursuant to O.C.G.A. § 21-2-33.2 are the members of the Fulton County Board of Elections and Registration and its staff.

5.      I was appointed to serve on the Performance Review Board for Fulton County Elections ("the Review Board") and the Review Board issued a report to the State Election Board on January 13, 2022.

6.      A true and correct copy of that report is attached as Ex. 1 to this declaration. The report is correct summation of the process and analysis used by the Review Board, which included a robust investigation involving state officials, county officials, and the Carter Center.

7.     Since the passage of SB 202, the SEB has only empaneled the Performance Review Board for Fulton County Elections and has not empaneled any other Review Boards to evaluate any other county election officials.

8.     The SEB has not announced any plans for additional performance reviews or consideration of suspension of additional county election officials.

9.     Posting election results quickly is one of the best things that election officials can do to generate confidence in the outcome of an election, especially in a close election. Posting results quickly requires county election officials to tabulate results both quickly and accurately. Following the 2020 election, some counties (particularly Fulton County) were repeatedly asked how many votes they had left to tabulate, and they could not answer in a timely fashion. The inability of the county to answer that question in a timely fashion contributed to a post-election environment where the accuracy and legitimacy of the overall result was challenged and still not accepted by some portion of the electorate.

10.    SB 202 codified a State Election Board emergency rule related to early processing of absentee ballots that was utilized in the 2020 election. A true and correct copy of the emergency rule related to early processing of absentee ballots that was used in 2020 is attached as Ex. 2 to this declaration.

11.   Early processing of absentee ballots, which Georgia law allows to begin as early as two weeks prior to the election, and early tabulation, which can begin at 7:00 a.m. on Election Day, allows election officials to quickly post results once the polls close on Election Day without rushing to do so, which helps to ensure accuracy and lets county election officials focus on tabulating and posting Election Day results as they come in. Quickly posting accurate election results following the closing of the polls is one of the best things that election officials can do to instill confidence in the results of the election.

12.   While early processing and early tabulation of absentee ballots can lead to increased confidence in election results by ensuring quick posting of accurate results once the polls close, both processes introduce the risk of leaked information prior to the polls closing that can harm the integrity of the election process. Both the SEB emergency rule in 2020 and its codification in SB 202 contain processes to mitigate that risk while still recognizing the importance of allowing bi-partisan and public monitoring of the processes. The rules put in place by the General Assembly and the State Election Board attempt to balance all three of those interests: (1) the benefit of posting accurate results quickly, with (2) the risk of leaked information prior to the close of polls, and (3) the importance of election procedures being subject to public inspection.

13.    Prior to the emergency rule passed by the State Election Board in 2020 and its subsequent codification in SB 202, early scanning of absentee ballots was only performed by a sequestered group of individuals beginning at 7:00 a.m. on Election Day itself as part of the early tabulation process, so (as long as the sequestration rules were properly followed), the risk of leaked vote totals getting out prior to the close of the polls was sufficiently mitigated because it took place on a single day and did not extend over multiple days, when individuals could not remain sequestered.

14.    In order to mitigate the risk that early vote counts would be disclosed when the option of early scanning in the weeks before an election was made available to local election officials, the legislature designed a process that ensured that information about vote totals would not be publicized prior to the official release of results following the close of the polls.

15.    SB 202 permits only election officials to handle absentee ballots, requires individuals involved to swear an oath, and places several requirements on observers to avoid disclosure of vote counts.

16.    The Communication Rule prohibits monitors and observers of the early scanning process from "communicating any information that they see while monitoring the processing and scanning of absentee ballots…about any ballot, vote, or selection to anyone other than an election official who needs

such information to carry out his or her official duties." O.C.G.A. § 21-2-386(a)(2)(B)(vii). It applies during the viewing or monitoring of the early scanning process.

17.    The early processing and early tabulation processes occur in a room that is already subject to other specific requirements about the use of recording devices and other equipment.

18.    Ensuring that information regarding vote totals is not gathered or leaked prior to the official reporting process is critical to preserving the integrity of the election process by ensuring vote totals are not disclosed while other voters are still voting or have yet to vote.

19.    The Tally Rules protect the integrity of the election process by ensuring that counting votes or estimates about vote totals do not take place prior to the official tabulation process.

20.    The Communication and Tally Rules ensure that early processing of absentee ballots can occur without any official or unofficial (and likely inaccurate) information about vote totals being leaked to media, campaigns, candidates, or otherwise used in a fashion that may attempt to depress or otherwise alter voter turnout by disclosing any vote totals prior to the closing of the polls and the official tabulation and reporting process.

21.     If observers were permitted to attempt to tally votes while they are observing the early scanning process and then to communicate that information to others, it is likely that they would (inadvertently or purposefully) disclose inaccurate information, which could depress or alter turnout in the election. Of course, even disclosing accurate information regarding partial or estimated vote totals could depress or otherwise alter turnout in the election

22.     If officials were enjoined from enforcing the Communication Rule and the Tally Rules, individuals would be free to attempt to count votes while observing the early-scanning process and provide that information to campaigns, candidates, political operatives, media, or others, which would undermine the integrity of the election process.

23.     The Photography Rules help to prevent vote-buying or voter-intimidation schemes. Both of those schemes are much more likely to exist in an environment where potential vote buyers or intimidators know that a voter can take a picture of their ballot and use that to prove for whom they voted.

24.     The Photography Rules protect individuals from being subject to outside pressure to cast their ballot a certain way and from being pressured to disclose who they voted for, as well as helping to ensure a secret ballot.

25.    Protecting voters from vote-buying schemes, intimidation, and pressure to vote a certain way or disclose how they voted is an important part of giving the entire electorate confidence in election results.

26.    Vote-buying schemes, where a third-party may offer to pay or offer something of value in return for a vote, or voter-intimidation schemes, where a third party may not explicitly offer to buy votes but may pressure a voter to show how they voted, undermine the foundations of merit-based representative democracy and the protections of a secret ballot guaranteed in the Georgia Constitution.

27.    The Photography Rules also ensure that photographic images of a voter's ballot are not stored in ways that can connect the ballot to the voter, preserving the voter's privacy, secret ballot, and the integrity of the election.

28.    Pictures taken on mobile devices are often quickly uploaded to a cloud storage provider on the internet and could connect the voter's ballot with the voter immediately.

29.    It is typically private companies—and not the voter—who are in charge of ensuring privacy and security protocols at cloud storage location where photographic data, including pictures of a voter's ballot, would be stored if voters were permitted to take pictures of their ballots on mobile devices.

30.     I am not aware of any investigation or charges against any individual in Georgia for violations of the Observation Rule based on merely approaching a polling place with large windows.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and accurate to the best of my knowledge, information, and belief.


  7/17/23
Date                                    C. Ryan Germany

# EXHIBIT 1

# PERFORMANCE REVIEW BOARD REPORT ON FULTON COUNTY ELECTIONS

January 13, 2022

Performance Review Board Members:
Ryan Germany
Stephen Day
Rickey Kittle

## SUMMARY

- In prior years, disorganization and a lack of a sense of urgency in resolving issues plagued Fulton County elections. However, Fulton County has shown improvement in administering elections from 2020 to 2022. This improvement is due to a multitude of factors. Prior staff that oversaw elections, voter registration, redistricting, and absentee ballots are no longer with the office, and new staff can bring new energy and renewed commitment. Training, processes and procedures, and overall organization have all been improved as well, but those things need further improvement to ensure readiness and success in the 2024 election cycle.

- The Fulton County Board of Elections and Registration is engaged and helping to drive those improvements. Replacing the board would not be helpful and would in fact hinder the ongoing improvements to Fulton County elections.

- The County Manager's Office in Fulton County has continued to be involved in planning, strategizing, and preparing for upcoming elections, which has positively contributed to improved execution of elections.

- Like election officials across the state, Fulton County elections staff show daily dedication and effort in carrying out and seeking to improve the administration of elections in Fulton County. Director level staff and the Fulton County Board of Elections need to ensure that staff has the necessary tools and guidance to ensure best practices and compliance.

- The Performance Review Board members individually donated hundreds of hours to this project and The Carter Center donated almost 4000 people hours. Both observations (which were conducted independently) noted significant improvement from the 2020 election, but both also noticed things that could use additional improvement, including further improvements to training and processes.

- The existence of the Performance Review helped incentivize Fulton County to make improvements to their elections, but it took an enormous amount of donated work, and it is difficult to see how it is a sustainable process that can continue to positively influence election administration in Georgia without some reforms. A positive, proactive, and periodic review process, appropriately funded, designed to support and assist all counties with election process improvements could be more effective than the performance review process in its current iteration.

- While the Performance Review Process has seen improvement in Fulton County elections since the 2020 election, further improvement is still needed to ensure readiness for the 2024 presidential election cycle. Presidential election cycles see more voters than midterms and take even more planning and preparation to ensure successful execution. Georgia will be a competitive state in next year's elections, so election preparation needs to recognize that

Fulton County's actions (and all counties in Georgia, for that matter) will be heavily scrutinized by political parties, campaigns, candidates, and activist groups. To ensure successful execution of the 2024 election, Fulton County should continue the improvements it has already embarked on and prioritize the areas for improvement noted in this report. Those areas are:

- More contextualized poll worker training
- Environment of order, organization, and control
- Compliance with State Election Board Regulation regarding ballot review
- Planning and Preparation based on capacity and execution
- Review polling place layout
- Compliance with Georgia law regarding sequestration during early tabulation

## BACKGROUND ON FULTON COUNTY ELECTIONS

Fulton County has a long and well-documented history of issues administering elections.[1] The 2012 Presidential Election in Fulton County resulted in the largest fine ever issued by the State Election Board and required remedial training.[2] In that election failures in timely processing voter registration applications snowballed into significant issues for voters on Election Day.[3] This "snowball" effect, where problems on Election Day are generally indicative of earlier failures in the election administration process, was also very present in the June 2020 primary in Fulton County.

The June 2020 Primary Election was marked by long lines and confusion in Fulton County. That election, which occurred during the brunt of the COVID-19 pandemic, was uniquely difficult from an election administration perspective. Massive increases in absentee ballots were difficult for all election officials to keep up with. Pandemic fears increased the already difficult task of recruiting and training poll workers and finding adequate polling locations. Georgia election officials faced the added difficulty of having to implement a new paper-ballot voting system during the 2020 Election Cycle. Implementing a new system always increases logistical and training issues, and issues due to the COVID-19 pandemic stretched election officials to their breaking point. But while every county in Georgia faced those issues, many Fulton County voters had a uniquely bad experience.

Some of the reasons for the issues in the June 2020 primary, in addition to the exigencies mentioned in the above paragraph, were outside Fulton County's control. In addition to certain polling locations electing not to make themselves available due to the COVID-19 pandemic, other locations were not available due to previously existing remodeling schedules. This led to combining many precincts into one voting location and to utilizing locations that were not typically polling locations, such as Park Tavern in Midtown Atlanta. Fulton's Chief Registrar at the time was hospitalized due to COVID-19 and another long-time employee passed away due to the virus. However, Fulton's response to these circumstances added to the Election Day difficulties, specifically the hiring of poll workers on the weekend before Election Day and not ensuring adequate training of those poll workers.

Following the June 2020 Primary Election, the State Election Board considered multiple complaints regarding the election in Fulton County, including accusations that absentee ballot applications were not processed, that polling places did not open on time and did not have all required forms (such as recap sheets), and that poll workers were not adequately trained. The State Election Board found probable cause to send the complaints to the Attorney General's office for

---

[1] "Fulton to Retool Absentee Vote System" *Atlanta Journal-Constitution* (1993); "Touch and No-Go in Fulton? Unreadiness for New Voting System Raises Florida Effect Fears" *Atlanta Journal-Constitution* (2002); "Fulton Needs 'Wake-Up Call'" *The Macon Telegraph* (2008); "Claim: The 'Error Rates' for Fulton County Elections Department are 'Well Below the Average, Rating: False" *Politifact* (2012); "Fulton County Tries to Recover from Election Problems" *Athens Banner-Herald* (2014).

[2] "State Approves Fulton Election Settlement." *Atlanta Journal-Constitution* (August 13, 2015).

[3] "Fulton Elections Investigation Sent to Attorney General." *Atlanta Journal-Constitution* (December 17, 2013).

further prosecution, but instructed the Attorney General's office, Secretary of State's office, and Fulton County to try to resolve these issues with an eye toward improving the issues prior to the November 2020 General Election.

In October 2020, Fulton County and the State Election Board agreed to a Consent Order to resolve the complaints stemming from the June 2020 Primary Election.[4] That order included certain remedial measures that Fulton County agreed to implement prior to the November 2020 General Election as well as the appointment of an independent, non-partisan monitor. The consulting firm Seven Hills Strategies was appointed by the State Election Board as the independent monitor. Carter Jones, of Seven Hills Strategies, spent more than 270 hours observing all aspects of Fulton County's election processes and was granted full access by Fulton County.[5] Seven Hills Strategies' report noted that it saw no instances of dishonesty, fraud, or intentional malfeasance, but that it did see areas of disorganization, sloppiness, and mismanagement.[6]

### REQUEST FROM GENERAL ASSEMBLY FOR PERFORMANCE REVIEW

On July 15, 2021, Senate President Pro Tempore Butch Miller and twenty-two of his Republican colleagues in the Georgia Senate sent a letter to Rick Barron, then-Director of the Fulton County Board of Elections and Registration, requesting answers to questions regarding the double-scanning of nearly 200 ballots and Fulton County's audit tally sheets. Senator Miller requested a response by July 22, 2021. On July 21, 2021, Mr. Barron responded that he wanted to provide answers to the inquiries but that he needed approval from the Fulton County Board of Elections prior to sending responses, that the next board meeting was scheduled for August 12, 2021, and that he would not be able to meet the requested deadline.

On July 27, 2021, Senators Matt Brass, Kay Kirkpatrick, and John Albers (Republican members of the Senate Fulton County delegation), along with twenty-two other members of the Senate Republican caucus, sent a letter to the State Election Board invoking O.C.G.A. § 21-2-106 and requesting a performance review of Fulton County based on their failure to respond to Senator Miller's questions.

On July 30, 2021, Speaker Pro Tempore Jan Jones of the Georgia House of Representatives, joined by four other Republican members of the Fulton County delegation in the House of Representatives, joined their Senate colleagues' request for a performance review of Fulton County elections, mentioning the same issues as their Senate colleagues in addition to "persistent sloppiness in election processes over multiple election cycles."

---

[4] "Consent Order." State Election Board Cases 2020-016 and 2020-027, attached hereto as Exhibit A.
[5] "State Election Board Report- Post Election Executive Summary" *Seven Hills Strategies* (February 16, 2021), attached hereto as Exhibit B.
[6] "Report Shows No Fraud But Many Problems with Fulton Voting Process." Georgia Public Broadcasting. (February 17, 2021).

## PERFORMANCE REVIEW PROCESS

On August 18, 2021, pursuant to the request from the requisite members of the General Assembly, the State Election Board appointed a Performance Review Board consisting of Stephen Day, member and former Chair of the Gwinnett County Board of Elections; Ryan Germany, General Counsel for the Office of the Secretary of State; and Rickey Kittle, Chair of the Catoosa County Board of Elections.

O.C.G.A. § 21-2-106 states that the duty of the performance review board is "to make a thorough and complete investigation of the local election official with respect to all actions of the local election official regarding the technical competency in the maintenance and operation of election equipment, proper administration and oversight of registration and elections, and compliance with state law and regulations." "Local election official" is defined in relevant part to this performance review by O.C.G.A. § 21-2-105 as "a county board of elections or a county board of elections and registration."

After completing that thorough and complete investigation, the performance review board is to "issue a written report of its findings to the Secretary of State, the State Election Board, and the local governing authority which shall include such evaluations, judgments, and recommendations as it deems appropriate." O.C.G.A. § 21-2-106(b).

The Performance Review Board utilized a multi-faceted approach to accomplish the required "thorough and complete investigation," which spanned across the municipal elections in 2021, the redistricting process, and the 2022 election cycle. We reviewed existing documentation regarding Fulton County elections, particularly the report of independent-monitor Seven Hills Strategies. We conducted an interview with Carter Jones, the author of that report, to get his insights into the performance review process and into Fulton County elections generally. The Performance Review Board itself observed pre-election, Election Day, and post-election processes at Fulton County in both the 2021 municipal elections and the 2022 general and runoff elections. This observation included at least four separate visits to the Fulton County Election Processing Center during the 2021 and 2022 elections to observe absentee by mail processes, equipment and paperwork return, vote tabulation and uploading, and other operations. It also included visits to at least nine different election day polling places and seven separate advance voting locations.

In addition to the observation of the Performance Review Board, The Carter Center, which has observed more than 100 elections in 39 countries since 1989, was invited by the Performance Review Board and the Fulton County Board of Elections to observe the November 2022 General Election in Fulton County. The thorough investigation that the Performance Review Board conducted would not have been possible without the independent observation efforts of The Carter Center. The Carter Center greatly expanded the reach of the three-person Performance Review Board, who each had other election-related duties to attend to during the 2022 election cycle. They contributed almost 4000 people hours to observation, as well as recruiting, managing, and training their observers and then analyzing and reporting the data they gathered. Their assistance was invaluable, and their work was of the highest quality. The Performance Review Board is exceedingly grateful to The Carter Center for their time and effort.[7]

---

[7] "2022 General Election Observation: Fulton County, Georgia." *The Carter Center*. Attached hereto as Exhibit C.

The Performance Review Board conducted formal interviews of key current and former staff members at Fulton County elections, reviewed Standard Operating Procedures, compared those Standard Operating Procedures to procedures in other counties, and interviewed members of the Fulton County Board of Elections.[8] We also were in close contact with the Secretary of State's Investigations Division and Elections Division as they looked into issues that were relevant to the ongoing review, including redistricting following the 2021 Census and processing of absentee ballot and absentee ballot applications.

## OBSERVATIONS

### 2020 Election Cycle

Before moving to the observations of the Performance Review Board, this section will discuss the 2020 elections in Fulton County based on our review of Seven Hills Strategies' report, interview with Carter Jones, discussions with Secretary of State Elections Divisions, and review of Secretary of State investigations.   We will then move to the current status of Fulton County's elections process with the intent of showing the marked improvement in both preparation and performance from 2020 to 2022.

Regarding the 2020 elections that occurred prior to the outset of the performance review process, our interviews and review of materials confirmed much of what has already been written about those elections in Fulton County. In our interview with Carter Jones, the author of the Seven Hills Strategies report, we found him to be knowledgeable, fair, and well-informed regarding Fulton County operations. We concur in his finding that we did not see any indications of fraud, dishonesty, or intentional malfeasance in the 2020 election results in Fulton County, but we did see how a lack of careful planning and precision in ensuring that processes were strictly followed led to errors and to an overall environment that appeared unorganized. In an election with as much interest from voters, media, and others around the country and world, the organizational deficiencies identified in Seven Hills Strategies' report were apparent to voters, observers, and media.

For example, in a pattern that echoed the issues from the 2012 General Election (where a failure to timely process voter registration applications led to difficulties on Election Day), the June 2020 Primary Election saw a failure to timely process absentee ballot applications "snowball" into voter frustration, a high number of absentee ballot requests being cancelled, and long lines on Election Day. In June 2020, these issues were exacerbated due to policies that Fulton County put in place to respond to the COVID-19 pandemic and by issues outside the control of Fulton County (long-time polling places choosing not to make themselves available due to COVID-19, other polling places being closed for previously scheduled remodels, etc.).

---

[8] The two Republican Party-appointed members of the Fulton County Board of Elections did not respond to requests for interviews.

While the November 2020 General Election and January 2021 Runoff Election were smoother than the June 2020 Primary (in large part thanks to the remedial measures from the October 2020 Consent Order) Seven Hills Strategies still observed areas where a lack of precision and strict adherence to policies and rules made post-election activities more difficult. Again, many of these difficulties were exacerbated due to policies the Fulton County Board of Elections and Registration chose to put in place in response to the COVID-19 pandemic and by a post-2020 election environment filled with misinformation and false allegations that increased the difficulty of performing all election-related tasks.

Secretary of State Investigators who investigated complaints regarding the November 2020 General Election in Fulton County elections had similar findings to the Seven Hills Strategies' report—no evidence of fraud, dishonesty, or intentional misconduct, but persistent disorganization that made it difficult to get to the bottom of certain claims. Our review reaches a similar conclusion—we do not see any evidence of fraud, intentional misconduct, or large systematic issues that would have affected the result of the November 2020 election. The fact that three separate counts of the 2020 presidential race in Fulton County (initial count, hand-audit count, and machine recount) all showed very similar results supports this conclusion.

*Hand-Count Audit of 2020 Presidential Race*

One example of Fulton County's disorganization leading to errors and those errors being used to make claims of fraud are the allegations regarding the hand-count audit of the November 2020 Presidential contest that were investigated by Secretary of State Investigators in Case No. SEB 2021-181. In that case, citizen-activists brought to light errors made on tally sheets and in data entry. In a presentation to the State Election Board on March 18, 2022, Secretary of State Investigators confirmed data-entry errors in Fulton County but found that the citizen-activists conclusions (that such errors obviated the usefulness of the hand-count) were not substantiated.

Independent audit experts confirmed to Secretary of State Investigators that some amount of human error is expected in large hand-counts and that the types of errors seen in the Fulton County audit are the typical types of errors that are seen in hand tabulations. As part of that investigation, Fulton County stated that one reason for the errors was that the Arlo system used for the audit did not have required naming conventions for batches and allowed counties to utilize their own naming conventions. However, the fact that Fulton County did not use standardized naming conventions in their hand audit of the 2020 presidential race indicates a failure of planning and execution to avoid a predictable issue, not something that should be blamed on the Arlo system. The State Election Board referred Case No. SEB 2021-181 to the Attorney General's office, and it remains there for final resolution.

Additional contributing factors to the challenges that occurred in Fulton County's hand-audit that were outside of the county's control include that this was the first election with paper ballots in more than twenty years, so this was the first time the county had put in place and executed paper ballot batch management procedures for such a large number of ballots. Due to its status as the largest county with the greatest number of votes to count, Fulton also ran up against the deadline to complete the hand-count audit and was not able to do reconciliation checks of its data entry.

Other counties, including large counties, did have time to check their data entry and caught and corrected errors prior to submission. A full hand-count audit was not something that was planned for or expected in any county. It came about due to the state's new audit requirement and the fact that the margin of the race for president (the contest selected for the audit) was incredibly small, so counties were not allowed much time to plan and train prior to execution of the audit. The environment post-election in Fulton County in 2020 was also extremely difficult to operate in given an influx of poll-watchers and public from around the country that made even regular operations difficult. Of course, policies put in place to respond to the COVID-19 pandemic also contributed to these difficulties.

