IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COALITION FOR GOOD GOVERNANCE, *et al.,* <br><br>     *Plaintiffs*, <br><br> v. <br><br> BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.,* <br><br>     *Defendants*. | CIVIL ACTION <br><br> FILE NO. 1:21-CV-02070-JPB |

## PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Plaintiffs file this Response to Defendants' Motion for Summary

Judgment.  (ECF No. 123).

## I.    INTRODUCTION

In their Motion for Summary Judgment, Defendants repeat meritless

arguments on the law that this Court thoroughly rejected in its order denying

their Motion to Dismiss.  (ECF No. 78).  Defendants argue again that

Plaintiffs do not have standing under *Clapper v. Amnesty Intl. USA,* 568 U.S.

398 (2013), that Plaintiffs' injuries from the challenged laws are not traceable

to the Defendants who are charged with their enforcement, and that this case

does not fall within the *Ex parte Young* exception to the Eleventh

Amendment.   The Court has rejected each of these arguments before and should do so again.

The only possibly new argument that the Defendants advance is that the Plaintiffs' claims are not justiciable (either because of standing or on the merits) because the challenged laws have not yet been enforced against them. But this has never been the law.  Courts routinely allow pre-enforcement challenges, even to rarely invoked statutes. *E.g., Babbitt v. Farm Workers*, 442 U.S. 289 (1979).  *See also Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014).  Plaintiffs have standing because the laws, even before their enforcement, chill the exercise of their constitutional rights and, separately, because they have a credible fear of prosecution. *Wollschlaeger v. Governor of Florida,* 848 F.3d 1293 (11th Cir. 2017).  Moreover, this action for prospective injunctive relief is timely brought *before* any additional injury is caused by the enforcement of the statutes.  *Summit Medical Associates, P.C. v. Pryor,* 180 F.3d 1326, 1338 (11th Cir. 1999).

The only evidence that Defendants have submitted in support of their Motion for Summary Judgment concerns policy justifications for some of the challenged laws.  But, as explained below, Defendants attempt to justify laws that Plaintiffs do not challenge, such as the provisions of SB 202 allowing the performance review process recently undertaken in Fulton County, or the

Communications Rule's prohibition on the disclosure of vote tallies.  As for the laws Plaintiffs do challenge, Defendants have little or nothing to say.  For example, Defendants provide no justification for the law that that allows Defendant State Election Board to remove (but not replace) boards of registration, or the law forbidding any communication whatsoever about absentee ballot processing.

## II.   STANDING

### A.   Organizational Standing

Defendants do not address or challenge the organizational standing of Plaintiffs Coalition for Good Governance ("CGG"), Jackson County Democratic Committee ("JCDC"), or Georgia Advancing Progress Political Action Committee ("GAPPAC").[1]  These organizations are parties[2] to every count except for Count I.  Because Defendants do not challenge the standing

---

[1] Defendants do not mention organizational standing in their Brief (ECF No. 123-1, *passim*) and identify no material facts relating to organizational standing in their Statement of Material Facts (ECF No. 123-2, *passim*).  Defendants also did not file the transcripts of the Rule 30(b)(6) depositions of the organizational plaintiffs.

[2] The Second Amended Complaint, like the prior complaints, defines two groups of plaintiffs.  The "Board Member Plaintiffs" are Plaintiffs Lang, Pullar, McNichols, Shirley and Thomas-Clark."  (ECF No. 104 at 119, ¶ 348).  The Board Member Plaintiffs are the only parties to Counts I. The "Voter Plaintiffs" are all the Plaintiffs (including organization plaintiffs and Board Member Plaintiffs) except for Plaintiff Friedman.  The Voter Plaintiffs are parties to Counts II through XI. Plaintiff Friedman, a California resident, is a party to Counts VII through XI.

of the organizational plaintiffs, the Defendants arguments relating to the

other plaintiffs on Counts II to XI (meritless anyway), are immaterial.

"Where only injunctive relief is sought, only one plaintiff with standing is

required." *Martin v. Kemp,* 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018); *see*

*also Glassroth v. Moore,* 335 F.3d 1282, 1293 (11th Cir. 2003) ("Having

concluded that those two plaintiffs have standing, we are not required to

decide whether the other plaintiff . . . has standing.").   As for Count I, the

Board Member Plaintiffs' standing is addressed below, in Part B.

Although they have no burden to do so,[3] each of the three

Organizational Plaintiffs have gone far beyond their pleadings and presented

evidence that the challenged laws "impair its ability to engage in its projects

by forcing the organization to divert resources to counteract those illegal

acts." *Fla. State Conf. of NAACP v. Browning,* 522 F.3d 1153, 1165 (11th Cir.

2008).   Citing the Declaration of CGG Executive Director Marilyn Marks, this

Court found in its Order on Plaintiffs' Motion for Preliminary Injunction that

---

[3] Plaintiffs have the ultimate burden at trial to prove standing, but Plaintiffs have
no burden on summary judgment to rebut arguments that Defendants do not make.
"When a party moves for summary judgment on ground A, his opponent is not
required to respond to ground B—a ground the movant might have presented but
did not." *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir. 1989) (Posner, J.);
*John Deere Co. v. American National Bank*, 809 F.2d 1190 (5th Cir. 1987) (reversing
granting of summary judgment on ground not advanced by moving party).

CGG "likewise testified that it is diverting resources to provide advice to its members regarding how to navigate SB 202's requirements.  Marks Decl. ¶ 13, ECF No. 15-3."  (ECF No. 49 at 10).  In the recent Rule 30(b)(6) deposition of CGG, Ms. Marks testified as to how CGG continues to divert its resources to counteract SB 202.  (ECF No. 130 at 32:22-36:7; 39:20-41:18).

In its Rule 30(b)(6) depositions, Plaintiff JCDC verified its allegations of standing in the Second Amended Complaint (found at ECF No. 104 at 114 to 115, ¶ 329; *see* ECF No.128 at 21:23-23:7) and described the organization's continuing diversion of resources (*id.* at 27:12-17).   In its Rule 30(b)(6) depositions, Plaintiff GAPPAC verified each of its allegations of standing in the Second Amended Complaint (found at ECF No. 104 at 80-82, ¶¶ 201-210; *see* ECF No. 126 at 24:24-25:6).   GAPPAC Chair Cam Ashling explained how SB 202 has made it more difficult to recruit poll monitors and how her organization continues to divert resources to educate volunteers on the dangers of the challenged laws.  (*Id.,* at 60:14-21).

Defendants point to no evidence rebutting the testimony of the Organization Plaintiffs.  Plaintiffs have therefore established that at least one plaintiff has standing as to Counts II through XI.

**B.      Board Member Plaintiffs Have Standing**

Relying again on *Clapper* and *Tsao v. Captiva MVP Rest. Partners,*
*LLC,* 986 F.3d 1332 (11th Cir. 2021), Defendants argue that the Board
Member Plaintiffs do not have standing because "there is no evidence of any
pending action against any county boards" and any injury to them "is only
speculative and cannot constitute the basis for any relief."  (ECF No. 123-1 at
15-16).   The argument has already been flatly rejected by this Court.  (ECF
No. 78 at 11) (distinguishing *Clapper* and *Tsao.*

Here, the threat of enforcement of the Suspension Rule is credible and
substantial.  First, and most obviously, Defendants still do not deny that "any
alleged violation of SB 202 will be 'vigorously' prosecuted." (ECF No. 78 at 9).
The Defendants' promise to enforce the challenged statute alone defeats any
argument that the threat of enforcement is not "credible." *See Pernell v. Fla.*
*Bd. of Governors,* 2022 WL 16985720, at *22 (N.D. Fla. Nov. 17, 2022).

Second, though the SEB has not suspended any superintendent, it has
initiated proceedings under SB 202 that easily could have led to the
suspension of Fulton County's Board of Elections and Registration.  *See*
*Susan B. Anthony List,* 573 U.S. at 164 (past enforcement "is good evidence
that the threat of enforcement is not 'chimerical'") (citations omitted).

