## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

COALITION FOR GOOD
GOVERNANCE, *et al.*

      *Plaintiffs,*

v.

BRIAN KEMP, in his official capacity
as Governor of the State of Georgia, *et al.*,

      *Defendants.*

Civil Action No.:
1:21-CV-02070-JPB

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

In their response to Defendants' Motion for Summary Judgment [Doc. 123], Plaintiffs continue their strategy of offering a series of self-serving or incomplete interpretations of Georgia law that do not comply with the rules of statutory interpretation or the language of the statute itself. Beyond that, Plaintiffs apparently hope to convince this Court they can get to trial based on the possibility that their entirely speculative fears may one day come to pass. But, as Defendants' Motion for Summary Judgment clearly demonstrates, these fears cannot support Article III jurisdiction. And even if this Court had

jurisdiction, discovery has not yielded any evidence to support the empty allegations of the Second Amended Complaint (the "Complaint").

In addition to these problems, Plaintiffs' response to Defendants' Motion highlights how their pre-enforcement facial challenges are ill-suited for adjudication. Indeed, the statute specifically contemplates that state agencies will promulgate additional regulations in the future. Accordingly, this Court should also grant Defendants' Motion because, absent a plausible claim of facial invalidity, there is no basis to take action until those regulations are put forth by the appropriate state agency.

Finally, each of the merits-based explanations provided by Plaintiffs for surviving summary judgment are equally unconvincing. Plaintiffs rely on a combination of self-serving statutory interpretation and a misreading of caselaw in an attempt to shove their allegations across the line of summary judgment to trial. But nothing in their 50-page response suggests that there is a genuine issue of material fact to be tried. Accordingly, this Court should grant Defendants' Motion for Summary Judgment.

## ARGUMENT AND CITATION TO AUTHORITY

This brief addresses Plaintiffs' Response on the issue of standing before addressing the each of Plaintiffs' merits-based arguments.

## I.     Nothing in Plaintiffs' Response demonstrates that they have made the requisite evidentiary showing of Article III standing to survive summary judgment.

As this Court is aware, it is *Plaintiffs'* burden at this stage of litigation to bring forth evidence demonstrating "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)); *U.S. v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019).  Plaintiffs have not met this standard.

### A.     Plaintiffs misstate the standard for establishing standing by the Organizational Plaintiffs.

Preliminarily, despite Defendants' clear and targeted challenges to standing for **each** of the Plaintiffs in this action—including the Organizational Plaintiffs—the Response attempts to ignore this foundational requirement, claiming the Organizational Plaintiffs "have no burden" to prove standing at the summary judgment phase. [Doc. 134, p. 4].[1] Even if Defendants had failed

---

[1] All citations to filed documents are to the blue ECF paginations at the top of each page.

to challenge Plaintiffs' organizational standing, which they have not, there is no support for Plaintiffs' position in the law.

First, Plaintiffs are incorrect that Defendants did not challenge the standing of the Organizational Plaintiffs. *See* [Doc. 123-1, pp. 17-25]. Defendants challenged the Board Member Plaintiffs on speculative injuries and all Plaintiffs on remaining grounds.

Second, Plaintiffs cannot avoid their burden to show that each element [of Article III standing is] supported . . . with the manner and degree of evidence required **at the successive stages of the litigation**.'" *Jacobson*, 974 F.3d at 1245 (emphasis added) (quoting *Lujan*, 504 U.S. at 561). And standing "must persist throughout a lawsuit." *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022). Plaintiffs cannot avoid this burden by conflating the ever-present demands of constitutional standing with summary judgment motions generally.