In conclusion, Secretary of State Investigators did confirm the existence of errors in the Fulton County audit, but independent audit experts confirmed that the existence of those errors was not surprising given the expected error rates in hand counts, the fact that Fulton did not have time to double check data entry, and the other circumstances surrounding the audit. Those same experts confirmed that some level of data entry errors are expected in a full hand-count, and they do not alter the overall conclusion of the audit, which confirmed that Joe Biden won the 2020 presidential race in Georgia.

*Double-Scanning of Ballots*

One of the allegations leading to the General Assembly's request for this review was that ballots were double scanned. As has already been reported, Secretary Investigators substantiated the allegations that two batches totaling almost 200 ballots were double scanned during the initial count of the November 2020 election.[9] As one election expert said, and the Performance Review Board concurs, double-scanning of ballots is "something that should never happen."[10] Contributing factors in this case likely include poor batch management and storage practices (also a contributing factor in errors in the hand-count audit and the recount), a time crunch created by the failure to utilize the early scanning period, and significantly heavier usage of central scanners due to the massive increase in absentee ballots resulting from the COVID-19 pandemic and a corresponding increase in paper jams.

*The January 2021 U.S. Senate Runoff*

The January 2021 U.S. Senate Runoff Election showed improvements from the November 2020 General Election, most notably in that Fulton County took advantage of the early scanning period for absentee ballots, which decreases the time crunch and rush to scan the ballots (increasing accuracy) and leads to faster posting of results on Election Day. Other reasons for these improvements include the fact that election officials and poll workers had more experience running elections with the new equipment, a decrease in the number of absentee ballots to issue and process, and greater familiarity with COVID-19 protocols.

---

[9] "Some Ballots Initially Double-Counted in Fulton Before Recount." *Atlanta Journal-Constitution*. (July 13, 2021).
[10] Id.

**2021 Municipal Elections**

After being appointed in August 2021, the first elections that the Performance Review Board observed in Fulton County were the 2021 municipal elections administered by Fulton County. These elections are orders of magnitude smaller than a presidential or midterm General Election, but they are still valuable to see how a county performs essential election functions. The 2021 municipal elections were significantly smoother than the 2020 elections in Fulton. On Election Night, one performance review board member was present at the Election Processing Center and spoke with Mr. Foris Webb, III, the Atlanta Municipal Clerk. Mr. Webb has observed elections in Fulton County (municipal elections, but also county, state, and federal elections) for 24 years, and he stated that the 2021 municipal election in Fulton was the smoothest one he had observed to date.

The Performance Review Board observation similarly showed smooth operations and significant improvement from the 2020 election. Some of this improvement is undoubtedly due to the fact that a municipal election is much smaller than a presidential election, but it also seemed that Fulton had improved some of their processes since 2020.

One area that contributed to the improvement in operations was staffing. Fulton County created and filled several key and new management positions. These new positions include a Deputy Director, an Absentee Ballot Manager, and a Manager for the Ballot Marking Equipment. The additional managers had staff focused on their areas, allowing for responsibilities to be more spread out and better executed.

*Absentee Ballot Process*

One example of improvement was identified during our observation of absentee ballot procedures. Following the 2020 election cycle, Fulton County split responsibility for managing the absentee ballot process and the registration process, which had been under one manager. Fulton County created and filled a new position of the Absentee Ballot Manager who supervised staff dedicated to absentee ballots. The Absentee Ballot Manager was new to her role in 2021 and had not been in charge of absentee ballots in 2020. This change seems to have resulted in significant process improvements. Our observation was that the processes put in place by the Absentee Ballot Manager were effective and compliant with Georgia law. The location where absentee ballot processing occurred was set up to ensure a good flow of the process while ensuring ballot security and allowing required transparency to poll watchers. The Absentee Ballot Manager stated that part of the training conducted for staff executing those processes is making sure they are aware of how important the task is to the success of the overall election and focuses on quality control.

*Equipment Handling*

Another issue Fulton County addressed following the 2020 election was to split responsibilities for managing ballot marking devices and other election site supplies. Fulton County hired a new manager responsible for ballot marking devices and assigned technicians to specific polling sites to address issues with the equipment. Fulton County also implemented a supply scanning system

that allowed more accurate and timely tracking of supplies and equipment. While this supply scanning system does not appear fully implemented, it is a positive step.

*Advance Voting*

We also observed several advance voting sites, including Sandy Springs Library and Metropolitan Library. At both locations, voting was proceeding smoothly with almost no wait time. Fulton had added a person to advance voting locations to ensure that voter credit was promptly and properly given in the ENET voter registration system and reconciled ENET voter credit with paper Advance Voting Ballot Applications filled out at the time of check-in. This reconciliation check is a noted improvement and shows increased attention to these important processes.

The Performance Review Board also observed advance voting at Buckhead Library and C.T. Martin Natatorium. The observation of those two locations occurred on the last day of early voting so traffic was heavier. Buckhead Library had some poll workers who did not show up that day and was experiencing long lines to vote. The check-in process was going smoothly, but we observed that some check-in stations were not being utilized due to the lack of staff. Buckhead Library is a popular voting location, but the setup is a bit cramped due to space that's available. On that same day, C.T. Martin Natatorium had a full complement of poll workers and kept a short line to vote. The facility at C.T. Martin Natatorium is bigger and allowed for more ease of movement.[11] We also noticed that the poll manager at C.T. Martin would jump-in to staff a check-in station when the line got long, which seemed to really set a good tone for all poll workers at that location.

*Election Day*

On Election Day for the municipal elections in November 2021, the Performance Review Board had a presence at Fulton County Election Headquarters, at the Election Processing Center, and at polling places around the county. At headquarters, Fulton County has an impressive system of logging issues that are reported at different polling places. But the overall atmosphere still seemed disorganized and reported issues did not seem to result in a sense of urgency to resolve. The Performance Review Board was able to visit locations that had specific issues reported such as North Springs High School in Sandy Springs and Independence High School in Roswell. Overall, voter experience on Election Day seemed to be smooth. Typical turnout during municipal elections is significantly lower than in a presidential or midterm election, so issues are able to be resolved without leading to major backups in voting. The two issues discussed below are indicative of the types of issues that can occur when administering an election.

---

[11] Finding good, centrally located polling locations that have sufficient space, parking, accessibility, security, etc. is a difficulty for election officials across the country, especially in urban environments and even more so since schools have understandably stepped back from being polling locations. We conclude that Fulton County does a good job managing this difficulty. Fulton County election seems to have a very good relationship with the Fulton County library system, and while the available space in libraries is not always large, libraries provide good accessibility, availability, and are under county control. We also understand that library staff has also been trained to assist in some election tasks, which could be a huge benefit. The Performance Review Board recognizes the vital assistance the Fulton County Library System plays in ensuring that Fulton County can continue improving administration of elections.

At North Springs High School, the poll manager noticed she was missing the key to the cabinets that store the ballot marking devices and scanners. Even though she reported this issue the Saturday before the election, the key to the cabinets was not delivered until 10:00 a.m. on Election Day. To the poll manager's credit, she utilized available backup procedures (i.e., emergency paper ballots) to ensure that voting was able to occur beginning at 7:00 a.m. on Election Day.

At Independence High School in Roswell, the equipment was delivered to the location much later in the day before the election than was scheduled (schedule for 2:00 p.m. but did not arrive until 8:30-9:30 p.m.). The equipment was incorrectly delivered to a cafeteria downstairs, but the poll manager was told by school officials that was not the proper place. The poll manager alerted Fulton County on Monday night that the equipment needed to be moved to a different location. She was told that a logistics team would be present at 5:00 a.m. on Election Day to move the equipment, but that team did not show up until 1:00 p.m. on Election Day. Fortunately, the poll officials (all female), took the initiative to manually move the necessary equipment themselves up a steep incline. They were up and running by the time the polls opened at 7:00 a.m. and had no delays to opening.

These examples both show poll managers utilizing their training and showing initiative to successfully resolve issues. The fact that backup procedures were utilized to ensure that voters were still able to vote without delay shows a massive improvement from the June 2020 Primary. However, the issues at both of those locations were ones that could have been avoided by better control and execution of the equipment delivery process.[12] These issues were also both noticed by poll managers well in advance of opening of the polls, and a quicker response from Fulton County would have mitigated the need for the extra steps that had to be taken by poll officials.

At the Election Processing Center on Election Night, we observed that the system for tracking memory cards that had already been uploaded was disorganized. Fulton County actually had to re-certify their election results after the Secretary of State's office pointed out to them that certain checks did not add up. Fulton County found memory cards that had not been uploaded. This is something that should never happen, would not happen with better organization, and would be caught with better checks and balances.

**Redistricting**

After the 2021 municipal elections and prior to the 2022 elections, all counties in Georgia had to redistrict voters following the new district maps passed by the General Assembly following the decennial census. Just like voter registration and the absentee ballot process, redistricting is an essential election process where errors can "snowball" into voters being in the wrong location, long lines, and confusion on Election Day. The Secretary of State's Elections Division, particularly Deputy State Elections Director Dr. Jesse Harris, communicated frequently with Fulton about their redistricting. Utilizing a mapping tool, the Secretary of State's office checked all counties state and federal redistricting work to identify voters that may have been placed in the wrong district

---

[12] One of the improvements observed in the 2022 election cycle by both the Performance Review Board and The Carter Center was improved organization in the warehouse. This improvement, if it is kept up, should help to minimize issues with equipment delivery moving forward.

and flagged those records for counties to review. In one of the initial checks, the mapping software identified approximately 30,000 records for counties to review. Approximately 20,000 of those records were in Fulton County.

Fulton County had new staff in charge of redistricting from previous cycles, and once this information was brought to their attention, they worked diligently to resolve any issues. Fulton County also separately contracted with a mapping service to help them check their work for county level districts. Due to the delay in the census caused by COVID-19, which caused maps to be passed by the General Assembly later than in previous cycles, the corrections that Fulton County was making were occurring closer to the May primary than is ideal. It also became clear that Fulton had not prioritized monthly and annual "street maintenance" (the process that ensures that street names and numbers in the voter registration database are updated to account for new development).

In other large counties, street maintenance is a monthly process regardless of whether redistricting is occurring. As a result of neglecting the street maintenance process, the new staff in Fulton had to spend significant time "catching up" on tasks that ideally would have been completed prior to redistricting. However, at the end of the process, one expert at the Secretary of State's office said that he thought Fulton's voter database was in better shape than it had been in a long time. This was due to dedicated effort by Fulton County elections staff, support from others in Fulton County, (including the County Manager) to ensure that elections had the resources they needed, and assistance from the Secretary of State's office.

### 2022 Election Cycle

In an effort to expand the reach of the three-member Performance Review Board and to further inform the review, the Performance Review Board and the Fulton County Board of Elections and Registration entered into an agreement with The Carter Center to provide independent, non-partisan observation[13] of Fulton County's election. In addition to The Carter Center's observation, the Performance Review Board also conducted some limited observations of advance voting and processes at Fulton's Election Preparation Center when advance voting equipment and ballots were being returned.[14]

During advance voting in the November General Election, The Carter Center deployed 64 observers to all 36 early voting locations and the four "outreach" advance voting locations, collecting over 330 observation reports on advance voting. On Election Day, the Center deployed 104 observers to 217 of the 249 polling places in Fulton County. The Carter Center also observed absentee ballot processing, election night drop-off, and tabulation. Their analysis is based on direct

---

[13] "Nonpartisan election observation is an impartial process where observers systematically gather data determine whether an election was fair, peaceful, and credible… [N]onpartisan observers have no stake in the election outcome. They do not interfere in the election day process, even if they see something take place that should not happen. They are trained to understand the election process as specified by law and report on whether election day procedures are being correctly followed." The Carter Center Report on Observation of Fulton County Election, pg. 5.

[14] Due to the fact that the Performance Review Board members have election-related duties that they must also attend to, the members were limited in what observations they could perform in the November 2022 election. The Carter Center observation was vital to the ability to complete the review in a timely fashion.

observation, desk analysis of documents provided by Fulton County, and conversations with Fulton County staff.

The Carter Center's observation and the Performance Review Board's observations were conducted independently from each other, but both reached similar conclusions. The Performance Review Board observed dedicated poll workers working efficiently to process voters. Voter check-in was proceeding smoothly at the locations we observed (Buckhead Library and Chastain Park), averaging between 55 seconds and 2 minutes and 55 seconds per voter. The overall process was more organized than 2021, which was more organized than 2020. This conclusion was echoed by the poll manager at Chastain Park and by Fulton County elections staff. We also observed that the Elections Preparation Center looked cleaner and more organized than it had in 2021. Fulton County had also implemented a new inventory tracking system that aimed to help with equipment delivery and return. The inventory tracking system is not perfectly implemented yet, but the fact that they have added it shows a recognition of the importance of organization and preparation to the overall election process.

The Carter Center observed that both advance voting and Election Day were calm and peaceful. During advance voting, lines were generally short, ranging from no line to a maximum of 25 minutes. The last day of advance voting saw longer lines (also noted by the Performance Review Board observation). On Election Day, lines generally stayed under 15 minutes throughout the day. Most voters waited far less than 15 minutes, with 57% of observed polling places having no line at all and 38% had lines of 5 minutes or less. Lines at opening were manageable at all observed locations. The longest line at opening at an observed location was 43 people and observers reported that it was cleared quickly. The Carter Center also noted that the presence of compliance officer during advance voting, tasked with ensuring reconciliation of voter credit and voter check-in throughout the day, and a technical specialist, tasked with troubleshooting equipment issues, helped streamline processes.

The Carter Center also noted that election workers were generally friendly, enthusiastic, and helpful to voters, and that there was a strong emphasis on customer service. This is no small task given that workdays could be up to 14 hours.

The Carter Center observed good processes for tracking and processing absentee ballot applications and absentee ballots, similar to what the Performance Review Board observed in 2021. They noted that absentee ballot applications were received by the mailroom, timestamped, opened, and batched in groups of 50 for processing, with batch cover sheets used to track each group of 50 through the process, recording the total accepted or rejected. Applications were processed and reconciled to the voter registration database each night.

In another big improvement from the November 2020 election, Fulton County fully utilized the early scanning period to scan verified and accepted absentee ballots prior to Election Day. Utilizing this time period (codified in Georgia law by S.B. 202 following the 2020 election) allows absentee ballot scanning to be less of a rush, provides more time for quality control checks, and still allows the county to get results posted quickly after the polls close. Observers witnessed absentee ballot processing from initial receipt through verification and tabulation. Best practices were observed at

each step of the process, including using small batches, tracking each batch via a cover sheet that logged any ballots that were removed (e.g., ballots rejected during verification), and reconciling counts of ballots at various stages throughout the process. Following processes like this in an organized fashion is what ensures that the double-scanning of ballots that occurred in 2020 is not something that happens again. One other improvement noted by the Performance Review Board from 2021 to 2022 was a more organized system for storing memory cards when they are returned to the Election Processing Center for tabulation.

## AREAS FOR IMPROVEMENT

Both The Carter Center and Performance Review Board observed significant improvements since 2020, but observers also noted things that could use further improvement.

While poll workers generally seemed better-trained in 2022 than 2020 given that essential functions were successfully performed with relative uniformity, poll worker training can still be improved. The Carter Center observers noted that more contextualized training that helped poll officials understand the big picture "why" of certain administrative steps would be beneficial. For example, the processes of checking seals and properly filling out recap sheets were completed by poll officials, but there did not seem to always be an understanding of why and how these processes were undertaken. Both of those processes are important for overall system security and for public confidence in elections, and both are also ways to potentially find any issues at the point where they can still be easily resolved.

General organization can continue to improve as well. While the reality is that there is no such thing as a mistake-free election, a tightly organized environment lessens the opportunity for mistakes and increases the probability of catching mistakes. For example, in the May 2022 Primary Election, just like in the November 2021 Municipal Election, the Secretary of State's office noticed that Fulton County did not upload all memory card that contained votes. The issue was resolved prior to certification, but it's something that should not have happened and, at the very least, should have been caught with basic reconciliation checks.

Another observation that can be resolved through better training is compliance with the State Election Board regulation that requires the poll official stationed at the ballot scanner to "offer each voter specific verbal instruction to review their printed ballot prior to scanning it."[15]

The Carter Center also noted that the "outreach" locations opened on college campuses for advance voting had the most significant staffing challenges, with poll managers having to give inexperienced staff on-the-job training. These locations were not initially planned to be advance voting locations, but they were added at the request of activist groups.[16] Preparation and planning is vital to successful election administration. In determining plans for polling locations, we assume the Fulton County Board of Elections and Registration is already taking into account what can

---

[15] Georgia Rules and Regulations 183-1-12-.11(8).
[16] "Following ACLU Complaint, Fulton to Host Voting on College Campuses." *Atlanta Journal-Constitution*. (August 11, 2022).

feasibly be accomplished by available resources and staff. Altering plans at the request of activist groups, who may be driven by motivations other than Fulton County executing a smooth election, can lead to the significant staffing challenges that The Carter Center observed.

We have already mentioned that finding suitable polling places is a difficulty for all, and especially urban, election officials. But one thing Fulton can pay more attention to is the layout of equipment at polling places. Voter privacy, voter flow, and appropriate transparency for certified partisan monitors should all be considered when determining setup and layout. Of course, given that available space will not always be perfect, it is not always possible to maximize each of those considerations, but polling place setup should be intentional and thought through.

One area noted by The Carter Center where significant improvement is needed is in following the sequestration requirements of O.C.G.A. § 21-2-386(a)(6) during early tabulation.[17] Fulton County should be applauded for taking advantage of both the early processing and early tabulating opportunities offered by Georgia law. Early processing and early tabulation ensure that sufficient time and care can be offered to those vital processes, which increases accuracy, while still allowing timely reporting of results. But the rules in place that allow for those processes to be done securely must be followed to ensure fairness and confidence.

Fulton County also has relatively new staff managing certain process since the 2020 election. The Performance Review Board's observation is that staff is dedicated and open to improvements when the necessary tools and guidance are provided. As The Carter Center stated well:

> Election processes are complex logistical exercises. As such, there are always opportunities for continuous improvement of processes to bolster efficiency and maximize appropriate and contextualized transparency. This process of continuous improvement relies on the observation of systems and processes and the creation of monitored feedback loops so that lessons from one election can be integrated into systems to improve future elections.

We hope that Fulton County will continue to build on the significant improvements that our review has noted since the 2020 election cycle.

**Fulton County's Future Plans**

In addition to the improvements that the Performance Review Board and The Carter Center were able to observe, Fulton County has also taken other steps that we believe can lead to even further improvements in future elections.

---

[17] Georgia law, clarified by S.B. 202, allows for both an early processing period where absentee ballots can be scanned but not tabulated (i.e. election officials can essentially do everything to prepare absentee ballots for tabulation but not yet tabulate) and a period beginning at 7:00 a.m. on Election Day where absentee ballots can be tabulated as long as all participants are sequestered so that results cannot be know by anyone outside that room until the polls close.

*Elections Central Location*

Many of the issues in 2020 were caused by or at least exacerbated by the fact that tasks and personnel were spread across many different locations. This was even more so the case in 2020 due to processes put in place to respond to the COVID-19 pandemic, but even outside of pandemic circumstances, Fulton County election operations are spread across multiple locations.

In Spring 2023, Fulton County plans to move to one central location ("Elections Central") where they will be able to conduct all election operations. Elections Central should reduce miscommunication and allow more visibility to managerial staff. Elections Central also shows the commitment of the Fulton County Commission to ensuring that Fulton County Elections has the resources they need to be successful.

*Budget Priority*

Along the same lines as the move to Elections Central, it became clear through our interviews that the Fulton County Commission now takes the budget needs of Fulton County Elections more seriously. One benefit of all the challenges from the 2020 election is that it showed people other than just election officials that election administration is a difficult and complicated logistical operation. Executing elections with the precision, integrity, and voter convenience that Georgia voters deserve and election officials want takes adequate resources.

We did not review the Fulton County Elections budget as part of this review, so we cannot speak to specifically to that issue. We have heard some rumblings that Fulton County Elections is over-funded. We are not able to speak specifically to that allegation, but it is the opinion of the Performance Review Board that elections in Georgia have generally been underfunded, not overfunded.

*Improvements to Poll Worker Training*

Even before The Carter Center's observation noted that some improvements to training would be beneficial, members of the Fulton County Board of Elections had already identified improvements to poll worker training. This came across in our interviews with Cathy Woolard, Chair of the Board, and Teri Crawford, one of the members. Apparently, certain poll managers noticed some weaknesses in training and approached the board about reworking the training manual. We understand that project is in progress. It is also encouraging that the poll managers themselves sought out to improve the training.

## CONCLUSIONS AND RECOMMENDATIONS

- In prior years, disorganization and a lack of a sense of urgency in resolving issues plagued Fulton County elections. However, Fulton County has shown improvement in administering elections from 2020 to 2022. This improvement is due to a multitude of factors. Prior staff that oversaw elections, voter registration, redistricting, and absentee ballots are no longer with the office, and new staff can bring new energy and renewed commitment. Training, processes and procedures, and overall organization have all been improved as well, but those things need further improvement to ensure readiness and success in the 2024 election cycle.

- The Fulton County Board of Elections and Registration is engaged and helping to drive those improvements. Replacing the board would not be helpful and would in fact hinder the ongoing improvements to Fulton County elections.

- The County Manager's Office in Fulton County has continued to be involved in planning, strategizing, and preparing for upcoming elections, which has positively contributed to improved execution of elections.

- Like election officials across the state, Fulton County elections staff show daily dedication and effort in carrying out and seeking to improve the administration of elections in Fulton County. Director level staff and the Fulton County Board of Elections need to ensure that staff has the necessary tools and guidance to ensure best practices and compliance.

- The Performance Review Board members individually donated hundreds of hours to this project and The Carter Center donated almost 4000 people hours. Both observations (which were conducted independently) noted significant improvement from the 2020 election, but both also noticed things that could use additional improvement, including further improvements to training and processes.

- The existence of the Performance Review helped incentivize Fulton County to make improvements to their elections, but it took an enormous amount of donated work, and it is difficult to see how it is a sustainable process that can continue to positively influence election administration in Georgia without some reforms. A positive, proactive, and periodic review process, appropriately funded, designed to support and assist all counties with election process improvements could be more effective than the performance review process in its current iteration.