Third, the credibility of the threat is bolstered by the fact that suspension proceedings may be initiated by any number of individuals or political organizations, including the jurisdiction's state legislative delegation, the "governing authority of the county," or the SEB "on its own motion."   O.C.G.A. § 21-2-33.2(a).  *See Susan B. Anthony List,* 573 U.S. at 164 ("The credibility of that threat is bolstered by the fact that authority to file a complaint with the Commission is not limited to a prosecutor or an agency.").

Fourth, the suspension of a Board Member Plaintiff is predicated – not on his or her own violation of an election statute or rule – but upon the violation by the "superintendent," which is defined by Georgia law as the local board in its entirety.   The county board could, over an individual board member's objection, decide to take action that led to a violation of election laws.  Under SB 202, the individual board member would be suspended along with the rest of the board.

In addition, relatively minor violations of Georgia's election laws in two consecutive election cycles may trigger suspension.[4]  This too increases the

---

[4] For example, three violations of the following rules could trigger suspension of the entire board: failure to print an individual badge for each poll watcher, Rule 183-1-13-.04; failure to swear in voting system programmers. Rule 183-1-12-.17; failure to conduct an hourly sweep of each voting station to find any unauthorized materials

credibility of the threat for purposes of standing to bring a pre-enforcement challenge. See *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1259 (11th Cir. 2012) (credibility of threat increased because defendants confirmed "that any minor traffic violation such as failure to use a turn signal or failure to come to a complete stop can provide the requisite probable cause to trigger application" of challenged law).

In sum, the Board Member Plaintiffs have satisfied the injury requirement by "establishing a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement." *Georgia Latino Alliance for Human Rights v. Governor of Georgia,* 691 F.3d 1250, 1257-58 (11th Cir. 2012).

In addition to standing under the diversion of resources doctrine, each of the organizational Plaintiffs has standing because the current laws, even before prosecution, is causing them direct injury because, among other reasons, they are unable to monitor elections effectively. (ECF No. 15-3 ¶¶ 3, 11-15, 17; Marks Dep., ECF No. 130 at 81:6-85:17, 86:1-9; Ashling Dep., ECF No. 126 at 34:3-34:25, 36:2-8; Fuller Dep., ECF No. 128 at 51:22-52:8).

---

left behind. Rule 183-1-12-.11(3)); equipment storage room exceeded 80% humidity on rainy day. Rule 183-1-12-.04(2).

## C.     Individual Plaintiffs Have Standing

In Section B,[5] Defendants address the standing of the Plaintiffs to

challenge the Observation, Tally, and Communications rules, arguing again

that "Plaintiffs have not shown any enforcement or investigation against

them personally for any violations." (ECF No. 123-1 at 17-18).  Initially,

since the organizational plaintiffs are parties to each of these counts, and

their standing is not challenged, the Court need not reach the standing of the

individual plaintiffs.   Nevertheless, Defendants' argument as to the

individual plaintiffs is meritless.

Throughout their Brief, Defendants contend that since none of the

challenged laws have been enforced, that Plaintiffs either do not have

standing or that their claims are for some other reason not justiciable.  This

is not and has never been the law.  Courts routinely allow pre-enforcement

challenges even to rarely invoked statutes.   In *Babbitt v. Farm Workers*, 442

U.S. 289 (1979), the Court found that the plaintiffs had standing to challenge

a criminal provision that "ha[d] not yet been applied and may never be

---

[5] In the first paragraph of Section B, Defendants repeat their "certainty impending"
argument from *Clapper* that this Court rejected in its Order and that is discussed
above.

applied to commissions of unfair labor practices." *Id.* at 302. Because "the State ha[d] not disavowed any intention of invoking the criminal penalty provision," the Court reasoned, the plaintiffs' fear of prosecution was "not without some reason[.]" *Id.  See also Brooklyn Branch of NAACP v. Kosinski,* 2023 WL 22185901 (S.D.N.Y. Feb. 23, 2023) (relying on *Babbitt,* holding that "although it is not certain that Plaintiff or its members will be prosecuted for violating the Line Warming Ban, Plaintiff has established a credible threat of such enforcement").

The controlling test in this Circuit is set forth in *Wollschlaeger,* as this Court explained:

> Therefore, courts allow a plaintiff to bring a pre-enforcement suit 'when he has alleged an intention to engage in the course of conduct arguably affected with a constitutional interest, but prescribed by a statute, and there appears a credible threat of prosecution. *Wollschlaeger,* 848 F.3d 1304 (internal punctuation omitted) (quoting *Driehaus,* 573 U.S. at 159).  This type of injury is not considered too remote or speculative for standing purposes. *See id.* at 1303.

(ECF No. 78 at 7).  The law does not require plaintiffs to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson,* 415 U.S. 452, 459 (1974).  Each of the Plaintiffs are actively involved in those very activities that expose citizens to prosecution under S.B. 202, whether it

is voting in-person, monitoring or observing elections, or gathering news about elections in Georgia.

As to the credibility of the threat of prosecution, again, Defendants do not deny that they intend to "vigorously enforce" SB 202, defeating any contention that the threat of prosecution is not credible.  In addition, this Court found that the evidence presented in support of Plaintiffs' Motion for Preliminary Injunction established that "at least Dufort has demonstrated a credible threat and fear of prosecution because SB 202 is the law, and the record reflects evidence of pending complaints against poll watchers for election monitoring activities not related to SB 202."  (ECF No. 78 at 9).  Defendants do not challenge this finding or cite any evidence suggesting that the threat of prosecution has diminished since this Court's Order.

Second, Defendants' argument ignores the actual Article III injury that Plaintiffs are *currently* suffering because of the laws.  Again, as this Court found:

> Here, the record shows that individual plaintiffs have changed or intend to change their behavior in response to SB 202 or are otherwise impacted by its provisions.  For example, Plaintiff Jeanne Dufort ("Dufort"), a poll watcher, member of the Vote Review Panel of Morgan County and vocal critic of Georgia's election system, testified that the challenged provisions will deter or prohibit her from voting in person, requesting an absentee ballot or serving as a poll watcher or election monitor.

(ECF No. 78 at 8).  In their Motion for Summary Judgment, Defendants do

not address this evidence or attempt to muster any new evidence that would

eliminate an issue of fact on Dufort's – or the other Plaintiff's – actual injury.

In her deposition, Plaintiff Rhonda Martin explained how SB 202 has in fact

changed her behavior:

> Q: [By Mr. Weigel, Defendants' counsel] So as far as your current
> election-related activities as you describe it, taking into
> consideration the one you identified, do you still currently
> participate in all of those Election Day activities or has it
> changed in any way?
>
> A: [By R. Martin] It's changed.  I've been much less likely to be an
> observer during elections because of the difficulties; the threat of
> SB202 and the constraints it places on poll watchers; the dangers
> of being accused of looking at someone's vote intentionally when
> it would be unintentional or impossible to avoid; not being
> allowed to speak about what you see when you observe elections;
> so various parts of SB202, which is why we are here, have made
> it problematic for me to continue the work I was doing before.

(ECF No. 131 at 20:6-20).

In its Order, the Court also reviewed the evidence showing the

"concrete" impact SB 202 was having on Plaintiff Friedman.  Friedman, "host

of a nationally syndicated radio show that addresses election security,

testified that SB 202's restrictions will limit his show's news reporting

activity for upcoming elections."  (ECF No. 785 at 8 (citing Friedman's

Declaration ¶ 8, ECF No. 15-5)).  In his deposition, Mr. Friedman agreed that

gathering information for his listeners and readers about elections in Georgia depends in part on "upon law-abiding citizens being willing to risk violating the law." (ECF No. 127 at 100:2-9; *see also id.* at 62: 17-20 ("Essentially, I may be asking them [his sources] to commit a crime by asking them to, you know, go to a poll, a polling place, and tell me what you see.")).

In sum, even without the presumptions as to which Plaintiffs, as the non-moving party, are entitled, Plaintiffs have easily met their burden of pointing to evidence of actual injury for purposes of Article III standing.