Nevertheless, Plaintiffs look to an out-of-circuit Title VII employment-discrimination case for the proposition that they "have no burden on summary judgment to rebut arguments that Defendants do not make." [Doc. 134, p.4 at n. 3] (quoting *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir. 1989)). In *Malhotra*, the defendant moved for summary judgment largely on statutory grounds under the applicable statute of limitations. The district court granted

4

the defendant's request for summary judgment, in part for reasons that were not advanced by the defendant. On appeal, the Seventh Circuit remanded in part, holding, among other things, that the district court erred by granting summary judgment for claims that defendant "had not rebutted on the merits." *Id.* While Defendants in this case agree that, generally, the failure to raise a necessary argument on summary judgment is a sufficient reason for a district court to deny it, granting summary judgment on Article III standing is not the same as a district court relying on a merits-based argument for a party that the party did not itself make.

To the contrary, Article III "[s]tanding 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Thus, "[s]tanding cannot be waived or conceded by the parties, and it may be raised (even by the court sua sponte) at any stage of the case." *Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1307 (N.D. Ga. 2020) (quoting *A&M Gerber Chiropractic, LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019)). This means that Plaintiffs **do** have the burden, here and now, to demonstrate standing.

**B.      Plaintiffs' purported injury-in-fact are all self-imposed harms based on imaginary or speculative fears.**

Besides misstating the applicable standard, Plaintiffs ignore the settled principle that, "[i]n election law cases, an organization can establish standing by showing that it will need to divert resources from general voting initiatives or other missions of the organization to address the impacts of election laws or policies." *Fair Fight Inc. v. Raffensperger,* 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019); *see also Arcia v. Fla. Sec'y of State,* 772 F.3d 1335, 1341 (11th Cir. 2014) ("[O]ur precedent provides that organizations can establish standing to challenge election laws by showing that they will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day."). But that does not give Plaintiffs free rein, as they do here, to conjure up imaginative scenarios wherein a challenged law may be enforced so haphazardly as to bring their usual, lawful, conduct under the ambit of potential prosecution. And it does not create the opportunity for an organization to divert resources for a legal problem that does not exist in order to manufacture standing. *City of S. Miami v. Governor of Fla.* 65 F.4th 631, 638, 640 (11th Cir. 2023). Plaintiffs' efforts to distinguish this binding precedent are unpersuasive.

6

First, Plaintiffs ignore the principle from the very case they cite in their own brief that "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Younger v. Harris,* 401 U.S. 37, 42 (1971)); *Golden v. Zwickler,* 394 U.S. 103 (1969). When a prosecution is not "remotely possible," "[w]e can only hypothesize that such an event will come to pass, and it is only on that basis that the constitutional claim could be adjudicated." *Babbitt*, 442 U.S. at 299, 304. Thus, any adjudication of the speculative harm "would be patently advisory." *Id.* at 304. Yet Plaintiffs base their diversion-of-resources claim on these types of speculative harms, with the only concrete harm identified being the cost of filing this litigation. [Doc. 134, p. 4–5]. But Plaintiffs cannot get their foot in the federal courthouse merely through the costs of pursuing the litigation itself. *See Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990).

In support of Organizational Plaintiffs' purported standing, Plaintiffs' Response cites the 30(b)(6) depositions of each of the organizations to demonstrate there has been a sufficient diversion of resources in response to SB 202. But this evidence is far from sufficient.

Ms. Marks, for example, did not adequately explain the Coalition's (CGG) diversion of resources. The first part of her deposition cited in Plaintiffs' Response deals exclusively with projects CGG would have engaged in but for

the *litigation* related to SB 202, not because of SB 202 itself. As she explained, "[w]ell, primarily we would prefer never to have to litigate provisions and challenge provisions of SB 202. And there are other things that we would have chosen to prioritize as our activities." [Doc. 130 at 32:22–33:1]. Each purported diversion she describes in this section deals with costs associated with the litigation, which is insufficient for standing. *See Spann*, 899 F.2d at 27.

The other purported resource diversion Ms. Marks claims CGG incurred is purely the result of the organization's speculative concerns in the way the challenged provisions might one day be applied to the organization's members and possibly others. *See* [Doc. 130 at 39:20–41:18]. But the informal "training" provided here by CGG to those who occasionally reach out seeking guidance is not yet necessary unless a Court or some prosecuting entity interprets SB 202 in the way CGG fears. And, as already mentioned, claimants "having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Babbitt,* 442 U.S. at 298; *see also City of S. Miami*, 65 F.4th at 638, 640. For these reasons, CGG lacks diversion-of-resources standing. And the same is true of the other Organizational Plaintiffs.