- While the Performance Review Board has seen improvement in Fulton County elections since the 2020 election, further improvement is still needed to ensure readiness for the 2024 presidential election cycle. Presidential election cycles see more voters than midterms and take even more planning and preparation to ensure successful execution. Georgia will be a competitive state in next year's elections, so election preparation needs to recognize that

18

Fulton County's actions (and all counties in Georgia, for that matter) will be heavily scrutinized by political parties, campaigns, candidates, and activist groups. To ensure successful execution of the 2024 election, Fulton County should continue the improvements it has already embarked on and prioritize the areas for improvement noted in this report. Those areas are:

- More contextualized poll worker training
- Environment of order, organization, and control
- Compliance with State Election Board Regulation regarding ballot review
- Planning and Preparation based on capacity and execution
- Review polling place layout
- Compliance with Georgia law regarding sequestration during early tabulation

# EXHIBIT A

**BEFORE THE STATE ELECTION BOARD**
**STATE OF GEORGIA**

In the matter of:                                    *
                                                     *    **SEB Cases 2020-016**
**FULTON COUNTY BOARD OF**                           *    **and 2020-027**
**REGISTRATION AND ELECTIONS**                       *    **Fulton County**
**and RICHARD BARRON,  in his official**             *
**capacity**                                         *
                                                     *
Respondents.                                         *

## CONSENT ORDER

The State Election Board and Respondents Fulton County Board of Registration and Elections and Elections Director Richard Barron (collectively, "Respondents" or "BRE"), hereby enter into the following Consent Order for use in SEB Cases 2020-016 and 2020-027 before the State Election Board in lieu of an evidentiary hearing.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

The findings of fact and conclusions of law set forth in the following Paragraphs 1 through 9 have been asserted against Respondents. The SEB and the Respondents agree that there is no evidence of any willful misconduct but desire that the above-captioned cases be resolved in their entirety in order to avoid further litigation.   Respondents and the SEB acknowledge that there is evidence of a *prima facie* case supporting the following assertions and enter into this negotiated Consent Order to resolve the issues that arose leading up to and including the June 9, 2020 general primary.

### INTRODUCTION

The primary election in Georgia, originally scheduled for March 24, 2020 and eventually held on June 9, 2020, was monumentally challenging for election officials throughout the State of Georgia.  The combination of an unexpected pandemic and the fear of the unknown health

dangers the pandemic posed, the substantial increase in the number of voters (including the explosive growth in the number of absentee by mail voters), implementing new voting machines at the early voting and election day polling locations, and the number of contested races on the ballot – all of these converging factors led to hurdles that had never before been envisioned or encountered by election officials.  These challenges occurred throughout the State of Georgia, in fact, throughout the country.  Not a single county in Georgia was untouched by the pandemic and its consequences. However, the majority of complaints and issues arose from Fulton County.

Fulton County's June 9 primary election was beset with problems.  Historically long lines were experienced at polling sites. The voting machines were operated by poll workers who were not adequately trained.  Poll workers who were scheduled to work on election day (and who were trained) did not report for duty because of the fear of the danger posed by the pandemic. Some supplies and forms that were needed at polling locations were not delivered and in other cases, supplies were delivered, but newly recruited poll workers failed to find them.

The absentee ballot process was besieged with obstacles. Prior to the pandemic the Fulton County Department of Registration and Elections ("DRE")  had anticipated that there would be approximately 1,000 absentee ballots, based on prior election data, for the primary.  In actuality, 144,000 absentee ballots were requested by voters in Fulton County.  The DRE office was particulary hard hit by the pandemic. The Chief Registrar was hospitalized with COVID-19 and another employee passed away. This led to chaos in the absentee ballot process (voters could send emails, or letters, or faxes to request an absentee ballot) and the inability to record every single ballot request without mistakes. An unknown number of people who requested absentee ballots never received a ballot.

Through it all, however, the staff of the Secretary of State and the DRE and its staff worked tirelessly (and at personal risk) in an effort to overcome these unpredicted obstacles and to make sure that every person in Fulton County voted who wanted to vote and that the process functioned as well as possible.  In some ways, Fulton County achieved remarkable success.  In some ways it did not.

Ultimately, despite the best efforts of the state and the county, there were violations of the election code.  While neither the State Election Board nor the Secretary of State's office believes these violations were the result of malicious intent, the fact remains there were violations that resulted in voters not receiving an absentee ballot and there were violations that resulted in voters not being able to vote.  Countless voters experienced unacceptably long lines at voting locations.

The State Elections Board filed three separate notices of violations that occasioned hearings on August 27, 2020, September 3, 2020 and September 10, 2020.[1]  Following those SEB hearings, referrals were made to the Attorney General's office to further investigate some of the matters.[2]  Immediately thereafter, Respondents' counsel and representatives from the Attorney General's office and the Secretary of State's Office met to resolve these issues.  The goal was to reach a Consent Order that had one set of paramount goals: improve the process for the November 3, 2020 election as well as the absentee ballot and early voting process; anticipate the problems that will inevitably arise; plan to solve those troubles; and enhance the ability of the SEB and the State Election staff, BRE, and DRE staff to work together to achieve an election in November that is the envy of the rest of the country.  This Consent Order has been reached with that multi-faceted goal in mind.

---

[1] The three notices of violations are attached as Exhibits A1, A2, and A3.

[2] The SEB found probable cause to refer violations to the Attorney General for further investigation.  The specific violations that were the subject of the referral are listed in Exhibit B.

## SEB Case 2020-016

### 1.

The Secretary of State's office received more than 250 complaints from Fulton County electors that they requested absentee ballots for the June 9, 2020 general primary, but did not receive them. An investigation by the Secretary of State showed that of the approximately 254 complainants, 105 did not have their request entered into the Election Net ("ENET") system to generate the absentee ballot.

### 2.

The investigation further revealed that at least 107 of the 254 complainants who did not receive their absentee ballot did not otherwise vote in the election. However, because Respondents did not retain paper copies of the applications, there is no log or audit to verify the applications received by Respondents compared to what was entered into ENET. Therefore, the number of electors that were affected is unknown.

### 3.

Based upon the foregoing, there is sufficient evidence to show that there were violations of O.C.G.A. § 21-2-384(2) based on the failure to properly process absentee ballot applications received via mail and email or properly enter the requests into the ENET system.

## SEB Case 2020-027

### 4.

The Georgia Secretary of State received over 160 complaints regarding election-day issues in reference to the June 09, 2020, general primary in Fulton County. These complaints alleged that Respondents (a) failed to timely open polling locations; (b) failed to provide voting equipment accessible to individuals with disabilities; (c) failed to provide the necessary forms to

polling locations; (d) failed to adequately train poll workers; and (e) failed to provide sufficient equipment to polling locations. An investigation into these complaints by the Secretary of State's office showed sufficient evidence of the following violations of the Elections Code.

5.

There is sufficient evidence to show that at least 12 polling locations were not open and available for voting by 7:00 a.m. on June 9, 2020. Respondents' failure to ensure that polling locations were opened on time violates O.C.G.A. § 21-2-403.

6.

There is sufficient evidence to show that at least two polling locations were not equipped with at least one electronic ballot marking device accessible to individuals with disabilities. Respondents' failure to adequately provide this equipment violates O.C.G.A. §§ 21-2-379.21.

7.

There is sufficient evidence to show that Respondents failed to provide the necessary election-day forms to a majority of polling locations within Fulton County. None of these polling locations were provided with Recap Sheets, leaving poll officers unable to complete the Recap Sheets at the polling locations. There were also reports of polling locations receiving insufficient Numbered List forms, and inner and outer provisional ballot envelopes. Respondents' failure to provide necessary forms violates O.C.G.A. §§ 21-2-401 and State Election Board Rule 183-1-12-6b.

8.

There is sufficient evidence to show that Respondents failure to provide adequately trained poll managers and workers about election procedures. Based upon complainant statements and interviews with poll managers, Respondents did not provide adequate instruction to poll officers and workers in the operation of the new voting equipment, basic trouble-shooting,

set up of the equipment, proper power supply set up, and completion of new forms and closing procedures. Respondents' failure to provide adequate instruction of poll officers and workers violates O.C.G.A. § 21-2-99(a). As explained in the Introduction, the problem with educating poll workers was largely caused by the pandemic, reflecting the unexpected inability to conduct in-person training with the new equipment, coupled with the unexpected exodus of scores of poll workers who were fearful of the dangers of appearing at crowded polling locations.

9.

There is sufficient evidence to show that two precincts (Hapeville and Fairburn) did not receive the correct voting equipment on June 9, 2020, which caused substantial delay at those precincts. Respondents' failure to provide sufficient equipment to polling locations violates O.C.G.A. § 21-2-267 and State Election Board Rules 183-1-12-.09(2) and 183-1-12.11(c).

**ORDER**

10.

This Consent Order addresses and resolves all matters regarding Respondent in connection with SEB Cases 2020-016 and 2020-027.

11.

The State Election Board, having considered the particular facts and circumstances of this case, inclusive of the within and foregoing Findings of Fact and Conclusions of Law, hereby ORDERS that Respondents cease and desist from further violations of the Election Code. If the remedies that are encompassed in this Consent Order in Paragraphs 12(A) – (F), are implemented, there will be no reprimand issued by the State Election Board.

12.

The State Election Board further ORDERS the Respondents pay a civil penalty of $50,000, subject to the following: The State Election Board agrees to waive the civil penalty if

Respondents fully implement the following remedial measures for the November 3, 2020, general election ("Election Day"):

(A)    **Absentee Ballot Procedures.**

1.    Respondents agree to put in place sufficient resources and procedures with the goal of accurately processing all absentee ballot applications by the close of the next business day after the application is received. "Processing" the application means that the application is entered into ENET, the signature on the application is checked against other signatures on file, the application is accepted or rejected as appropriate (and such acceptance or rejection is entered into ENET), and, if accepted, the ballot (or provisional ballot if appropriate) is issued to the voter at the requested address. Personnel shall also be sufficiently trained in how to cancel absentee ballot requests in ENET and in the importance of entering those cancellations immediately upon receipt.

2.    Respondents agree to put in place sufficient resources and procedures to accurately process all returned absentee ballots by the close of business on the next business day after the ballot is received (but no later than 3:00 p.m. on the day after Election Day). "Processing" absentee ballots means the signature on back of the ballot is compared to the signature on the absentee ballot application or other signature on file, the ballot is entered into ENET as accepted or rejected as appropriate, and any required cure notification is sent to the voter if needed. All personnel processing absentee ballots shall be properly trained on how to reject absentee ballots that come in when the

absentee ballot request has been cancelled (i.e. when the voter has voted in person).

3. Respondents agree to put in place sufficient resources and procedures to fully utilize State Election Board Emergency Rule 183-1-14-0.9-.15 Processing Absentee Ballots Prior to Election Day so that all accepted absentee ballots can be scanned by the day after Election Day.

4. Respondents agree to put in place sufficient resources and procedures to fully utilize State Election Board Emergency Rule 183-1-14-0.8-.14 Secure Absentee Ballot Drop Boxes. Respondents agree to arrange for the collection of ballots from drop boxes at least once every 24 hours and to ensure that all drop boxes are properly closed, emptied, and secured at 7:00 p.m. on Election Day. Respondents further agree to process, as described in paragraph (b) all absentee ballots received from drop boxes by the close of business on the next business day after the ballot is received by the elections office.

**(B)    Poll Workers and Poll Worker Training.**

1. Respondents agree to have an available force of at least 2,200 poll officers, along with a sufficient pool of alternate, trained poll officers to fill unexpected absences.

2. Respondents agree to put in place sufficient resources and procedures to adequately train all poll officers and alternates. Such sufficient resources and procedures shall include, but not be limited to:

   a. Certification for each poll officer and alternate that they completed training.

    b.   Dedicated Poll Pad training, including proper steps to be taken when somebody who has requested an absentee ballot shows up to vote in person.

    c.   Dedicated training on proper setup, opening, shutdown, and ballot transfer procedures.

    d.   Dedicated training on all backup procedures (i.e. backup paper pollbooks, backup procedures for pulling up correct ballot on BMD, use of emergency paper ballots, and emergency bin in scanner) to ensure that voting does not stop during voting hours.

3.   Respondents agree to provide the State Election Board with weekly updates on total poll officers and alternates, training, and allocation plan of poll officers to polling places, including contingency plan for alternate poll officers for the November election, as well as any runoff election in this election cycle.

4.   Respondents agree to put in place a plan to provide for emergency allocation of poll officers on Election Day should they experience attrition or no shows.

**(C)**    **Advance Voting Locations.** Respondents agree to provide at least 24 fully-staffed advanced in-person voting locations. Respondents further agree to enter the fact that the voter has voted early into ENET at the time that the voter votes.

**(D)**    **Election Day Logistics and Polling Locations.**

1.   Respondents agree to provide no fewer than 255 polling locations on November 3.

2. For any polling location that was not previously inspected by the Secretary of State's vendor, Respondents agree to conduct an inspection for infrastructure, accessibility, and security.

3. Respondents agree to provide their plan for Election Day distribution of election equipment (*i.e.*, pollbooks, BMDs, polling place scanners) and poll officers to the Secretary of State's office no later than October 2, 2020.

4. Respondents agree to provide extra equipment and personnel to Election Day polling locations as identified by the Secretary of State's office after plugging Respondent's plan into the MIT Election Data Lab allocation tool.

5. Respondents agree to put in place sufficient resources and procedures (including quality control procedures) to ensure that each polling place has a sufficient amount of emergency/provisional paper ballots (at least 10% of active voters assigned to the polling place), paper backup pollbooks, and all required forms.

6. Respondents agree to staff each polling location with a dedicated staffer who is designated and properly trained as a deputy registrar. Such deputy registrar shall have access to ENET at the polling location and shall be dedicated to determining whether a voter's absentee ballot has been accepted if that voter show up in person, and if the absentee ballot has not been accepted, cancelling the absentee ballot request in ENET before allowing the voter to vote in person.

7. Respondents agree to put in place sufficient resources and procedures to implement a communications plan that allows effective and timely communication from poll officers and technical support personnel at polling

locations to the county elections office and for effective and timely response, including a plan to provide additional equipment or personnel to a polling place in a timely manner.

8.  Respondents agree to put in place sufficient resources and procedures to ensure effective line management at all polling locations, with the goal of processing 100 voters per hour at each voting location.

**(E)**   **Technical Support.** Respondents agree to have a dedicated technical support person located in every polling location on Election Day. Such person shall have completed technical support training provided by Dominion and such additional training as deemed necessary by Respondent.

**(F)**   **Audit Preparation.** Respondents agree to put in place sufficient resources and procedures to prepare for and complete a post-election audit, including proper ballot handling, ballot storage procedures, and preparation of a ballot manifest as specified by the Secretary of State's office.

13.

Respondents agree that the State Election Board may appoint an independent monitor who shall monitor progress and compliance with this Order. Respondents agree to fully cooperate with and give all required access to monitor. The monitor shall submit written reports to the State Election Board every seven (7) days from the Effective Date of this Consent Order, providing the status of the implementation of the measures detailed in Paragraph 12 above. The monitor shall be in place through certification of the January 5, 2021 runoff election. The monitor shall be compensated by Respondents for appropriate time spent gathering information and preparing reports at a reasonable hourly rate to be agreed to by Respondents, State Election Board, and monitor.

**(A)** The monitor who is appointed has no supervisory authority with respect to any employee of the DRE.  The monitor is only authorized to report progress on the remedial measures to the SEB and is required to provide prior notification to respondents of any report to the SEB that includes any notice of non-compliance. The monitor is not authorized to direct any person in Fulton County to perform some duty, or to refrain from performing some duty.  The monitor's responsibility is limited to issuing a report to the SEB on a weekly basis between now and the conclusion of this election cycle in January, 2021.

**(B)** If the monitor provides notice of any non-compliance, this will *not* serve as prima facie evidence of non-compliance and respondents will be provided an opportunity to respond and to correct any alleged deficiency.

**(C)** It is the intent of the parties in agreeing to the appointment of a monitor, that the monitor will assist Fulton County in the reporting about the remedial measures. The monitor will not only assist Fulton County reporting the progress relating to these remedial measures but will *also* alert the SEB and the state elections office to measures that the state can implement to effectuate these remedial measures and to assure the optimum election procedures that are possible.

14.

Respondents have been provided with a copy of this Consent Order and have acknowledged that they understand the contents. Respondents understand that they have a right to a hearing in this matter. Respondents knowingly and voluntarily waive such right to a hearing, as well as any other rights under the Georgia Administrative Procedure Act pertaining to notice and hearing for contested cases, by entering into this Consent Order.

15.

This Consent Order is entered in settlement of disputed matters, and the Consent Order entered herein is not to be construed as an admission of guilt or liability on the part of Respondents but is entered herein to resolve the referenced State Election Board cases. This Consent Order is a civil settlement and has no criminal ramifications.

16.

This Consent Order shall not become effective unless and until approved by the State Election Board. If not approved by and executed on behalf of the State Election Board, neither the stipulations nor any other part of this agreement shall have any binding legal effect whatsoever and shall not constitute an admission against interest or prejudice the ability of either the State Election Board or Respondents to adjudicate this matter.

17.

In the event of any conflict with any Performance Enhancement Plan (PEP) proposed by the Secretary of State's office, compliance with this Consent Order shall be deemed to be compliance with the PEP.

18.

In the event of force majeure outside Respondents' control, the State Election Board agrees that it will not assess the proposed civil penalty even if the remediations in this Consent Order are not fully remediated by the November 3, 2020 as long as Respondents exercise their best efforts to remain as compliant as possible with this Consent Order. For purposes of this paragraph, the COVID-19 pandemic, significant increase in voter turnout, and significant increase in absentee ballots shall not be considered a force majeure.

This _____ day of _____, 2020.

FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS

BY: *Mary Carole Cooney*

MARY CAROLE COONEY
CHAIRPERSON

Sworn to and subscribed
before me this 12th day
of October, 2020.

*Susan S. Beale*

NOTARY PUBLIC

> Susan S Beale
> NOTARY PUBLIC
> Fulton County, GEORGIA
> My Commission Expires 08/08/2022

RICHARD BARRON
ELECTIONS DIRECTOR

Sworn to and subscribed
before me this _____ day
of _____, 2020.

_____
NOTARY PUBLIC

Approved by the State Election Board this _____ day of _____, 2020.

STATE ELECTION BOARD

BY: _____

BRAD RAFFENSPERGER
CHAIRPERSON

- 14 -

Consented to:

FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS

BY: _____

      MARY CAROLE COONEY
      CHAIRPERSON

Sworn to and subscribed
before me this _____ day
of _____, 2020.

_____
NOTARY PUBLIC

_____
RICHARD BARRON
ELECTIONS DIRECTOR

Sworn to and subscribed
before me this _16_ day
of _October_, 2020.

_Mariska Bodison_
NOTARY PUBLIC
exp. 3-19-2023

Approved by the State Election Board this _____ day of _____, 2020.

STATE ELECTION BOARD

BY: _____

      BRAD RAFFENSPERGER
      CHAIRPERSON

- 14 -

# EXHIBIT B



# State Election Board Report – Post-Election Executive Summary
# Updated February 16, 2021

## Introduction

Seven Hills Strategies, LLC (SHS) has been contracted by the State Election Board (SEB) to serve as an independent, non-partisan monitor for the pre-electoral processes in Fulton County leading up to the November 3, 2020 general election and for any subsequent runoffs. SHS will observe absentee ballot request processing procedures, absentee ballot processing/scanning, early voting procedures, and actual ballot counting on Election Day and beyond. The goal of SHS is to identify areas of improvement and generate suggestions to ensure that Fulton County is adequately prepared to implement effective, efficient, credible, and code-compliant elections moving forward.

## Fulton County's Compliance with the Terms of Sec. 12 of the Consent Order[1]

In addition to this report on compliance with the terms of Consent Order, SHS believes that is necessary to share this observation: From October to January, I spent nearly 270 hours at various locations observing every aspect of Fulton County's election processes. At no time did I ever observe any conduct by Fulton County election officials that involved dishonesty, fraud, or intentional malfeasance. During my weeks of monitoring, I witnessed neither "ballot stuffing" nor "double-counting" nor any other fraudulent conduct that would undermine the validity, fairness, and accuracy of the results published and certified by Fulton County.

### A) Absentee Ballot Procedures:

1) Leading up to the Nov. 3 election, SHS had the opportunity to observe the signature matching processes for absentee ballot applications being processed both at Darnell Senior Center and at Fulton County headquarters. During the runoff, I was stationed at Georgia World Congress Center (GWCC) and was able to monitor the vast majority of signature matching for the weeks leading into the runoff.

SHS determined the signature matching processes to be in-line with the terms outlined in the Consent Order, and generally erred on the side of "give it further research" when there was any doubt about a signature's authenticity.

However, although most applications were being processed within 48 hours of being received, SHS found one ballot application at Darnell Senior Center that had been in Fulton County's custody for more than two weeks. Given the massive influx of applications and

---

[1] Throughout this report, the term "Consent Order" is used to refer to the Consolidated Consent Order for SEB Cases 2020-016 and 2020-027 that created the role of State Election Board Monitor.



ballots, it is not surprising that a few ballots might be left behind, but Fulton County must re-double their efforts in future elections to speed up processing times.

Additionally, SHS received multiple reports of absentee ballots being sent to the wrong addresses, which seems to be the fault of sloppy data entry by staff. Future staff trainings should underscore the importance of correctly entering the temporary/preferred addresses of all ballot applicants.

2) Although Fulton County allocated ample resources for absentee ballot processing leading into the Nov. 3 election, the processes themselves were extremely sloppy and replete with chain of custody issues as the massive tide of ballots bounced around the Fulton County Gov't HQ building.

The system, created by Ralph Jones, Registration Chief for Fulton County, seemed to function, but there were many processes that seemed to be *ad hoc* solutions to problems caused by a lack of organization or permanent staff with the expertise to manage the system in place. For example, the room which housed the team doing additional voter verification was also a temporary housing location for ballots between the mail room (which receives, opens, and records the numbers of ballots) and the ENET processing room. Staff in this room seemed to not understand the process, and Jones had to intervene to stop a temporary staffer from moving a pile of recently-accepted but unverified absentee ballots into the stack to go straight to State Farm Arena for scanning/counting. Had Jones not been there with me to catch this mistake, it is safe to assume that those ballots would've been counted as if they had been verified.

I observed an additional security issue here, as one staff member told me that people had not been signing out batches of ballots as they moved around the building in trays between processing rooms, which is a clear failure in the chain of custody mandated by the O.C.G.A.

Given the inefficiencies of this system and the volume of absentee ballots received, there was no way that Fulton County could possibly comply with the mandate to "process all absentee ballots by the close of business on the next business day after the ballot is received."

Despite the aforementioned deficiencies during the Nov. 3 election, Jones and his team were able to both streamline and improve processes for the Jan. 5 runoff. The Fulton County team migrated the entire signature verification process to the facility established at GWCC and for several days even attempted to do the voter credit step on-site before resolving to handle that at Pryor St. before bringing credited ballots to GWCC. Performing the entire process[2] linearly and in full view of the public was a tremendous improvement on the labyrinthine

---

[2] Voter credit → 1st pass signature verification with ENET → 2nd pass signature verification with RocketFile → Return RocketFile rejects to Pryor St for curing



SEVEN HILLS
STRATEGIES

system concocted for the Nov. 3 election. In my opinion, Fulton County clearly made available sufficient resources to handle the influx of ballots for the runoff.