### D.   Traceability and Redressability

Defendants argue that the Governor's general authority to enforce criminal laws, and the SEB and Secretary's general authority to enforce election laws, do not make the injuries caused by these laws traceable to the Defendants or redressed by an injunction against them. (ECF No. 123-1 at 18 – 22).[6] Defendants acknowledge that this Court has already rejected this argument (*see* ECF No. 49 at 11), but contend that the Court relied on Eleventh Circuit caselaw predating *Jacobson v. Fla. Secretary of State,* 974

---

[6] Defendants concede that these traceability and redressability arguments do not apply to the counts challenging the Suspension Rules, and only to the counts challenging the Observation, Tally, Communication and, presumably, Photography Rules. (ECF No. 123-1 at 20).

F.3d 1236 (11th Cir. 2020), *Lewis v. Governor of Alabama,* 944 F.2d 1287 (11th Cir. 2019), and *City of South Miami v. Governor of Florida,* 65 F.4th 631 (11th Cir. 2023), cases which, according to Defendants, compel a different result. (ECF No. 123-1 at 19).  This Court's holding on traceability and redressability is completely consistent with *Jacobson* and *Lewis,* which this Court cited in its discussion, and *City of South Miami,* decided earlier this year.  The facts and holding of these three cases will be discussed in detail below.

*Jacobson.*  Plaintiffs alleged that they were injured because Republicans, not Democrats, appeared first on the ballot in Florida's general elections.   The plaintiffs, however, only sued the Secretary of State, and the Secretary *did not have any role* in determining the sequence of the candidates on the ballot. 974 F.3d at 1253.  Instead, Florida law gave election supervisors, and not the Secretary, authority for the "printing the names of candidates on ballots in the order prescribed by the ballot statute."  Because the Secretary, the lone defendant, would not do (or fail to do) anything that harmed the Plaintiffs, the Court concluded, the plaintiffs "cannot meet Article III's traceability requirement."  *Id.*

In this case, on the other hand, Plaintiffs have also sued the Governor and, as this Court held, the Governor is *the* state official responsible for the enforcement of the laws.  Ga. Const. Art. 5, § 2, ¶ 2.  The Governor further

has the power to commence criminal prosecutions, O.C.G.A. § 17-1-2, and has

the final authority to direct the Attorney General to "institute and prosecute"

on behalf of the state. O.C.G.A. § 45–15–35.

Furthermore, even if the Governor were not a defendant, Plaintiffs'

injuries would be traceable for standing purposes to the SEB.  The SEB has

the power to enforce the challenged provisions by initiating civil prosecutions

which can, and do, result in fines and referrals to the Attorney General for

criminal prosecution.  As the unanimous Supreme Court held in *Susan B.*

*Anthony List*: "administrative action, like arrest or prosecution, may give rise

to harm sufficient to justify pre-enforcement review."  573 U.S. at 165 (citing

*Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619,

625–626, n. 1 (1986) ("If a reasonable threat of prosecution creates a ripe

controversy, we fail to see how the actual filing of the administrative action

threatening sanctions in this case does not")).

*Lewis:* Like *Jacobson, Lewis* featured plaintiffs who simply sued the

wrong defendants.  The City of Birmingham had raised the minimum wage to

$10.10, which was above the $7.25 federal baseline.  In response, the State

Legislature passed a law that voided any local law, including Birmingham's,

from requiring employers to pay wages higher than state of federal law

mandates.  944 F.3d at 1292.  The plaintiffs were two city employees who

were paid at a rate lower than the $10.10 prescribed by the City ordinance.

Rather than suing their employers – whose violation of the City ordinance

was causing plaintiffs harm – the Plaintiffs brought suit against the Alabama

Attorney General, alleging that the State law that voided the Birmingham

ordinance violated Equal Protection.  The Eleventh Circuit held had since

the Attorney General had not done, or threatened to do, anything that

harmed the Plaintiffs, the plaintiffs' injuries were not traceable to the

Attorney General, 944 F.3d at 1299-1301, or redressable by an injunction

against the Attorney General.  944 F.3d at 1301-1303.

*Lewis* is completely consistent with the Court's rejection of Defendants'

traceability and redressability arguments.  Unlike the Attorney General in

*Lewis,* the Defendants here are threatening to enforce the challenged laws

and, also unlike the Attorney General in *Lewis,* are empowered by state law

to do so.  An order enjoining Defendants from enforcing the laws will

obviously redress the harm that will be caused by their enforcement.

*City of South Miami:* Plaintiffs sued the governor and attorney general,

challenging a state law that required local law enforcement to cooperate with

federal immigration officials and allowed local law enforcement to transport

aliens to federal custody.  65 F.4th at 634.  The plaintiffs claimed the state

law was being enforced in a racially discriminatory way by local law

16

enforcement.  The plaintiffs insisted that their injuries were traceable to the

governor and the attorney general and redressable by an injunction against

them "because those officials have sufficient control over law enforcement."

*Id.* at 641.  But the plaintiffs "failed to produce any evidence at trial to

support this claim."  "Indeed, they have offered nothing to prove that the

governor or attorney general has enforced or threatened to enforce" the

challenged law.  65 F.4th at 641.  *City of South Miami* is obviously

distinguishable.  Here, the Defendants have the authority to enforce the

challenged laws and have threatened to do so.

Moreover, all three cases relied upon by Defendants address a

fundamentally different fact pattern.  In none of the three cases were *the*

*plaintiffs* the subject of the challenged regulatory action.  Where, as here, the

plaintiff is the object of the regulatory action, traceability and redressability

are seldom an issue.  The Eleventh Circuit in *Lewis* explained:

> In explaining the traceability and redressability aspects of the
> case [*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)], the
> Supreme Court observed that where, as is perhaps typically the
> case, 'the plaintiff is himself an object of the [regulatory] action
> (or foregone action) at issue,' there is 'ordinarily little question
> that the action or inaction has caused him injury and that a
> judgment preventing or requiring the action will redress it.' . . .
> But when, as the Court said was true in the case before it, 'a
> plaintiff's asserted injury arises from the government's allegedly
> unlawful regulation (or lack of regulation) of *someone else*" –

there, the funding agencies – "much more is needed" to establish standing.

For the foregoing reasons, Defendants' traceability and redressability arguments should be rejected.

## III.    MERITS

### A.    Suspension Rules (Counts I, II and III)

#### 1.    *Count I – Procedural Due Process*

In their long argument on the Board Member Plaintiffs' procedural due process claims, Defendants begin with the question of whether the Suspension Rules provide due process (ECF No. 123-1 at 22 – 24), then address the "initial" question of whether Plaintiffs have a constitutionally protected interest in the first place (*id.* at 24 – 25), and then return to the issue of whether the Suspension Rules provide due process (*id.* at 26 – 27). In this response, Plaintiffs will first address the threshold issue of whether Plaintiffs have a constitutionally protected interest and then address whether the Suspension Rules provide the required due process.

##### a)    *Plaintiffs Have a Constitutionally Protected Property Interest*

Citing *Taylor v. Beckham,* 178 U.S. 548, 576 (1900), Defendants argue that Plaintiffs do not have a constitutionally protected property interest in their tenure as appointed board members of their county's boards of election.

18

(ECF No. 123-1 at 28).  *Taylor,* however, concerned publicly *elected* officials and its holding, reached decades before the currently authoritative Supreme Court due process cases,[7] has never been applied to persons, like the Board Member Plaintiffs, who serve by appointment on governmental boards.