Similarly insufficient is the testimony by Larry Fuller, on behalf of Jackson County Democratic Committee (JCDC), that resources had to be diverted "**to engage in this legal action** and protect its interests." [Doc. 128, 22:8–11] (emphasis added). And other purported resource diversion by JCDC

rests on the flawed notion that the organization would need "to explore mitigating strategies to the voter intimidation **that is certain to be experienced**" because of SB 202. *Id.* at 22:8-23:7 (emphasis added). Not only is this an "imaginary or speculative" fear, but Plaintiffs can also point to no admissible evidence that the election of 2022 led to what JCDC predicted was "certain to be experienced." Resources that were diverted to alleviate this non-existent harm do not amount to an injury-in-fact for purposes of Article III. *City of S. Miami*, 65 F.4th at 638, 640.

Finally, the purported diversion described by Cam Ashling on behalf of Plaintiff GAPPAC rests on the same shaky and subjective foundation as the other organizational plaintiffs, because her testimony is only that the organization has not had as much success recruiting poll monitors as before, claiming "[i]t shouldn't be this hard." [Doc. 126 at 59:22–60:21].

## C.   Board Member Plaintiffs lack standing.

In their attempt to show a non-speculative injury to the Board Member Plaintiffs, the Response does not deny the chain of possibilities necessary for any injury. *Compare* [Doc. 134 pp. 6–8] *with* [Doc. 123-1, pp. 18–19]. Instead, Plaintiffs rely on the threat of potential enforcement. But, as discussed below, a pre-enforcement challenge does not mean an injury exists in every possible context. *Babbitt,* 442 U.S. at 298. Thus, Board Member Plaintiffs cannot establish an injury by their fears alone.

**D.    Individual Plaintiffs lack standing.**

As to the Individual Plaintiffs, their brief relies primarily on two cases to demonstrate standing. First, Plaintiffs note that "[c]ourts routinely allow pre-enforcement challenges even to rarely invoked statutes," [Doc. 134, p. 9]. While that is true enough, the case they cite for that proposition contains the important caveat noted in the previous section, i.e., that an injury in a pre-enforcement challenge does not apply to "imaginary or speculative" fears. *Babbitt,* 442 U.S. at 298. And this caveat connects the question of standing with the merits of Plaintiffs' claims about these provisions because the reason *why* the harm is "imaginary" is largely attributable to Plaintiffs' extremely unlikely interpretation of the law. While this error infects each of Plaintiffs' theories, Plaintiffs cite to the Observation Rule, [Doc. 134, p. 12], which highlights the issue with the Individual Plaintiffs' standing more broadly.

The Observation Rule occupies Counts IV–VI of Plaintiffs' Complaint. It provides simply that, other than for those providing authorized assistance in voting or children authorized to be in the enclosed space, it is a felony to "intentionally observe an elector while casting a ballot in a manner that would allow such person to see for whom or what the elector is voting." O.C.G.A. § 21-2-568.1. The "intentional" aspect of this rule is sufficient to ameliorate the Plaintiffs' fears that merely "casting a vote in person in Georgia will subject them to prosecution and felony." [Doc. 134, p. 36]. Indeed, no Plaintiff has

10

suggested they *intend* to observe the casting of a ballot in violation of the statute. Plaintiffs only posit their speculation that they *might* be prosecuted if someone misinterprets their actions *and* misinterprets the law. But this means that any fears Plaintiffs have are precisely the "imaginary and speculative" concerns *Babbitt* noted do not support standing.