3) SHS has not yet been able to conduct an audit to graphically represent the rate at which absentee ballots were scanned for the Nov. 3 election; however, my research indicates that the staff was able to scan fewer than 80,000 ballots in the period leading up to Nov. 3. Judging by final absentee/UOCAVA numbers (approx. 147k), in the 72 hours from 11/3 to 11/5, the staff were able to scan nearly 80 percent (approx. 67k) of that which they had scanned in the previous two weeks. Regardless of whether the bottleneck was in receiving the ballots, verifying the signatures, opening the ballots or scanning them, this rapid acceleration in scanning rate indicates that Fulton County failed to adequately utilize the pre-scanning period allowed by SEB Emergency Rule 183-1-14-0.9-.15.

The Jan. 5 runoff, however, was a stark dichotomy and a comparative great success. With the eyes of the world watching, Fulton County was able to report 106,117 absentee votes (the vast majority) on Election Day itself due to the diligent pre-scanning work by Fulton County staff. By the time that the operation was closed at 2 a.m., Fulton County had fewer than 5,000 absentee ballots left to process. This small remainder – all received from ballot drop boxes on the evening of Jan. 5 – is a testament to how hard the Fulton County team worked to comply with this item in the Consent Order.

4) Based upon a conversation with Captain M. McHugh, Fulton County Police Department, regarding the security protocols installed to ensure the protection of ballot drop boxes, I am confident that Fulton County's robust security architecture made it impossible to tamper with votes at ballot drop boxes.

Given the daily influx of new ballots to the GWCC facility, I believe that ballots were, in fact, collected each day as required by SEB Emergency Rule 183-1-14-0.8-.14. On Jan. 5, multiple shipments of drop box ballots were received at GWCC (one at 4:38 p.m. and another at 11:30 p.m.) after first being checked-in at the Pryor St. mail room. As far as I witnessed, Fulton County fully complied with this item of the Consent Order.

**B) Poll Workers and Poll Worker Training:**

1) Fulton County greatly exceeded the target number (2,200) of poll workers required for both the Nov. 3 general and January 5 runoff elections. Fulton County enlisted so many poll workers to account for any potential emergencies, attrition, or no-shows on Election Day.[3]

---

[3] N.B. This point also covers Section 12.B.4 of the Consent Order



| Indicator | Target | Poll Workers Assigned (11/3) | Poll Workers Assigned (1/5) |
|---|---|---|---|
| Dual Manager | | 81 | 81 |
| Manager | | 174 | 174 |
| Assistant Manager | | 510 | 510 |
| Line Manager | | 558 | 525 |
| Clerk | | 2,420 | 1,495 |
| Deputy Registrar Clerk | | 255 | 155 |
| Provisional | | 30 | 17 |
| **Total** | **2,200 + 560 alts.** | **4,028** | **2,957** |

2)   On October 28, 2020, SHS attended the four-hour Fulton County poll worker training at the North Annex Service Center. This training accurately and concisely reviewed all voting implementation procedures, how to use Poll Pads and other hardware, and the test at the end ensured that workers had actually learned the content.

A particular importance was placed on securing election materials and ensuring that all zip ties and numbered seal stickers are appropriately installed and recorded at the beginning and end of each day. In accordance with O.C.G.A Code, verifying the zero-count in the morning and recording the final count at the end of the day were also underscored, though there was no emphasis placed on the need to dually-sign these count receipts. Additionally, the trainer underscored processes for keeping voting open despite technological issues, stating that, "you can open the polls with one poll pad, one BMD, and one scanner; if you are not able to open at 7a.m., immediately contact Fulton County and see if you need to fall back to provisional ballots." The trainer also frequently repeated that "we do not turn voters away" to encourage poll workers to find a workable solution to any problems that may arise.

The sole training deficit that I recognized was regarding the Senate District 39 Special Election. While it was somewhat odd that a primary election would be taking place during a general election, this lack of knowledge was a failure to adequately train the trainers regarding this special election. This lack of knowledge was passed on to poll workers, which resulted in numerous complaints to SHS about a failure to offer voters the opportunity to participate in this special election.

3)   Fulton County was to provide the SEB with weekly updates on total poll officers and alternates, training, and allocation plan of poll officers to polling places, including contingency plan for alternate poll officers for the Nov. 3 election, as well as any runoff election in this election cycle. As these reports did not come to SHS, I cannot comment on this item.

**C)  Advance Voting Locations:**



1) Fulton County was required to have 24 early voting locations, but greatly exceeded this requirement in both the Nov. 3 general and Jan. 5 runoff elections.

| Indicator | Target | Nov. 3 | Jan. 5 |
|---|---|---|---|
| Early Voting Locations | 24 | 30 + 2 mobile + 7 outreach sites | 30 + 2 mobile + 2 outreach sites |

Both Fulton County staff and poll workers could have done a better job ensuring that ENET records were kept up to date. Failure to keep accurate records of whether a voter had voted yet led to a great deal of confusion at the polls during both the Nov. 3 general and the Jan. 5 runoff as well as concerns of widespread voter fraud. Some human error is to be expected, but Fulton County must strive to reduce the number of these instances.

**D) Election Day Logistics and Polling Locations:**

1&2) Fulton County was required to have 255 voting locations for Election Day, and met this requirement in both the Nov. 3 general and Jan. 5 runoff elections. It is also worth noting that Fulton County established 91 new polling locations for this election cycle to meet this goal.

| Indicator | Target | Nov. 3 | Jan. 5 |
|---|---|---|---|
| Election Day Voting Locations | 255 | 255 | 254 |

3) Fulton County was to provide the SOS with their plan for Election Day distribution of election equipment and poll officers no later than October 2, 2020. As these plans did not come to SHS, I cannot comment on this item.

4) On October 29, Rick Barron shared early voting turnout data with the Gabriel Sterling, Chris Harvey, and Blake Evans from the SOS' office. Sterling ran the modeling through MIT's Election Data Lab allocation tool, and shared the results with Barron. Complying with this term of the Consent Order, Barron then re-programmed Poll Pads and redirected election materials to buttress any weaknesses revealed by the data model.

5) At no point during either the Nov. 3 election or Jan. 5 runoff election did any polling unit run out of emergency/provisional paper ballots, paper backup pollbooks, or required forms. In January, three polling units (all served as both early voting and Election Day locations) received re-supply from headquarters but never ran out of materials.

6) During the Nov. 3 election, Barron negotiated with the ACLU to provide 255 deputy registrars to use ENET to cancel absentee ballots. During the runoff, this task was performed mainly by a smaller number of non-ACLU deputy registrars. SHS received no complaints



during the runoff about unnecessary wait times related to not having additional dedicated deputy registrars.

7) Fulton County established three call centers with a combined staff of more than 100 people to answer questions from poll managers during Nov. 3 and Jan. 5. My poll worker training encouraged me to call the hotline if any problems arose while voters were casting their ballots.

8) After 9:30 a.m. on Nov. 3, no polling precincts in Fulton County had a wait time greater than 30 minutes. The same was true for the entirety of voting on Jan. 5. Both of these should be seen as tremendous victories for the Fulton County team, as they had allocated sufficient staff, resources, and procedures to ensure that all voters were able to cast their ballots quickly regardless of where they lived in the county.

**E) Technical Support:**

1) Fulton County trained 255 technicians for the Nov. 3 election, and additionally ensured that each early voting site also had a dedicated tech aside from State Farm Arena, which had five techs on-hand to manage their large number of BMDs. For the Jan. 5 runoff, Fulton County trained 254 technical support experts, but 22 did not report for work on Election Day for one reason or another.

**F) Audit Preparation:**

1) Fulton County's document retention processes at State Farm were adequate for protecting ballots from tampering and the system of marking boxes with scanner number, batch number, and date made it much easier to process during the forthcoming audit and recount.

2) Risk-Limiting Audit (RLA)

- The scale to which Fulton County prepared for the RLA was staggering. With a maximum of 174 teams of two processing ballots by-hand, Fulton County completed the RLA more quickly and accurately than anyone had anticipated. It is a testament to the team's leadership that they were able to keep feeding the processors while keeping accurate records.

3) Recount

- As with the RLA, Fulton County aggressively tackled the Recount and initially seemed as if they would complete their recount more quickly than estimated. However, failure to comply with approved technological procedures led to a server crash and significant, costly delays that required the Fulton County team to completely rescan all ballots once



again. Additionally, during the fourth count (the second lap of the recount), sloppy document storage procedures led to confusion as box labels no longer had precinct names and batch numbers on them but instead all said "ELECTION DAY." This mistake therefore made it difficult to ascertain which ballots had been missed while trying to solve the second technical issue that resulted from accidentally naming two scanners "ICC 16" during the fourth count. Until this point, proper ballot handling, storage, and manifest procedures had been observed.

## Appendices

- Appendix A – Challenges and Recommendations from the Entire 2020 Election Cycle



# State Election Board Report

# Appendix A - Challenges and Recommendations from the Entire 2020 Election Cycle
# Updated February 16, 2021

## I.    The Pre-Election Period

- COVID-19 preparedness was obviously on the forefront of Barron's mind. He and his team had taken a multitude of steps to ensure that everyone was safely fulfilling all required duties in the lead-up to Election Day, but the virus had taken a heavy toll on the permanent staff leading the warehouse team. This caused several pivots and logistical changes to protect the staff, but there was still concern that a team of new players would be able to handle the tremendous workload as seamlessly as the high stakes of this election required. SHS learned that the SOS office offered vendor support to mitigate the breadth of the COVID outbreak, but this was offer was declined by Fulton County.

- SHS received multiple reports that Fulton County was slow to update MVP and give voters credit for having voted by absentee ballot (both mailed in and deposited in a drop box). It was imperative that - as the Consent Order[1] mandates - the BRE keep accurate and up-to-date records about who has voted in the publicly-visible portals lest they face double voting problems.  Reports have shown that this problem has affected both absentee and early voters, so the problem was bordering on systemic.

- Additional training should be done regarding O.C.G.A. § 21-2-381(a)(1)(A-G) pertaining to relatives or helpers filling out the absentee ballot for their temporarily out of state, disabled, or elderly voters. SHS witnessed multiple staff having difficulty deciding how best to handle family members and helpers requesting absentee ballots for others.

- SHS has received a multitude of reports of absentee ballots being sent to wrong addresses even though alternate/secondary addresses were provided or already on file. One notable case being from a servicemember currently serving out-of-state who felt disenfranchised by Fulton County's inability to properly process his absentee ballot request. As witnessed at the Darnell Senior Center, the data entry for processing absentee ballot requests can be burdensome, but each entry much be triple-checked for accuracy to avoid careless mistakes like this.

- On 10/23, SHS saw one absentee ballot request dated 10/07. While this was a lone outlier and the vast majority of the ballot requests seen were dated 10/21, Fulton County must ensure that all absentee ballot requests are processed in a timely manner.

- In his press conference on 10/22, Barron stated that there was no wait time difference between the early voting locations in the north and south parts of the county; however,

---

[1] Throughout this report, the term "Consent Order" is used to refer to the Consolidated Consent Order for SEB Cases 2020-016 and 2020-027 that created the role of State Election Board Monitor.



anecdotal accounts have said that there have been long wait times in the Alpharetta/Johns Creek parts of the county.

- The Senate District 39 special election was a persistent source of confusion for both voters and poll workers. During SHS' poll worker training, a trainee asked about the Senate District 39 Special Election ballot and when to offer that to voters.  The trainer said, frankly that "I don't know anything about this," and told her to ask her poll manager.  While it is somewhat odd that a primary election will be taking place during a general election, this lack of knowledge is a failure to adequately train the trainers regarding this special election. This lack of knowledge was passed on to poll workers, which resulted in numerous complaints to SHS about a failure to offer voters the opportunity to participate in this special election. That deficiency should be corrected in the event that this occurs in the future. SHS suggests that to fix this, Fulton County consider pivoting to an "opt out" instead of an "opt in" policy for these types of elections so that all voters may participate regardless of whether or not they are aware of the race.

- There were myriad problems with the absentee processing system at Fulton County Government Headquarters, including:

  - Failure of staff to understand the process of moving ballots around the office
  - No chain of custody forms being used as ballots move from room to room
  - Mask-optional policy putting essential staff at unnecessary risk for COVID
  - Failure to sufficiently protect spoiled and rejected ballots in the mail room

- While touring the mail room at Fulton County Government Headquarters, SHS saw many ballots set to be cancelled because they were returned to drop boxes without the yellow exterior oath envelope.  It should be stressed more clearly to voters that they must precisely follow all the instructions on the absentee ballots and return both envelopes if they want their vote to be counted.  Since it is impossible to update the MVP of "naked" ballots when they are processed, it is likely that some of the complaints that the SOS office received about a failure to record ballots deposited at drop boxes were due to the fact that voters failed to correctly follow the necessary protocol.

- While there was a large focus on the "Know Before You Go" Campaign and encouraging voters to use the FultonVotes App to notify voters that their precincts may have changed, it is concerning that SHS has received a report that Fulton County waited until 5:51pm on October 26 to mail 169,714 postcards notifying voters of changed precincts.  SHS received complaints that Fulton County was "suddenly changing polling locations without notice."  It would have been prudent to send these notifications earlier so that the news did not surprise people already making plans for in-person voting on Election Day.

- On October 29-30, widespread power outages resulting from Tropical Storm Zeta forced seven polling precincts to close on 10/29 and two to stay closed on 10/30.  This unanticipated closure surely had a negative impact on turnout numbers as early voting came to an end on 10/30, but there was very little that the BRE could have done to avoid this.  In fact, it seems that they handled the crisis well by deploying the two mobile voting centers to the downed precincts to help manage the flow of voters.



- On October 26, the ACLU raised concern that the Fulton County office was sitting on 1,500 voter registrations that for all intents and purposes seemed to voters to have gone missing.  It took two days before SHS was able to get an update from Ralph Jones, who said that there were indeed 1,500 remaining voter registrations awaiting processing and that they would be finished by the end of 10/28. This is cutting it far too close to actual Election Day for new voters who are likely unsure of the process.  These voter registrations should have been processed weeks ago.

- It was brought to the attention of SHS that Fulton County has been using an outdated version of Easy Vote to check in voters and keep ENET records up to date.  All software used must be updated to benefit from the latest bug and security patches.

- Fulton County has leaned very heavily upon an army of temporary workers to fulfill the litany of tasks that must be completed from logistics to processing ballots to scanning final results.  It would perhaps be best to offset this number of workers with stakeholders from the local community who would like to get involved in the electoral process.  By conducting multiple interviews with temporary staff, it was made clear that some have no keen interest in participating in this immensely-important process, which is perhaps to blame for some of the sloppy clerical errors and logistical shortcomings that have plagued the complicated electoral process.  However, others (particularly those scanning at State Farm) are the glue that holds the entire process together.  It is the opinion of SHS that several of these leaders should be hired full-time if the budget allows.

## II.   The November 3 General Election

- The 4-BMD unit transporters are not ADA-compliant if used for duplicating ballots.  People must stand for hours to duplicate and the screens are too tall to sit and operate.  One of the Fulton County staff has a bad knee and uses a cane.  She was saying that her knee was hurting but she needed to keep working.

- The truth about what happened on the night of November 3rd between 10:30PM and 11:52PM continues to be elusive.  GOP party poll watchers say that Fulton County staff told them and the media to go home (implying that they did so in order to count without supervision).  Fulton County staff tell me that the poll watchers and the media just left when Moss sent home everyone but the scanner team. A SOS investigator is involved, so the truth will come out, but if the party poll watchers are correct, then there is a serious problem.

- There were persistent chain of custody issues throughout the entire absentee ballot processing system.  Aside from the problems with the system at Pryor St (see executive summary report), the fact that ballots were being delivered to State Farm Arena in unsecured mail carts is very concerning.  Protocol for securing ballots exists not only to protect the ballots themselves but also to ensure that no ballot box stuffing occurred.  This problem was exacerbated by poor managerial processes by Ralph Jones, who failed to do intake counts for the provisional ballots.  Similar problems seem to exist at the



warehouse as well (e.g. poll pads for SC11). Fulton County must bolster these processes to retain faith in their process.

- The entirety of events on Saturday, Nov. 7 was plagued by the mismanagement issues.  If there had been a clear process on Friday, then perhaps that mess may have been avoided, but the fact that no one verified the number of provisional ballots either at intake at State Farm or at adjudication is concerning. Therefore, there was a possibility that 1) not all provisional ballots made it to State Farm or that 2) some were missing because they never did an intake count. It turned out that both were true. If Santé had not gone back into the office to look up her file on provisional ballots, what would have happened to the 17 ballots that remained at Pryor St?

- The process for equipment delivery at the warehouse is in desperate need of an overhaul. SHS concurs with Barron that a digital check-in/out system would make the logistical job much smoother. Monday evening was far too chaotic for an operation of that size, and in the disorder, many mistakes were made that just caused more trouble for a team that was already underwater. As a result, SHS has received multiple complaints about a lack of sufficient numbers of ballot bags making it to precincts, which led to a chain of custody issue before tabulation. Additionally, SHS caught wind of missing CFs (e.g. Palmetto) after Election Day that had likely been misplaced due to inadequate check-in processes.

  - Furthermore, if Fulton County implements a new digital system, it must be used by both the poll managers and the Fulton County staff.  The fact that a poll tech was able to show me that 157 polls were still "open" in Fulton County's backend demonstrates that they were simply not utilizing a tool that they either developed or purchased. Working partially from two systems is a fantastic way to forget mission critical materials.

- Staff not using correct terminology caused confusion on multiple instances, including for this monitor attempting to audit Fulton County's data. In pre-election reports, Fulton County reported that they had "processed and scanned" 127k ballots.  The term "processed" was used multiple times and by different teams, which indicates organizational silos and led to confusion because SHS thought that "scanned" meant literally scanned instead of having the barcode read and processed through MVP.  In actuality, few ballots had actually been scanned in the pre-election period.

  - This same problem was evident when a staffer told SHS that ballots had been "found" instead of "cured."  It is a distinction with dire consequences.

- The entire Fulton County team must be more aware of the optics of their actions in such a high-scrutiny environment.  It was a judgment call, but I still think that bringing ballots in through the back door on 11/5 was the wrong call for transparency purposes. It would have ignited a media firestorm if the Fulton County team had not immediately held a press conference afterward.  By far the worst maneuver for optics occurred on Saturday in using the OPEX cutters to count ballots.  Aside from being slower than counting by hand, this gave the impression to everyone (myself included) that they had found more ballots after the deadline.  I personally had to talk to the media and the party poll



watchers, who were all understandably concerned by what was appearing to happen, to tell them that those were empty ballots being counted.

- In the "Provisional Ballot Recap Notice," Fulton County stated that 1,205 people were "Not found in Express Poll, researched and found to be registered in Fulton County, U.S. Citizens, and ballot not challenged." Why were that many people not in the Fulton County system and required to vote provisional?

- The OPEX scanners require constant re-calibration.  The machines being out of calibration and failing to operate properly generated more work for workers that were already exhausted and stretched thin.  Fulton County should either insist that OPEX techs remain available for service calls during election crunch time or dispatch a large number of letter openers to vote processing centers as a backup plan for the inevitable failure of the technology.

## III.   The Risk-Limiting Audit

- There were persistent chain of custody issues throughout the entire RLA process. From ballots being left unattended in front of party audit monitors to unsealed bags being transported for storage to zip tie seals being left unattended to not recording the seal numbers placed on the ballot bags, Fulton County's system is plagued with these procedural issues. They must strengthen their chain of custody systems to follow the strict guidance in the O.C.G.A. code given the (inter)national significance of the processes happening here.

- Additionally, regarding proper seals, Fulton County staff complained that the stickers provided by the Secretary of State's office for sealing cardboard boxes do not stick to tape and cardboard. I even noticed a few that had just fallen off boxes of absentee ballots. Would it be possible to change vendors for these stickers and provide counties with something more robust?

- Transparency is of utmost importance, and the party audit monitors are completely necessary, but the parties must strengthen their vetting procedures for their monitors, train them on the process they are observing, and brief them on their roles. Furthermore, it is my suggestion that repeat offenders who show a frequent disregard for the rules should be barred from serving as monitors again.

- Fulton County was initially slow to report their numbers into Arlo because they only had one login. Then, to catch up they overcompensated and assigned too many staff to work on data entry. Is it possible to split the difference and provide Fulton County (and the other large population counties) with more Arlo logins from the beginning? Fulton County leaders were complaining that they should have more than the one they were initially assigned so that they could better manage the workload.

- There was a clear training deficit for auditors working through the new audit process. For future RLAs, additional guidance should be provided about how/when to use the manila



envelopes, what constitutes clear voter intent (checkmarks, bubbles, or x's), and large number batch counting best practices to remove as much confusion as possible from the audit process.

- Following the procedure detailed in the training video, audit teams quickly ran out of envelopes for write-ins, under-votes, undecideds, etc. It is imperative that the Fulton County team have a back-up supply of these envelopes for the next RLA so that their team does not have to scramble to help those working according to official procedure.

- Some of the precinct batches (particularly for early voting) were massive (3,500+), which increase human error due to fatigue as well as call into question the policies regarding leaving the audit table for necessary bathroom and food breaks. Is it possible to split batches larger than 1,500 to mitigate these issues if proper ballot manifests are kept?

## III.  The Recount

- Cardboard seems to be an insufficient storage method for document retention. Glancing at the boxes, it is clear to see that many of them have been crushed by the weight of the other boxes on the pallets upon which they were loaded. Additionally, the leak at State Farm Arena – though certainly anomalous – revealed the necessity for a more robust and potentially waterproof system for document retention.  SHS recommends using plastic storage bins instead of cardboard for future election cycles.

- Generally poor records keeping led to a multitude of procedural problems for Fulton County throughout the recount process.  The poor managerial decision at the Fulton County warehouse to reclaim ballot bags for then-upcoming December runoff and mix ballots of different types (e.g. early voting and Election Day) together for "deep storage" required additional rounds of scanning during the recount because the wrong ballots were scanned on two separate occasions.
    - In contravention to what they had done on Count 3 (during which they labelled all Election Day boxes with the precinct numbers on outer labels), all of Count 4's Election Day ballots were simply being placed in boxes marked "ELECTION DAY" but with no precinct information visible on the outside. This became a problem later when they had to retrieve particular batches because they had been overlooked during scanning.  This may have produced a chain of custody issue at the end as two Fulton County leaders were sending out individual ballot batches instead of full boxes to make sure that each batch contained only Election Day ballots as expected. They were careful to correctly complete the coversheets for each batch, but it would not be difficult for a batch to be forgotten or fall to the wayside as it changed hands.