There is abundant authority confirming that the Board Member Plaintiffs have a constitutionally protected property interest in their board seats.  *See, e.g., Langton v. Town of Chester,* 168 F.Supp.3d 597, 606 (S.D. N.Y. 2016) (plaintiff had protected property interest in unpaid, appointed, town library board position); *Cirulli v. Astorino,* 2015 WL 4635707, at *8-10 (S.D.N.Y. Aug. 3, 2015) (plaintiff had protected property interest in unpaid politically appointed board position);  *DeKalb County School District v. Georgia State Board of Educ.,* No. 1:13-cv-00544 (N.D. Ga., Mar. 3, 2013, ECF No. 16 at 8) (Story, J.) (school board member plaintiff "appears to have a property interest that is subject to the protections of the Fourteenth Amendment").  ; *Allman v. Padilla,* 979 F.Supp.2d 205, 219-220 (D. P.R. 2013) (Veteran's Ombudsman "had a property interest in his position that

---

[7] *See Velez v. Levy,* 401 F.3d 75, 86-87 (2nd Cir. 2005) (holding that elected officials did not have a protected property interest, but noting: "We are mindful that, since *Taylor* and *Snowden* were decided, the Court has adopted a more expansive approach to identifying 'property' within the meaning of the 14th Amendment.").

validly stemmed from the enabling statute under which he was appointed");
*Guzman-Vargas v. Calderon,* 672 F.Supp.2d 273, 292 (D. P.R. 2009) (plaintiff had protected property interest in unpaid appointed board position on Puerto Rico Corporation for Public Broadcasting); *Ford v. Blagojevich,* 282 F. Supp. 2d 898, 905 (C.D. Ill. 2003) ("those lawfully appointed as commissioners have a constitutionally protected property interest in the position").  *See also City of Ludowici v. Stapleton*, 258 Ga. 868, 869 (1989) (an "elected . . . official who is entitled to hold office under state law has a property interest in his office which can be taken from him only by procedures meeting the requirements of due process."); *Linskey v. Guariglia,* 2012 WL 1268913, at *8 (M.D. Pa., Apr. 16, 2012) (elected board member had constitutionally protected property interest).[8]

> b)   *Defendants are Not Entitled to Summary Judgment on Whether the Suspension Rule Complies with Due Process*

Defendants explain correctly that the "what process is due" issue is resolved by balancing the factors set forth in *Mathews v. Eldridge*, 424 U.S.

---

[8] Under these cases, a constitutionally protected interest does not depend upon the board membership being a paid position.  *E.g., Cirulli, supra, Guzman-Vargas, supra.*  In this case, however, the Board Memberships are paid positions, further strengthening the claim for due process protection.

319 (1976).  (ECF No. 123-1 at 22-23).  But then Defendants jump to another issue (whether Plaintiffs have a property interest in the first place), *id.* at 24-25, then restate their standing argument, *id.* at 26, and never return to evaluating the *Mathews* factors, much less showing how they could possibility be entitled to summary judgment on such a fact-specific issue.

Along the way, Defendants state that Plaintiffs acknowledge "they would only be deprived of their purported property right *after* a notice and hearing takes place," citing Paragraph 84 of the Second Amended Complaint, ECF No. 104.  But Plaintiffs make no such concession.  Instead, in Paragraph 84(g), Plaintiffs allege, correctly, "[T]here is no stated required notice period for a takeover action when initiated by the SEB."  (ECF No. 104 at 41). O.C.G.A. § 21-2-33.2 states: "the State Election Board may suspend a county or municipal superintendent pursuant to this Code section if at least three members of the board find, after notice and hearing" that a superintendent "has committed at least three violations of this title or of the State Election Board rules or regulations."  But the law does not describe the notice that must be provided and does not say, anywhere, that *individual board members* must be given notice or the opportunity to be heard.

Moreover, Defendants do not address one of the fatal due process defects in SB 202's Suspension Rules.  Throughout, SB 202 refers to the

"superintendent," which is a county's entire board of directors, as if the "superintendent" were an individual board member.  For example, the law states: "In the event that a suspended superintendent or registrar does not petition for reinstatement … *his or her* suspension shall be converted into permanent removal."  O.C.G.A. § 21-2-33.2(e)(2).   This provision makes absolutely no sense at all: the "superintendent" is not a "his or her," it is the entire local board.  Using the wrong personal pronouns is not a constitutional violation.  But whether by mistake or design, SB 202 does not require that the SEB give any notice to any individual board members, either before or after they are deprived of their constitutionally protected property interest in their board positions.  In addition, SB 202 only allows the superintendent (i.e., the entire board) to petition for reinstatement following a suspension; unless a board member convinces a majority of the suspended board to petition for reinstatement, the individual board member's suspension becomes permanent.

Defendants also make the confounding argument that, although it has never been enforced, "the Suspension Rule incentivized the county official to improve the administration of elections."   What Defendants are referring to is the performance review process, not the Suspension Rules that Plaintiffs

are challenging.  Plaintiffs do not challenge the performance reviews and they have nothing to do with this case.

As they did in their Motion to Dismiss, Defendants rely heavily on the decision of Georgia Supreme Court in *DeKalb County School District v. Georgia State Board of Education,* 249 Ga. 349 (2013).  But analysis of that case, and a comparison of the local school board provisions at issue to SB 202, shows exactly why the Suspension Rule violates due process.

In *DeKalb County,* the Georgia Supreme Court held that the local school board removal provisions of O.C.G.A. § 20-2-73 complied with procedural due process under the Georgia Constitution, which the Court held mirrored the requirements of the U.S. Constitution.  294 Ga. at 369.  The Court's analysis of the statutory school board removal provisions shows essential protections missing from SB202:

*Initiation of removal.*   If a local school board receives notice from an accrediting agency of the school system's impending loss of accreditation, it is obligated to self-report the notification to state authorities, which reporting will trigger the Governor's authority to remove the local school board.

23

O.C.G.A. § 20-2-73 (a)(1)(A).[9] As the Georgia Supreme Court found, this provides adequate notice because the process is initiated by the *self-reporting* of the local school board.   294 Ga. at 369.  SB202 begins with a provision that triggers the SEB's authority to initiate removal proceedings upon a "petition" from certain groups of *elected* officials (not the local board of elections) "following a recommendation based on an investigation by a performance review board."  O.C.G.A. §21-2-33.2 (a).[10]  SB202, however, also permits the SEB to initiate removal proceedings "on its own motion," *id., without* an investigation by performance review board.  In addition, another provision of SB202, O.C.G.A. § 21-2-107(d), states: "the findings of . . . *any* audit or investigation performed by the State Election Board may be grounds for removal of one or more local election officials[11] pursuant to Code Section 21.2.33.2(b)." (Emphasis added).  SB202 thus gives the SEB much more independent power to swiftly remove boards of elections than O.C.G.A. § 20-

---

[9] The Governor's authority may also be triggered if one-half of the schools in the district are deemed "turnaround eligible." O.C.G.A. § 20-2-73 (a)(1)(B).  In *DeKalb Schools,* the triggering event was the notice of pending loss of accreditation.

[10] That performance review board is not independent, but one chosen by the State Election Board. O.C.G.A. § 21-2-107(b).

[11] "Local election official" means a county board of elections, a board of elections and registration, a probate judge fulfilling the role of election superintendent, or a municipal election superintendent.  O.C.G.A. § 21-2-105.

2-73 gives to the Governor to remove local school boards.

More significant for procedural due process, however, is that SB202 allows the SEB to begin suspension proceedings "on its own motion" without providing affected individual board members with any notice at all. *Compare DeKalb County,* 249 Ga. at 371 (the notice from the accrediting agency "should give at least some indication of the problems identified by the accrediting agency to which the members of the local board of education could respond").

*Predeprivation hearings.* O.C.G.A. § 20-2-73(a)(1) requires the State School Board to conduct a public hearing in which testimony is taken and then make a recommendation to the Governor as to whether the local school board should be temporarily removed. SB202 provides that the SEB is to conduct a preliminary hearing to determine "if sufficient cause exists to proceed to a full hearing on the petition or if the petition should be dismissed." But no "full hearing" is required by, or provided for, in the law. In addition, SB202, does not require that individual members like the Board Member Plaintiffs receive any kind of notice or grant individual board members an opportunity to be heard at the hearing.