Plaintiffs attempt to avoid the speculative nature of their claims by relying on the general rule that plaintiffs may bring a pre-enforcement suit "when he has alleged an intention to engage in the course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there appears to be a credible threat of prosecution." *Wollschlaeger v. Governor of Fla.,* 848 F.3d 1293, 1304 (11th Cir. 2017) (internal punctuation and citation omitted). But this rule does not bring the Observation Rule—or any other of Plaintiffs' challenges—within the ambit of a pre-enforcement challenge. Notably, no plaintiff has "alleged an *intention* to engage in the course of conduct… proscribed by a statute." *Id.* (emphasis added). That is to say, no Plaintiff has alleged an intention to "intentionally observe" another voter's ballot in a way that the Observation Rule prohibits or to engage in other activities proscribed by the statutes. To the contrary, Plaintiffs' concerns about their own conduct deal exclusively with potential *unintentional* observations. And that is not enough to state a pre-enforcement challenge under *Babbitt* or *Wollschlaeger.*

Thus, because the standing of the Individual Plaintiffs depends on an unlikely and contextually improper interpretation of the statutes at issue and a similarly unlikely chain of events occurring that would ultimately lead to their prosecution, their purported fears of prosecution do not constitute sufficient evidence for this Court to grant them jurisdiction.

## II.   Even if Plaintiffs could show an injury-in-fact, they still have not demonstrated traceability and redressability for their claims.

Plaintiffs also have no answer to the Eleventh Circuit law Defendants highlighted in their Motion on traceability and redressability. Plaintiffs' Response attempts to distinguish this case from the *Jacobson* and *Lewis* line of cases by recasting the general authorities of the Governor or State Election Board's as legal duties specifically implicated by the challenged provisions. The trouble is that the criminal provisions of the challenged laws do no such thing. Instead, they "are only enforceable by district attorneys or other prosecutorial officials." [Doc 123-1, p. 21] (citing O.C.G.A. §§ 21-2-598, -599, -600, 15-18-6, 17-7-71). This matters, because district attorneys and prosecutors "are independent officials under [Georgia] law who are not subject to the [Defendants'] control." *Jacobson*, 974 F.3d at 1253. Thus, the challenged provisions are not traceable to Defendants despite Plaintiffs' continuing citation to general powers—which are insufficient. *City of S. Miami*, 65 F.4th at 640; *Jacobson*, 974 F.3d at 1254; *Lewis v. Governor of Ala.*, 944 F.3d 1287,

1300 (11th Cir. 2019) (en banc). But perhaps more importantly, enjoining Defendants would do little to resolve the Plaintiffs' purported harm here.

Plaintiffs nonetheless argue that this case is distinguishable from the *Jacobson* line of cases because "[i]n none of the three cases were the plaintiffs the subject of the challenged regulatory action," [Doc. 134, p. 17], and here, Plaintiffs claim they sit squarely in the regulatory crosshairs. But that misses the point of the redressability inquiry, which demands of federal courts to ensure that it be "the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury." *Jacobson*, 974 F.3d at 1254 (quoting *Lewis*, 944 F.3d at 1301). Plainly, no order by this Court against the Defendants in this action can address the criminal prosecutorial concerns Plaintiffs have advanced here because any prosecutor in Georgia would remain free to prosecute Plaintiffs even after an order from this Court.

Further, any persuasive effect that an order from this Court might have on district attorneys and other non-party prosecutorial officials does not otherwise establish redressability: "If courts may simply assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees, then redressability will *always* exist." *Lewis*, 944 F.3d at 1305 (emphasis in original) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment)). Plaintiffs' arguments on redressability

13

ultimately miss the mark because they fail to account for the fact that the power of federal courts is "more limited: [they] may 'enjoin executive officials from taking steps to enforce a statute.'" *Jacobson,* 974 F.3d at 1255 (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018)). Accordingly, "[r]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Franklin*, 505 U.S. at 825 (Scalia, J., concurring in part and concurring in the judgment)). That is why the key questions for traceability and redressability "are who caused the injury and how it can be remedied." *City of S. Miami*, 65 F.4th at 640. Because Defendants here are not the cause of Plaintiffs' imagined injury, they cannot meet the redressability requirement and thus lack standing.