- Transparency is of utmost importance, and the party monitors are completely necessary, but the parties must strengthen their vetting procedures for their monitors, train them on the process they are observing, and brief them on their roles. Furthermore, it is my suggestion that repeat offenders who show a frequent disregard for the rules should be



barred from serving as monitors again.  Throughout the time at GWCC, the party monitors flagrantly disobeyed guidance from Fulton County staff and GWCC police regarding the mask policy and taking photos/videos of the procedure. One monitor even yelled, "THIS IS TREASON UNDER PENALTY OF DEATH!" in the face of a Fulton County manager who was simply trying to check his party monitor credential – which he turned out to not have – for sign-in.

- SHS had received reports of several unsealed ballot bags, and hunted down the bag numbers to investigate. SHS found four unsealed ballot bags that were clearly marked with zero counts on the exterior labels. For future best practices, it is encouraged that staff seal every ballot bag regardless if it's empty to mitigate accusations of "magic ballots" appearing from thin air.  Additionally, if ballot bins are empty, it is a good idea to place the tops in them so that it is clear to monitors that the box is empty and is not an unsealed ballot bin.

- Technological issues abounded during the recount. The server crash on November 29 was a costly error caused by a failure to properly follow protocols for backing up and uploading data to the servers.  This mistake cost Fulton County taxpayers several days' worth of staff time as the entirety of the ballots had to be rescanned for a fourth time. Additionally, the small typographical mistake of accidentally naming two scanners "ICC16" on the fourth count led to a great deal of confusion and another full day of staff time for solving the problem.  Fulton County technological team must work more slowly, carefully, and in accordance with all protocol to ensure that these mistakes do not happen in the future.

## V.    The Jan. 5 Runoff Election

- When it comes to communicating with monitors, it is encouraged to keep comments short and to the point without much editorialization.  Early in runoff proceedings, Ralph Jones had a good faith conversation with several GOP monitors, one of which had declined to sign the sheet that said he would not record in the processing center.  It turned out that that gentleman refused to sign because he was, in fact, wearing a recording device, and recorded Jones' answers to his question without Jones' knowledge. These monitors then submitted an eight page complaint to the SOS quoting long passages from their nearly 45 minute conversation.

- Monitors were very concerned about compact flash memory cards being left in scanners in the L&A side of the warehouse. Additional training regarding election security protocol is required to mitigate alarmist fears that these memory cards are arriving at precincts pre-loaded with votes.

- Parties must fully brief monitors on their role and the appropriate limit of their duties. Multiple monitors told me that they had been recording the license plates of the staff that parked in the deck as well as on the L&A side of the warehouse as "evidence."  This seems like a massive invasion of the privacy of the election workers. It is recommended



that Fulton County put pressure on the county wings of political parties to have greater accountability for the actions of the people to whom they provide monitoring credentials.

- Fulton County was having an accuracy problem due to the data entry required to verify the signatures on received ballot envelopes. In order to improve both speed and accuracy it is recommended that Fulton County provide barcode scanners to all signature verifiers in the future.  These scanners allow workers to go directly to the correct voter page in ENET without  worrying about typographical errors.  This system was deployed with great success during the second half of the runoff.

- Fulton County staff must be careful to accurately enter data into ENET. SHS received several reports of voters receiving multiple absentee ballots (N.B. not ballot applications) during the runoff.  Additionally, there were widespread stories of voters showing up at the polls and being told that they had already voted. Taking voters' claims of not having voted at face-value and as the entire system is built to catch double voting, the only logical explanation for this problem is that an election worker incorrectly pulled voter information in ENET at some point. Extra training on ENET accuracy must be conducted in future elections.

- While I vehemently disagree with the assertion that proximity is tantamount to transparency, it would have alleviated a great deal of stress on Election Day if Fulton County had initially provided more access to the party monitors. The floor was set up to allow more access, but the potential of the "cattle calls" was not utilized until it became a necessity. Additionally, SHS suggested that the blue barriers be removed from the UOCAVA duplication station on 12/30, but my suggestion was not followed for the worthy cause of ballot security. Unfortunately, the perceived lack of transparency led to a court order that immensely disrupted Election Day processes. If Fulton County had more actively allowed monitors to approach election processes, then it would have been easier for them to see that Fulton County had absolutely nothing to hide. The resultant overcompensating backlash left many staff fearing for their personal safety due to monitors violating the photography rules, staff receiving threats on social media, and astoundingly poor mask hygiene by monitors. Furthermore, the increased access to the ballot cage generated a considerable ballot security concern due to the proximity of partisan monitors to ballots being processed.

- A persistent impediment to continued processing was the rate at which ballots were transported from Pryor St to GWCC.  While most days that can be attributed to sending all ballots that they had received, on Election Day there must be a faster turnaround. Though three ballot bins had been delivered at 7:04PM, it was not until 11:30PM on Jan. 5 that five bins arrived at GWCC from the 7pm collection of ballot drop boxes.  At that point most of the election staff had already gone home due to a lack work, but the massive tide of ballots to be processed made it impossible to finish processing in its entirety on election night. If the Fulton County team had dispatched the ballots sooner – even in smaller batches – then perhaps everything could have been finalized on Election Day.



This same problem was repeated on Friday, Jan. 8. The tremendous GWCC team had waited all day for provisional ballots to arrive from Pryor St, but it was not until 3:47PM that four ballot bins were delivered. A large portion of the staff clocked out at 4:30PM, but the remaining team was left working until 8:15PM to handle the workload while shorthanded. This could have been mitigated by sending smaller batches of ballots as they became available.

# EXHIBIT C

# 2022 General Election Observation: Fulton County, Georgia

Prepared by The Carter Center for the Fulton County Board of Elections and Registration and the Georgia State Election Board's Performance Review Board on Dec. 15, 2022.



THE
CARTER CENTER

## Table of Contents

Summary and Key Takeaways ................................................................................................3

Background and Context on the Carter Center's Fulton County Observation ........................4

Observation Methods ............................................................................................................5

    Observer Recruitment and Training ..................................................................................6

    Polling Place Observer Deployment/Coverage .................................................................6

    Data Collection ................................................................................................................7

Observations on Voting (Oct. 17 – Nov. 8, 2022) ..................................................................7

    General Atmosphere ........................................................................................................7

    Voting Locations .............................................................................................................7

        Accessibility of Voting Locations ...............................................................................8

        Signage and Campaigning Outside the 150-foot Boundary ..........................................8

    Lines ...............................................................................................................................9

    Staffing .........................................................................................................................10

    Poll Openings ................................................................................................................11

    Voting Operations .........................................................................................................12

        Check-in processes ...................................................................................................12

        Voting ......................................................................................................................12

            Nonstandard Processes ........................................................................................13

        Accessibility of Voting Procedures ...........................................................................13

        Closings ...................................................................................................................13

        Transparency and Observer Access ...........................................................................14

    Other Observations of Note ...........................................................................................14

        Wrong Locations ......................................................................................................14

        Voter Credit Error .....................................................................................................14

The Runoff ..........................................................................................................................15

Internal County Operations ..................................................................................................16

    Absentee ballot applications ..........................................................................................16

    Absentee Ballot Processing ...........................................................................................16

    Election Night Drop-off .................................................................................................17

    Early Tabulation & Sequestration ..................................................................................17

    Results Reporting ..........................................................................................................18

Risk-limiting Audit .............................................................................................................18

    Audit Premises ..............................................................................................................18

    Training for Audit Boards ..............................................................................................18

    Vote Review Panels ......................................................................................................18

    Data Entry ....................................................................................................................18

Conclusion ..........................................................................................................................19

Appendices ..........................................................................................................................19

## Summary and Key Takeaways

The Carter Center, which has observed more than 100 elections in 39 countries since 1989, was invited by the Georgia State Election Board-appointed Performance Review Board (PRB) and the Fulton County Board of Elections and Registrations (BOER) to observe the Nov. 8, 2022, general election. This observation fell under the framework of the performance review provisions of a state law known as SB202. Although this observation was conducted at the invitation of both the Performance Review Board and the Fulton County Board of Elections and Registration, The Carter Center conducted its observation as an independent organization, and the conclusions herein are its own.

Carter Center nonpartisan observers collected firsthand data on early voting and election day processes, as well as processes within the Fulton County election offices. This report summarizes the findings of The Carter Center and is intended to assist Fulton County in the continued improvement of its election administration processes and to inform the report of the Performance Review Board as it completes the performance review of Fulton County.

Based on its observation of the November 2022 general elections, The Carter Center considers Fulton County to have successfully implemented the key aspects of the elections that it observed. Within the parameters of its observation efforts, The Carter Center did not observe any election administration irregularities that would call into question the ability of the Fulton County Department of Registrations and Elections to administer secure and accessible elections for the citizens of Fulton County. Indeed, the Center noted that the Nov. 8, 2022, election showed many improvements in Fulton County's election administration practices compared to those noted during 2020.[1] Election workers paid particular attention to reconciliation processes, quality assurance checks, and security measures like chain-of-custody documentation, which made a marked improvement on the overall trustworthiness of the election.

Recognizing that Fulton County strives for continuous improvement of its election administration processes, The Carter Center offers the following summary of our observations and recommendations for future elections:

***Contextualized Training for Election Workers:*** Carter Center observers noted that Fulton County election workers are generally well-trained, as demonstrated by the effective and consistent implementation of most procedures.  While some variation in the application of procedures is to be expected given the temporary nature of the workforce, this can be minimized through poll worker training that not only focuses on the steps of the process, but also helps workers understand the big-picture "why" of what they are doing. At times, it seemed that election workers didn't have a full understanding of the importance of particular administrative steps (checking seals, for example, or providing provisional ballots) to the overall security and accessibility of the election. A better understanding of how each step in the process fits into the multiple layers of safeguards could ensure more consistent application.

Training should also emphasize the following procedures:

- Announcing each step of the opening and closing processes, particularly for ballot security and chain-of-custody steps, to enhance transparency and public confidence;
- Optimal placement of voting equipment containers to ensure ballot secrecy;
- Processes associated with nonstandard situations (e.g., provisional balloting or challenged voters);
- Pulling seals tight and immediately recording seal numbers; and,
- Reminding voters to check their paper ballots before placing them in the scanner.

---

[1] Seven Hills Strategies, LLC (SHS) was contracted by the State Election Board (SEB) to serve as an independent, nonpartisan monitor for the pre-electoral processes in Fulton County leading up to the Nov. 3, 2020, general election and January 2021 runoffs. The report from that observation can be found here: https://www.documentcloud.org/documents/20484973-fulton-county-state-election-board-report (accessed Dec. 10, 2022).

- Training audit boards on the proper procedures before beginning the risk-limiting audit, ideally in the presence of observers.

***Staffing:*** Overall, Carter Center observers reported that Fulton County staff and temporary election workers were enthusiastic, took their roles seriously, and wanted to provide voters with a good voting experience. The Carter Center notes that Fulton County met its staffing needs to administer the election, although the Thanksgiving holiday made it more challenging to recruit for advance voting for the Dec. 6 runoff election, as did confusion over whether Saturday voting would be allowed. Despite a long voting calendar that took its toll on election workers, Fulton County staff demonstrated a deep commitment to the process and the voters of Fulton County.

***Voter Education about Voting Locations:*** On election day in both November and December, Carter Center observers noted many instances in which voters showed up to vote at the wrong voting location. In some cases, this resulted from confusion about the difference between voting during advance in-person voting (at vote centers) versus election day (at assigned precincts). In others, it appeared to be the result of changes to voting locations following redistricting. Fulton County mailed voters information about their correct voting location, but The Carter Center suggests that more be done by the county, the political parties, and others who conduct voter education to encourage voters to check their voting location in advance of going out to vote on election day.

***Runoff Advance Voting Locations and Check-in Processes:*** During advance voting for the Nov. 8 elections, Carter Center observers generally reported smooth and efficient voting processes and short wait times. Advance voting for the Dec. 6 runoff, however, was characterized by wait times of over an hour. A number of factors likely contributed to the length of the lines (see below for additional detail). Going forward, the Center recommends that Fulton County open additional advance voting locations and have additional check-in stations inside early-voting locations for federal and statewide runoffs to facilitate faster movement of voters through the process.

***Standard Operating Procedures:*** As Fulton County Registrations and Elections moves into its new facility in 2023, The Carter Center encourages the department to take the opportunity to revisit and update its standard operating procedures to help ensure consistency in procedure implementation. This was a priority already identified by the Fulton County Department of Elections for 2023.

***Sequestration During Advance Vote Tabulation:*** Sequestration rules for early tabulation, governing the practice of restricting movement and communication of persons who could have knowledge of early vote totals prior to close of polls, were not effectively enforced during the Carter Center's observation. While we have no reason to think this affected the election, once Fulton County's purpose-built election space is complete next year, a dedicated space to sequester staff and observers should be made available for this purpose. Elections staff should also be trained to enforce the rules directly, rather than relying on temporary security staff.

## Background and Context on the Carter Center's Fulton County Observation

In August 2021, in response to a request from the Georgia General Assembly, the Georgia State Election Board appointed a Performance Review Board (PRB) to conduct a performance review of the Fulton County Board of Elections and Registration (Fulton BOER) pursuant to OCGA § 21-2-106. The duty of the PRB is to make a thorough and complete investigation and issue a written report of its findings to the Secretary of State (SOS), the State Election Board (SEB), and the local governing authority that shall

include such evaluations, judgments, and recommendations as it deems appropriate. See OCGA § 21-2-106.

As part of the performance review process, the PRB conducted interviews of Fulton BOER staff and observed election processes, absentee ballot processing, early voting, and election day voting. To fulfill its duties under Georgia law, the PRB wanted to conduct further observation and analysis during the November 2022 general election in Fulton County. This observation effort would allow the PRB to complete its report by the end of the 2022 calendar year.

Recognizing the Carter Center's decades of experience with independent and impartial analysis of elections and election observation, the PRB, SEB, and Fulton BOER agreed that the Carter Center's independent and objective analysis would be beneficial to all parties within the framework of the ongoing performance review. To that end, and at the invitation of the PRB and Fulton BOER, The Carter Center agreed to conduct independent, nonpartisan observation of the Nov. 8, 2022, general election. This invitation was formalized in a memorandum of understanding (MOU) that was entered into on Oct. 13, 2022, following a 4-1 vote of approval by the Fulton BOER.

The Carter Center did not conduct this observation on behalf of the PRB, SEB, or Fulton BOER; this report makes its observations and analysis available to the PRB so that additional independent and objective analysis can inform the PRB's report to the SEB.

Under the MOU (see Appendix 1), the Carter Center's specific scope of work for this observation effort included observation of early voting, election day polling places, and procedures at the Fulton County election office before and after election day. Carter Center observation efforts began on Oct. 17, 2022, and continued through the Dec. 6 runoff. The Carter Center agreed to make its final report available to both the PRB and the Fulton BOER simultaneously on Dec. 15, 2022.

In conducting this observation effort, The Carter Center received the full cooperation of the Fulton County Department of Registrations and Elections. In particular, the Fulton County interim director of registrations and elections, Nadine Williams, and her deputy, Patrick Eskridge, made themselves and other staff available to The Carter Center team to respond to any and all questions.[2]

## Observation Methods

Nonpartisan election observation is an impartial process where observers systematically gather data to determine whether an election was fair, peaceful, and credible. Unlike partisan observers — also called "challengers" or "poll watchers" — who generally look for activity that could undermine their own party's or candidate's interests, nonpartisan observers have no stake in the election outcome. They do not interfere in the election day process, even if they see something take place that should not happen. They are trained to understand the election process as specified by law and report on whether election day procedures are being correctly followed.

The Carter Center has observed more than 100 elections in 39 countries since 1989 and was a pioneer in establishing the election observation methods now widely used around the world. The Carter Center's election observation approach focuses not only on areas for improvement but also on strengths that should be replicated in the future to ensure the validity, fairness and accuracy of an election process that is secure and accessible for voters.

---

[2] Nadine Williams has served as the interim elections director since the departure of Richard Barron from the post on April 1, 2022.

The Carter Center's analysis is based on direct observation, desk analysis of documents provided by Fulton County, and conversations with Fulton County elections staff. This report captures the analysis of data collected over the eight weeks between Oct. 17 and Dec. 12, 2022.[3]

## Observer Recruitment and Training

The Carter Center's election observation efforts were supported both by subject matter experts in the field of elections and election administration and by volunteers. Subject matter experts (often former election administrators or individuals who have worked closely with election administrators) observed processes within Fulton County's election office as well as some aspects of the voting process. Carter Center volunteer observers watched processes at voting locations only.

Carter Center volunteer observers were recruited through several channels, including from among the Carter Center's staff, volunteers, and interns; the Carter Center's Board of Councilors (made up of community and business leaders in the Atlanta area); the Democracy Resilience Network (a Georgia-based cross-partisan group of community leaders); and faculty and students from Atlanta area colleges and universities, including Emory, Georgia Tech, Georgia State, and Morehouse.

The Carter Center required all observers to attend training, virtually or in person, sign a code of conduct for nonpartisan election observers (see appendices), and receive proper observation credentials. Observer training focused on polling place procedures, data collection methods, the roles and responsibilities of nonpartisan observers, and the observer code of conduct. All Carter Center observers were U.S. citizens.

## Polling Place Observer Deployment/Coverage

During the early voting period for the Nov. 8 election, The Carter Center deployed 64 observers to all 36 early voting locations (vote centers) and the four "outreach" advance voting locations, collecting over 330 observation reports on early voting. Each early voting center was observed at least six times. Each outreach location was observed at least once during early voting. Observers were deployed in approximately six-hour shifts to a cluster of four voting locations organized by geographic proximity to one another.[4] Carter Center observers were not able to observe opening through closing of the polls in every location for every day of early voting or election day.[5]

On Nov. 8, the Center deployed 104 observers to 217 of 249 Fulton County polling locations. Each observer was assigned two to three polling places grouped by geographic proximity to one another. Of the 32 election day polling places not observed, 12 were early voting locations The Carter Center had already observed numerous times, leaving only 20 polling places unobserved.

Two Carter Center observers also attended the Nov. 17 risk-limiting audit in Fulton County.

For the Dec. 6 runoff, the Center's observation footprint was much smaller, with eight observers who followed up on a small number of preliminary findings from the Nov. 8 election observation effort. This smaller-scale effort was in part necessitated by the completion of this report by the Dec. 15 deadline.

---

[3] The Carter Center notes that by Oct. 17, many preelection processes were already complete or near complete. As such, the Center is unable to offer an assessment of those processes. If similar observations are undertaken in the context of future reviews, an earlier start date for the effort is recommended to allow for additional areas of observation.

[4] The Carter Center deployed observers every day of early voting, except for Oct. 18. This was due to volunteer shortages that day.

[5] Carter Center observers were present for poll opening at 26 early voting locations and 63 election day locations and at poll closing at 23 early voting locations and 61 election day locations.

6

## Data Collection

Carter Center election observers always use data collection instruments to ensure the systematic collection of information about the processes observed. For the Fulton County observation, Carter Center volunteer observers used paper checklists to avoid the use of mobile telephones in polling places. The checklists included questions about the exterior and interior of polling places, accessibility, staffing, equipment, voting procedures, efficiency, special circumstances, and a space for additional notes. Subject matter experts also collected qualitative information about the processes that they observed.[6] The Carter Center also held multiple virtual debriefing sessions following both early voting and election day to collect more qualitative data about observation. This report summarizes and synthesizes the data collected through these methods.

# Observations on Voting (Oct. 17 – Nov. 8, 2022)

Advance voting for the November general election took place in 36 early voting centers across Fulton County from Oct. 17 through Nov. 4, 2022. In addition, the county opened four outreach locations on college campuses. These outreach locations were open for two days each during the 19 days of early voting. Voting took place at 249 polling places on election day.

As outlined above, The Carter Center observed advance voting at each of the advance voting locations on multiple days in advance of the Nov. 8 elections, and at about 87% of election day locations. The Carter Center observations recorded here draw from data collected during the Oct. 17-Nov. 8 period. Observations regarding the runoff are included below.

## General Atmosphere

Carter Center observers noted the calm and peaceful atmosphere that characterized both the early voting and election day processes. There were no reports of systematic voter intimidation or anyone blocking access to the polls. During early voting, there was only one report of unusual or potentially disruptive activity outside the early voting locations observed, and election workers promptly addressed the issue. Similarly, on election day, observers noted one instance of poll workers disrupting operations and arguing with a poll manager, but the offending parties were quickly removed and replaced. A security presence was standard across the majority of polling places both during early voting and on election day.

## Voting Locations

Voting took place in a variety of locations in Fulton County, from schools to churches to art museums. The Carter Center observers noted that each location affected the voter experience differently.

Early voting locations were often public libraries, community or senior centers, gyms, government facilities, or public spaces (e.g., the High Museum). Carter Center observers reported that some locations were more suitable for use as voting locations than others. In some cases, there was adequate space to accommodate election equipment and facilitate the movement of voters; in other cases, the space was more restricted. Gyms and government buildings provided more space for voting, while libraries tended to be more challenging. Observers noted that the space in eight of the 17 libraries used for early voting affected the flow and movement of voters around the polling place but did not appear to deter voters from casting their ballots.

In some cases, the small space available for early voting limited the ability of party poll watchers and nonpartisan observers to easily observe the voting process, as they had to be seated out of the way. In a small number of cases, it was also noted that the space restrictions could make it more difficult for voters

---

[6] Observations were entered into an Excel form in a secure environment (through Microsoft forms) for analysis by the Carter Center team.

in wheelchairs to maneuver around a polling place. Parking was noted as a specific challenge at a few locations, either because the lot was small or because there was a parking structure or other facility that was challenging to navigate or required parking validation.

On election day, two locations were highlighted as being especially hard to find: The Center for Civil & Human Rights and the Sandtown Middle School. Where only a portion of the area/campus is being used, especially an area away from the main access point, additional signage would be helpful. Observers reported adequate parking capacity in over 95% of locations but noted that three locations (West Manor Road Recreation Center, Dogwood Senior Center, and the Center for Civil & Human Rights) lacked capacity.

Locations using paid parking lots or garages for voter or poll worker parking on election day were uniquely problematic, with observers noting that it was often unclear whether free parking was available and where it was available. Observers also reported cars being booted or towed at two locations, requiring election officials to take time away from their duties to address the situation and, in at least one case at Morehouse College's Archer Hall, incur costs to retrieve their vehicles.