*Reinstatement – postdeprivation hearing.* Crucially, although both O.C.G.A. § 20-2-73 and SB202 provide for the temporary suspension of the

entire board as a group, O.C.G.A. § 20-2-73, unlike SB202, gives *individual*
board members the right to seek reinstatement based upon whether the
removed "member's continued service on the local board of education is more
likely than not to improve the ability of the local school system or school to
retain or reattain its accreditation."  O.C.G.A. § 20-2-73(c).  SB202, by
contrast, allows for reinstatement of the election board entity, not an
individual member, if the service of the "superintendent" – (apparently the
*new appointee* superintendent) "is more likely than not to improve the ability
of the jurisdiction to conduct elections."  SB202 gives the individual board
member no opportunity to be heard – ever – as to whether his or her
continued service would be beneficial.  Thus, under SB202, even an
outstanding board member with impeccable service can be removed and have
no opportunity for separate reinstatement.

In its consideration of whether O.C.G.A. § 20-2-73 complied with due
process, the Georgia Supreme Court placed dispositive weight upon two
features of the law: the requirement that the local boards be given notice of
the deficiencies from objective third parties prior to the initiation of the
removal proceedings and the opportunity it gave to an individual board

member to make his or her case for reinstatement.[12]  SB202 has neither of these due process protections nor any process that resembles it.

Defendants' motion as to Count I should be denied.

2. *Count II – The Suspension Rules Violate Substantive Due Process*

In Count II, Plaintiffs allege that the Suspension Rules infringe on Plaintiffs' substantive due process rights by violating the Georgia Constitution in two distinct ways.  First, the Suspension Rules "constitute a delegation of legislative functions to the executive in violation of the Separation of Powers Clause of the Georgia Constitution, Ga. Const. Art. I, § II, Para. III."  (ECF 104 at 123, ¶ 360).  Second, because the Suspension Rules allow the SEB to remove (but not replace) boards of registrars in counties that have separate boards of registration, it violates Article II, Section 1, Paragraph II of the Georgia Constitution, which provides: "The General Assembly shall provide by law for the registration of voters."  (ECF 104 at ¶ 371).   These state law violations are actionable under Section 1983:

---

[12] 249 Ga. at 370: "Before a member is removed permanently, however, the member is afforded the opportunity to petition for reinstatement;" "the member is afforded the opportunity to represented by counsel, to respond, and to present evidence on all issues involved"; *id.* at 371; the law "permits a suspended member petitioning for reinstatement to present evidence relevant to his or her role." *Id.*

Violations of state statutes or constitutional laws implicating the very integrity of the electoral process constitute a denial of substantive due process under the Fourteenth Amendment. *Gonzalez v. Governor of Georgia,* 978 F.3d 1266, 1271 (2020); *Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981).

In their Motion for Summary Judgment, Defendants repeat the arguments that they made in their unsuccessful Motion to Dismiss, each of which were rejected by this Court.  Defendants first contend that the "claims are not cognizable in federal court because they do not allege 'an ongoing violation of *federal* law and seek[] relief properly characterized as prospective.  *Verizon Md. Inc. v. PSC,* 535 U.S. 635, 645 (2002)."  (ECF No. 123-1 at 30-31 (emphasis added by the Defendants).  Yet the claims seek *only* prospective relief, and it is hard to imagine a claim more cognizable in federal court than one that alleges that the enforcement of a state law should be enjoined because it violates the U.S. Constitution.  Defendants cite *Verizon,* but do not explain the case's relevance.  In *Verizon,* the Court, per Justice Scalia flatly rejected the defendants' jurisdictional argument, holding that "the doctrine of *Ex parte Young* permits Verizon's suit to go forward against the state commissioner in their official capacities."  535 U.S. at 648.

Defendants next argue that Count II, because it turns on state-law violations, intrudes upon state sovereignty contrary to the holding in *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984). *Pennhurst,* however, applies only to state law claims.  Count II is a federal claim brought, explicitly, under Section 1983 and the Fourteenth Amendment.  As the Eleventh Circuit recently held in *Gonzalez,* violations of the state constitution implicating the very integrity of the electoral process also violate federal substantive due process.  *See Duncan,* 657 F.2d at 691.

Defendants next argue that the *Ex parte Young* exception to the Eleventh Amendment does not apply to Count II because there is "no evidence that the SEB has or will use the takeover provision in the cavalier manner suggested by Plaintiffs."  (ECF No. 123-1 at 31).  Initially, this argument improperly conflates the merits of the claim with the *Ex parte Young* inquiry.[13]  To the extent that the *Ex parte Young* issue overlaps with a consideration of the merits, there is no dispute that the SEB has not yet used the suspension provisions – carefully or cavalierly. It also is correct that the

---

[13] As this Court stated in its Order denying Defendants' Motion to Dismiss, "[i]n determining whether the *Ex parte Young* exception applies, a court conducts only a 'straightforward inquiry' into the complaint's allegations and does not analyze the merits of the claim."  (ECF No. 78at 26, citing *Verizon,* 535 U.S. at 645-46).

*Ex parte Young* doctrine applies to on-going violations of federal law.  But, as Judge Marcus explained in *Summit,* 180 F.3d at 1338, *Ex parte Young* does not require "that the enforcement of the allegedly unconstitutional state statute actually must be in progress."  Rather, "where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied."  *Id.*

Moreover, to survive summary judgment on their claims for prospective injunctive relief under *Ex parte Young*, Plaintiffs do not need to show that the enforcement of the Suspension Rules is "imminent."  As Judge Marcus explained in *Summit,* a suit to enjoin the enforcement of an unconstitutional state law under *Ex parte Young* is properly brought "*before* enforcement is imminent."  *Id.* (emphasis added).  In fact, multiple lines of precedent encourage plaintiffs to seek equitable relief at the earliest opportunity to

avoid interfering with an ongoing election[14] or ongoing state criminal

prosecutions.[15]

As to the actual merits of Count II - whether the Suspension Rule is an

unconstitutional delegation of legislative authority - Defendants make only

two brief arguments.  First, Defendants, without elaboration, state that the

issue is controlled by the decision of the Georgia Supreme Court in *DeKalb*

*County,* 294 Ga. at 368 (ECF No. 123-1 at 32).  In *DeKalb,* however, "no one

contend[ed] that OCGA § 20–2–73 vests *legislative* or *judicial* power in the

Governor, an executive officer."  *Id.* (emphasis in original).  In this case,

however, this is exactly the contention: SB 202 vests in the SEB, an executive

office, legislative power by giving the SEB the authority to make the rules

which, if violated, triggers suspension. "A statute will be held

unconstitutional as an improper delegation of legislative power if it is

---

[14] *See Purcell v. Gonzalez*, 549 U.S. 1 (2006).  As this Court explained recently in the consolidated cases, In re. SB 202, No. 1;21-mi-55555 (ECF No. 613 at 33), "[h]ad Plaintiffs filed their motions earlier, their prospective harms would not have been imminent, but had they filed any later, their relief may have been barred by Purcel."  Plaintiffs do not concede that any of the injunctive relief that they now seek would be subject to *Purcell*, but the Court's reasoning demonstrates that it is entirely appropriate to seek injunctive relief well in advance of the enforcement of the challenged statute.

[15] *See Younger v. Harris*, 401 U.S. 37 (1971) (federal courts should abstain from exercising jurisdiction over lawsuits when, among other requirements, the federal proceeding would interfere with an ongoing state judicial proceeding).

incomplete as legislation and authorizes an executive board to decide what shall and what shall not be an infringement of the law, because any statute which leaves the authority to a ministerial officer to define the thing to which the statute is to be applied is invalid." *Howell v. State,* 238 Ga. 95, 95 (1976).

Second, Defendants argue that the issue should be certified to the Georgia Supreme Court. Plaintiffs note that, in *Gonzalez,* Judge Cohen declined the State's request for certification of the state constitutional issue and ruled for the plaintiffs. On appeal, the Eleventh Circuit affirmed, but only after certifying the issue to the Georgia Supreme Court, which agreed with Judge Cohen's analysis of Georgia constitutional law. *Gonzalez,* 978 F.3d at 1271.

Plaintiffs do not necessarily oppose consideration of certifying the delegation issue at the appropriate time, provided the Defendants agree, or the Court order, that the Suspension Rule not be invoked during the pendency of the litigation on the issue. Such a stay would not harm Defendants. To the contrary: pre-existing law (outside of SB 202), gives the SEB full authority to investigate violations of election law and oversee local boards of election. O.C.G.A. §§ 21-2-31(5), 21-2-33.1.