For the foregoing reasons, the remaining claims of Plaintiffs' complaint are neither traceable to nor redressable by an order of this Court against Defendants.

## III. Defendants are entitled to summary judgment on the merits of Plaintiffs' claims.

But even if Plaintiffs could satisfy all the elements to demonstrate standing, Defendants are still entitled to summary judgment on the merits.

A.     **The Suspension Rules provide Board Member Plaintiffs with due process.**

Beginning with the Suspension Rules: As with many of their claims, Plaintiffs read those Rules in a way that defies the text of the statute in order to bolster their due process claim. [Doc. 134, pp. 18–27]. But any plain reading of the statute reveals their due-process allegations to be meritless. While Plaintiffs concede that any suspension of a county or municipal *superintendent* can only occur "after notice and hearing," [Doc. 134, p. 21], they take issue with the contention that the "law does not describe the notice that must be provided and does not say, anywhere, that *individual board members* must be given notice or the opportunity to be heard." *Id.* (Emphasis original). Far from assisting them on the merits of the claims, the concerns Plaintiffs have only highlighted the problems with their decision to bring a pre-enforcement facial challenge to this provision of SB 202.

O.C.G.A. § 21-2-33.2(b) not only provides for a "preliminary investigation" to be followed by a "preliminary hearing," it also directs the State Election Board to "promulgate rules and regulations for conducting such preliminary investigation and preliminary hearing." These rules have not yet been promulgated, but they provide the State Election Board with the ability to responsibly fill in any purported interpretive gaps Plaintiffs claim to see as problematic, including establishing a protocol for providing a more descriptive

15

notice procedure to individual members of a superintendent and any Board as a whole.[2] Further, once the preliminary hearing occurs, the State Election Board is then statutorily required to provide a "full hearing" or to dismiss the petition against the superintendent. *Id.* And if that were not enough, the Georgia Administrative Procedure Act specifically provides a notice procedure for adjudication by administrative agencies like the SEB. *See generally,* O.C.G.A. § 50-13-13, *et seq.* These are robust safeguards that more than ensure adequate due process for any superintendent—individual or otherwise—that could potentially be suspended from their position under SB 202. And despite Plaintiffs' fears, there is nothing to suggest that adequate notice, for some reason, will be withheld from the subject of an investigation when not one, but two hearings are required before any action can be taken by the State Election Board.

Plaintiffs also take issue with what they call a "fatal due process defect," that the term "superintendent" is used to refer to both an entire board of directors as well as individual board members. [Doc. 134, pp. 21–22]. But Plaintiffs' own description of this phenomenon admits that it is not simply an isolated error in prose, but rather, it occurs "throughout." *Id.*, p. 21. Therefore, the pronouns "his or her" in describing the "superintendent" are descriptive

---

[2] Under Georgia law, a superintendent can be a board or an individual, depending on the county. O.C.G.A. §§ 21-2-2(35), 21-2-74.

rather than erroneous or contradictory. In other words, while the term "superintendent" when used in isolation refers to the entire Board, when modified with individualizing pronouns, it is clear that the legislature meant to refer to the individual members. Plaintiffs continue to ignore the context around terms used in the statute. Unsurprisingly, then, Plaintiffs conclude those provisions are unconstitutional.

Plaintiffs' overzealous reading of the statute continues with the claim that "SB 202 allows the SEB to begin suspension proceedings 'on its own motion' without providing affected individual board members with any notice at all." [Doc. 134, p. 25]. They do not cite a provision of SB 202 that clearly permits this action likely because it is not present. While it is true that the SEB may "on its own motion... pursue the extraordinary relief provided in this Code section," O.C.G.A. § 21-2-33.2(a), that effectively only authorizes the SEB to begin an investigation and hold a preliminary hearing. O.C.G.A. § 21-2-33.2(b). That is quite different from "begin[ning] suspension proceedings." And the existence of the preliminary hearing itself again indicates that the affected party receives notice. Moreover, because the SEB is still able to promulgate rules relating the investigation and preliminary hearing pursuant to this section, Plaintiffs are not able to claim that "no notice" will be provided for under SB 202.