### Accessibility of Voting Locations

Overall, the locations selected for voting appeared to be accessible for persons with disabilities. Clearly marked accessible parking, an easily accessible entrance, and a clear path to allow voters with disabilities access to the location were present at over 90% of voting locations observed on election day, and those percentages were even higher during advance voting. For urban locations using garages, Fulton County could consider temporary street parking right in front of the building as an alternative.

Most sites used the main entrance to the building as the accessible entrance. However, when separate entrances were used, observers noted that additional signage directing voters to the accessible entrance would have been useful (e.g., Dad's Garage Theater, Bethune Elementary, Birmingham Falls Elementary, New Prospect Elementary). Approximately 13% of election day sites lacked a working automatic door opener and had doors too heavy to open comfortably from a seated position; for these reasons, The Carter Center suggests propping exterior doors open (weather permitting) or stationing a poll worker at the entrance to assist voters.

### Signage and Campaigning Outside the 150-foot Boundary

Most advance voting and election day locations for the Nov. 8 election were clearly marked with exterior signage. In a small number of early voting locations, signage was missing. The 150-foot boundary was marked in most locations during early voting and on election day. However, it was noted that the 150-foot campaigning boundary sign was sometimes hard to find and even harder to read. The Center recommends the state review the design of the sign, and Fulton County move to using lawn or A-frame signs to indicate the boundary.

Of the more than 330 observations over the 19 days of early voting, observers only noted eight instances of campaign materials being placed within the 150-foot boundary. During subsequent observation at those locations, the campaign materials were moved back outside the 150-foot radius, indicating that election teams were monitoring this and taking measures to ensure that rules were followed.

On election day, signs at locations where precincts had changed were helpful but also may have caused misunderstandings, with observers noting that it sometimes appeared that a location was not in use rather than simply being used for a different precinct. For the future, signs stating the precincts served at each location, in addition to any that are no longer in use, would be ideal.

## Lines

During early voting for the Nov. 8 elections, lines were generally short at locations observed by the Center. Wait times varied from none to a maximum of 25 minutes at a handful of locations across the early voting period. The last day of early voting saw longer lines, with Metropolitan Library experiencing particularly long lines. This may have been exacerbated by a get-out-the-vote event nearby which was reportedly driving voters to that location to vote. Voters over the age of 75 and those with disabilities were consistently allowed to move to the front of the line.

Wait times observed at election day sites on Nov. 8 generally stayed under 15 minutes throughout the day, apart from lines at the beginning and end of the day. Most voters waited far less than 15 minutes, with 57% of sites observed having no wait at all and another 38% at five minutes or less during observation. Lines at opening were manageable at all locations observed on Nov. 8, with the longest line at 43 people, and observers reported that lines cleared quickly.

The voter throughput for polling places on Election Day was an average of 36 voters per hour, with an hourly distribution shown in Figure 1. This is faster than voting progressed during advance voting, which averaged around 32 voters per hour (Figure 2), chiefly due to the simplified check-in process on election day: no application requirement to vote in-person absentee; voter confirmation via ID scan rather than manual entry; and no precinct configuration requirement when programming ballot activation cards.

Figure 1



Figure 2



## Staffing

Voting locations were staffed by teams that included a poll manager, assistant poll manager(s), clerks, a technician, a line manager, and a compliance officer. A public safety officer was present and visible at most locations observed.

Observers noted the friendly and enthusiastic attitudes of election workers at many voting locations, that they were helpful and supportive of voters, and that there was a strong emphasis on customer service. Observers commented that election administration staff took their roles seriously and recognized the significance of their work.

During advance voting, Carter Center observers found that many poll managers had considerable experience working the polls and that this was particularly beneficial in ensuring the smooth operation of advance voting centers — a difference from election day, when many more inexperienced staff were working. Even with the mix of experience among election workers on election day, the consistent grasp of their various tasks across locations indicated a successful training program. The emphasis placed on training workers for particular roles, rather than cross-training every worker in everything, paid dividends.

In particular, the presence of two specific roles — early voting compliance officers, tasked with performing quality assurance measures like ballot reconciliation throughout the day, and technical personnel, trained to troubleshoot machines — were especially helpful in streamlining processes and enhancing efficiency. On election day, several observers noted that locations reporting IT problems during setup waited for technical support when voting began. The Carter Center understands that Fulton County's goal is to have a trained technician at every voting location and agrees that having more technical personnel available, especially early on election day, would be helpful.

In almost all cases, the early voting locations had sufficient staff to ensure the smooth operation of the voting center. Likewise, the number of poll workers recruited for election day was adequate. Over 90% of locations observed had all assigned staff in attendance on Nov. 8, and the county ensured that replacements were available and ready to fill gaps where needed.

The use of staffing agencies for election worker recruitment continues to pose challenges regarding temporary election staff retention. This election, an increase in pay (minimum $15/hour) for early voting

and election day workers appears to have helped to attract temporary workers. However, the 14-hour workdays over 19 days of early voting did take a toll. In addition, recruiting staff for the runoff was a challenge given the Thanksgiving holiday.

The Fulton County call center was staffed by 20-30 people (depending on whether it was the early voting period or election day). The call center appeared to be responsive to the needs of poll managers.

As noted above, Fulton County opened outreach locations on college campuses during early voting. Of the advance voting locations observed, the outreach locations appeared to have the most significant staffing challenges. Experienced poll managers were working with inexperienced staff — often students — at times giving them on-the-job training. At two outreach locations, observers reported that the flow of voters was confusing. Additional training for student poll workers would be helpful, with an emphasis on directing traffic in the polling location.

## Poll Openings

The Carter Center observed 47 openings of advance voting locations across the county and 63 openings on Nov. 8. In several cases, observers arrived at the advance voting locations at 6:15 a.m. to find that the advance voting center was already set for the opening. Like the experience during early voting, observers arriving at 6 a.m. on election day often found voting sites already set up, as poll workers had arrived at 5 a.m.[7]

Ballot chain of custody and machine security measures, like checking and recording seal numbers, were generally consistent. However, it was clear that poll workers did not understand why these steps were required. They were simply focused on completing their paperwork and, without an understanding of why they were recording numbers on various "recap" sheets, often took simplifying shortcuts. For example, practices like cutting all the seals off at once and recording the seal numbers afterward, or recording the seal numbers before putting the seals on, streamline the process but also separate the act of checking/recording the seal number from opening/closing the machines. If an incorrect seal number had been found under these circumstances, for example, it might not have been discovered until after the seal was cut and the machine opened, which defeats the purpose. Additionally, poll workers need to pull the zip-tie-style seals tight, closing the loop of the seal as much as possible, to minimize the opportunity for tampering. Placing more emphasis on the purpose of recap paperwork and seal procedures during training would help poll workers better understand their role in the election security process.
In many instances, election workers moved through the opening procedures to maximize efficiency, following procedures but not taking the time to explain what they were doing to party poll watchers or observers. This would be a valuable and simple way to increase transparency in the process.

Wall space was often inadequate for the number of signs required, and election workers struggled to find space. Since many of the state-mandated signs are clearly perfunctory, with text that is both too small and too lengthy to read in the context of voting (see appendices), we recommend that the state reassess signage requirements in view of what is both practical and useful. Including nonessential signage may train voters to ignore signage altogether, missing notices that are necessary to read.

Over 80% of early voting locations and 90% of election day polling places were rated by Carter Center observers as "good" or "very good" on their opening procedures, and none were ranked below "average."

---

[7] In these cases, observers backfilled by asking questions where procedures appeared to have been completed before their arrival.

## Voting Operations

Carter Center observers reported that early voting was largely well-run, with only one observation noting below-average ratings during the time of observation.[8] Fulton County's election day voting locations were consistently well run, with 93% of observed locations rated as "very good" or "good" by Carter Center observers and no location rated below "average."

### Check-in processes

During advance voting, Carter Center observers noted that check-in procedures were followed. There were a few instances where voters expressed confusion about the paper absentee ballot application form that needs to be completed during advance voting check-in. Election officials were generally able to explain the process to voters.

On election day, general procedures for voter check-in, including verifying voters' identity, confirming eligibility, and preparing a ballot activation card, were completed smoothly and consistently across the board.

### Voting

Voting processes generally unfolded smoothly at locations where The Carter Center observed. Voters appeared able to use the ballot marking devices (BMDs) and ballot scanners without confusion — observers noted that there is now a level of familiarity with the equipment for many voters. Indeed, on election day, 95% of observers reported that both BMDs and scanners were used without confusion by voters, and poll workers were available to help answer questions that did arise. It was noted that at times acceptance of the ballot by scanners took several tries.

Carter Center observers noted that the equipment containers used by Fulton County made voting location setup efficient and easy for election workers. While equipment containers have many benefits with regard to ease of transportation and setup, observers also noted several challenges:

- The size of the containers in the smaller voting locations made the locations especially cramped (see points on size of locations — particularly for early voting — above);
- The height and angle of the BMD screen within the equipment container inadvertently undermined the secrecy of the voting process, especially in locations where tight space did not allow for optimal placement of the equipment containers (see voting location diagrams in Appendices). Voters' bodies could not always adequately shield the screen while they were voting, though Carter Center observers noted that this did not appear to deter voters from participating. Going forward, the doors to the containers should be more consistently used as privacy screens to block visibility from the side and, if possible, the angle of the screen adjusted to help increase voter privacy. Privacy filters for the screens could also be considered, although they would need to be tested to ensure that they did not negatively impact overall usability.

During early voting, Carter Center observers reported several instances where election workers quickly addressed voter cell phone usage inside the early voting locations. Unrestricted phone usage was much higher during election day than during early voting, with 43% of observers reporting that phones were used at their location.

Carter Center observers noted that election workers rarely verbally prompted voters to review their paper ballots before inserting them into the scanner, although they noted that some voters did so anyway. Forty

---

[8] The below average rating was for the outreach location referenced above where there was more confusion about processes than at other locations observed. This did not appear to deter voters from voting or have other effects on the process.

percent of observations from early voting and 49% of election day observations record that voters were never asked to review their ballots. Given that voter review of the human-readable text on the paper ballot is essential to ensuring an auditable paper trail and codified by administrative rule,[9] The Carter Center strongly recommends re-emphasizing this point in poll worker training and ensuring that this becomes a standard part of procedure for the staff working the scanner. (It should be noted that signage to this effect was present but has been shown to be relatively ineffective; verbal prompts, generally by the poll worker at the ballot scanner, are considered best practice.)

*Nonstandard Processes*

Nonstandard processes like voter challenges, provisional ballots, and canceling mail absentee ballots were rare, but the process widely varied from place to place. Many poll workers were unsure of how to proceed even after reviewing documentation and simply called their regional manager for guidance. The Carter Center recommends implementing that escalation path as the standard practice, as those who tried to complete these procedures alone were not always successful. In addition, providing very clear step-by-step checklists/decision trees for each scenario would be helpful.

Provisional ballots, in particular, create a burden for poll workers. Training on the subject was made significantly harder by SB202, which added complexity to the circumstances under which a provisional ballot should be completed. Despite these challenges, provisional ballots provide one of the best stopgaps against administrative problems that could otherwise disenfranchise voters. Fulton County can and should place greater emphasis on provisional ballot procedures and importance during poll worker training, to ensure that provisional ballots are readily available when voters need them.

*Accessibility of Voting Procedures*

In all locations, accessible BMDs and lower scanners were available for use by people with disabilities, though the angle of the screen at the accessible BMD was described as difficult for some as it required raising one's arm to head height or higher to vote.

Observers noted several instances of voters requiring assistance to vote. Election workers followed the procedures, requiring those giving assistance to sign the appropriate assistance form. In addition, during advance voting, observers reported a few instances where language assistance was requested. After a phone call and a short wait, an interpreter would arrive to help. On election day, language assistance was requested in 11 locations and generally provided. In a single instance, the poll manager expressed the view that voters didn't need translated ballots since it was "just names" that they needed to read (though we note that the general election ballot also contains instructions and ballot initiative text that should be translated).

*Closings*

The Carter Center collected 41 observations on the closing process during early voting for the Nov. 8 election and 61 on election day. Carter Center observers rated all advance voting closings but one as "average," "good," or "very good." On election day, all but three were rated at least "average," with the three locations rated negatively suffering from inexperienced poll managers who had difficulty completing the closing procedures in a timely manner after polls closed at 7 p.m.

As with openings, in many cases observers noted election workers moved through the closing process with efficiency as a key consideration. However, they often did not take the time to explain what they were doing as they moved through the closing process, making it difficult for party poll watchers and Carter Center observers to follow along. Where observers could follow the process more closely, they noted that while

---

[9] Rule 183-1-12-.11 (8)

there was some variability in the implementation of closing procedures, steps related to the chain of custody and the integrity of the election equipment were generally consistently followed.

### Transparency and Observer Access

Carter Center observers noted party poll watchers in about one-third of early voting observations for the Nov. 8 election. During advance voting, Democratic Party monitors were observed almost twice as frequently as Republican Party monitors. In less than 10% of reports did Carter Center observers note the presence of both parties. On election day, the number of Democratic and Republican party monitors was more even, but both parties were present in just 6% of polling places observed. In a small number of locations, representatives of third parties were present.

Throughout the process, party poll watchers largely conducted themselves according to Fulton County's observer guidelines at almost all locations observed. In three cases during early voting, Carter Center observers noted that poll watchers were disruptive — in particular, speaking loudly in the quieter environment of the polling location and sometimes promoting partisan views. Poll watcher credentials were not consistently checked in places where the Center observed.

As many as 12% of early voting observation reports mentioned some limitation on the ability of observers to watch the process. Often this was because party poll watchers and observers were seated in spaces that restricted their ability to observe key procedures due to space constraints. In these cases, observers were often allowed to move around and check scanner numbers etc. when there were no voters present.

In a few instances, Carter Center observers were not initially granted access to observe early voting by the poll manager. This was generally addressed by a phone call to the poll manager from the Fulton County interim elections director. On election day, poll workers were not always aware that observers were allowed to witness the voting location setup procedures and seemed uncomfortable allowing access to polling locations before 7 a.m., even to observers with credentials and badges. Several observers were denied entry and so were unable to observe opening procedures. In all cases, observer access was resolved.

## Other Observations of Note

### Wrong Locations

On election day, Carter Center observers at specific locations noted significant numbers of voters turned away because they were not at their correct polling place, including: Buckhead Library, North Fulton Annex, St. James UM Church, Adams Park Library, Therrell D.M. High School, Love T. Nolan Elementary, Springfield Missionary Baptist Church, Metropolitan Library, East Point First Mallalieu UM Church, and Roswell Library. Some confusion is generally present when moving from vote centers during early voting, where voters can choose to vote at any location, to assigned polling places on election day. However, the fact that this was a significant problem for large numbers of voters beyond the sites also in use for early voting indicates a larger issue. The most logical explanation is that changes to assigned locations due to redistricting were to blame. Redistricting after the 2020 census occurred between the primary and general elections this year, and we note that Fulton County notified voters whose precincts had changed via postcards mailed prior to the election. However, the impact of redistricting seemed to be largely ignored by the political parties. Parties provided the most widespread communications prior to the election but failed to warn voters that their assigned location may have changed.

### Voter Credit Error

In one location, a Carter Center observer noted that poll workers had an "Application to Vote Early In-Person" form that they could not finish processing as the statewide voter registration database indicated the voter had already voted the day before at a different early voting location. The poll worker did not note the presence of an earlier ballot record during the check-in process for the voter (during which they added a

new ballot record in the statewide voter registration database but did not finish processing it), so the voter was allowed to vote. Only when poll workers did final data entry for that application later in the night, checking they had entered information correctly and processing the added ballot records in the database, did the system prevent them from entering a duplicate record. The poll manager at the early voting location responded quickly and effectively and immediately called her supervisors for assistance. The Carter Center also raised this case with the Fulton County Elections Department and was subsequently informed that the case had been elevated to the Office of the Secretary of State for further investigation (which is ongoing at the time of writing this report).

The Carter Center cannot confirm that this was a case of double voting. It could have been the result of data entry error at either of the early voting locations. The poll manager should be commended for identifying the error during her reconciliation process and taking the appropriate steps to ensure timely resolution of the issue through the correct channels. Looking forward, ensuring that the ballot record for the voter is completely created during voter check-in, with voter credit assigned is critical. The introduction of new early voting check-in practices (to be rolled out statewide in 2023 in advance of the 2024 elections) may also help reduce the opportunity for error.

## The Runoff

The Carter Center deployed a smaller number of observers for the runoff to follow up on outstanding questions from the Nov. 8 observation effort. Carter Center observers found many aspects of the process on Dec. 6 to be like those observed in November. The principal difference, well reported in the press, was the longer wait times at early voting locations.

Early voting for the Dec. 6 runoff election took place in 24 locations around the county and at three outreach locations on college campuses. The outreach locations were open for two to three days during the seven days of early voting. According to Fulton County, the reduction in locations was the result of budgetary constraints and the considerable challenge of recruiting sufficient staff over the Thanksgiving holiday (the latter shared by other counties). Runoffs also tend to have significantly lower voter turnout, which may also have been a factor in deciding to open fewer locations.

During early voting for the Dec. 6 runoff election, lines were considerably longer than in November, with wait times of an hour or more at many of the locations on multiple days during the seven-day voting period. This may be explained by a number of factors, including: voter enthusiasm (news outlets reported voters lining up hours in advance of polls opening); the shorter timeframe for early voting for the runoff (seven days as opposed to 19 days); and the reduced number of early voting locations.[10] It should be noted that several of the more populous counties around Georgia experienced longer wait times for the runoff than for the Nov. 8 elections.

Observers noted that the check-in process caused a bottleneck within polling places, as election workers completed the multistep process for a high volume of voters during the condensed early voting timeframe. Locations observed addressed this problem differently; some locations allowed voters to fill in most of the form while waiting in line, which allowed voters to move through the check-in process much more quickly. In other locations, the voters completed the form at the check-in table; observers noted that this slowed the check-in process considerably. The new check-in process to be rolled out statewide in 2023 should help address these delays by streamlining the process.[11] The Center also recommends that additional early voting

---

[10] 188,003 people voted early in person for the Dec. 6, 2022, runoff election (https://sos.ga.gov/data-hub-december-6-2022-runoff accessed Dec. 11, 2022)

[11] For example, Cobb County, which piloted the use of the new check-in process in the 2022 midterm elections, appeared to have consistently shorter wait times at early voting locations.

locations be opened for federal and statewide runoffs in the future, and that appropriate budgetary allocations be made to accommodate this need.

Election day was markedly different from the early voting experience. Voters were processed quickly and seldom had to wait more than a few minutes.

## Internal County Operations

### Absentee ballot applications

Absentee ballot processing began with the applications, which were received from five different sources. Observers witnessed paper applications received by the mailroom, timestamped, opened, and batched in groups of 50 for processing. Batch cover sheets were used to track each group of 50 through the process, recording the total accepted or rejected, and counts were reconciled each night. Electronic applications were also printed, and all applications were scanned, ensuring both a paper and electronic record. Totals of applications received and processed were reconciled to the voter registration database each night.

Fulton County, like some other counties in Georgia, uses a process where rejected absentee ballot applications are returned to the voter with a provisional ballot included in addition to the paperwork needed to cure the application. This streamlines the process considerably as a voter can complete the cure paperwork and return a marked provisional ballot in a single step. Assuming the cure of the application is successful and no further errors are found, the provisional ballot can be counted.

### Absentee Ballot Processing

Fulton County took full advantage of the opportunity to process absentee ballots prior to election day, beginning the process on Monday, October 31, after issuing a notice of its intent to do so. Carter Center observers and party poll watchers were in attendance during the process. This extra processing time ensured that mail ballots did not accumulate and could be dealt with promptly.

Observers witnessed absentee ballot processing from initial receipt, logging, and storage to the verification, opening of envelopes, ballot extraction and flattening, vote review and duplication (where necessary), and eventual tabulation. Best practices were evident at each step in the process, including using small batches (50 ballots), tracking each batch via a cover sheet that logged any ballots that were removed for further processing (e.g., rejected during verification, or needing to be duplicated before tabulation), and reconciling counts of ballots at various stages throughout the process.

Election law changes in SB202, requiring that both absentee applications and completed ballots include a driver's license/state ID number or other acceptable photo ID as proof of identity, have eliminated the need for election officials to match signatures. This has streamlined the process and made it easier for election officials since they can simply check that all the necessary information is present and correct.

Vote review panels, comprised of both a Republican and a Democrat, were comfortable with the process used to duplicate unreadable ballots and were able to review and interpret ballots efficiently. While most panels were following the standard procedure, having both members look at each vote on the ballot and both members confirm that it matched the vote entered on screen, a few teams had only one person reading the ballot and the other only entering data. Reminding panels of the importance of checking each other's work will ensure that each duplicated ballot goes through consistent checks and balances.

## Election Night Drop-off

On election night, nine intermediate drop-off locations throughout the county were set up to receive materials from the precincts. Not only did this prevent a high number of people and cars at the main Election Preparation Center warehouse, but it also allowed for a detailed inventory of materials to be compiled very quickly after polls closed. Fulton County split the deliveries from the precincts into two groups; runners from each voting location, responsible only for the memory cards from the scanners, were dispatched to the drop-off location as soon as possible. All the other materials, including completed ballots, followed in a separate delivery. Once all the memory cards had been received at a particular drop-off location, they could be transferred to the Election Preparation Center — escorted by police — without delay. For the most part, this system worked well. Observers noted that some precincts went to the wrong drop-off location, so providing a phone list for the precincts would have been helpful in coordinating the proper destinations.

Sites consistently had problems with the handheld scanners used to log materials into the electronic inventory system, perhaps due to limited internet connectivity, but they had ample paper records as an alternative. Different drop-off sites also had varying procedures for fixing problems (e.g., a bag accidentally sealed inside another bag). Some site managers would break seals, noting the action on the chain-of-custody forms, remedy the situation, reseal the container, and note the new seal number on the form. Others were adamant about not breaking seals to fix anything, simply recording the problems on the chain-of-custody forms. Retraining personnel on which method is preferred would be helpful for future elections.

## Early Tabulation & Sequestration

Sequestration — the practice of restricting movement and communication for those who could have knowledge of early vote totals until the close of polls when totals can legally be released — during early tabulation of absentee ballots on election day (required by O.C.G.A. § 21-2-386 (a)(6)) is one of the few areas where Fulton County could make considerable improvements. Due to space constraints, early tabulation was done in one section of the main floor at the Election Preparation Center warehouse rather than in an enclosed space. No attempt was made to sequester staff, and they were using cell phones throughout the day, often walking in and out of the tabulation area to attend to other duties. Observers were similarly not constrained and were allowed to use cell phones and walk in and out freely for most of the day. One member of the public was even soliciting in the area during the general election, handing business cards to observers and vote review panelists. A modest attempt was made to limit observers' cell phone use after a complaint was made, but unfortunately, the security guard informed observers that they could simply leave the room if they wanted to make a call.