Plaintiffs, however, *do* oppose certification of the "remove-but-not-replace" provision since there is no question that it violates Georgia law (and

Defendants do not contend otherwise).  In counties, like Fulton, that have a

combined board of elections and registration, the issue does not arise.  A

separate board of registration, however, like Chatham County's, is not a

"superintendent" under Georgia law, O.C.G.A. § 21–2–2 (35) (2021), or a

"local election official" under SB202.   O.C.G.A. § 21–2–105 (2021).  A

separate board of registration may be suspended under SB202, O.C.G.A. §

21–2–33.2(e), but only "superintendents" (which includes boards of election

and combined boards of registration and election), may be replaced. Thus,

under SB 202, the SEB may remove, but not replace, a board of registrars,

leaving an entire county and its voters with no official to handle voter

registration or any of the many tasks associated with absentee voting.  (ECF

No. 104 at 29, ¶ 64).

In their Brief, Defendants do *not* deny that removing but not replacing

a board of registrars would be unconstitutional under the Georgia

Constitution.[16]  The Defendants should concede the point and consent to (or

not oppose) an order enjoining its enforcement.

---

[16] The Suspension Rules that allow the SEB to remove (but not replace) boards of
registrars in counties that have separate boards of registration is challenged by the
Plaintiffs in both Count II (substantive due process) and Count III (fundamental
right to vote).  In their Brief, Defendants address this claim only in their discussion
of Count III.

3. *The "Remove but Not Replace" Provision of SB 202 Violates the Fundamental Right to Vote*

In Count III, Plaintiffs allege that the "remove but not replace" provisions of SB 202 violate the fundamental right to vote.  As the Court stated in its Order denying Defendants' Motion to Dismiss, resolving an *Anderson-Burdick* claims requires the Court to balance the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment" against the "precise interest" advanced by the state as a justification for the burden.  (ECF No. 78 at 30 (quoting *Anderson v. Celebreeze,* 460 U.S. 780, 789 (1983)).  There is no dispute that without a board of registration, a county has no means of conducting absentee balloting.

The law plainly is unconstitutional under *Anderson-Burdick.*  The law allows the SEB to disable absentee balloting in an entire county – a severe burden on the right to vote – with no conceivable governmental justification. The only question is whether injunctive relief should be granted is whether Plaintiffs must wait until the SEB actually invokes this provision and guts absentee balloting in an entire county.   The answer is "no."  "A plaintiff 'does not have to await the consummation of threatened injury to obtain preventive relief.'"  *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 473 (7th Cir. 2012) (quoting *Babbitt,* 442 U.S. at 298).

34

### B.  Observation Rule: Counts IV, V, and VI

##### 1.  *Count IV - The Observation Rule Violates the Fundamental Right to Vote*

The Observation Rule makes it a felony to "intentionally observe an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting."  O.C.G.A. § 21-2-568.1.  In its Order on Plaintiff's Motion for Preliminary Injunction, this Court held that the Observation Rule requires the voter to have the intention, not just to see another elector, but of seeing for whom or what the other elector is voting. (ECF No. 49 at 28-29).  Plaintiffs do not agree with that reading of the rule, but for purposes of weighing the burden that the law places on the right to vote, the difference may be immaterial for two reasons.

First, the Court's reading of the Rule may reduce voters' exposure to the felony, but only as a matter of degree, and any conclusion as to whether the burden is "severe," "substantial," or "minimal" for purposes of *Anderson/Burdick,* is essential a fact question that depends upon the credibility of Plaintiffs' testimony.   Given the size of the BMD touchscreen that the state uses for in-person voting, as a factual matter the requirement that the voter have the intention to see for whom or what another elector is voting does not make much of a difference.  The Plaintiffs' evidence, which for

purposes of summary judgment must be taken as true, establishes that voters are genuinely and reasonably fearful that lawfully casting a vote in person in Georgia will subject them to prosecution for a felony.

Without doubt, protecting ballot secrecy is a legitimate state interest. But if existing Georgia law were followed, the Observation Rule, and the burden on the vote that it imposes, would be unnecessary. O.C.G.A. § 21-2-379.22(5) states: "No electronic ballot marker shall be adopted or used" unless they "[p]ermit voting in absolute secrecy so that no person can see or know any other elector's votes." The Georgia Constitution provides: "Elections by the people shall be by secret ballot." Ga. Const. Art. II, § 1, Para. 1. Thus, a voter cannot violate the Observation Rule unless the State has already violated the Georgia Constitution and O.C.G.A. § 21-2-379.22. Or, to put in terms of the *Anderson-Burdick* test, the State interest in ballot secrecy does not make it "necessary to burden the plaintiff's rights" with the Observation Rule, *Anderson,* 460 U.S. at 789; the state simply needs to follow existing Georgia Constitutional and statutory law. If it cannot use electronic ballot markers "so no person can see or know any other elector's votes," then it cannot use electronic ballot markers.

In partial anticipation of this argument, the Defendants make the

breathtaking argument that Defendants are not responsible for ensuring that

BMDs are used in compliance with Georgia law:

> It is the *counties* that select polling locations and decide how to
> set up ballot stations according to the orientation of the space
> they have selected. . . . If the scenario occurs where Plaintiffs
> simply cannot look around without accidentally (but also
> somehow intentionally) viewing other voters' ballots, it is because
> the county has set up the polling location in a way that allows for
> that.

(ECF No. 123-1 at 33-34 (emphasis in original).  But O.C.G.A. § 21-2-

379.22(5) is a state election law that these Defendants are duty bound to

respect and enforce.  Blaming this ongoing violation of Georgia law upon local

superintendents (who the SEB is supposed to be overseeing) is irresponsible

when it has been demonstrated since the system's implementation in 2020

that counties are unable to position BMD touchscreens to avoid ballot secrecy

problems.[17]   If Defendants complied with their duty to ensure that the

superintendents are following Georgia law, and ensured that BMDs were

used properly, then the Observation Rule could not be violated and would be

---

[17] (ECF No. 104 at 29 (photo of Dalton voting location BMD layout); ECF No. 15-1 at
7 (photos of Cartersville and State Farm Arena voting locations); ECF No. 15-3 at
17-19 (multiple photos of voting locations using layout not in compliance with
Secretary's "guidance"); Nakamura Dep., ECF No. 132 at 27:1-4 (across the room "I
could see three BMDs very clearly").

unnecessary.   But the issue is not who amongst Georgia's government officials are responsible for protecting ballot secrecy with the BMDs.  With respect to Plaintiffs' fundamental right to vote claim, it cannot be disputed that the size and placement of the BMDs make it extremely difficult to vote without reasonable fear of committing a felony.  This is at least a substantial burden on the right to vote.

In their Motion for Summary Judgment, Defendants do not point to any undisputed facts supporting any governmental interest that outweighs the burden that the Observation Rule places on the right to vote.  Summary judgment on this claim, therefore, must be denied.

### 2.     *Count V - The Observation Rule is Void for Vagueness*

The Court denied Plaintiffs' Motion for Preliminary Injunction on Plaintiffs' void for vagueness challenge to the Observation Rule, stating that Plaintiffs were unlikely to prevail at trial.  (ECF No. 49 at 31).  Plaintiffs have now submitted evidence creating a genuine issue of material fact as to whether, in the actual context of typical voting locations crammed with large screen BMDs, the vagueness of the Observation Rule allows it to be selectively enforced.  (This evidence will overlap with the evidence supporting the other challenges to the Observation Rule.)  Other than noting that the law has never been enforced, Defendants provide no argument or evidence

supporting summary judgment on this claim.  A trial on the issue will allow the Court to consider this testimony live and consider its strength.