Next, Plaintiffs take issue with the section of SB 202 that provides, following a preliminary hearing, that the SEB is charged with determining "if sufficient cause exists to proceed to a full hearing on the petition or if the petition should be dismissed." [Doc. 134, p. 25]. Despite quoting this clear language, Plaintiffs immediately go on to strangely complain that no "full hearing" is required by law. *Id*. That is true, but only because the law allows for the petition to *simply be dismissed* if the petition lacks sufficient cause to proceed to a full hearing. It is difficult to see how providing an avenue for the dismissal of an action in the absence of evidence constitutes a violation of a plaintiff's constitutional right to due process.

Finally, Plaintiffs complain that, following a suspension, SB 202 only "allows for reinstatement of the election board entity, not an individual member." [Doc. 134, p. 26]. For the same reasons discussed above that demonstrate the term "superintendent" has both an individual and group definition depending on the context of the provision, Plaintiffs' concerns regarding individualized reinstatement also do not rise to the level of anything beyond speculation. Nothing in the statute supports this twisted reading of the law.

For all the reasons explained in their Motion, SB 202 provides sufficient due process, and Defendants are entitled to judgment as a matter of law on Counts I of Plaintiffs' Complaint.

18

## IV.   The Suspension Rules comply with substantive due process and the U.S. Constitution.

Plaintiffs' claims about substantive due process move quickly away from the state-law issues they raise. Plaintiffs also rely on a case that does exactly what Defendants suggested be done here—certifying the state-law questions to the Georgia Supreme Court. *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1269 (11th Cir. 2020). Plaintiffs further make arguments to distinguish a very similar suspension statute in *DeKalb Cty. Sch. Dist. v. Ga. State Bd. of Educ.*, 294 Ga. 349 (2013), but again rely on state law to do so, which just emphasizes the state-law nature of this claim. Plaintiffs continue relying on their speculative reading of the replacement of a board of registrars as well, none of which shows any violation of *federal* law.

Plaintiffs' last attack on the Suspension Rule offers almost nothing in response beyond the bald assertion that the law is "plainly [] unconstitutional." [Doc. 134, p. 34]. Plaintiffs do not address the reality of state interests outlined in Defendants' Motion or even attempt to argue they do not apply. As set out in Defendants' Motion, the law clearly satisfies all constitutional requirements.

Thus, Defendants are also entitled to judgment as a matter of law on Counts II and III of Plaintiffs' Complaint.

## V.   The Observation Rules are constitutional and comply with the law.

As already discussed in the section on standing, Plaintiffs' interpretation of the Observation Rules is not consistent with the law, and Defendants are entitled to summary judgment on their claims in Counts IV through VI. Plaintiffs ultimately offer no response to the state's interests and clarity of the statute, nor a basis to find a violation of the Voting Rights Act.

## VI.   The Communications Rule is constitutional.

As to the Communications Rule:   Plaintiffs claim this Court's interpretation of that Rule "as applying to only communications in the ballot processing room is incorrect."  [Doc. 134, p. 42]. To the extent this Court is inclined to reverse its earlier interpretation, that would create sufficient ambiguity to certify the question to the Georgia Supreme Court. As the Supreme Court has emphasized, "[w]arnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997). But Plaintiffs do not otherwise offer any explanation of why the Communications Rule, as properly interpreted by this Court, violates any provision of the Constitution, especially in light of the

strong state interests involved. Thus, Defendants are entitled to judgment as a matter of law on Plaintiffs' claims involving the Communications Rule in Count VII.