During the runoff election, the processes improved somewhat, as cell phones were taken from observers before entering the room. However, both observers and staff were still allowed in and out of the sequestered area and able to retrieve and use their phones anytime they stepped outside. It should be noted that Carter Center observers did not report any ill-effects from this lapse in sequestration, and there is no evidence that any vote totals were revealed prematurely. Still, the public perception of such lapses is problematic and should be addressed when Fulton County moves to its new warehouse in 2023.

Observers also witnessed members of the public and party poll watchers at the Election Preparation Center being given name tags that said "Election Official" at the top, presumably because these were what the county had available. There was no evidence that inappropriate access was granted based on these name tags, but in the future, it would be best to avoid labeling anyone as an election official if they are not.

17

## Results Reporting

Results reporting was efficient and orderly, with memory cards processed as soon as they arrived at the Election Preparation Center warehouse from the drop-off locations. Three tables of staff, set up in view of observers, logged receipt of each location's sealed transfer bags and had the transport team sign chain-of-custody paperwork. Staff then proceeded to inventory each returned bag, checking to see that each arrived appropriately sealed, with all the necessary memory cards, and contained the correct cards for the scanners in that location. Memory cards were then walked over to the election management server, housed in a corner of the warehouse's main room, and results were loaded onto the server. Results of all ballots tabulated through election night were available by midnight. Given the interest in this process from party poll watchers, it would be helpful to have an election staff member tasked with explaining the process stationed with the observers in the future.

# Risk-limiting Audit

Fulton County participated in the Nov. 17, 2022, risk-limiting audit (RLA) of the secretary of state contest.[12] The audit began at 8 a.m., proceeded smoothly, and was completed by 10a.m.

## Audit Premises

The Fulton County audit was conducted at the Georgia International Convention Center. There was ample space for the audit operations (17 audit boards, one vote review panel, ballot storage, a ballot check-in/check-out station, and data entry). There was a clearly defined space for public observers. The audit floor was well organized, with plenty of room for monitors to move around without crowding the audit boards. The ballot storage area was always secure and guarded and ballot containers were well organized in the storage area. Election workers checked batches in and out of storage, and runners carried containers between storage and audit boards.

## Training for Audit Boards

No audit board training took place during the time observers were present; it is unknown whether any training was held earlier or whether audit board members were election staff familiar with handling ballots. The secretary of state's training video, which focused on counting procedures, was displayed (without audio) on two screens. Observers reported that audit boards asked supervisors many questions while auditing the first batches, and fewer questions as the day progressed. This training strategy was adequate for conveying "sort and stack" counting, and supervisors could easily handle questions, given the lack of time constraints and the small number of ballots to be audited. The Carter Center recommends that training be conducted before auditing begins to prepare auditors and election staff for their tasks.

## Vote Review Panels

Fulton County staffed one bipartisan vote review panel, but there was nothing to adjudicate, since voter intent issues occur only on handwritten mail ballots. Of the audit boards observed, only one had a mail ballot batch, consisting of eight ballots. Most of the observed audited ballots were advance voting (2,302 ballots assigned to one audit board) and election day (847 ballots).

## Data Entry

Tally sheets completed by audit boards were entered as soon as auditing was complete. Data entry was generally done by a team of two, with one checking the other, but observers were not consistently able to view the computer data entry screens. Best practice calls for both the tally sheet and computer screen to be readily viewed by observers. In some jurisdictions, this is done by overhead screen projection so that anyone

---

[12] The Carter Center deployed observers to 34 Georgia counties during the statewide RLA, including Fulton County.

can confirm the accuracy of data entry without interfering with the operators. Again, the process was adequate for the small amount of data to be entered, but future audits may be more challenging.

In sum, Fulton County conducted its RLA carefully, smoothly, and expeditiously. These findings should support citizen confidence in the reported outcome. Increased attention to systematizing procedures would ensure smooth audit operations should more challenging conditions occur in the future.

## Conclusion

Overall and within the parameters of its observation efforts, The Carter Center did not observe any election administration irregularities that would call into question the ability of the Fulton County Department of Registrations and Elections to administer secure and accessible elections for the citizens of Fulton County. The minor issues observed and noted in this report are consistent with the kinds of small hiccups that occur within any complex election administration process; Fulton County residents should feel confident these snags did not affect the election results. The aspects of the election process the Center observed were clearly improved from 2020 and demonstrated the implementation of best practices (for example, frequent reconciliation and prioritization of chain of custody and security).

Election processes are complex logistical exercises. As such, there are always opportunities for continuous improvement of processes to bolster efficiency and maximize appropriate and contextualized transparency. This process of continuous improvement relies on the observation of systems and processes and the creation of monitoring feedback loops so that lessons from one election can be integrated into systems to improve future elections. It is in this spirit that the Center has offered recommendations and suggestions for improvement throughout this report.

Finally, The Carter Center notes that the Fulton County Department of Registrations and Elections cooperated fully with the observation effort and demonstrated an openness to transparency and learning that is to be commended. The Carter Center thanks the Performance Review Board and Fulton County Board of Elections and Registration for the invitation to observe the 2022 general election.

## Appendices
1. Memorandum of Understanding
2. Sample Observer Checklists – Election Day
3. Code of Conduct of Nonpartisan Election Observers
4. Signage within the Polling Place
5. Voting Location Diagrams

19

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN**
**PERFORMANCE REVIEW BOARD,**
**FULTON COUNTY BOARD OF ELECTIONS AND REGISTRATION,**
**AND**
**THE CARTER CENTER**

In August 2021, pursuant to a request from the Georgia General Assembly, the State Election Board appointed a Performance Review Board ("PRB") to conduct a performance review of the Fulton County Board of Elections and Registration ("Fulton BOER") pursuant to OCGA § 21-2-106. The duty of the PRB is to make a thorough and complete investigation and issue a written report of its findings to the Secretary of State ("SOS"), the State Election Board ("SEB"), and the local governing authority which shall include such evaluations, judgments, and recommendations as it deems appropriate. *See* OCGA § 21-2-106.

To date, the PRB has conducted interviews of Fulton BOER staff, observed election processes, observed processing of absentee ballots, observed early voting, and observed Election Day voting. To fulfill its duties under Georgia law, the PRB would like to conduct further observation and analysis during the 2022 November General Election in Fulton County ("Election"). The Carter Center ("TCC") has a well-deserved reputation for independent and objective observation and analysis of election administration. Within the framework of the ongoing performance review, the PRB and Fulton BOER believe that the independent and objective analysis and observation that TCC is known for would be beneficial to all parties. The PRB would like to complete it's report by the end of calendar year 2022 and believes that TCC observation will help the effort to finalize the performance review by that time. To that end, at the invitation of the PRB and Fulton BOER, TCC has agreed to conduct independent, non-partisan observation of the Election. TCC does not conduct this observation on behalf of the PRB, SOS, SEB, or Fulton BOER, but will make its observations and analysis available to the PRB so that additional independent and objective analysis can inform the PRB's report to the SEB.

Therefore, PRB and Fulton BOER invite TCC to conduct independent, non-partisan observation and analysis of the Election. TCC agrees that it will follow all guidelines and respect any restrictions, as determined by the parties, appropriate for an accredited independent non-partisan observation effort. TCC will also follow instructions given by Fulton BOER while observing the election process to ensure the observation does not interfere with day-to-day election activities.

As an accredited observer, TCC will be provided with adequate and meaningful access to all stages of the work involved in the election, so that TCC's observers can credibly report on the process, including:
- access to relevant training materials and training sessions, either for poll-workers or staff;

- access to speak with PRB and Fulton BOER officials about their work and processes;
- access to internal documentation and records about the elections process, including but not limited to chain-of-custody documentation, recap sheets, drop box ballot transfer forms etc.
- ability to observe and accompany Fulton BOER officials and staff through their work process from start to finish.

Observation by The Carter Center will begin on October 14, 2022 and will terminate on December 15, 2022 unless an extension of the observation effort is agreed by all parties.

The specific scope-of-work for this observation effort includes:

- Observation of pre-Election procedures at the Fulton County election office
- Observation of absentee ballot issuance and receipt procedures
- Observation of equipment preparation
- Observation of early voting
- Observation of Election Day polling places
- Observation of Election Day procedures at the Fulton County election office
- Observation of post-Election procedures
- Delivery of a final report of observations by December 15, 2022. The final report will be delivered to both the PRB and Fulton BOER simultaneously.

The Carter Center will deploy a sufficient number of observers to adequately assess the aforementioned processes. All Carter Center observers will receive training on Georgia's election rules and procedures.

TCC reserves the right to:
- Select the dates, times, and locations of the observation, subject to the availability of Fulton BOER officials.
- Provide all parties a preliminary statement about the observation by November 30, 2022 and a more detailed final report, including key findings and recommendations for future efforts, no later than December 15, 2022.
- In coordination with the PRB and Fulton BOER, release public statements in advance of the election to announce our observation efforts and educate the public on the purpose of nonpartisan election observation and the role of TCC in this effort.

TCC will not:
- Attempt observation beyond the specific scope included here
- Violate the Observer Code of Conduct included here
- Divulge any information protected from disclosure by state law
- Interfere in the elections process

- Handle ballots or other sensitive materials
- Divulge any documents or confidential information shared with them about the election process without approval from the PRB and Fulton BOER.
- Divulge any documents or confidential information to any person regarding the election process or observation if that person is adverse in litigation to the State of Georgia or any county elections office

----------------------

Observer Code of Conduct

The purpose of election observation is to help ensure the integrity of the election process, by witnessing and reporting accurately and impartially on each aspect of the process to evaluate whether it is conducted in an open and transparent manner and in conformance with applicable laws and electoral regulations. Election observation and monitoring also seeks to ensure the integrity of the election process by calling on all electoral actors (including the candidates, political parties, those supporting or opposing referendum initiatives, election officials, other governmental authorities, mass media, and voters) to respect the laws and election-related rights of all citizens and to hold accountable those who violate the law or any person's election-related rights.

**While serving as an election observer, I will:**

- **Be an informed observer**
  - I will attend all required election observation training sessions and familiarize myself with relevant election law and processes prior to the election
- **Be an objective observer**
  - Report what I see – whether positive or negative - impartially, accurately, and in a timely manner, and include sufficient documentation of serious problems to allow for verification
- **Respect the election process**
  - I will respect state and federal laws governing elections, follow the instructions of election officials, and maintain a respectful attitude at all times
- **Remain politically neutral**
  - I will not publicly express any preference for or against any candidate, political party, or initiative, in accordance with laws prohibiting electioneering
- **Protect the integrity of the election**
  - I will not interfere unlawfully or inappropriately with election processes or procedures, where I have objections or concerns, I will elevate them through established channels

**Appendix 2 – Sample Observer Checklist**

**Fulton County Election Day Observation Checklist – Cover Sheet**

*Instructions:*

*Please fill in Part A **as soon as you reach the voting location where you are observing**, and **fill out Part B as you are leaving the voting location**. You will need a separate checklist for each location you observe throughout the day. Please fill out only the parts applicable to the processes you observed, and thank you!*

**PART A: Observer Info**

Your Name: _____

Voting Location Name/Address: _____

Today's date *(e.g. 10/31/22)*: _____

Time you arrive at the voting location *(e.g. 2:30 PM)*: _____

Public count of votes cast on the scanner(s) when you arrive: _____

**PART B: Post-observation Questions**

Time you leave the voting location *(e.g. 2:30 PM)*: _____

Public count of votes cast on the scanner(s) when you leave: _____

*(If you answer "no" to any of these, please explain on the "Notes" form)*

| B1 | Were you allowed to observe? | O Yes   O No |
|----|------------------------------|--------------|
| B2 | Were you able to observe all procedures without restrictions? | O Yes   O No |
| B3 | Did the pollworkers cooperate with you? | O Yes   O No |
| B4 | Were party pollwatchers able to observe in accordance with pollwatcher rules? | O Yes   O No |

**I have, to the best of my ability, conducted myself in accordance with the Carter Center's Code of Conduct for Observation and provided truthful, complete answers to these questions**

_____

*(Sign on the above line)*

**PART C: Physical Space (Exterior)**

*(If you answer "no" to any of these, please explain on the Notes form)*

| | | |
|---|---|---|
| **C1** | Is there adequate parking in the parking lot? <br> (i.e. spaces are available if more voters arrive right now) | O Yes O No O Don't know |
| **C2** | Is the required exterior signage present? <br> *This includes:* <br> • *A sign identifying the voting location ("Vote Here" etc.)* <br> • *A sign marking the 150ft electioneering boundary* | O Yes O No   O Don't know |
| **C3** | Are there clearly-marked accessible parking spots? <br> *(i.e. blue lines and obvious signage)* | O Yes O No O Don't know |
| **C4** | Is there an accessible path from the parking space to the building entrance (paved and clear of stairs, narrow doorways, and physical obstacles that would make it hard for a wheelchair user or visually-impaired person to enter)? | O Yes O No   O Don't know |
| **C5** | Is the wheelchair-accessible entrance to the building the main entrance or a side/back entrance? | O Main   O Side/back |
| **C6** | Is the wheelchair-accessible entrance clearly marked? | O Yes   O No   O Don't know |
| **C7** | Is the wheelchair-accessible entrance unlocked? | O Yes   O No   O Don't know |
| **C8** | Are the doors light enough to open easily *OR* have button-activated openers? <br> *(Either option is acceptable)* | O Yes   O No   O Don't know |
| **C9** | Are there campaign materials or campaign activity <u>outside</u> the 150-foot radius of the voting location? | O Yes   O No   O Don't know |
| **C10** | Are there campaign materials or campaign activity visible <u>inside</u> the 150-foot radius of the voting location? | O Yes   O No   O Don't know |
| **C11** | Is there tension or unrest in the area around the voting location? <br> *(If yes, please describe in Notes section)* | O Yes   O No   O Don't know |
| **C12** | Is there any indication of pressure/intimidation of voters in the area around the voting location? <br> *(If yes, please describe in Notes section)* | O Yes   O No   O Don't know |
| **C13** | Are people blocking access to the voting location or acting violently? | O Yes   O No   O Don't know |

| | *(If yes, please describe in Notes section)* | |
|---|---|---|

## PART D: Physical Space (Interior)

*(If you answer "no" to any of these, please explain on the Notes form)*

| | | |
|---|---|---|
| **D1** | Is there an accessible path through the building from the exterior door to the voting location? (e.g. smooth and clear of stairs, narrow doorways, and physical obstacles that would make it hard for a wheelchair user or visually-impaired person to navigate) | O Yes   O No   O Don't know |
| **D2** | How many check-in stations are set up? | Count: |
| **D3** | How many voting stations are set up (including accessible stations)? | Count: |
| **D4** | How many scanning stations are set up? | Count: |
| **D5** | Is a separate station set up to process voters who need provisional ballots (separate from the normal check-in table)? | O Yes   O No   O Don't know |
| **D6** | Is there a clear flow indicated in the room – where voters should go 1st, 2nd, 3rd etc? | O Yes   O No   O Don't know |
| **D7** | Are people able to move smoothly around the room to complete each step of the voting process? | O Yes   O No   O Don't know |
| **D8** | Is there enough space for a wheelchair to maneuver through each station to complete the voting process? | O Yes   O No   O Don't know |
| **D9** | Is a lower-height accessible voting station, suitable for a chair or wheelchair, available for use? | O Yes   O No   O Don't know |
| **D10** | Are all voting stations, including the accessible station, placed to ensure ballot secrecy (no one should see the screen)? | O Yes   O No   O Don't know |
| **D11** | Are accessibility aids (headphones, accessible keypads, etc) available at the accessible station? | O Yes   O No   O Don't know |
| **D12** | Is all appropriate signage present? *This includes:* | O Yes   O No   O Don't know |

| | *(Outside Voting Location)* | |
| |    a.  *Vote Here signs* | |
| |    b.  *150 ft No Campaigning* | |
| |    c.  *Accessible parking signs* | |
| | *(Inside Voting Location)* | |
| |    d.  *Poll Worker Area* | |
| |    e.  *No Leaving With Ballot* | |
| |    f.  *Large Print Viewing* | |
| |    g.  *Voter Notice (Wrong/Incorrect Ballot)* | |
| |    h.  *Ballot Review* | |
| |    i.  *Georgia Voting Information* | |
| |    j.  *Card of Instructions* | |
| |    k.  *Identification Required* | |
| |    l.  *Notice of Penalties* | |
| |    m. *Sample Ballots (2)* | |
| |    n.  *Prohibition of Electronics Notice* | |
| |    o.  *Magnified Ballot Request* | |
| |    p.  *Notice to Voters 75 Years & Older* | |
| |    q.  *Acceptable Proof of Citizenship* | |
| |    r.  *Video Surveillance* | |
| | *(At Each Voting Station)* | |
| |    s.  *Voting Instructions* | |
| |    t.  *Large Print Viewing* | |
| |    u.  *Voter Notice* | |
| |    v.  *Return Voter Card* | |

D13: Draw the approximate layout of the voting area. Example:

Use arrows to indicate voter flow, be sure to mark entrances/exits, and indicate which voting booths are lower/accessible. If a drop box or separate provisional ballot processing station are used, draw those.

**PART F: Pollworkers & Others**

| | | |
|---|---|---|
| **F1** | How many pollworkers are present, including the head pollworker? *[2-digit number]* | Count: |
| **F2** | How many party pollwatchers did you observe while you were there? | Count: |
| **F3** | If pollwatchers are present, what parties did they represent (if you can tell)? *(Circle all that apply)* | DEM        REP |
| **F4** | Did a pollworker check the credentials of all pollwatchers present? | O Yes   O No   O Don't know |
| **F5** | Were any pollwatchers disruptive? | O Yes   O No   O Don't know |
| **F6** | Did pollwatchers attempt to challenge any voters? | O Yes   O No   O Don't know |
| **F7** | Are media present at this voting location? | O Yes   O No   O Don't know |
| **F8** | IF YES: what media outlet do they represent? | Outlet: |
| **F9** | Are uniformed law enforcement or security present? | O Yes   O No   O Don't know |
| **F10** | Did anyone report a problem to you that you did not directly observe? *(If yes, describe on the Notes sheet)* | O Yes   O No   O Don't know |
| **F11** | Did you witness anyone being removed from the voting location for any reason? *(If yes, describe on the Notes sheet)* | O Yes   O No   O Don't know |

**PART G: Voting Procedures**

| | | |
|---|---|---|
| **G1** | Are voters being asked to present valid photo ID at check-in (or providing one without being asked)? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| **G2** | Are pollworkers scanning the voter's ID into the Poll Pad OR manually entering their name to find the voter's record and verify that they are on the voter list? | O Always<br>O Mostly<br>O Sometimes<br>O Never |

| | | |
|---|---|---|
| **G3** | Are voters being asked to check their current information on the Poll Pad and then signing their name onscreen? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| **G4** | Are voters able to use the BMD without confusion/questions?<br>*(If no, describe in the Notes section)* | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| **G5** | Are voters being prompted to check their printed summary ballot before inserting it into the scanner? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| **G6** | Are voters checking their summary ballot (any time after printing but before placing it into the scanner)? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| **G7** | Are voters placing their own ballot in the ballot scanner? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| **G8** | Are voters able to use the ballot scanner without confusion/questions?<br>*(If no, describe in the Notes section)* | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| **G9** | How many times did you see the ballot scanner return a ballot to the voter/fail to scan the first time a ballot is inserted? | Count: |
| **G10** | Are voters returning their voter card to a pollworker before leaving? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| **G11** | How many times did a voter exit the voting location with either their paper summary ballot or their voter card instead of turning it in? | Count: |
| **G12** | Are voters offered an "I Voted" sticker before they leave? | O Always<br>O Mostly<br>O Sometimes<br>O Never |

| G13 | How many times did a voter ask for language assistance? | Count: |
|---|---|---|
| G14 | How many times did a voter ask for a caretaker or helper to assist with voting? | Count: |
| G15 | Did any voter(s) ask to spoil their ballot and start over after printing? *(If yes, describe why on Notes form – voter mistake, voter thinks printout is wrong, etc.)* | O Yes   O No   O Don't know |
| G16 | Did the scanner ballot box fill to capacity/need to be emptied at any point? | O Yes   O No   O Don't know |
| G17 | IF YES, did pollworkers do the following in view of the public: announce what was happening, break the seal on the ballot box, remove ballots to the black ballot transport bag, seal the black ballot transport bag, seal the ballot box, and fill out the 'Voted Ballot Removal Form' and the 'Scanner Recap Sheet' with the new seal numbers and other appropriate information? | O Yes   O No   O N/A |
| G18 | Did any voter use their phone in the voting location? | O Yes   O No   O Don't know |
| G19 | Is anyone using derogatory or abusive language towards pollworkers or voters? *(If yes, describe the situation in Notes)* | O Yes   O No   O Don't know |
| G20 | Did anyone attempt to inappropriately access, manipulate, or otherwise interfere with any voting equipment? *(If yes, describe the situation in Notes)* | O Yes   O No   O Don't know |
| G21 | Were any voters above 75 years of age or voters with disabilities invited to skip the line? | O Yes   O No   O N/A |
| G22 | Did anyone lodge an official complaint with the pollworkers while you were there? | O Yes   O No   O Don't know |
| G23 | The overall voting process in this voting location is: | O Very Good<br>O Good<br>O Average<br>O Bad<br>O Very Bad |

**PART H: Voting Procedures for Special Circumstances**

| | | |
|---|---|---|
| **H1** | VOTER NOT ON LIST:<br>Are voters not on the voter list (either via the Poll Pad or on the supplemental list) being redirected to the provisional ballot station and offered a provisional ballot? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| | VOTER IN WRONG PLACE:<br>Are voters being redirected to the correct location or, if they want to vote at this location:<br>- BEFORE 5 PM, being told that they can cast a provisional ballot but it will not count<br>- AFTER 5 PM, being told that they can cast a provisional ballot and the contests that they are eligible to vote in will count | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| **H2** | NO ACCEPTABLE ID:<br>Are voters who are told they lack acceptable ID being offered a provisional ballot? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| **H3** | VOTER SENT MAIL BALLOT:<br>If the Poll Pad shows voters were sent a mail ballot, are pollworkers asking voters to surrender/cancel their mail ballot before being allowed to vote? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| **H4** | VOTER SENT MAIL BALLOT – CANNOT SURRENDER:<br>If voters who were sent a mail ballot do not have their ballot with them, are pollworkers:<br>- confirming that the county has not received the mail ballot before allowing the voter to vote as normal, or<br>- if the county has received the ballot/is not available, only allowing a voter to vote a provisional ballot (if they wish)? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| **H5** | VOTER ALREADY VOTED IN PERSON:<br>If the Poll Pad shows voters have already voted early in-person, are pollworkers asking the voter whether they have already voted and:<br>- If the voter says yes, refusing them any ballot and providing contact information for the county to answer any questions | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |

| | | |
|---|---|---|
| | - If the voter says no, only allowing the voter to vote a provisional ballot (if they wish)? | |
| H6 | CHALLENGED VOTER:<br>If the Poll Pad shows voters have been challenged, are voters offered the chance to cure via an affidavit or, if they cannot cure, redirected to the provisional ballot station and offered a challenged provisional ballot? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |

**PART J: Efficiency**

| | | |
|---|---|---|
| J1 | How long did a typical voter have to wait in line before voting?<br>*(To measure, pick a voter who has just entered the line and time how long it takes until they reach the front of the line. E.g. "10 minutes")* | Time: |
| J2 | How long did it take a typical voter to complete the voting process?<br>*(To measure, pick a voter who has just started to check in and time how long it takes until they cast their ballot and exit. E.g. "10 minutes")* | Time: |
| J3 | What was the longest line you saw, and at what time did this occur?<br>*(e.g. "23 people, 7 am")* | Length:<br>Time: |
| J4 | Was the number of pollworkers sufficient for a timely and orderly process? | O Yes   O No   O Don't know |

**PART X: Notes and Other Observations**

Use these pages to either:

- **Give more detail on your answers to any question earlier on the form**
- Describe other observations you feel are important to record

For each comment, include a reference to the **question ID** from the form. Start a **new row for each question**.

For comments **not related to any specific questions in the form, put "0" in the question ID column.**

*EXAMPLE:*

*G13    10:30-11:00. Long discussions with challengers from another nonpartisan organization about the location of this polling station. It is located in a building owned by one of the candidates.*

| Question ID | Commments |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**Fulton County Election Day Checklist – OPENING THE POLLS**

**PART E: Opening the Polls**

*(If you answer "no" to any of these, please explain on the Notes form)*

| | | | | |
|---|---|---|---|---|
| E1 | Are all poll workers in attendance? | O Yes | O No | O Don't know |
| E2 | Are all poll workers sworn in? | O Yes | O No | O Don't know |
| E3 | Are all poll workers wearing name badges? | O Yes | O No | O Don't know |
| E4 | *(Check-in station)* Do poll workers check that the serial numbers on Poll Pad case and tablet match? | O Yes | O No | O Don't know |
| E5 | *(Check-in station)* Do poll workers check that the Poll Pad tablet is turned on and functioning correctly? | O Yes | O No | O Don't know |
| E6 | *(Check-in station)* Do poll workers check that the Poll Pad is set for the correct polling location? | O Yes | O No | O Don't know |
| E7 | *(Check-in station)* Do poll workers check that the check-in count reads zero? | O Yes | O No | O Don't know |
| E8 | *(Check-in station)* Is the supplemental voter list present? | O Yes | O No | O Don't know |
| E9 | *(Check-in station)* Is the paper backup voter list present? | O Yes | O No | O Don't know |
| E10 | *(Equipment carriers)* Do poll workers verify the seal numbers on the doors of the equipment carriers match the numbers on the "Equipment Carrier/Voting Booth Security Seals Form" before seals are broken/doors are opened?<br><br>*(This refers to the grey doors into the supply/scanner areas of the carriers, not the black doors over the voting stations)* | O Yes | O No | O Don't know |

| E11 | *(Scanner in equipment carrier)* Do poll workers verify that the seals on the Emergency Ballot Box door (above the scanner) and the Ballot Box door match the number on the "Scanner/Ballot Box Recap Form," before opening both boxes, confirming that they are empty, resealing them, and noting the new seal numbers on the recap forms? | O Yes   O No   O Don't know |
| --- | --- | --- |
| E12 | *(Scanner in equipment carrier)* Do poll workers verify that the two seals on the front of the scanner are intact, and match the numbers on the Scanner/Ballot Box recap form? | O Yes   O No   O Don't know |
| E13 | *(Voting Stations)* Do poll workers verify the seal numbers on the black doors securing the BMDs in the equipment carriers match the numbers on the "Equipment Carrier/Voting Booth Security Seals Form" before seals are broken/doors are opened?<br><br>*(This refers to the black doors that enclose the touchscreens in the carriers, not the grey doors)* | O Yes   O No   O Don't know |
| E14 | *(Voting Stations)* Once the black doors are opened, do poll workers check the seal/serial numbers on the sides of the BMDs – <u>WITHOUT OPENING SEALS</u> - and record them on the recap sheet?<br><br>*(two seals on the left side of the touchscreen, top and bottom, and one on the upper right side)* | O Yes   O No   O Don't know |
| E15 | *(Voting Stations)* Do poll workers check that the voting machines are turned on and functioning correctly? | O Yes   O No   O Don't know |
| E16 | *(Voting Stations)* Do poll workers check that the date/time on each machine is correct? | O Yes   O No   O Don't know |
| E17 | *(Voting Stations)* Do poll workers check that the public counter on each machine reads zero? | O Yes   O No   O Don't know |

| | | |
|---|---|---|
| E18 | *(Standalone Scanning Station)* Do poll workers check the seals on both the Ballot Box and the Emergency Ballot Box match the recap form before opening both boxes, confirming that they are empty, resealing them, and noting the new seal numbers on the recap form? | O Yes   O No   O Don't know |
| E19 | *(Standalone Scanning Station)* Do poll workers check the rest of the existing seal numbers on the scanner – <u>WITHOUT OPENING THEM</u> - and record them on the recap sheet?<br><br>*(Admin & Poll Worker memory card slots, scanner lock)* | O Yes   O No   O Don't know |
| E20 | *(Standalone Scanning Station)* Do poll workers check that the date/time is correct? | O Yes   O No   O Don't know |
| E21 | *(Standalone Scanning Station)* Do poll workers check that the ballot counter is zeroed, and the two zero reports are printed & stored? | O Yes   O No   O Don't know |
| E22 | Are poll workers comfortable with the technology & setup process? | O Yes   O No   O Don't know |
| E23 | If poll workers had a problem, did they know how to contact HQ and resolve it?<br>*(Please describe any issues on Notes form: missing materials, machine malfunctions, procedural confusion etc.)* | O Yes   O No   O Don't know |
| E24 | Did the voting location open on time at 7 AM? | O Yes   O No   O Don't know |
| E25 | IF NO: at what time did the voting location open for voting? | Time: |
| E26 | If the voting location opened <u>late</u>, what was the cause? | O Missing materials<br>O Absent pollworkers<br>O Locked facility |

|   |   |   |
|---|---|---|
|   |   | O Not set-up |
|   |   | O Unrest |
|   |   | O Other (add Notes) |
|   |   | O N/A |
| E27 | How many people were in line at polls open? | Count: |
| E28 | The overall conduct of the opening of this voting location was: | O Very Good |
|   |   | O Good |
|   |   | O Average |
|   |   | O Bad |
|   |   | O Very Bad |

**Fulton County Election Day Checklist – CLOSING THE POLLS**

**PART I: Closing the Polls**

*(If you answer "no" to any of these, please explain on the Notes form)*

|   |   |   |
|---|---|---|
| I1 | At 7 PM, do pollworkers:<br>- announce that polls are closed,<br>- position a pollworker at the end of the line to ensure that no one in line after 7 pm is allowed to vote, and<br>- allow voters already in line to vote? | O Yes   O No   O Don't know |
| I2 | If the county notifies pollworkers that a court has ordered polls to stay open longer, do the pollworkers comply? | O Yes   O No   O Don't know |
| I3 | At what time did the last voter cast their ballot?<br>*(e.g. "7:04 pm")* | Time: |
| I4 | (Check-in Stations) Do pollworkers note the final check-in number for each Poll Pad on the Poll Pad Recap Sheet before turning them off and storing them? | O Yes   O No   O Don't know |
| I5 | (Voting Stations) Do pollworkers record the total count of voters for each voting machine on the | O Yes   O No   O Don't know |

| | | |
|---|---|---|
| | Touchscreen Recap Sheets before turning off the machines? | |
| I6 | (Voting Stations) Do pollworkers recheck and/or replace the necessary seals and record seal numbers on the Touchscreen Recap Sheets when sealing the black doors in front of the touchscreens? | O Yes   O No   O Don't know |
| I7 | (Scanning Stations) Do pollworkers unseal the emergency ballot box on the scanner, scan any ballots found there through the scanner, and then reseal the emergency ballot box, noting the new seal number on the Scanner/Ballot box Recap Form?<br><br>*(This must be done prior to printing the results tape)* | O Yes   O No   O Don't know |
| I8 | (Scanning Stations) Do pollworkers record the public count on the Scanner/Ballot Box Recap Form and the Ballot Recap Sheet before printing the results tape and turning off the scanners? | O Yes   O No   O Don't know |
| I9 | (Scanning Station) Do pollworkers close polls and print 3 copies of the results tape, posting one copy on the door/window of the polling place? | O Yes   O No   O Don't know |
| I10 | (Scanning Station) Do pollworkers unseal & remove the memory card(s) from the scanner(s), sealing it in the yellow memory card transport bag and resealing the memory card slot on the scanner? | O Yes   O No   O Don't know |
| I11 | Do pollworkers unseal & remove ballots from the ballot box in the scanner(s), sealing them in the black ballot transport bag? | O Yes   O No   O Don't know |
| I12 | Did the sealed ballot bag and all other materials to be transferred remain in sight of the pollworkers until they were loaded into a vehicle for transfer? | O Yes   O No   O Don't know |
| I13 | Was the yellow memory card bag dispatched to a team of (2) runners to return to the election office? | O Yes   O No   O Don't know |

15

| I14 | Are any spoiled or unaccompanied ballots documented on the Spoiled and Unaccompanied Ballot Recap Sheet and properly stored? | O Yes    O No    O Don't know |
|-----|---|---|
| I15 | Are any provisional ballots documented on the Provisional Ballot Recap Sheet and properly stored? | O Yes    O No    O Don't know |
| I16 | Are Poll Pads, unused paper ballots, recap sheets and the numbered list of voters, the supplemental voters list and the backup paper voters list, spoiled/provisional/unaccompanied ballots and other materials securely sealed and stored? | O Yes    O No    O Don't know |
| I17 | Do pollworkers check to make sure that the number of check-ins from the Poll Pad(s) matches the public count on the BMDs and the public count on the scanner? *(Note that spoiled, emergency, & unaccompanied ballots may also need to be factored in.)* | O Yes    O No    O Don't know |
| I18 | Did the pollworkers have difficulties in completing the closing procedure and paperwork? | O Yes    O No    O Don't know |
| I19 | The overall closing process in this voting location is: | O Very Good<br>O Good<br>O Average<br>O Bad<br>O Very Bad |

16

**Appendix 3 – Nonpartisan Observer Code of Conduct**

# Election Observer Code of Conduct

The purpose of election observation is to help ensure the integrity of the election process, by witnessing and reporting accurately and impartially on each aspect of the process to evaluate whether it is conducted in an open and transparent manner and in conformity with applicable laws and electoral regulations. Election observation and monitoring also seeks to ensure the integrity of the election process by calling on all electoral actors (including the candidates, political parties, those supporting or opposing referendum initiatives, election officials, other governmental authorities, mass media, and voters) to respect the laws and election-related rights of all citizens and to hold accountable those who violate the law or any person's election-related rights.

**While serving as a Nonpartisan Election Observer, I will:**

- **Be an informed observer**
    - I will complete all required election observation training, familiarize myself with relevant election law and processes prior to the election, and adhere to the observation methods used by The Carter Center.

- **Be an objective observer**
    - I will report what I see – whether positive or negative – impartially, accurately, and in a timely manner. I will adhere to the highest standards of accuracy of information and impartiality of analysis. I will document my observations and return this documentation to The Carter Center. If I report a serious problem, I will include documentation sufficient to allow for verification.

- **Respect the election process**
    - I will respect state and federal election laws, follow the instructions of election officials, and maintain a respectful and professional attitude at all times.

- **Remain politically neutral**
    - I will not publicly express or exhibit any preference for or against any candidate, political party, initiative, or public official.

- **Protect the integrity of the election**
    - I will not interfere with election processes or procedures. If I have objections or concerns, I will elevate them using the methods from my training.

- **Follow the rules and guidance of the observer organizations**
    - I will follow this code of conduct, and any written or verbal instructions given by the Carter Center's observation effort leadership. I will report any conflict of interest that I may have and report any improper behavior that I see conducted by any other observers that are part of this effort.

- **Refrain from speaking about the observation process on social media, to the media or to the public**
  - I will refrain from making any personal comments on my observations to the media or members of the public (including through social media). I will refer all media enquiries to The Carter Center leadership team.

I understand that my violation of this Code of Conduct may result in my accreditation as observer being withdrawn and my dismissal from the observation effort.


NAME (please print):


Signature:


Date:

# Voting Area Posters and Signs

**Signs to be placed** INSIDE POLLING SITE:





**POLL WORKER AREA**

**NO LEAVING WITH BALLOT**



**LARGE PRINT VIEWING**



**VOTER NOTICE**

**BALLOT REVIEW**



**VIDEO SURVEILLANCE**



**PROOF OF CITIZENSHIP**



**NOTICE OF PENALTIES**



**GEORGIA VOTING INFORMATION**



**SAMPLE BALLOT - WALL POSTERS**

*Sample Ballot flyers will also be provided for distribution to voters*



**CARD OF INSTRUCTIONS**



**IDENTIFICATION REQUIRED**



**NOTICE TO VOTERS 75 OR OLDER**



**PROHIBITION OF ELECTRONICS**

**Appendix 5: Voting Location Diagrams**

As part of their checklist, observers were asked to make a rough sketch of the layout of each voting location they observed. They are included here to show variation in layout and placement of the equipment containers. From top to bottom, the diagrams show: Sutton Middle School, Roswell High School, and Buckhead Library.





# EXHIBIT 2



# Office of Secretary of State

*Brad Raffensperger*
**SECRETARY OF STATE**

*C. Ryan Germany*
**GENERAL COUNSEL**

May 18, 2020

<u>VIA ELECTRONIC MAIL</u>

Doris Cooley
Administrative Procedures Division
5800 Jonesboro Road
Morrow, GA 30260
Email: aparules@sos.ga.gov

> Re:   Letter of Transmittal
>        Rules of the State Election Board

Dear Ms. Cooley:

Please find transmitted electronic versions of the following rules for filing in accordance with the Georgia Administrative Procedures Act: Rule 183-1-14-0.7-.15.

Should questions arise about these rules, please contact me at (470) 312-2808 or rgermany@sos.ga.gov.

Sincerely,

Ryan Germany

Attachments

**RULES
OF
STATE ELECTION BOARD**

**CHAPTER 183-1
GEORGIA ELECTION CODE**

**SUBJECT 183-1-14
ABSENTEE VOTING**

**TABLE OF CONTENTS**

183-1-14-0.7-.15 Processing Absentee Ballots Prior to Election Day

**RULE 183-1-14-0.7-.15 Processing Absentee Ballots Prior to Election Day**

(1) For the Elections held on June 9, 2020, beginning at 8:00 a.m. on the second Monday prior to Election Day, county election superintendents shall be authorized to open the outer envelope of accepted absentee ballots, remove the contents including the absentee ballot, and scan the absentee ballot using one or more ballot scanners, in accordance with this rule, and may continue until all accepted absentee ballots are processed. However, no person shall tally, tabulate, estimate or attempt to tally, tabulate or estimate or cause the voting equipment to produce any tally or tabulation, partial or otherwise, of the absentee votes cast until the time for the closing of the polls on Election Day.

(2) Absentee ballots shall be processed in batches of not more than 100. At least three persons who are registrars, deputy registrars, poll workers, or absentee ballot clerks must be present at all times during the processing of a batch of absentee ballots.

(3) Outer envelopes shall be opened in such a manner as not to destroy the oath and signature of the voter.

(4) All outer envelopes in a batch shall be counted and recorded on a reconciliation form prior to opening the outer envelopes of a batch. Upon opening the outer envelopes of a batch, the contents shall be removed in a manner that ensures that the contents of the envelope cannot be matched back to the outer envelope. Once all of the outer envelopes of a batch have been opened and the contents removed, the inner envelopes and/or secrecy sleeves shall be opened and the absentee ballots removed. Once all of the absentee ballots have been removed, the number of ballots shall be counted and recorded on a reconciliation form and compared to the original count of outer envelopes in the batch. Any discrepancy shall be investigated and recorded on a reconciliation form. The form shall be signed by the officials processing the batch of ballots. The absentee ballots shall then be scanned on a ballot scanner. A batch number assigned by the ballot scanner shall be recorded on the reconciliation form for that batch. Any ballot that is so torn, bent, or otherwise defective that it cannot be processed by the scanner shall be duplicated pursuant to O.C.G.A. § 21-2-483. Vote review panels shall be established, as needed, to adjudicate any rejected ballots per O.C.G.A. § 21-2-483 and Rule 183-1-15-.02. Once

successfully scanned, the batch of ballots shall be bound together with the reconciliation form (or a copy thereof) and the official who scanned the ballots shall notate on the reconciliation form that the batch has been scanned, including the date and location of the scanning, and initial the notation.  The scanned absentee ballots shall then be secured in a container. More than one batch of scanned absentee ballots may be placed in the container, but the individual batches must be separately bound. A security seal shall be placed on the container. The batch number(s), the number of scanned absentee ballots in each batch, and the security seal number shall be recorded on the container.

(5) If the county election superintendent chooses to scan absentee ballots prior to Election Day according to this Rule, the superintendent shall notify the Secretary of State in writing at least seven days prior to processing absentee ballots.

(6) The proceedings described in this rule shall be open to the view of the public, but no person except one employed and designated for the purpose by the superintendent shall touch any ballot or ballot container. The state executive committee of each political party and political body having candidates whose names appear on the ballot in such county shall have the right to designate two persons and each independent and nonpartisan candidate whose name appears on the ballot in such county shall have the right to designate one person to act as monitors for such process.  The designated monitors shall be given a letter by the designating entity containing the name of the monitor, his or her address, and the county in which he or she may monitor the process. A copy of the letter designating the monitor shall be delivered to the county elections superintendent prior to the monitor being allowed to monitor the process. Each monitor shall wear a name tag indicating their name and the entity that designated them while monitoring the process. Any other observer shall be required to wear a name tag that indicates their name and that they are a public observer. The superintendent may make reasonable regulations, including regulations regarding social distancing measures and required personal protective equipment, that designated monitors and observers shall follow so that they do not interfere in any way with the processing of ballots or conduct of the election. If a monitor or observer interferes with the processing of the ballots or conduct of the election after being duly warned by an election official or superintendent, or if he or she violates any of the prohibited activities in this rule, the superintendent may revoke the person's designation to monitor the process, remove them from any further monitoring or observing, and refer the incident to the Secretary of State's office for investigation. Any infraction or irregularity observed by a monitor or observer shall be reported to the superintendent or to the Secretary of State. No person whose name is on the ballot shall be eligible to serve as a designated monitor.

(7) While viewing the process set forth in this rule, monitors and observers are prohibited from:

   (a)  In any way interfering with the processing of absentee ballots or conduct of the election;

   (b)  Using or bringing in to the room any photographic or other electronic monitoring or recording devices, cellular telephones, or computers;

   (c) Engaging in any form of campaigning or campaign activity;

(d) Taking any action that endangers the secrecy and security of the ballots;

(e) Touching any ballot or ballot container;

(f) Tallying, tabulating, estimating, or attempting to tally, tabulate, or estimate, whether partial or otherwise, any of the votes on the absentee ballots cast; and

(g) Communicating any information that they see, whether intentionally or inadvertently, about any ballot, vote, or selection to anyone other than to an election official who needs to such information to lawfully carry out his or her official duties.

(8) Before being allowed to view the process set forth in this rule, each designated monitor and observer shall execute an oath swearing or affirming, under penalty of perjury, that they understand the prohibitions set forth above, that they will not engage in any prohibited activity, and that they understand any violations of this rule will be punishable by the State Election Board.

(9) The county election superintendent shall publish a written notice, containing the date, time and location where absentee ballots will be processed. Such notice shall be posted in the superintendent's office and on the home page of the county election website at least seven days prior to scanning ballots in accordance with this rule. The Secretary of State shall publish on his website the information he receives from counties stating the dates, times and locations where absentee ballots will be processed.

(10) Any person involved in processing absentee ballots according to this rule shall swear an oath, in the same form as the oath for poll officers set forth in O.C.G.A. § 21-2-95, prior to beginning the processing of absentee ballots.

(11) All cell phones, laptops, audio or video recording devices, and other communication devices shall be prohibited from the room where processing of absentee ballots is taking place, except for county election computers necessary to carry out this rule or otherwise conduct the election. No information concerning the tally of votes, or any partial tally of votes, shall be communicated until the time for the closing of the polls on Election day.

(12) The county superintendent shall be permitted to designate locations where public observers may view the process described in this rule to protect the security and secrecy of the ballots. Monitors designated by political parties, political bodies, and independent and non-partisan candidates shall be allowed to monitor the process described in this rule, but they must do so in a way that does not interfere with election officials. The superintendent may designate locations that allow designated monitors to monitor the process set forth in this rule, and such locations shall include areas that allow credentialed monitors to view the batching of the ballots, reconciliation of envelopes to ballots, scanning the ballots, duplication of ballots, adjudication of ballots by vote review panels, sealing the ballots after scanning, and other such areas as the superintendent may deem necessary to the assurance of fair and honest procedures in the carrying out of the procedures set forth in this rule.

Authority: O.C.G.A. § 21-2-31

CERTIFICATION
OF ADMINISTRATIVE RULES
FILED WITH THE SECRETARY OF STATE
BRAD RAFFENSPERGER

(Pursuant to the Official Code of Georgia Annotated, Sections 50-13-3, 50-13-4, and 50-13-6.)

I do hereby certify that the attached emergency rule is a correct copy as promulgated and adopted on the day of May 18, 2020.

## RULES OF THE STATE ELECTION BOARD

FILED: May 18, 2020

*Rule 183-1-14-0.7-.15 "Processing Absentee Ballots Prior to Election Day" is adopted as attached hereto to become effective on the date of adoption and to remain in effect for a period of 120 days.*

STATUTORY AUTHORITY:

O.C.G.A. §§ 21-2-31

Due to the ongoing public health emergency related to the COVID-19 pandemic, the State Election Board adopts the above Emergency Rule pursuant to O.C.G.A. § 50-13-4(b).

This 18th day of May, 2020.

C. Ryan Germany
General Counsel
Office of the Secretary of State

Sworn and subscribed before me this 18th day of May, 2020.

Notary Public:
My commission expires:

**Ari Schaffer**
**NOTARY PUBLIC**
**DeKalb County, GEORGIA**
**My Commission Expires 01/30/2024**