### 3.   *Count VI - The Observation Rule Violates the VRA*

In their Motion for Summary Judgment, Defendants argue that there is no private right of action to enforce the Voting Rights Act, again citing Judge Branch's *dissent* in *Alabama State Conference of the NAACP v. Alabama,* 949 F3d 647, 656-57 (11th Cir. 2020).  The Court already rejected this identical argument, explaining that the Supreme Court's decision in *Brnovich v. Democratic National Committee,* 141 S. Ct. 2321 (2021), "confirms that the Supreme Court has assured that an implied right of action exists under the VRA.  (ECF No. 78 at 36).  Plaintiffs also have submitted evidence supporting their allegations (deemed by the Court sufficient, *id.*) that the Observation Rule could be "invoked to selectively criminalize mere entry into a polling place." Graham Dep., ECF No. 129 at 76:11-13.

### C.   **Communications and Tally Rule (Counts VII, VIII and XI)**

### 1.   *The Communications Rule Violates the First Amendment*

The "Communications Rule," O.C.G.A. § 21-2-386(a)(2)(B)(vii), prohibits "monitors" and "observers," under penalty of criminal misdemeanor, from:

> (vii) Communicating any information that they see while monitoring the processing and scanning of the absentee ballots, whether intentionally or inadvertently, about any ballot, vote, or

selection to anyone other than an election official who needs such information to lawfully carry out his or her official duties.

Plaintiffs do not challenge restrictions on the disclosure of information about tallies of contests "before the close of the polls," but the Communications Rule "criminalizes far more," including "any information about absentee ballot processing or scanning."   (ECF No. 104 at 411).  Plaintiffs allege:

> For example, if a monitor or observer (including the public and members of the press) witnessed scanning machine malfunctions, unsecured ballots, mishandling of ballots, or improperly rejected ballots, such information must not be concealed from the Secretary of State, law enforcement, interested parties and the public.   Under SB202, however, if the monitor or observer reported such discrepancies to someone other than the election official who was responsible for the failure, the monitor or observer would be potentially guilty of a criminal misdemeanor.

(ECF No. 104 at 412).

In its Order on the Motion for Preliminary Injunction, this Court held that content-based restrictions like the Communications Rule are "'presumptively unconstitutional and may be justified only if the government proves that the regulation is narrowly tailored to serve compelling state interests.'" (ECF No. 49 at 16 (quoting *Reed v. Town of Gilbert,* 576 U.S. 155, 165 (2015)).  "However," this Court continued, "the Supreme Court of the United States has 'long recognized that the government may impose some

40

content-based restrictions on speech in nonpublic forums,'" where the justification needs only be reasonable. (ECF No. 49 at 16-17).

The issue to be tried in this case is whether the Communications Rule operates to restrict speech in a nonpublic forum – such as in the "physical space" of the ballot processing room (ECF No. 49 at 18-19), or beyond, and whether there is a sufficient justification for the restriction. In its Order denying Defendants' Motion to Dismiss this claim, the Court observed: "Determining the type of forum where the rules would apply and selecting the appropriate level of review requires the type of substantive merits inquiry that is not appropriate on a motion to dismiss." (ECF No. 78at 40).

In their Motion for Summary Judgment, Defendants do not address the "substantive merits issue" framed by the Court, but instead   claim that the Communications Rule is justified in prohibiting communications about vote counts prior to the closing of the polls. (ECF No. 123-1 at 10, 39). But this argument only makes sense if the Communications Rule prohibited the disclosure of vote counts anywhere, not just in the ballot processing room. Though the argument reveals that the Defendants agree with the Plaintiffs that the Communications Rule prohibits speech anywhere, and not just in the ballot processing room, it is otherwise irrelevant: Plaintiffs specifically do *not*

challenge the restrictions on the disclosure of information about vote tallies "before the close of the polls."  (ECF No. 104 at 412).

The Communication Rule, however, criminalizes the disclosure not only of vote counts, but "any information" "about any ballot, vote or selection," restrictions that the Defendants do not address.

Plaintiffs respectfully submit that Court's reading of the Communications Rule as applying to only communications in the ballot processing room is incorrect.[18]  As discussed above, the Defendants do not read the rule as limited to the ballot processing room.  The "while monitoring" phrase describes the *information* that is subject to the Rule ("information that they see while monitoring"), not the forum in which the speech occurs.   Since it is a content-based restriction on speech outside nonpublic fora and is not narrowly drawn to serve a compelling state interest, the Communications Rule is unconstitutional.

Though Plaintiffs have no burden to do so, Plaintiffs have presented substantial evidence showing how the Communications Rule seriously

---

[18] If any doubt remains on the meaning of this concededly poorly drafted provision, it should be found void for vagueness.  *See Center for Individual Freedom v. Madigan,* 697 F.3d 464, 503-04 (7th Cir. 2012) (Posner, J., concurring) ("We should insist, in the name of the First Amendment, that the Illinois legislature speak with greater clarity."). !!!

inhibits the work, and speech, of poll monitors and observers.  (*E.g.,* ECF No.

15-3 ¶¶ 3, 11-15, 17; Marks Dep., ECF No. 130 at 81:6-85:17, 86:1-9; Ashling

Dep., ECF No. 126 at 34:3-34:25, 36:2-8; Fuller Dep., ECF No. 128 at 51:22-

52:8; Martin Dep., ECF No. 131 at 20:6-20; Nakamura Dep., ECF No. 132 at

27:11-13).

>   **D.     The Tally Rules – Counts VIII and XI**
>
>   > *a)     Overview*

Plaintiffs challenge two Tally Rules as void for vagueness (Count VIII)

and a violation of the First Amendment (Count XI).  Defendants attempt to

defend the broad language of the Tally Rules as necessary to avoid early

disclosure of ongoing vote tallies, which Plaintiffs agree is a critical policy

element of ballot processing.  But the Defendants' analysis fails to distinguish

between the disclosure of information about absentee ballot processes and

ballot counts, which is crucial for election transparency, on the one hand, and

disclosure of *vote* counts before the close of the polls, which is appropriately

universally condemned, on the other.

To review: what Plaintiffs call "Tally Rule 1" makes it a misdemeanor

to "tally, tabulate, or estimate or cause the ballot scanner or any other

equipment to produce any tally or tabulate partial or otherwise, of the

absentee ballots cast until the time for the closing of the polls."  O.C.G.A. §

21-2-386(a)(2)(A).  What Plaintiffs call "Tally Rule 2" prohibits "monitors or observers" "while viewing or monitoring" from "[t]allying, tabulating, estimating, or attempting to tally, tabulate, or estimate, whether partial or otherwise, any of the votes on the absentee ballots cast."   O.C.G.A. § 21-2-386(a)(2)(B)(vi).[19]  The two "Tally Rules" are found in O.C.G.A. § 21-2-386(a)(2), which governs the wide-ranging activities that must be open to the public taking place in the absentee mail ballot processing facilities up until 7 am on Election Day.[20]

There are two important distinctions between Tally Rule 1 and Tally Rule 2.  First, while the Court has read Tally Rule 2 to prohibit speech occurring only in the ballot processing room where the monitoring occurs,[21]

---

[19] The Tally Rule provisions of SB 2020, O.C.G.A. § 21-2-386(a)(2)(A) & (B)(vi), relate to the processing of absentee mail ballots from the third Monday prior to Election Day until 7 AM on Election Day.  Long-existing statutes, codified at O.C.G.A. § 21-2-386(a)(5) & (6), provide different regulations for the same activities beginning at 7 AM on Election Day.

[20] Such activities include, but are not limited to, removing ballots from envelopes, inspecting ballots for damage, manual duplication of damaged ballots, verifying the validity of the ballot style, documenting ballot accounting controls, documenting and verifying chain of custody of ballots and envelopes, scanning and tabulation of ballots, and securing ballots when not in active use.

[21] Tally Rule 2 is in the same subsection as the Communications Rule and presents the same issue as to its territorial scope.  It is Plaintiffs' position that both Tally Rule 2 and the Communications Rule apply to speech anywhere, not just in the ballot room.

Tally Rule 1 contains no such limitation and inarguably prohibits speech anywhere.  Second, the content that Tally Rule 1 regulates is information about the "absentee ballots *cast*." Tally Rule 2, by contrast, regulates information about "*votes on* the absentee ballots cast." The number of absentee ballots cast – the subject of Tally Rule 1 - includes the number of absentee ballots that are in various stages of processing and counting.  "Votes cast," "vote tallies," or "vote counts," the subject of Tally Rule 2, on the other hand, refers to how many votes a particular candidate or a particular proposition has received.  This is a crucial distinction, addressed in greater detail below.

Plaintiffs originally challenged the Tally Rules as void for vagueness under the Due Process Clause because, among other reasons, they criminalize "pure thought."   Plaintiffs did not originally challenge the Tally Rules under the First Amendment because Plaintiffs did not read the Tally Rules as prohibiting or restricting communications.  In its Order on Plaintiffs' Motion for Preliminary Injunction, however, the Court rejected Plaintiffs' reading of the Tally Rules, holding that "objective conduct, rather than mere thought, would be necessary for enforcement," and noting in a footnote that Plaintiffs "mentioned but did not develop and argument that prohibiting communications regarding ballot estimates would implicate the First

Amendment." (ECF No. 49 at 34-35). With leave of Court, Plaintiffs amended their complaint to add a First Amendment challenge to the Tally Rules. (ECF No. 104 at 144).

> b)    *Defendants' Arguments as to Count VIII (Void for Vagueness)*

In their Motion for Summary Judgment, Defendants contend that the Court's clarification that the Tally Rules require objective conduct cures any unconstitutional vagueness in the Rules. The uncertain territorial scope of Tally Rule 2, however, still renders it void for vagueness. *See* note 22, *supra.*

> c)    *Defendants' Arguments as to Count XI (First Amendment)*

In their Brief, Defendants contend that they are entitled to summary judgment on Count XI because, first, the conduct prohibited by the Tally Rules "takes place in a non-public forum." (ECF No. 123-1 at 44). This is incorrect, particularly with respect to Tally Rule 1. Unlike Tally Rule 2 (and the Communications Rule), which might be read to prohibit only speech in the ballot counting room, Tally Rule 1 plainly criminalizes speech about absentee ballots cast wherever that speech may occur, "until the time for the closing of the polls." O.C.G.A. § 21-2-386(a)(2)(A).

Second, Defendants insist that the Tally Rules are "not content-based." (ECF No. 123-1 at 44). This too is incorrect. Both Tally Rules, as this Court

has already held, are explicitly content-based: they criminalize speech about estimating, tabulation, and tallying of absentee ballots cast (Tally Rule 1) or votes on the absentee ballots cast (Tally Rule 2), and not speech about other matters.[22]

Third, Defendants contend that the Tally Rules should be evaluated under *Anderson/Burdick* because the Tally Rules relate to the "mechanics of the electoral process."  This argument is baseless, as this Court has held. (ECF No. 78 at 39).  Plaintiffs do not challenge the Tally Rules as burdens on the right to vote, which *Anderson/Burdick* addresses, but instead as burdens their freedom of speech under the First Amendment.

Having thoroughly misstated the scope of the Tally Rules and the governing law, Defendants have no basis for summary judgment on Plaintiffs' First Amendment challenge to the Tally Rules.  As content-based restrictions on speech, the Tally Rules are presumptively unconstitutional and may be justified only if the government proves that they are "narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert, Ariz.,* 575 U.S. 155, 163 (2015).  *See also Consol. Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 537 (1980) (even if viewpoint neutral, content-based restrictions are

---

[22] In this respect, they are no different that the Communications Rule, which this Court found to be content-based.  *See* Order, ECF No. 49 at 18.

presumptively unconstitutional).  Defendants contend that the government
has a legitimate interest in prohibiting the disclosure of the number of *votes*
cast for candidates or propositions before the close of the polls.  Plaintiffs
completely agree, and such a sound prohibition is almost universal across the
nation. But this governmental interest has nothing to do with Tally Rule 1,
which criminalizes communications about *the number of absentee ballots cast.*
Defendants have identified no governmental interest in criminalizes
communication about the number of absentee ballots cast.    This is public
information that is routinely the subject of public and official oversight and
legitimate press coverage.

### E.    Photography Rules (Counts IX and X)

#### 1.    Overview

The Photography Rules, O.C.G.A. §21-2-568.2 (2)(B), contains two bans.
Photography Rule I (what Plaintiffs called "Photo Ban A") makes it a
misdemeanor to "[p]hotograph or record the face of an electronic ballot
marker while a ballot is being voted or while an elector's votes are displayed
on such electronic market."  In light of the Court's holding that Photography
Rule 1 applies only to photography in the nonpublic forum of a voting location
(ECF No. 49 at 22), Plaintiffs do not challenge Photography Rule 1.
Photography Rule II (what Plaintiffs called "Photo Ban B") makes it a

misdemeanor to "[p]hotograph or record a voted ballot."  This Court granted

Plaintiffs' motion for preliminary injunction as to Photography Rule II,

holding:

> Even if the Court accepts State Defendants' argument that
> Photography Rule II serves the compelling state interest of
> preserving ballot secrecy and preventing fraud, they have neither
> argument that it is narrowly tailored to serve those interests or
> rebutted Plaintiffs' assertion that the rule is a blanket
> prohibition on recording any voted ballot under any
> circumstance.

(ECF 49 at 22).  The Court therefore found that Plaintiffs were likely to

succeed on the merits of their claim.  (*Id.*).

In their Motion for Summary Judgment, Defendants again discuss the

interest in preserving ballot secrecy and preventing fraud (such as through

"vote buying schemes"[23]), but do not address their failure to explain how

Photograph Rule II is narrowly tailored to serve those interests.

Photography Rule II prohibits the recording of a voted ballot at any time,

before or after an election, under any circumstances.  On this basis alone,

Photography Ban II is not narrowly tailored.

Since voted ballots do not disclose the identity of the voter, photographs

---

[23] Vote buying schemes are already a crime in Georgia.  O.C.G.A. § 21-1-579(1).

of them are commonplace and an essential part of transparent elections.  As the historic photos previously filed vividly display,[24] photographs of voted ballots are essential to preserving election transparency, one stated purpose of SB202.  Photo Ban II, which criminalizes them, is unconstitutional.  *See also* GFAF Amicus Brief, ECF No. 29 at 8 – 10.   Defendants articulate no basis for a reconsideration of this Court's ruling.   The Court has found that Plaintiffs are likely to prevail on this claim at trial; a fortiori they have carried their lighter burden of showing that Defendants are not entitled to summary judgment.

2.     *Count X:  Photography Rule – Void for Vagueness*

So long as Photography Rule I is read to apply only to photography in the nonpublic forum of a voting location while active voting is occurring (ECF No. 49 at 22), it is not void for vagueness.   Photography Rule II, if read literally, is not void for vagueness but it is unconstitutional under the First Amendment.   If Photography Rule II is given something other than its plain meaning, then it is to that extent void for vagueness.

Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted this 24th day of August 2023.

---

[24] *See* ECF No. 15-2 at 2-3.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 386-6856
bbrown@brucepbrownlaw.com

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600
CIchter@Ichterdavis.com

*/s/ Greg K. Hecht*
Greg K. Hecht
Georgia Bar No. 003860
HECHT WALKER, P.C.
205 Corporate Center Dr.
Suite B
Stockbridge, Georgia 30281
(404) 348-4881
greg@hmhwlaw.com

*/s/ Shea E. Roberts*
Shea E. Roberts
Georgia Bar No. 608874
GIACOMA ROBERTS & DAUGHDRILL
LLC
945 East Paces Rd.
Suite 2750
Atlanta, Georgia 30326
(404) 924-2850
sroberts@grdlegal.com

<u>CERTIFICATE OF SERVICE AND CERTIFICATE OF COMPLIANCE</u>
<u>WITH LOCAL RULE 5.1</u>

Pursuant to N.D. Ga. L.R. 5.1(C), I certify that the foregoing was prepared using Times New Roman 14 font.  I electronically filed this using CM/ECF, thus electronically serving all counsel of record.

This 24th day of August 2023.

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 386-6856
bbrown@brucepbrownlaw.com