## VII.  The Tally Rules are constitutional.

By contrast, Plaintiffs propose a variety of different meanings and scopes of the challenged provisions relating to tallying. They refer to "Tally Rule 1" as the provision in SB 202 that "makes it a misdemeanor to 'tally, tabulate, or estimate or cause the ballot scanner or any other equipment to produce any tally or tabulate partial or otherwise, of the absentee ballots cast until the time for the closing of the polls.'" [Doc. 134, p. 43] (citing O.C.G.A. § 21-2-386(a)(2)(A)). They define Tally Rule 2 as the companion provision of O.C.G.A. § 21-2-386(a)(2)(B)(vi), which prohibits "monitors or observers" "while viewing or monitoring" from "[t]allying, tabulating, estimating, or attempting to tally, tabulate, or estimate, whether partial or otherwise, any of the votes on the absentee ballots cast." *Id.*, p. 44. On the one hand, Plaintiffs suggest in their argument in Count VIII that "[t]he uncertain territorial scope of Tally Rule 2... renders it void for vagueness." *Id.*, p. 46. In the next breath, however, they state in their argument on Count XI that Tally Rule 2 "might be read to prohibit only speech in the ballot counting room." *Id.* Apart from being emblematic of Plaintiffs' tortured reading of SB 202 more broadly, Plaintiffs' concession regarding the territorial scope being limited to the ballot room cures

any potential constitutional defects in Tally Rule 2, as this Court previously found with regard to the Communications Rule.

Tally Rule 1, moreover, limits the timing of prohibited disclosures until "the closing of the polls." O.C.G.A. § 21-2-386(a)(2)(A). This operates to narrow the scope of the limitation provided by law, such that speech is not indefinitely constrained, which it is not. Moreover, there is very good reason to not divulge information as to the number of absentee ballot cast: Depending on the location of the polling place, and the general political makeup of the voters in the area, the number of absentee ballots cast could serve as a reasonably good proxy for the number of votes cast for a particular political party, which could conceivably affect voter turnout. For these reasons and for the reasons explained in Defendants' Motion, the rule is narrowly tailored with a definitive temporal limitation to achieve a compelling government interest, and Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims involving the Tally Rules.

## VIII. The Photography Rules are constitutional.

Next, Plaintiffs expressly "do not challenge Photography Rule 1" in light of the Court's holding that it "applies only to photography in the nonpublic forum of a voting location." [Doc. 134, p. 48]. Plaintiffs likewise concede they are no longer challenging either Photography Rule for vagueness. *Id.*, p. 50. That leaves just Photography Rule 2.

As to that Rule, Plaintiffs incorrectly claim that Defendants failed to "explain how Photograph Rule II is narrowly tailored" to serve the State's interest. [Doc. 134, p. 49]. But Defendants articulated a host of reasons for the prohibition, including the fact that "cameras are now commonplace in almost every mobile device," [Doc. 123-1, p. 48], and these cameras take pictures that are "often quickly uploaded to a cloud storage provider on the Internet **that would connect the voter's ballot with the voter immediately,**" *id.* (emphasis added), and because there were numerous parties of varying security sophistication that interact with these ballots. *Id.* Accordingly, Georgia "needs a reliable way to ensure that sensitive data like a voted ballot [that could be connected to an identifiable voter] is not leaked or otherwise aggregated by a nefarious actor." *Id.* Plaintiffs simply do not address these points, which were not part of the evidence when this Court previously considered Plaintiffs' motion for preliminary injunction.

In short, the Photography Rules are highly sensible and narrowly tailored exercises of the State's authority to secure its elections, and Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims involving the Photography Rules.

## CONCLUSION

Plaintiffs brought this case as a sweeping challenge to a variety of election statutes they oppose. But Plaintiffs can no longer rely on theories—

they must come forward with admissible evidence supporting their claims. They have not, and thus cannot avoid summary judgment on their claims.

As Defendants have noted, disagreement with the decisions of the General Assembly about how elections should be run are not enough to raise constitutional questions because this Court cannot judge the wisdom of the legislature's policy choices. Because Plaintiffs have only presented disagreements on policy decisions, this Court should grant judgment as a matter of law to Defendants on all counts.

Respectfully submitted this 5th day of October, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*

24

Brian J. Field*
Cristina Martinez Squiers*
Edward H. Trent*
Nicholas P. Miller*
Joshua J. Prince*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104
ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson